UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MERSAD DOLIC,

                Plaintiff,

v.

UTICA POLICE DEP'T,

                Defendant.

LEAD CASE
6:25-CV-1081
(BKS/ML)

---

MERSAD DOLIC,

                Plaintiff,

v.

TODD CARVILLE, Oneida County
District Attorney,

                Defendant.

MEMBER CASE
6:25-CV-1347
(BKS/ML)

---

MERSAD DOLIC,

                Plaintiff,

v.

EMRAH LATIC, Police Officer; PETER
ALLEN, Sgt Police Officer; SOJA, Sgt
Police Officer; and BRYCE PATTERSON,
Police Officer/Utica PD,

                Defendants.

MEMBER CASE
6:25-CV-1687
(BKS/ML)

---

APPEARANCES:                                    OF COUNSEL:

MERSAD DOLIC
  Plaintiff, *Pro Se*
744 Jay Street
Utica, New York 13501

MIROSLAV LOVRIC, United States Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

The Clerk has sent *pro se* pleadings in the above captioned actions[1] together with an

amended application to proceed *in forma pauperis*, filed by Mersad Dolic ("Plaintiff") to this

Court for review.  For the reasons discussed below, I (1) grant Plaintiff's amended *in forma*

*pauperis* application, and (2) recommend that Plaintiff's pleadings be accepted in part for filing

and dismissed in part.

I.      **INTRODUCTION**

        A.      ***Dolic I* Amended Complaint[2]**

Construed as liberally[3] as possible, the Amended Complaint in *Dolic I* alleges that on

July 6, 2025, Plaintiff was unlawfully arrested by Defendant Latic for unauthorized use of a

---

[1]      *Dolic v. Utica Police Dep't, et al.*, 6:25-CV-1081 (BKS/ML) ("*Dolic I*"); *Dolic v. Carvell*, 6:25-CV-1347 (BKS/ML) ("*Dolic II*"); and *Dolic v. Latic, et al.*, 6:25-CV-1687 (BKS/ML) ("*Dolic III*").  Chief United States District Judge Brenda K. Sannes consolidated *Dolic I* and *Dolic II* on October 14, 2025.  (*Dolic I*, Dkt. No. 16; *Dolic II*, Dkt. No. 7.)  Chief Judge Sannes consolidated *Dolic III* on December 8, 2025.  (*Dolic III*, Dkt. No. 5.)

[2]      The filing of an amended complaint moots the original pleading.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.")  As a result, the Court has not considered Plaintiff's original Complaint.  (*Dolic I*, Dkt. No. 1.)

[3]      The court must interpret *pro se* complaints to raise the strongest arguments they suggest.  *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

vehicle in the City of Utica.  (*Dolic I*, Dkt. No. 11 at 4.)  Plaintiff alleges that he was on the side of the road, not in fresh pursuit, and Defendant Latic stated that he never saw Plaintiff operate the vehicle in question, he merely saw Plaintiff standing near the vehicle.  (*Id*.)  Plaintiff alleges that Defendant Latic works for Defendant New Hartford Police Department, but the incident occurred in the City of Utica, outside of Defendant Latic's jurisdiction.  (*Id*.)

Based on these factual allegations, Plaintiff appears to assert the following two claims: (1) a claim of unlawful arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; and (2) a claim pursuant to the Fifth Amendment and 42 U.S.C. § 1983.  (*Dolic I*, Dkt. No. 11 at 5.)  As relief, Plaintiff seeks damages in the amount of $1,000,000.  (*Id*.)

After filing his Amended Complaint, Plaintiff filed a letter that purported to add the following parties to this action: Todd Carville, D.A.[4]; Elizabeth Boswell, A.D.A.; Christopher Jiruzzi, City Court Judge; Emrah Latic, P.O. N.H.; Bryce Patterson, P.O. Utica; Sgt. Soja N.H.; Sgt. Peter Allen, N.H.[5]; Cornish P.O. N.H.; Greg Griffith, Adirondack Towing; Utica Police Department; City of Utica; Oneida County District Attorney's Office; Oneida County; New Hartford Police Department; Town of New Hartford; and Beslic, P.O. Utica.  (*Dolic I*, Dkt. No. 14 at 1.)

---

[4]     At various points Plaintiff spells Defendant Todd Carville's name as "Tod Carville" (*Dolic I*, Dkt. No. 14 at 1 [referring to Defendant Carville as "Tod Carville"]; *Dolic II*, Dkt. No. 4 at 3 [same]) and "Todd Carwell" (*Dolic II*, Dkt. No. 1 at 1-2 [referring to Defendant Carville as "Todd Carwell"]; *Dolic II*, Dkt. No. 4 at 1 [same]).  For consistency, the undersigned refers to this individual as Defendant Carville.  (*Dolic I*, Dkt. No. 34 at 2.)

[5]     At various points Plaintiff spells Defendant Peter Allen's name as "Petter Allean" (*Dolic I*, Dkt. No. 14 at 1 [referring to Defendant Allen as "Petter Allean"]; *Dolic I*, Dkt. No. 34 at 3 [same]; *Dolic III*, Dkt. No. 1 at 2 [same]) and "Petter Allen" (*Dolic I*, Dkt. No. 34 at 2 [referring to Defendant Allen as "Petter Allen"]; *Dolic III*, Dkt. No. 1 at 4 [same]).  For consistency, the undersigned refers to this individual as Defendant Allen.  (*Dolic I*, Dkt. No. 11 at 2 [referring to Defendant Allen as "Peter Allen"]; *Dolic I*, Dkt. 35 at 3, 8 [police records referring to "Peter Allen"].)

Plaintiff also filed three letters "in support" of his pleading in *Dolic I*. (*Dolic I*, Dkt. Nos. 34, 35, 36.) Plaintiff asserts that Defendant Latic violated Plaintiff's constitutional rights by leaving his jurisdictional limits within the Town of New Hartford, and placing Plaintiff under arrest in the City of Utica. (*Dolic I*, Dkt. No. 34 at 1.) Plaintiff asserts that at the time of his arrest, he did not have any warrants for his arrest. (*Id.*) Plaintiff asserts that the alleged crime happened 48 hours before his arrest and thus, there was no reason for Defendant Latic to "come and arrest [Plaintiff]." (*Id.*) Plaintiff asserts that Defendant Latic did not contact the Utica Police Department until after Plaintiff was arrested and placed in the patrol car. (*Id.*) Plaintiff asserts that his arrest was "illegal based on the fact that by law New Hartford Police Dep. and Officer Latic cant arrest anyone outside . . . of town limits of New Hartford, there was no fresh pursuit or fresh crime committed that would give [Defendant Latic] reason to arrest [Plaintiff] or fol[l]ow [Plaintiff]." (*Id.*)

Plaintiff asserts that Defendant Utica Police Department violated his Fourth Amendment constitutional right by allowing Defendant Latic to bring Plaintiff to the Utica Police Department and book him for the crime where Plaintiff was not seen inside the car or driving the car. (*Dolic I*, Dkt. No. 34 at 1.)

Plaintiff asserts that he saw a motion filed by his criminal defense attorney, which stated that Defendants Latic and New Hartford Police Department could not legally arrest Plaintiff; hence, Plaintiff's arrest was "false Illegal and unconstitutional." (*Dolic I*, Dkt. No. 34 at 1.) Plaintiff asserts that Defendant Carville prosecuted him "for this crime" and he was convicted and sentenced to one year incarceration for the crimes at issue in this action. (*Id.* at 2.)

Plaintiff included a letter that attached several police reports and narrative related to his arrest on July 6, 2025. (*See generally* Dkt. Nos. 35, 36.)

4

**B.**    *Dolic II* **Amended Complaint[6]**

Construed as liberally as possible, the Amended Complaint in *Dolic II* alleges that Defendants Oneida County District Attorney, Carville, Boswell, Jiruzzi, violated Plaintiff's rights by refusing to consent to dismissal of the criminal charges against Plaintiff. (*Dolic II*, Dkt. No. 4 at 1-4.)  Plaintiff alleges that the accusatory instruments stated that Plaintiff did not commit the crime but was arrested anyways because of his history with auto theft. (*Id*. at 1.) Plaintiff alleges that during his arraignment on July 21, 2025, his attorney identified for the "DA" that Plaintiff did not commit the crime and should be released but Defendant Carville refused. (*Id*.)

Based on these factual allegations, the Amended Complaint asserts the following three claims: (1) a claim that Plaintiff's rights pursuant to the Fourth and Fifth Amendments and 42 U.S.C. § 1983 were violated; (2) a claim that Plaintiff's rights pursuant to the Eighth Amendment and 42 U.S.C. § 1983 were violated; and (3) a claim that Plaintiff's rights pursuant to the Sixth and Fourteenth Amendments and 42 U.S.C. § 1983 were violated. (*Dolic II*, Dkt. No. 4 at 6.)  As relief, Plaintiff is seeking damages in the amount of $10,000,000. (*Id*.)

**C.**    *Dolic III* **Complaint**

Construed as liberally as possible, the Complaint in *Dolic III* alleges that on July 6, 2025, New Hartford Police Officer Defendant Latic drove to the City of Utica and arrested Plaintiff for unauthorized use of a car. (*Dolic III*, Dkt. No. 1 at 5.)  Plaintiff alleges that Defendant Latic did not have a warrant for Plaintiff's arrest and was outside of his jurisdiction. (*Id*.)  Plaintiff asserts that Defendant Latic "legally could not arrest anyone in City of Utica" but—upon approval by Defendants Allen and Soja—Defendant Latic nonetheless arrested Plaintiff. (*Id*. at 4-5.)  The

---

[6]    *See*, *supra*, note 2.

5

Complaint alleges that after Defendant Latic arrested Plaintiff, he called Defendant Utica Police Department and "handed" Plaintiff over to the custody of Defendant Utica Police Department. (*Id.*)

Based on these factual allegations, Plaintiff asserts a claim that his arrest was unlawful pursuant to the Fourth Amendment and 42 U.S.C. § 1983. (*Dolic III*, Dkt. No. 1 at 6.) As relief, Plaintiff seeks damages in the amount of $5,000,000. (*Id.*)

## II.   PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[7] After reviewing Plaintiff's amended IFP application (*Dolic I*, Dkt. No. 44), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's amended application to proceed IFP is granted.[8]

## III.   LEGAL STANDARD GOVERNING REVIEW OF THE COMPLAINTS

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is

---

[7]     The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[8]     Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.   ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint in *Dolic I*, Amended Complaint in *Dolic II*, and Complaint in *Dolic III*, with this principle in mind, I recommend that the pleadings be accepted in part for filing and dismissed in part.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990). "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983.

**A.    Claims Against Defendants Carville and Boswell**

"Prosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'" *Joyner v. Cnty. of Cayuga*, 20-CV-0060, 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (D'Agostino, J.) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).  Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)).  This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, 11-CV-0316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, 00-CV-3626, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)).  In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).

Plaintiff's pleadings appear to allege that Defendant Carville as District Attorney and Defendant Boswell as Assistant District Attorney, should have dismissed the criminal charges against him.  (*Dolic I*, Dkt. No. 34 at 2; *Dolic II*, Dkt. No. 4 at 1.)  Based on these allegations, Defendants Carville and Boswell are entitled to prosecutorial immunity for the actions they took in their roles as prosecutors.  *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (citation and internal quotation marks omitted) (collecting cases) ("It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursing a criminal prosecution is immune from a civil suit for damages under § 1983.").

As a result, I recommend that claims against Defendants Carville and Boswell in their individual capacities be dismissed because the claims seek monetary relief against defendants who are immune from such relief pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

With respect to Plaintiff's claims against Defendants Carville and Boswell in their official capacities—as employees of the Oneida County District Attorney's Office—those claims are subject to dismissal pursuant to the Eleventh Amendment. *See D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New York*, 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment.").

### B. Claims Against Defendants Utica Police Department and New Hartford Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850 at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, C.J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *rep't and rec. adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

10

Hence, Defendants Utica Police Department and New Hartford Police Department are not proper parties amenable to suit. As a result, I recommend that Plaintiff's claims against Defendants Utica Police Department and New Hartford Police Department be dismissed.

### C.    Claims Against Defendant Jiruzzi

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209. Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991); *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature). However, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff asserts claims that arise from the actions of Defendant Jiruzzi in his capacity as a City of Utica judge. (*Dolic II*, Dkt. No. 4 at 4.) Plaintiff's pleadings fail to allege facts plausibly suggesting that Defendant Jiruzzi was acting outside of his judicial capacity or in the absence of jurisdiction. (*See generally Dolic I*, Dkt. No. 11; *Dolic II*, Dkt. No. 4; *Dolic III*, Dkt. No. 1.) Hence, Defendant Jiruzzi is immune from suit seeking monetary damages.

Further, to the extent that Plaintiff asserts claims against Defendant Jiruzzi in his official capacity, those claims must be dismissed because he is immune from suit pursuant to sovereign immunity. The Second Circuit has ruled that "the New York State Unified Court System is

11

unquestionably an arm of the State, and is entitled to Eleventh Amendment sovereign immunity." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). Similarly, judges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity. *See Aron v. Becker*, 48 F. Supp. 3d 347, 366 (N.D.N.Y. 2014) (dismissing claim against a Delaware County judge on sovereign immunity grounds).

As a result, I recommend that Plaintiff's claims against Defendant Jiruzzi be dismissed.

### D. Claims Against Defendant Griffith

The requirement that a defendant act "under color of state law," means that the typical § 1983 claim is brought against state and local government officials and entities, not against private individuals or entities. Private actors "may only be held liable under § 1983 where the conduct at issue constitutes 'state action' [–] which only occurs where the challenged action of a private party is 'fairly attributable' to the state." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 504 (N.D.N.Y. 2017) (Hurd, J.) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010)).

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test').

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012).

It is well-settled that "a private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were improperly influenced or controlled by the private party." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005).  Moreover "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights." *Fisk*, 401 F. Supp. 2d at 377 (citing *Kramer v. City of New York*, 04-CV-0106, 2004 WL 2429811, at *7 (S.D.N.Y. Nov. 1, 2004)).

Under any of the applicable tests, Plaintiff's pleadings fail to allege facts plausibly suggesting that Defendant Griffith acted "under color of state law."  Although Defendant Griffith allegedly informed law enforcement about his stolen vehicle and his suspicion that Plaintiff may have been involved, that does not transform him into a state actor.  *See Neal v. Neal,* 11-CV-0297, 2011 WL 7176374, at *3 (N.D.N.Y. Dec. 16, 2011) (Lowe, M.J.) (collecting cases) (dismissing the pro se complaint pursuant to § 1983 because there was no state action alleged when the defendant, a private actor, called the police to have the plaintiff removed from the defendant's parent's house); *Luciano v. City of New York,* 09-CV-0359, 2009 WL 1953431 *2 (S.D.N.Y. July 2, 2009) (holding that information provided to law enforcement, even if that information is false or mistaken, does not render the supplier of the information a state actor); *Kelly v. Yorktown Police Dep't,* 05-CV-6984, 2006 WL 3316183 *5 (S.D.N.Y. Nov. 13, 2006) (holding a private party supplying information or seeking police assistance "does not become a state actor . . . unless the police officers were improperly influenced or controlled by the private party.").

The allegations contained in the pleadings fail to plausibly suggest that Defendant Griffith acted in concert with state actors. *See Illescas v. Annucci*, 21-CV-8473, 2024 WL 4882774, at *4 (S.D.N.Y. Nov. 25, 2024) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)) ("Courts in this circuit have held that 'mere conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.' "); *Altieri v. Tsopanides*, 21-CV-1224, 2022 WL 1912851, at *3 (D. Conn. June 3, 2022) (dismissing § 1983 complaint against non-state actor because conclusory allegations that defendants "acted jointly and in concert" with the state were insufficient to plausibly state a claim upon which relief may be granted).

As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendant Griffith be dismissed for failure to state a claim upon which relief may be granted.

### E. Claims Against Oneida County District Attorney

Defendant Oneida County District Attorney's Office is immune from suit. *See Campbell v. New York State Police*, 23-CV-1337, 2024 WL 1702010 at *5 (N.D.N.Y. Apr. 19, 2024) (Lovric, M.J.) (citing *Roark v. New York*, 23-CV-1237, 2023 WL 8827185, at *3 (N.D.N.Y. Dec. 21, 2023) (Lovric, M.J.) (citations omitted) (recommending that the plaintiff's claims against the Watertown District Attorney's Office be dismissed as barred by the Eleventh Amendment), *report and recommendation adopted by*, 2024 WL 125512, at *1 (N.D.N.Y. Jan. 11, 2024) (Hurd, J.)) (recommending dismissal of the plaintiff's claims against defendant Broome County District Attorney's Office), *report and recommendation adopted*, 2024 WL 3063674 (N.D.N.Y. June 20, 2024) (Nardacci, J.).

As a result, I recommend that any claims against Defendant Oneida County District Attorney's Office be dismissed based on the doctrine of sovereign immunity.

### F.    Claims Against Defendants City of Utica, Oneida County, and Town of New Hartford

"[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)).  A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The pleadings here essentially complain of a discrete incident in July of 2025, during which Plaintiff was allegedly treated improperly by employees of Defendants City of Utica, New Hartford, and County of Oneida. (*See generally Dolic I*, Dkt. No. 11; *Dolic I*, Dkt. No. 34; *Dolic II*, Dkt. No. 4; *Dolic III*, Dkt. No. 1.)  Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts.  *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014)

15

(Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Defendants City of Utica, New Hartford, and County of Oneida.

As a result, I recommend that any claims against Defendants City of Utica, New Hartford, and County of Oneida be dismissed for failure to state a claim upon which relief may be granted.

### G.    Claims Against Defendants Cornish and Beslic

In *Dolic I*, Plaintiff filed a letter that purported to add parties to the case. (*Dolic I*, Dkt. No. 14.) Plaintiff listed "Cornish P.O. N.H" and "Beslic P.O Utica" as additional parties to the action. (*Id*. at 1.) However, the pleadings and additional filings by Plaintiff do not appear to contain allegations of any action or inaction taken by Defendants Cornish and Beslic.[9] (*Dolic I*, Dkt. Nos. 11, 34, 35, 36; *Dolic II*, Dkt. No. 4; *Dolic III*, Dkt. No. 1.) Hence, the pleadings lack factual allegations sufficient to allege that Defendants Cornish and Beslic were personally involved in conduct that violated Plaintiff's constitutional rights.

As a result, I recommend that to the extent that Plaintiff's pleadings are liberally construed as asserting claims against Defendants Cornish and Beslic, they be dismissed for

---

[9]    In *Dolic I*, Plaintiff filed a Letter in Support of the Amended Complaint that attached police reports related to the incident that forms this basis of this action. (*Dolic I*, Dkt. Nos. 34, 35, 36.) One police report refers to Defendant Cornish. According to the police report, on July 4, 2025, Defendant Cornish stopped Plaintiff and had Plaintiff's vehicle towed by Defendant Griffith. (*Dolic I*, Dkt. No. 35 at 8.) The police report states that during the towing process, Plaintiff made a comment to Defendant Griffith—who is the owner of Adirondack Towing—that Plaintiff "was going to get back at" Defendant Griffith. (*Id*.) On July 5, 2025, Defendant Griffith reported that his vehicle was stolen. (*Id*.) Defendant Griffith's stolen vehicle is the subject vehicle that Plaintiff was charged with unlawfully operating. (*Id*.) Based on Plaintiff's filings, Defendant Cornish does not appear to have been involved with Plaintiff's arrest on July 6, 2025, or subsequent criminal proceeding related to that arrest.

failure to state a claim upon which relief may be granted. *Hamza v. Kotsidis*, 25-CV-0968, 25-CV-1429, 25-CV-1506, 2026 WL 1296172, at *2-3 (N.D.N.Y. May 12, 2026) (Coombe, J.) (citing *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) (Kahn, J.) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, 14-CV-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint)) (dismissing the plaintiff's claims against defendants who were listed in the caption and list of parties but not otherwise referenced in the body of the operative pleading).

### H.    Claims Against Patterson, Soja, Allen, and Latic[10]

Plaintiff's allegations against Defendants Patterson, Soja, Allen, and Latic are essentially that of unlawful arrest.  (*See generally Dolic I*, Dkt. No. 11; *Dolic I*, Dkt. No. 34; *Dolic II*, Dkt. No. 4; *Dolic III*, Dkt. No. 1.)

A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)); *see also*, *e.g.*, *Kirby v. Abraham*, 24-CV-0522, 2024 WL 4906112, at *4 (N.D.N.Y. Oct. 25, 2024) (Dancks, M.J.), *report and recommendation adopted*, 2024 WL 4905131

---

[10]    To the extent that Plaintiff asserts any claims against Defendants Patterson, Soja, Allen, and Latic in their official capacities as employees of Defendants New Hartford Police Department and Utica Police Department, I recommend that they be dismissed for the reasons set forth above in Part IV.F. of this Order and Report Recommendation. *See Ellis v. Erie Cnty.*, 24-CV-1242, 2026 WL 1289874, at *3 (W.D.N.Y. Mar. 26, 2026) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)) ("Claims asserted against municipal employees in their official capacity are essentially claims against the municipality.").

17

(N.D.N.Y. Nov. 27, 2024) (Sannes, C.J.).  "Such claims are one and the same because '[f]alse arrest and false imprisonment overlap; the former is a species of the latter.'"  *Kirby*, 2024 WL 4906112, at *4 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)) (additional citation omitted).  "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852).  Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).  "An arrest is privileged if it is based on probable cause." *Kirby*, 2024 WL 4906112, at *5 (citing *Jenkins*, 478 F.3d at 84).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendants Patterson, Soja, Allen, and Latic in their individual capacities.[11]

---

[11]     To the extent that the pleadings are construed as asserting a malicious prosecution claim pursuant to the Fourth Amendment, I recommend that it be dismissed because the pleadings fail to allege facts plausibly suggesting that the criminal proceeding terminated in Plaintiff's favor. (*Dolic I*, Dkt. No. 34 at 2 [alleging that Plaintiff "got 1 year in prison" for the crimes he was convicted of]); *Hogan v. Vandewater*, 25-CV-1359, 2026 WL 2042919, at *6 (N.D.N.Y. July 15, 2026) (Sannes, C.J.) (citing *Carruthers v. Colton*, 153 F.4th 169, 181 (2d Cir. 2025)) (holding that to prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish, among other elements, "termination of the proceeding in favor of the accused).

18

## V.  OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[12]

The deficiencies identified related to Plaintiff's claims against Defendants Carville, Boswell, Utica Police Department, New Hartford Police Department, Jiruzzi, and Oneida County District Attorney's Office are substantive, such that a better pleading cannot cure them.  As a result, I recommend that Plaintiff's claims against Defendants Carville, Boswell, Utica Police

---

[12]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Department, New Hartford Police Department, Jiruzzi, and Oneida County District Attorney's Office be dismissed without leave to replead.

Although I have serious doubts about whether Plaintiff can replead to assert actionable claims against Defendants Griffith, City of Utica, Town of New Hartford, Oneida County, Cornish, and Beslic, given that this is the Court's first review of Plaintiff's pleadings, out of an abundance of caution and in light of Plaintiff's status as a *pro se* litigant, I recommend that he be permitted leave to amend.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Amended Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (*Dolic I*, Dkt. No. 44) is **GRANTED**; and it is further respectfully

20

**RECOMMENDED** that the Court **ACCEPT FOR FILING** Plaintiff's pleadings in *Dolic I*, *Dolic II*, and *Dolic III*, to the extent that they assert a false arrest claim against Defendants Patterson, Soja, Allen, and Latic in their individual capacities; **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's pleadings in *Dolic I*, *Dolic II*, and *Dolic III*, to the extent that they assert claims against Defendants Griffith, City of Utica, Town of New Hartford, Oneida County, Cornish, and Beslic; and **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's pleadings in *Dolic I*, *Dolic II*, and *Dolic III*, to the extent that they assert claims against Carville, Boswell, Utica Police Department, New Hartford Police Department, Jiruzzi, and Oneida County District Attorney's Office, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[13]

---

[13]    The Clerk shall also provide Plaintiffs with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

21

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[14]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: July  29 , 2026
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[14]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Blue-Striped Flag

Appeal Filed by  Adams v. City of Syracuse,  2nd Cir.,  October 17, 2025

2025 WL 2772081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,
v.
CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Anne M. Nardacci, United States District Judge:

### I. INTRODUCTION

**\*1**  On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

### II. BACKGROUND[3]

#### A. The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

#### B. Relevant Events

##### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

### 2. May 6, 2016

#### a. 941 James Street

**\*2** At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

#### i. 911 call

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

#### ii. Police response

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

**\*3** Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him." [5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

**\*4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?" [6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

 **\*5**  Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed

Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

### 3. Criminal Investigations Division

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication." [7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

 **\*6**  The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed." [8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

**\*7** Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

**\*8** Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

 **\*9**  Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do,"[9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....

(g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....

(h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and

(i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

**\*10**  According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

### b. Officer Cecile

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the

male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

### c. Officer Tolone

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

### d. Other Police Reports

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

### 5. Criminal Prosecution

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff [10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

**\*11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter. [11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1[st] with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.
>
> **\*12** ....
>
> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.

I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt.

No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

### a. Plaintiff's Capacity

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

**\*13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

### 6. Additional Investigation by CID

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic

state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

**\*14**  *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

#### D. Procedural History

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

#### E. Plaintiff's Claims

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

### III. STANDARD OF REVIEW

**\*15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines

"whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505).

### IV. DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from

which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

**\*16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

### A. False Arrest under Section 1983 and New York law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

### 1. Plaintiff's Detention at 941 James Street

**\*17** Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case. [14] *See, e.g., United States v. Lefebvre*, 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario*, 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice*, 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: ['] the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

**\*18** Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice*, 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice*, 873 F.3d at 167. *See also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice*, 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

### 2. Probable Cause

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id*. The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id*. Ms. Goldych also indicated that the man's name was Pete. *Id*. Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

**\*19**  Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

**\*20** At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a

"green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

**3. Subsequent Information**

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, 153 F.4th at 179 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

**a. Plaintiff's Continued Detention Prior to His Interrogation**

 **\*21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

**b. Plaintiff's Interrogation**

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

 **\*22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth)

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced

his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

**\*23**  Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally

acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch, J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

 **\*24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739,

89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons,[18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

**B. Malicious Prosecution under Section 1983**

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562, 144 S.Ct. 1745, 219 L.Ed.2d 262 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019.

*See, e.g., Walsh v. City of New York, 742 F. App'x 557, 562 (2d Cir. 2018)* (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury, 721 F.3d at 95*). Summary judgment is thus not appropriate on this ground.

**\*25** Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano, 29 F.4th at 107* ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta, 460 F.3d at 395*). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g., Werkheiser v. Cnty. of Broome, 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023)* ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003)*). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago, 823 F. App'x 25, 32 (2d Cir. 2020)* ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010)*); *Dufort, 874 F.3d at 353* ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello, 612 F.3d at 163*); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell,[19] *see, e.g., Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010)* ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser, 655 F. Supp. 3d at 103* ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017)*; additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello, 612 F.3d at 162* ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti, 124 F.3d at 130*); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y.

Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

**\*26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkheiser*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at \*13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

**\*27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at \*13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

### C. Fabricated Evidence under Section 1983

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also Ortiz,* 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's]

testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting *United States v. Ocampo-Guarin,* 968 F.2d 1406, 1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

**\*28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants.[22]

**D. *Monell* Claim**

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." *Alexander,* 132 F.4th at 160 (citing *Friend v. Gasparino,* 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk,* 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't. of Soc. Servs. of the City of New York,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

*Deferio v. City of Syracuse,* 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet,*

619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); then citing *Turpin,* 619 F.2d at 199; and then quoting *City of Canton v. Harris,* 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York,* No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz,* No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson,* 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

**\*29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia,* that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)). The Second Circuit has set forth the following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

"First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins,* 478 F.3d at 94 (first quoting *Walker v. City of New York,* 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York,* 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green,* 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants

largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

 **\*30**  The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12.[23] Following that conclusion are signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at \*11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own

testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis*.") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state,"[24] Dkt. No. 85-11 at 9.

 **\*31**  At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). But he has done enough to survive summary judgment— particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-

employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 972 N.Y.S.2d 169, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.*, 972 N.Y.S.2d 169, 995 N.E.2d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 592, 960 N.E.2d 356 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

### F. Qualified Immunity for the Individual Defendants

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause

to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

**\*32** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of

the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir.

2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 51 A.D.2d 432, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

**\*33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074).[25]

**G. John Does 1-100**

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

---

## Footnotes

1   The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2   This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3   Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4   A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5   During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6   Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

7 Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8 Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9 The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10 Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11 From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12 The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13 To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14 It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15 Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

16    The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.*, Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

17    Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

18    Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

19    Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

20    Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

21    To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

22    To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

23    This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

24    It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC,

https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25    Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656, 134 S.Ct. 1861). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1912851
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Robert ALTIERI, Plaintiff,
v.
Timothy TSOPANIDES, Defendant.

No. 3:21-cv-01224 (MPS)
|
Signed 06/03/2022

**Attorneys and Law Firms**

John R. Williams, New Haven, CT, for Plaintiff.

Josephine S. Miller, Danbury, CT, for Defendant.

**RULING ON MOTION TO DISMISS**

Michael P. Shea, United States District Judge

 **\*1**  This case arises from a property dispute between Plaintiff Robert Altieri and Defendant Timothy Tsopanides. Altieri filed suit against Tsopanides and "Officer Valdavinos (#129)," a police officer at the Orange Police Department ("OPD"), claiming that they acted in concert to deprive Altieri of his property without due process of law in violation of 42 U.S.C. § 1983. Altieri voluntarily dismissed his claims against Valdavinos, ECF Nos. 31, 32, and thus, the only remaining claims in this case are against Tsopanides. Tsopanides now moves to dismiss the Section 1983 claim under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, I grant the motion to dismiss the Section 1983 claim and dismiss without prejudice any state law claims.

**I. FACTUAL BACKGROUND**
The following facts are taken from Altieri's complaint, ECF No. 1, and are accepted as true for the purposes of this ruling.

Tsopanides is a resident of Orange, Connecticut and owns real estate located at 628 Grassy Hill Road in Orange, Connecticut. ECF No. 1 ¶¶ 4, 7. "Long ago," Tsopanides borrowed $60,000 without interest from Altieri. *Id.* ¶ 7. In exchange for the loan, Tsopanides allowed Altieri "to place a non-motorized residence on Tsopanides's property as a residence for himself until such time as the loan was fully

repaid." *Id.* As of the filing of the complaint, Tsopanides had repaid $38,000 of the loan. *Id.*

On September 8, 2021, Tsopanides visited Altieri at his non-motorized residence and "demanded that [he] immediately vacate the premises." *Id.* ¶ 8. Altieri explained that he had a right to live on Tsopanides's property until Tsopanides repaid the loan. *Id.* Tsopanides then "became enraged," damaged "some of [Altieri's] personal property," and left. *Id.* Altieri filed a complaint with the OPD but the OPD took no action. *Id.*

On September 10, 2021, four OPD officers, including Valdavinos, "pounded" on Altieri's door and "accused [him] of trespassing." *Id.* ¶ 9. Altieri "explained ... that he has a legal right to remain [on] the property in his residence unless and until some court rules otherwise." *Id.* The four officers did not make an arrest, as, Altieri alleges, "they could have done if – but only if – they knew that [he] in fact was trespassing." *Id.* Instead, the officers "proceeded to inflict substantial damage upon [Altieri's] property" by disconnecting his electricity and water. *Id.* The officers inflicted damage that rendered Altieri's home "uninhabitable" and forced him to live at a motel. *Id.*

Altieri alleges that "the police officers acted jointly and in concert with ... Tsopanides and for the specific purpose of violently evicting [Altieri] from his home." *Id.* ¶ 10. Further, Altieri alleges that Tsopanides "was working closely and in conspiracy with the police ... for the specific purpose," *id.* ¶ 5, of depriving Altieri of his property without due process, *id.* ¶ 6.

**II. PROCEDURAL HISTORY**
On September 14, 2021, Altieri filed this lawsuit against Valdavinos and Tsopanides. ECF No. 1. On October 9, 2021, Tsopanides filed a motion to dismiss. ECF No. 14. On March 5, 2022, Altieri filed a motion to dismiss his claims against Valdavinos pursuant to Fed. R. Civ. P. 41(a)(2), ECF No. 31, which I granted, ECF No. 32. Tsopanides is the only remaining defendant.

**III. LEGAL STANDARD**
 **\*2**  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 55 of 238

Altieri v. Tsopanides, Not Reported in Fed. Supp. (2022)

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)). The Court must accept the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014). The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

### IV. DISCUSSION

Tsopanides seeks dismissal of Altieri's Section 1983 claim, arguing that Altieri has not alleged that Tsopanides acted jointly or in concert with the police officers. ECF No. 14 at 3. To state a Section 1983 claim against a private party, such as Tsopanides, Altieri must allege facts showing that Tsopanides acted under the color of state law. "Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)); *see Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) ("[A] plaintiff pressing a claim of violation of his constitutional rights under § 1983 is ... required to show state action." (internal quotation marks and citation omitted)). "Private parties act under the color of state law if they jointly participate or conspire with a state actor to violate an individual's federal rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005).

To state a claim for a Section 1983 conspiracy involving a private party, "a plaintiff must allege '(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Knopf v. Esposito*, 803 F. App'x 448, 452–53 (2d Cir. 2020) (quoting *Ciambriello*, 292 F.3d at 324–25). A private actor also acts under the color of state law "when the private actor is a willful participant in joint activity with the State or its agents." *Betts*, 751 F.3d at 84 (internal quotation marks and citation omitted). A complaint that contains "only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights [is] properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (internal quotation marks omitted); *see also Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 381–82 (E.D.N.Y. 2021)

("[T]he complaint must allege facts that plausibly suggest a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."). And while "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (internal quotation marks and citation omitted), the plaintiff is still required to allege facts beyond "conclusory, vague, or general allegations" to state a claim "that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights," *Ciambriello*, 292 F.3d at 325.

**\*3** Here, Altieri fails to allege any facts demonstrating that Tsopanides acted in concert or conspired with the police officers. He makes only a conclusory allegation that "the police officers acted jointly and in concert with the defendant Tsopanides and for the specific purpose of violently evicting the plaintiff from his home." ECF No. 1 ¶ 10; *see also id.* ¶ 6 ("At all times mentioned in this Complaint, the defendants acted jointly and in concert with each other for the express purpose of achieving the unlawful objective of the conspiracy, that is, to deprive the plaintiff of his property without due process of law."). Conclusory allegations that a private actor and a state actor acted in concert, however, are insufficient to state a Section 1983 claim against a private actor. *See Ciambriello*, 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.").

Altieri argues that a conspiracy may be inferred circumstantially from the factual allegations in the Complaint. Specifically, he argues that "a finder of fact" may infer that "the police acted in conjunction with Tsopanides" to evict him based on the "close proximity in time between" Tsopanides's September 8 visit to his residence, Altieri's complaint to the OPD upon which the police took no action, and the police officers' September 10 visit to Altieri's residence. ECF No. 15 at 3–4. When drawing all reasonable inferences in favor of Altieri, I find that there are no factual allegations from which I may infer that Tsopanides acted jointly or conspired with the police officers. At most, I can infer from the factual allegations that the OPD received Altieri's complaint, that Tsopanides also complained to OPD, and that the police officers credited and acted on Tsopanides's complaint rather than Altieri's complaint. But these inferences, even when taken together, do not establish that Tsopanides was acting under the color of state law. A private party's calling or

summoning police officers does not constitute joint action with the officers that is actionable under Section 1983. *See Rodriguez v. Winski*, 973 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) (finding that a private party "summoning police or requesting that police take action ... simply does not suffice to constitute joint action or to convert the private party into a state actor"); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (private party's "provision of background information to a police officer does not by itself make [the private party] a joint participant in state action under Section 1983"). Even if I infer that Tsopanides filed a false report with the OPD, causing the police officers to wrongfully evict Altieri, that would not make Tsopanides a state actor. *See Rodriguez*, 973 F. Supp. at 422 ("[E]ven if a private party provides false information to police, ... such provision alone does not constitute joint action actionable under § 1983."); *Vazquez v. Combs*, No. 04-Civ-4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation."). And the reasonable inferences that I can draw from Altieri's factual allegations do not suggest that the police officers—when visiting Altieri on September 10—relied on Tsopanides's judgment rather than their own. *See Ginsberg*, 189 F.3d at 272 ("Where ... a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983."); *Rodriguez*, 973 F. Supp. 2d at 423 (A "substitution of private judgment for police judgment [is] necessary to constitute joint action."). There are no factual allegations suggesting that Tsopanides was present on September 10 or exercised any influence over the police officers and their decision-making—other than by potentially making a complaint to the police which, as noted, is insufficient and is not even expressly alleged. *Cf. Powell v. Alexander*, No. 3:16-CV-01654 (SRU), 2018 WL 4425986, at *4 (D. Conn. Sept. 17, 2018) (concluding that plaintiff sufficiently stated a § 1983 claim against a private party when plaintiff claimed "much more than

simply that" defendants contacted the police, and alleged facts that indicated that defendants "exercised such extreme influence over the [state] defendants, ... [and] that the police officers ceased to exercise[ ] independent judgment" (internal quotation marks and citation omitted)).

**\*4** I conclude that Altieri has failed to state a Section 1983 claim. Nonetheless, because Altieri may be able to plead additional facts that would make out a claim of joint action under Section 1983, I will dismiss the Section 1983 claim without prejudice. Having dismissed Altieri's only federal claim, I note that Altieri has not alleged any other independent basis for federal court jurisdiction. *See* ECF No. 1 (invoking the court's federal question jurisdiction based on the Section 1983 claim and the court's supplemental jurisdiction over any state law claim). It is unclear whether the complaint was intended to plead any state law claims. The complaint does not contain separate counts and, although it mentions 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state law claims, it does not identify any such claims. Altieri's brief, however, asserts that, in addition to being liable under Section 1983, Tsopanides "is liable ... as a civilian damaging personal property in an attempt to carry out an unlawful eviction." ECF No. 15 at 4. In any event, to the extent that the complaint pleads any state law claims, they are dismissed without prejudice to being filed in state court. *See* 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the reasons above, the motion to dismiss (ECF No. 14) is hereby GRANTED, and Altieri's Section 1983 claim is DISMISSED without prejudice. Further, Altieri's state law claims, if any, are DISMISSED without prejudice to being filed in state court. The Clerk is directed this close this case, but within 30 days of this order, Altieri may file a motion to reopen together with an amended complaint that addresses the defects discussed in this ruling.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1912851

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 57 of 238

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 59 of 238

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

## CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

## ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

## BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

**B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.**

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

**C. Motion to Dismiss by Herman, Stewart and Stanford.**

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

**D. Plaintiff's "John Doe" Claims.**

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

**E. Discovery Motions.**

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

**Footnotes**

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 63 of 238

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

**2024 WL 1702010**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David John CAMPBELL, Plaintiff,
v.
NEW YORK STATE POLICE; Steven A. Negrelli, Superintendent of New York State Police; Broome County; Broome County Sheriff's Office; David Harder, Broome County Sheriff; Mark Hamilton, Deputy Sheriff for Broome County; Brian Curtis, CO for Broome County; Broome County District Attorney's Office; Lucas Finley, Assistant District Attorney for Broome County in official and individual capacities; City of Binghamton; Jared M. Kraham, Mayor of City of Binghamton, New York in official and individual capacities; Binghamton Police Department; Chief Joseph Zikuski, Binghamton Police Department; Nicholas Mushalla, Officer for Binghamton Police Department; Bryan Sostowski, Detective for Binghamton Police Department; UHS Binghamton General Hospital, City owned hospital/Department of City of Binghamton; Jessica R. Raymond, Nurse Practitioner for UHS Binghamton General Hospital; Unknown 1, in official and individual capacities; Unkown 2, in official and individual capacities; and Unknown 3, in official and individual capacities, Defendants.

3:23-CV-1337 (AMN/ML)
|
Signed April 19, 2024

**Attorneys and Law Firms**

DAVID JOHN CAMPBELL, Plaintiff, Pro Se, 5 Bradley Street, Binghamton, New York 13904.

### <u>ORDER and REPORT-RECOMMENDATION</u>

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1** The Clerk has sent a complaint in the above captioned action together with an amended application to proceed *in forma pauperis* and letter motion, filed by David John Campbell ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 5, 6.) For the reasons discussed below, I (1) grant Plaintiff's amended *in forma pauperis* application (Dkt. No. 5), (2) recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed (a) in part with leave to amend, and (b) in part without leave to amend, and (3) recommend that Plaintiff's Letter Request/Motion (Dkt. No. 6) be denied as moot.

## I. INTRODUCTION

Construed as liberally [1] as possible, Plaintiff's Complaint alleges that his rights were violated by Defendants New York State Police ("Defendant NYSP"), Steven A. Negrelli, Broome County, Broome County Sheriff's Office ("Defendant BCS"), David Harder, Mark Hamilton, Brian Curtis, Broome County District Attorney's Office ("Defendant BCDA"), Lucas Finley, City of Binghamton, Jared M. Kraham, Binghamton Police Department ("Defendant BPD"), Chief Jospeh Zikuski, Nicholas Mushalla, Bryan Sostowski, UHS Binghamton General Hospital ("Defendant UHS"), Jessica R. Raymond, Unknown 1, Unknown 2, and Unknown 3 (collectively "Defendants"). (*See generally* Dkt. No. 1.) The Complaint is difficult to follow and includes terse sentences that make little sense.

As best as the undersigned can decipher, the Complaint alleges that on May 4, 2022, Plaintiff called Defendant BCS to inquire about "local gun policies." (Dkt. No. 1 at 8.) The Complaint alleges that Plaintiff was directed to surrender "what he had" so, on May 5, 2022, he "show[ed] up to [Defendant] BCS ... to surrender property." (*Id.*) The Complaint alleges that Plaintiff was detained, "unreasonably searched and property seized by [Defendant] Hamilton." (*Id.*)

The Complaint alleges that at some point in time, Plaintiff attempted to "redress again" (presumably the issue with the property that he surrendered) but that his attempt "triggered a *blue alert*" wherein, Plaintiff was falsely accused of threatening law enforcement officers. (Dkt. No. 1 at 8.) Plaintiff alleges that, as a result, he "had to leave his job out of safety concerns." (*Id.*)

The Complaint alleges that at, at some point in time, Defendant BPD attempted to enter Plaintiff's apartment and claimed that someone inside the apartment called 911. (Dkt. No. 1 at 8.)

The Complaint alleges that on November 23, 2023, Plaintiff was pulled over by Defendant NYSP "just after updating his professional credentials." (*Id.*) Plaintiff alleges that the stop was never documented by Defendant NYSP. (*Id.*)

The Complaint alleges that on January 13, 2023, Plaintiff found his vehicle vandalized "and completely disabled." (Dkt. No. 1 at 8.) Notwithstanding the damage, Plaintiff alleges that he was able to "rig" the car to make it operable. (*Id.*) The Complaint alleges that Plaintiff's wife called Defendant BPD to report the crime and Defendant Mushalla responded. (*Id.*) Plaintiff alleges that Defendant Mushalla and another officer confiscated "an undocumented amount of property exceeding $3,000 in value." (Dkt. No. 1 at 8-9.)

**\*2** The Complaint alleges that on January 14, 2023, approximately five officers employed by Defendant BPD went to Plaintiff's house and claimed that they had a warrant to enter. (Dkt. No. 1 at 9.) The Complaint alleges that Plaintiff was in only boxer-style underwear at the time officers arrived and was inappropriately touched and taunted during the search. (*Id.*) The Complaint alleges that Defendant Sostowski tried to trick Plaintiff into signing a consent form by telling Plaintiff that it was a confiscation form. (*Id.*)

The Complaint alleges that as a result of the stress from the searches, "[k]nowing the police were harassing [him,] his wife [was] turning people against [him]," and "knowing someone [was] out to get Plaintiff but no[ ]one believing [him,] Plaintiff checked into the local hospital for [an] evaluation." (Dkt. No. 1 at 9.) The Complaint alleges that on January 16, 2023, Defendant BPD lied to Defendant Raymond about having warrants to search his home, which led to misdiagnosis and mistreatment. (*Id.*)

The Complaint alleges that Plaintiff was involuntarily committed to Defendant UHS for six days without due process or Plaintiff's consent. (Dkt. No. 1 at 9.) The Complaint alleges that on January 17, 2023, while Plaintiff was involuntarily committed, Defendant Sostowski—with assistance from Defendants BCDA and Finley—filed false documents with the Court pursuant to the New York State red flag laws. (Dkt. No. 1 at 9-10.)

The Complaint alleges that Defendants BPD, BCS, and UHS included false records of encounters with Plaintiff, which resulted in Plaintiff permanently losing his gun rights. (Dkt. No. 1 at 10.) The Complaint alleges that neither Plaintiff nor his wife were ever charged with a crime. (*Id.*)

The Complaint alleges that All Star Pawn informed Plaintiff that "gun pieces were sabotaged/switched by [Defendant BCS]." (Dkt. No. 1 at 10.)

Based on these factual allegations, the Complaint appears to allege the following nine causes of action: (1) a claim that on May 5, 2022, Defendant Hamilton conducted an unreasonable search and seizure of Plaintiff's personal items in violation of the First, Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983; (2) a claim that Defendant BCS retaliated against Plaintiff by creating false information to conceal its unreasonable searches in violation of the First, Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983; (3) a claim that on January 16, 2023, Defendant BPD's actions intentionally influenced Defendant UHS's involuntary commitment of Plaintiff in violation of the First, Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983; (4) a claim that on January 13, 2023, Defendant Mushalla unreasonably seized property valued at over $3,000 and created false business records in violation of the First, Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983; (5) a claim that on January 14, 2023, Defendant BPD officers unreasonably searched Plaintiff's home causing $1,000 in damages in violation of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments and 42 U.S.C. § 1983; (6) a claim that Defendant Sostowski filed a false petition in violation of the Fourth, Seventh, and Fourteenth Amendments and 42 U.S.C. § 1983; (7) a claim that Defendants NYSP, City of Binghamton, BPD, Broome County, BCS, and UHS failed to provide services in violation of the First, Fifth, Seventh, and Fourteenth Amendments and 42 U.S.C. § 1983; (8) a claim that on November 23, 2022 at 10:30 p.m., an unknown officer employed by Defendant NYSP conducted a traffic stop of Plaintiff without calling in the stop and was verbally aggressive during the encounter in violation of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments and 42 U.S.C. § 1983; and (9) a claim that between January 15, 2023, and January 23, 2023, Defendant UHS falsified records in the scheme devised by Defendant BPD in violation of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments and 42 U.S.C. § 1983. (Dkt. No. 1 at 12-15.) As relief, Plaintiff seeks, *inter alia*, (1) "$10,000 from each [D]efendant per each seized item per day every single day kept from Plaintiff," (2) "Supervised Policy improvement(s) to [Defendants NYSP, Broome County, City of Binghamton, and UHS] preventing similar acts," (3) "immediate deactivation of ERPO and TERPO," (4) destruction of all inaccurate documents with corrected records created to accurately reflect Plaintiff's encounters with Defendants and "$10,000 per day for every

day record releases and corrections not completed," (5) the return of Plaintiff's property and "$3,000,000 for items not returned to Plaintiff after release," (6) $2,000,000 in punitive damages, (7) contempt of court proceedings against Defendants, and (8) an order that in the future, Plaintiff be handcuffed in the front and/or that Defendants use two pars of handcuffs in the back. (*Id.* at 16-18.)

## II. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

**\*3** When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing Plaintiff's amended *in forma pauperis* application (Dkt. No. 5), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's amended application to proceed *in forma pauperis* is granted. [3]

## III. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at \*1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

**\*4** "In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be dismissed for the following six reasons.

First, the undersigned finds Plaintiff's Complaint factually frivolous. [4] To the extent allegations are discernible from

the pleading, they are "wholly incredible, irrational, and/or appear to be the product of delusion or fantasy." *Curmen v. U.S. Gov't*, 18-CV-1546, 2018 WL 2324060, at *3 (E.D.N.Y. May 22, 2018). The Complaint alleges a wide-ranging conspiracy among various law enforcement agencies and a hospital to seize Plaintiff's firearms and personal property. (*See generally* Dkt. No. 1.)

Courts routinely dismiss this kind of *pro se* complaint. *See Gallop v. Cheney*, 08-CV-10881, 2010 WL 909203, at *5 (S.D.N.Y. Mar. 15, 2010) ("Courts have not hesitated to dismiss complaints asserting delusional claims of conspiracy."), *aff'd*, 642 F.3d 364 (2d Cir. 2011); *Ceparano v. Suffolk Cnty.*, 10-CV-2030, 2010 WL 5437212, at *3 (E.D.N.Y. Dec. 15, 2010) ("[P]rolix, unintelligible, speculative complaints that are argumentative, disjointed and needlessly ramble have routinely been dismissed in this Circuit.").

For example, in *Harvey v. Kirk*, 19-CV-0411, 2019 WL 5150035, at *4 (N.D.N.Y. May 9, 2019) (Baxter, M.J.), the trial court *sua sponte* dismissed as frivolous a *pro se* litigant's claim without leave to amend where the plaintiff alleged that government agents were surveilling and harassing him using telepathic methods. *Harvey*, 2019 WL 5150035, at *4, *report and recommendation adopted by*, 2019 WL 3491264 (N.D.N.Y. Aug. 1, 2019) (D'Agostino, J.); *see also Ciltas v. Wang*, 20-CV-2520, 2020 WL 6146865, at *1 (E.D.N.Y. Oct. 20, 2020) (dismissing as frivolous the plaintiff's claims that a defendant had been trying to murder her for years, had made false statements and hidden cameras in her home and vehicle and hacked her electronic devices); *Raoul v. City of N.Y. Police Dep't*, 14-CV-1787, 2015 WL 1014204, at *1-2 (E.D.N.Y. Mar. 6, 2015) (dismissing as factually frivolous a complaint alleging a "wide-ranging conspiracy" between state and federal agencies that involved a campaign to harass, torture, and harm the plaintiff). As a result, I recommend that Plaintiff's Complaint be dismissed in its entirety because it is factually frivolous.

**\*5** Second, to the extent that the Complaint seeks monetary damages, it asserts claims against several Defendants who are immune. More specifically, Plaintiff's claims against Defendant NYSP "are barred by both the Eleventh Amendment and the language of § 1983." *Kilcher v. New York State Police*, 19-CV-0157, 2019 WL 2511154, at *2-3 (N.D.N.Y. June 18, 2019) (D'Agostino, J.) (citing *Pierce v. New York State Police (Troop D Lowville)*, 05-CV-1477, 2011 WL 1315485, at *13 (N.D.N.Y. Apr. 4, 2011)). To

the extent that the Complaint alleges any claims against Defendant Negrelli in his official capacity as Superintendent of Defendant NYSP, those claims are also barred pursuant to the Eleventh Amendment immunity applicable to Defendant NYSP. *See Swanhart v. New York*, 20-CV-6819, 2022 WL 875846, at *4-5 (S.D.N.Y. Mar. 24, 2022) (citing *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988)) ("The immunity provided by the Eleventh Amendment extends to actions seeking damages against state officials sued in their official capacities if the state is the real party in interest."). Moreover, Plaintiff's claims against Defendant BCDA and Defendant Finley in his official capacity are barred by the Eleventh Amendment. *Roark v. New York*, 23-CV-1237, 2023 WL 8827185, at *3 (N.D.N.Y. Dec. 21, 2023) (Lovric, M.J.) (citations omitted) (recommending that the plaintiff's claims against the Watertown District Attorney's Office be dismissed as barred by the Eleventh Amendment), *report and recommendation adopted by*, 2024 WL 125512, at *1 (N.D.N.Y. Jan. 11, 2024) (Hurd, J.). As a result, I recommend that, in the alternative, Plaintiff's claims seeking monetary damages against Defendants NYSP, Negrelli in his official capacity, BCDA, and Finely in his official capacity, be dismissed because they are immune from suit pursuant to 28 U.S.C. § 1915(e)(2)(B).

Third, the Complaint failed to allege the personal involvement of Defendants Negrelli, Harder, Curtis, Kraham, Zikuski, Unknown 1, Unknown 2, and Unknown 3 in any alleged constitutional deprivation, which is a prerequisite to an award of damages under 42 U.S.C. § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *see Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) (holding that in order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted) ("[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."). The Second Circuit has made clear that "there is no special rule for supervisory liability," and a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Here, although

Plaintiff names Defendants Negrelli, Harder, Curtis, Kraham, and Zikuski as defendants, the body of the Complaint lacks any allegations of wrongdoing by them. (*See generally* Dkt. No. 1.) As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants Negrelli, Harder, Curtis, Kraham, and Zikuski be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

Fourth, Defendants BPD and BCS, which are merely departments of a municipality, are not amenable to suit.[5] *See White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")) ("Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal ... department does not have the capacity to be sued as an entity separate from the municipality in which it is located."), *report and recommendation adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants BPD and BCS be dismissed because they are not entities amenable to suit.

**\*6** Fifth, the Complaint fails to allege facts plausibly suggesting that municipal Defendants Broome County and the City of Binghamton violated Plaintiff's constitutional rights through the execution of their policies. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (outlining the limited circumstances under which a municipality may be liable under Section 1983 and holding that only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) (holding that official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law."). A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010).

Here, there is no basis for municipal liability alleged in the Complaint. Plaintiff essentially complains of a series of discrete incidents, during which an officer or officers employed by Defendants City of Binghamton and Broome County did not act properly. There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Defendants City of Binghamton and Broome County.

As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants City of Binghamton and Broome County be dismissed for failure to state a claim upon which relief may be granted. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.).

Sixth, to the extent that the Complaint seeks the return of property confiscated by the police, such a claim "is not cognizable in federal court if the state courts provide a remedy for the deprivation of that property" and "New York provides such an adequate post-deprivation remedy." *Winters v. New York*, 20-CV-8128, 2020 WL 6586364, at *4 (S.D.N.Y. Nov. 9, 2020) (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir. 1988); *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)). "Because Plaintiff does not allege facts suggesting that his remedy under state law is in any way inadequate or inappropriate, his claim with respect to the seized property must be dismissed." *Winters*, 2020 WL 6586364, at *4 (citing *Butler v. Castro*, 896 F.2d 698, 700-04 (2d Cir. 1990)). As a result, I recommend that, in the alternative, Plaintiff's claims seeking the return of his seized property be dismissed.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to

amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [6]

**\*7** Here, an amended pleading cannot cure the defects outlined above with respect to Plaintiff's claims against Defendants (1) NYSP, BCDA, Negrelli in his official capacity, and Finley in his official capacity because they are immune from suit, and (2) BPD and BCS because they are not entities amenable to suit. As a result, I recommend that the claims against those defendants be dismissed without prejudice but without leave to amend.

Although I have serious doubts about whether Plaintiff can replead to assert actionable claims against Defendants (1) Negrelli in his individual capacity, (2) Broome County, (3) Harder, (4) Hamilton, (5) Curtis, (6) Finley in his individual capacity, (7) City of Binghamton, (8) Kraham, (9) Zikuski, (10) Mushalla, (11) Sostowski, (12) UHS, (13) Raymond, (14) Unknown 1, (15) Unknown 2, and (16) Unknown 3, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution and in light of Plaintiff's status as a *pro se* litigant, I recommend that he be permitted leave to amend.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each

alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

## VI. PLAINTIFF'S LETTER REQUEST/MOTION

On March 26, 2024, Plaintiff filed a Letter Request/ Motion. (Dkt. No. 6.) To the extent that the Court adopts the recommendations contained herein which recommend dismissal of the Complaint, I recommend that Plaintiff's Letter Request/Motion be dismissed as moot.

In the alternative, as best as the undersigned can glean from Plaintiff's Letter Request/Motion, Plaintiff is merely requesting that the Court rule on his motion for IFP. (Dkt. No. 6.) This Order and Report-Recommendation rules on Plaintiff's amended IFP application and thus, Plaintiff's Letter/Motion is moot.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (Dkt. No. 5) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts claims against Defendants (1) Negrelli in his individual capacity, (2) Broome County, (3) Harder, (4) Hamilton, (5) Curtis, (6) Finley in his individual capacity, (7) City of Binghamton, (8) Kraham, (9) Zikuski, (10) Mushalla, (11) Sostowski, (12) UHS, (13) Raymond, (14) Unknown 1, (15) Unknown 2, and (16) Unknown 3, because it is factually frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**\*8 RECOMMENDED** that the Court **DISMISS WITHOUT PREJUDICE BUT WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts claims against Defendants (1) NYSP, BCDA,

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 69 of 238

Negrelli in his official capacity, and Finley in his official capacity because they are immune from suit, and (2) BPD and BCS because they are not entities amenable to suit pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that the Court **DENY** Plaintiff's Letter Request/Motion (Dkt. No. 6) as moot; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b) (1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1702010

---

**Footnotes**

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

4    While the undersigned has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public resources.

5    The Complaint alleges that Defendant UHS is a "City owned hospital/Department of City of Binghamton." (Dkt. No. 1 at 6.) Thus, Defendant UHS, as a department of Defendant City of Binghamton, would also not be amenable to suit. Notwithstanding Plaintiff's allegation that Defendant UNS is a municipal-run hospital, it appears that Defendant UHS is a private medical institution. *See* New York United Health Services, https://www.nyuhs.org/why-choose-us/leadership-performance (last visited Apr. 4, 2024) ("UHS is a not-for-profit, community-benefit organization governed by a board of directors whose members are selected from the communities we serve."). The Complaint fails to allege facts plausibly suggesting that Defendant UHS's actions are "fairly attributable to the state" and thus, fails to state any claims for relief pursuant to 42 U.S.C. § 1983. *See Roark*, 2023 WL 8827185, at *5 (citing *White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals ... named as defendants in [plaintiff's] complaint, are generally not proper § 1983 defendants because they do not act under color of state law."); *Guillory v. Benedict*, 21-CV-0073, 2021 WL 707076, at *2 (N.D.N.Y. Feb. 4, 2021) (Baxter, M.J.) (recommending dismissal of the plaintiff's § 1983 claims against private medical institution St. Joseph's Hospital), *report and recommendation adopted by*, 2021 WL 706644 (N.D.N.Y. Feb. 23, 2021) (Sharpe, J.); *Guillory v. Crouse*

*Hosp.*, 21-CV-1177, 2021 WL 5605260, at *2 (N.D.N.Y. Nov. 2, 2021) (Baxter, M.J.) ("it remains well settled in this Circuit that a private hospital, and its employees, are not deemed state actors solely because the state has granted them authority to practice medicine within its borders."), *report and recommendation adopted by*, 2021 WL 5585926 (N.D.N.Y. Nov. 30, 2021) (Hurd, J.)) (recommending dismissal of the § 1983 claims against Samaritan Hospital, a private medical institution, because the complaint failed to allege facts plausibly suggesting how its actions are "fairly attributable to the state.").

6    *See also Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

7    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

8    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 71 of 238

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

2024 WL 3063674
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David John CAMPBELL, Plaintiff,
v.
NEW YORK STATE POLICE, et al., Defendants.
David J. Campbell, Plaintiff,
v.
City of Binghamton, NY, et al., Defendants.

3:23-cv-01337 (AMN/ML), 3:24-cv-00067 (AMN/ML)
|
Signed June 20, 2024

**Attorneys and Law Firms**

DAVID J. CAMPBELL, Binghamton, NY 13904, Plaintiff pro se

## MEMORANDUM-DECISION AND ORDER

Anne M. Nardacci, United States District Judge:

## I. INTRODUCTION

**\*1** On October 30, 2023, Plaintiff *pro se* David John Campbell ("Plaintiff"), filed a civil rights complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants New York State Police ("NYSP"), Steven A. Negrelli, Broome County, Broome County Sheriff's Office ("BCSO"), David Harder, Mark Hamilton, Brian Curtis, Broome County District Attorney's Office ("BCDA"), Lucas Finley, City of Binghamton ("Binghamton"), Jared M. Kraham, Binghamton Police Department ("BPD"), Chief Jospeh Zikuski, Nicholas Mushalla, Bryan Sostowski, UHS Binghamton General Hospital ("UHS"), Jessica R. Raymond, Unknown 1, Unknown 2, and Unknown 3. Case No. 3:23-cv-01337-AMN-ML (N.D.N.Y.) (the "2023 Action"), Dkt. No. 1 (the "2023 Complaint"). [1] In the 2023 Complaint, Plaintiff asserts nine claims, which generally allege the mistreatment of Plaintiff and his property in violation of his First, Fourth, Fifth, Sixth, Seventh, and Fourteenth Amendment rights, and seeks declaratory, injunctive, and monetary relief. *See id.* at 12-15. Plaintiff also sought leave to proceed *in forma pauperis* ("IFP"), 2023 Action, Dkt. No. 2, which motion was denied, 2023 Action, Dkt. No. 4, and on March 25, 2024, Plaintiff filed a second IFP motion, 2023 Action, Dkt. No. 5.

On January 16, 2024, Plaintiff filed a second civil rights suit pursuant to Section 1983 against Defendants Binghamton, Jared M. Kraham, BPD, Chief Joseph Zikuski, Detective Bryan Sostowski, Broome County, Broome County Clerk's Office, Judith E. Osburn, Honorable Judge Joseph A. Cawley, and Unknown(s). Case No. 3:24-cv-00067-AMN-ML (N.D.N.Y.) (the "2024 Action"), Dkt. No. 1 (the "2024 Complaint"). In the 2024 Complaint, Plaintiff asserts two claims related to the allegations in the 2023 Complaint for violations of Plaintiff's own and his wife's due process rights, and seeks declaratory, injunctive, and monetary relief. *See id.* at 5-7. Plaintiff also sought leave to proceed IFP, 2024 Action, Dkt. No. 2, which motion was denied, 2024 Action, Dkt. No. 4, and on March 22, 2024, Plaintiff filed a second IFP motion, 2024 Action, Dkt. No. 5. [2]

Both actions were referred to United States Magistrate Judge Miroslav Lovric, who, on April 19, 2024, issued an Order and Report-Recommendation in the 2023 Action (1) granting Plaintiff's IFP motion; (2) recommending that Plaintiff's claims against Defendants Negrelli in his individual capacity, Broome County, Harder, Hamilton, Curtis, Finley in his individual capacity, Binghamton, Kraham, Zikuski, Mushalla, Sostowski, UHS, Raymond, Unknown 1, Unknown 2, and Unknown 3 be dismissed with leave to replead; and (3) recommending that Plaintiff's claims against Defendants NYSP, BCDA, Negrelli in his official capacity, Finley in his official capacity, BPD, and BCS be dismissed without leave to replead. 2023 Action, Dkt. No. 7 at 16-18 (the "2023 Action Report-Recommendation"). Also on April 19, 2024, Magistrate Judge Lovric issued an Order and Report-Recommendation in the 2024 Action (1) granting the IFP Motion; (2) recommending that Plaintiff's claims against Defendants Binghamton, Broome County, Kraham, Zikuski, and Unknown(s) be dismissed with leave to replead; and (3) recommending that Plaintiff's claims against Defendants Crawley, Osburn, Broome County Clerk's Office, and BPD be dismissed without leave to replead. 2024 Action, Dkt. No. 7 at 16-18 (the "2024 Action Report-Recommendation"). Finally, in light of the above recommendations, Magistrate Judge Lovric recommended denying Plaintiff's Letter Requests as moot. 2023 Action, Dkt. No. 7 at 17-18; 2024 Action, Dkt. No. 7 at 17-18.

**\*2** Magistrate Judge Lovric advised Plaintiff that under 28 U.S.C. § 636(b)(1), he had fourteen days to file written objections to the Report-Recommendations and failure to object within fourteen days would preclude appellate review. 2023 Action, Dkt. No. 7 at 18; 2024 Action, Dkt. No. 7 at

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 72 of 238

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

18. On April 26, 2024, Plaintiff timely filed Objections to the 2024 Action Report-Recommendation, 2024 Action, Dkt. No. 8 (the "2024 Action Objections"), and on April 29, 2024, Plaintiff timely filed Objections to the 2023 Action Report-Recommendation, 2023 Action, Dkt. No. 8 (the "2023 Action Objections").

For the reasons set forth below, the Court adopts the Report-Recommendations in their entireties.

## II. STANDARD OF REVIEW

This Court reviews *de novo* those portions of a magistrate judge's report-recommendation that have been properly preserved with a specific objection. 28 U.S.C. § 636(b)(1)(C). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012) (alteration in original) (quoting N.D.N.Y. Local Rule 72.1(c)). If no specific objections have been filed, this Court reviews a magistrate judge's report-recommendation for clear error. *See id.* at 229 (citing Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition). Similarly, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322 (TJM) (DRH), 2011 WL 933846, at *1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim); *Petersen*, 2 F. Supp. 3d at 228-29 & n.6 (collecting cases). "When performing [ ] a 'clear error' review, 'the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Dezarea W. v. Comm'r of Soc. Sec.*, No. 6:21-CV-01138 (MAD/TWD), 2023 WL 2552452, at *1 (N.D.N.Y. Mar. 17, 2023) (quoting *Canady v. Comm'r of Soc. Sec.*, No. 1:17-CV-0367 (GTS/WBC), 2017 WL 5484663, at *1 n.1 (N.D.N.Y. Nov. 14, 2017)).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted).

The Second Circuit has held that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06 Civ. 13320 (DAB) (JCF), 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 1:22-cv-567 (BKS/CFH), 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

### A. The 2023 Action Report-Recommendation and Objections

**\*3** In his Objections to the 2023 Action Report-Recommendation, Plaintiff contends, among other things, that he has standing to bring his action, it is of major public concern, and it addresses prohibited official acts which would nullify any immunity defenses. 2023 Action, Dkt. No. 8 at 1-2. Notably, Plaintiff does not cite to or quote from the 2023 Action Report-Recommendation, does not cite to any additional allegations from the 2023 Complaint that support his claims, does not cite any allegations Magistrate Lovric allegedly overlooked or misinterpreted, and cites only one case. *See id.* (citing *Ex Parte Young*, 209 U.S. 123 (1908)). Read in the light most favorable to Plaintiff, the Court finds that these objections are not specific,[3] and accordingly the Court reviews the 2023 Action Report-Recommendation for clear error. *See Mario*, 313 F.3d at 766; *O'Diah*, 2011 WL 933846, at *1.

The 2023 Action Report-Recommendation details the factual allegations contained in the 2023 Complaint, *see* 2023 Action, Dkt. No. 7 at 2-6, before undertaking a reasoned analysis and concluding that the 2023 Complaint should be dismissed for one overarching reason, *see id.* at 8-10, or alternatively, for five claim- and Defendant-specific reasons, *see id.* at 10-14. Magistrate Judge Lovric first concluded that the 2023 Complaint should be dismissed for frivolousness. *Id.* at 9-10. Second, Magistrate Judge Lovric also found that Defendants NYSP, BCDA, Negrelli in his official capacity, and Finley in his official capacity are immune from the claims asserted under the Eleventh Amendment and 28 U.S.C. § 1915(e)(2)(B), and should be dismissed from the action.

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 73 of 238

*Id.* at 10-11. Third, Magistrate Judge Lovric found that the 2023 Complaint lacks any allegations of wrongdoing by Defendants Negrelli, Harder, Curtis, Kraham, and Zikuski, and thus the claims against them should be dismissed for failure to state a claim. *Id.* at 11-12. Fourth, Magistrate Judge Lovric found that Defendants BPD, BCS, and UHS are not proper Section 1983 defendants. *Id.* at 12-13. Fifth, Magistrate Judge Lovric found that the 2023 Complaint does not allege a municipal policy or custom, failure to train, or deliberate indifference that would support liability with respect to Defendants Binghamton or Broome County. *Id.* at 13-14. And sixth, to the extent Plaintiff seeks to have certain property returned, Magistrate Judge Lovric found that Plaintiff has not shown that his remedy under state law is inadequate or unavailable. *Id.* at 14.

Finding no clear error in the above-described analysis and conclusions, the Court adopts the 2023 Action Report-Recommendation determination as to each claim in the 2023 Complaint. Further, upon a *de novo* review of the 2023 Complaint, the Court agrees with Magistrate Judge Lovric's conclusions for the reasons stated in the 2023 Action Report-Recommendation.

### B. The 2024 Action Report-Recommendation and Objections

In his Objections to the 2024 Action Report-Recommendation, Plaintiff contends, among other things, that Defendants are not immune from suit and that Magistrate Judge Lovric did not consider all of his claims. *See* 2024 Action, Dkt. No. 8 at 1-4. However, these objections are either not specific or merely assert disagreements without providing a basis to find otherwise. Accordingly, the Court reviews the 2024 Action Report-Recommendation for clear error. *See Mario*, 313 F.3d at 766; *O'Diah*, 2011 WL 933846, at *1.

In the 2024 Action Report-Recommendation, Magistrate Judge Lovric carefully considered the claims against the nine named Defendants and one unknown Defendant in light of the deference due to *pro se* pleadings, and found each claim lacking. *See* 2024 Action, Dkt. No. 7 at 6-14. First, Magistrate Judge Lovric considered the 2024 Complaint claims against Broome County Court Judge Cawley, noting the limitations on judicial immunity "when a judge takes action outside his or her judicial capacity" or " 'in the complete absence of all jurisdiction[,]' " *id.* at 6-7 (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)), and recommended that claims against Defendant Judge Cawley in his individual capacity be dismissed due to judicial immunity and in his official

capacity due to the Eleventh Amendment, *id.* (collecting cases). Second, Magistrate Judge Lovric considered the claims against the Broome County Clerk's Office, finding that such claims were barred "under the Eleventh Amendment because it is an arm of the State of New York." *Id.* at 7-8 (citing, *inter alia, Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)). Third, Magistrate Judge Lovric properly determined that BPD, as a municipal department of Defendant Binghamton, is not a proper Section 1983 Defendant. *Id.* at 8 (collecting cases); *see Moulton v. Cnty. of Tioga, NY, No. 3:22-cv-00340 (AMN/ML), 2023 WL 4627646, at *15 (N.D.N.Y. July 19, 2023)*. Fourth, Magistrate Judge Lovric considered Plaintiff's claims against Osburn, the Chief Clerk of Broome County Supreme Courts and County Clerks, and determined that she is immune from suit in her individual capacity as a quasi-judicial actor, the 2024 Complaint failed to allege her personal involvement in any of the alleged constitutional deprivations, and that she is immune from suit in her official capacity under the Eleventh Amendment. 2024 Action, Dkt. No. 7 at 9-10. Fifth, Magistrate Judge Lovric found that the body of the 2024 Complaint completely lacked allegations of wrongdoing by Defendants Kraham, Zikuski, and Unknown(s), and accordingly concluded that the claims against them should be dismissed for failure to state a claim. *Id.* at 10-11. Sixth, Magistrate Judge Lovric considered the claims against Binghamton and Broome County and concluded that the 2024 Complaint failed to state a claim because the acts alleged did not amount to a policy or custom sufficient to support municipal liability, nor did the allegations reflect a failure to train or deliberate indifference to the rights of Plaintiff or others considering the acts alleged. *Id.* at 11-12. Lastly, Magistrate Judge Lovric considered the claims against Defendant Sostowski, interpreting them as either a civil extortion claim, or more broadly as a procedural due process claim, and determined that the allegations were conclusory, extortion is not a cognizable civil claim, the Complaints do not allege or suggest a due process violation, and New York has adequate post-deprivation remedies that were available to Plaintiff. *Id.* at 12-14.

**\*4** Finding no clear error in the above-described analysis and conclusions, the Court adopts the 2024 Action Report-Recommendation determination as to each claim in the 2024 Complaint. Further, upon a *de novo* review of the 2024 Complaint, the Court agrees with Magistrate Judge Lovric's conclusions for the reasons stated in the 2024 Action Report-Recommendation.

### C. Leave to Amend

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 74 of 238

Campbell v. New York State Police, Not Reported in Fed. Supp. (2024)

Finally, Magistrate Judge Lovric recommended that certain claims should be dismissed without leave to amend, while others, in an abundance of caution, should be dismissed with leave to amend. Magistrate Judge Lovric articulated the proper standard cautioning courts against dismissing claims filed by a *pro se* litigant without affording the opportunity to amend, and as a result only recommended dismissal without leave to amend claims for which better pleading could not cure the defects identified. *See* Dkt. No. 7 at 14-16; 2024 Action, Dkt. No. 7 at 14-16. Plaintiff's Objections do not specifically take issue with the amendment analysis contained in the Report-Recommendation, and the Court finds no clear error in the determination to dismiss certain futile claims without leave to amend, while permitting Plaintiff an additional opportunity to state his other claims. [4]

Accordingly, the Court adopts both Report-Recommendations in their entireties.

**IV. CONCLUSION**

For these reasons, the Court hereby

**ORDERS** that the 2023 Action Report-Recommendation, Case No. 3:23-cv-01337-AMN-ML (N.D.N.Y.), Dkt. No. 7, is **ADOPTED in its entirety**; and the Court further

**ORDERS** that the 2023 Complaint, Case No. 3:23-cv-01337-AMN-ML (N.D.N.Y.), Dkt. No. 1, is **DISMISSED with leave to amend claims against Defendants Negrelli in his individual capacity, Broome County, Harder, Hamilton, Curtis, Finley in his individual capacity, Binghamton, Kraham, Zikuski, Mushalla, Sostowski, UHS, Raymond, Unknown 1, Unknown 2, and Unknown 3**, and the remainder **DISMISSED without leave to amend**; and the Court further

**ORDERS** that the 2024 Action Report-Recommendation, Case No. 3:24-cv-00067-AMN-ML (N.D.N.Y.), Dkt. No. 7, is **ADOPTED in its entirety**; and the Court further

**ORDERS** that the 2024 Complaint, Case No. 3:24-cv-00067-AMN-ML (N.D.N.Y.), Dkt. No. 1, is **DISMISSED with leave to amend claims against Defendants Binghamton, Broome County, Kraham, Zikuski, and Unknown(s)**, and the remainder **DISMISSED without leave to amend**; and the Court further

 **\*5 ORDERS** that Plaintiff's Letter Requests, 2023 Action, Dkt. No. 6; 2024 Action, Dkt. No. 6, are **DENIED as moot**; and the Court further

**ORDERS** that Plaintiff shall file an amended complaint in either or both of his actions within **SIXTY (60) DAYS** of the date of this Order. Any amended complaint must be a complete pleading which will replace the current complaint in the respective case in total; and the Court further

**ORDERS** that if Plaintiff timely files an amended complaint in either or both of his actions, such complaint shall be referred to Magistrate Judge Lovric for review; and if Plaintiff fails to timely file an amended complaint, the Clerk is directed to close the applicable case without further order of this Court; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3063674

---

**Footnotes**

1    Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2    Additionally, on March 26, 2024, Plaintiff filed identical letters in both Actions requesting that the Court act on his pending Complaints and IFP motions. 2023 Action, Dkt. No. 6; 2024 Action, Dkt. No. 6 (collectively, "Plaintiff's Letter Requests").

3    To the extent Plaintiff attempts to incorporate his earlier-filed 2024 Action Objections into his 2023 Action Objections, *see* Dkt. No. 8 at 2, the Court considers those arguments below, *infra* § III.B.

4    The Court reiterates Magistrate Judge Lovric's admonition to Plaintiff that any amended complaint "will replace the existing complaint, and must be a wholly integrated and complete pleading," Dkt. No. 7 at 16, and must "contain some specific allegations of fact indicating a deprivation of rights," *id.* (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987)), "set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts," and "allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations[,]" *id.* (quoting *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986)). Finally, should Plaintiff wish to pursue this case as a single action, he may file an amended complaint compiling all of his related allegations in one of his cases, and not the other.

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5425501
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Eileen CASINO, Plaintiff,

v.

" 'Mr R. ROHL' or 'John Doe' Owner/Administrator
of Woodhaven Nursing Home," Defendant.

No. 14–CV–2175 (SJF)(GRB).
|
Signed Oct. 23, 2014.

**Attorneys and Law Firms**

Eileen Casino, South Haven, NY, pro se.

**ORDER**

FEUERSTEIN, District Judge.

**\*1** On April 3, 2014, *pro se* plaintiff Eileen Casino ("plaintiff")[1] filed a fourth *in forma pauperis* complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") challenging the quality of care Donato J. Casino allegedly received at, *inter alia,* Woodhaven Nursing Home ("Woodhaven"),[2] accompanied by an application to proceed *in forma pauperis*. On May 30, 2014, plaintiff filed an amended complaint pursuant to Section 1983 against ' "MR. R. ROHL' or 'JOHN DOE' Owner/Administrator of Woodhaven Nursing Home" ("defendant").

Since plaintiff's financial status, as set forth in her declaration in support of her application to proceed *in forma pauperis,* qualifies her to commence this action without prepayment of the filing fees, *see* 28 U.S.C. § 1915(a)(1), her application to proceed *in forma pauperis* is granted. However, for the reasons set forth below, the amended complaint is *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim for relief.

I. Background

A. Prior Litigation

1. The First Casino Action

On September 11, 2013, plaintiff filed in this Court, *inter alia,* a complaint pursuant to Section 1983 against Brian Cassidy ("Cassidy") and "Mr, Rohl, as owner/admin,"[3] among others, alleging violations of Mr. Casino's civil rights relating to his treatment and care in an unidentified nursing home and to court proceedings in which Cassidy acted as his law guardian, which was assigned docket number 13–CV–5095 ("the first action"). By Order dated November 8, 2013, *inter alia:* (1) plaintiff's claims in the first action were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) for lack of standing and failure to state a claim for relief; and (2) Mr. Casino's claims in the first action were *sua sponte* dismissed without prejudice on the basis that plaintiff, who is not an attorney, could not assert *pro se* claims on his behalf.

2. The Second Complaint
On October 28, 2013, plaintiff filed another complaint in this court pursuant to Section 1983 against "Stonybrook [sic] University Medical Center" ("Stony Brook"), Cassidy and Woodhaven alleging, *inter alia,* that those defendants were "not always acting in the best interest of [Mr.] Casino or his family or according to all our wishes" and "unfair competition for family time with my husband" (Compl. under docket number 13–6357 at 1–2), which was assigned docket number 13–CV–6357 ("the second action"). By Order dated January 27, 2014, *inter alia:* (1) plaintiff's claims against Stony Brook were *sua sponte* dismissed for lack of subject matter jurisdiction pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure; (2) plaintiff's Section 1983 claims against Woodhaven and Cassidy were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim for relief; and any state law claims were dismissed without prejudice pursuant to 28 U.S.C. § 1367.

3. The Third Complaint
**\*2** On or about January 22, 2014, plaintiff filed a third complaint ("the third action") pursuant to Section 1983 on behalf of herself and Mr. Casino against Stony Brook, Cassidy, Woodmere Nursing Home ("Woodmere") and the New York State Mental Health Court ("the State Court") alleging, *inter alia,* that those defendants' actions concerning Mr. Casino's care were "against [the] best interest[s] & wish[es] of p[atien]t & [his] family resulting in setbacks of health at Stonybrook [sic] Hospital" (Compl. under docket number 14–CV–00629 at ¶ III), which was assigned docket number 14–CV–00629 ("the third action"). By Order dated April 10, 2014, *inter alia:* (1) plaintiff's claims against Stony

Brook and the State Court were *sua sponte* dismissed pursuant to Rule 12(h) (3) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction; (2) plaintiff's Section 1983 claims against Woodmere and Cassidy were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) for failure to state a claim for relief; (3) any state law claims were dismissed without prejudice pursuant to 28 U.S.C. § 1367; and (4) Mr. Casino's claims were *sua sponte* dismissed without prejudice because plaintiff, who is not an attorney, could not assert *pro se* claims on his behalf.

### B. The Instant Complaint [4]

Since the original complaint filed by plaintiff was not signed, the Court's *pro se* office sent plaintiff a Notice of Deficiency ("Notice") on May 14, 2014, informing her that she must file a signed complaint within fourteen (14) days from the date of the Notice in order to proceed with this case. [See Docket Entry No. 5]. On May 30, 2014, plaintiff filed a signed amended complaint against defendant alleging that the "right to life[,] liberty[,] happiness guarantee [sic] in Constitution of USA was denied [and] there is now wrongful death of Donato Casino caused by criminal negligence [and] human rights abuses." (Amended Complaint ["Am. Compl."], ¶ II(B)) (case converted to lowercase).

The following is plaintiff's statement of her claims against defendant in the amended complaint, which she alleges occurred "[b]etween June of 2013–Sept 10 of 2013," (Am.Compl., ¶ III(A));

> "At all visits from myself I found Dan in a dark room, no company, no radio or tv turned on, on his back, no care given yet that day incl. no diaper change or feeding or fluid/ice [indecipherable] Approx. 2 visits or more per [week]. Approx. 2 [weeks] per [month]. Actually Dan on their premises....
>
> [ ] No ability or available call bell[.]
>
> [ ] 'Sterile['] dressing table filthy at each visit[.]
>
> [ ] 'Sterile' dressing to be used left on table unattended, open to dirty air for who knows how long w/ointments on them open to air[ .]
>
> 5 different hosp. stays-only they sent him later rather than in timely fashion. Also-last hosp. stay at Stony Brook Hosp. was 5 months from Sept–2013 to end of Jan/Feb '14[,] which consisted of health crisis after health crisis requiring heroic means to save Dan's life during that 5 mos.

> After [transfer] to new home in Nassau Co. Dan was never the same-responsive, but min. interactive–1 more stay at Franklin Hosp. (2–3 wk) back to Woodmere-then final stay at S. Nassau Hosp. Dan did not get his last wish for me to be by his side in his last hour because of location. I arr[ived] at Nassau after (Cassidy) (law guardian) approved a DNR.

**\*3** At Nassau Hosp.–3 handwritten pps. of meds scheduled on 1 shift shown to me[.] Feeding at 30 ml. (only 1/3 what they [brought] him up to at Franklin (90 ml) still insufficient for his frame[.) ]

> I *saw* 5 dark spots (large) on Doplar in his stomach-they were ulcers, yet hosp. claims they could not determine cause of bleeding or infection. Nassau continued use of Tylenol, though Franklin had said they would not use it-contraindicated by a condition Dan had.

> Woodmere had Dan off [of] ventilator, IV P/C Line, feeding & hydration at 2 visits and failed [indecipherable] to hosp[.]"

(Am.Compl.¶¶ III–IV) (emphasis in original; case converted).

Plaintiff seeks, *inter alia,* compensatory damages in the amount of "½ a million dollars."

(Am.Compl.¶ V) (case converted).

## II. Discussion

### A. Standard of Review

Under the *in forma pauperis* statute, 28 U.S.C. § 1915(e) (2) (B), a district court must dismiss a complaint if it "(i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

It is axiomatic that district courts are required to read *pro se* complaints liberally, *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir.2013), and to construe them "to raise the strongest arguments that they suggest." *Gerstenbluth v. Credit Suisse Securities (USA) LLC,* 728 F.3d 139, 142–43 (2d Cir.2013) (quotations and citations omitted). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations in the complaint." *Harrington v. Cnty. of Suffolk,* 607 F.3d 31, 33 (2d Cir.2010);

*see also Ashcroft v. Iqbal* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Nevertheless, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868; *see also In re Amaranth Natural Gas Commodities Litig.,* 730 F.3d 170, 180 (2d Cir.2013).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929); *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.2013) (accord). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 127 S.Ct. at 1959, 167 L.Ed.2d 929.

### B. Section 1983

**\*4** Section 1983 of Tile 42 of the United States Code provides, in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally

guaranteed rights 'under color' of state law." *Filarsky v. Delia,* —— U.S. ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). Thus, to state a Section 1983 claim, a plaintiff must allege: (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Paulk,* —— U.S. ——, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012).

Although Section 1983 liability may only be imposed upon wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it," *Nat'l Collegiate Athletic Ass'n. v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (quotations and citation omitted); *see also Hafer v. Melo,* 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Congress enacted § 1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." (quotations and citations omitted)), "[a] private actor may be liable under § 1983 * * * if there is a sufficiently close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Sykes v. Bank of Am.,* 723 F.3d 399, 406 (2d Cir.2013) (quotations, internal quotations and citations omitted); *see also Fabrikant v. French,* 691 F.3d 193, 206–07 (2d Cir.2012) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action. * * * [T]here must be such a close nexus between the state and the challenged action that the state is responsible for the specific conduct of which the plaintiff complains." (quotations, alterations, emphasis and citations omitted)). "Anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." *Filarsky,* 132 S.Ct. at 1661 (quotations and citation omitted); *see also Fabrikant,* 691 F.3d at 207 ("The fundamental question * * * is whether the private entity's challenged actions are 'fairly attributable' to the state." (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982))). "Three main tests have emerged:

**\*5** For the purposes of section 1983, the actions of a nominally private entity are attributable to the state ... (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state ('the public function test')."

*Fabrikant,* 691 F.3d at 207 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (alteration in original)).

Defendant, as the owner or administrator of Woodhaven, a private nursing home, was not acting "under color of state law" for purposes of Section 1983 with respect to the conduct alleged in the amended complaint. *White v. St. Joseph's Hosp.,* 369 F. App'x 225, 226 (2d Cir. Mar.10, 2010) (summary order) ("[P]rivate actors and institutions, such as the * * * nursing home * * * are generally not proper Section 1983 defendants because they do not act under color of state law. * * * [T]he presence of state funding or regulation, in the absence of some concerted action with state officials, does not transform a private party's actions into state action."); *Baum v. Northern Dutchess Hosp.,* 764 F.Supp.2d 410, 430–33 (N.D.N.Y.2011) (dismissing Section 1983 claims against private nursing home because it is not a state actor); *Mitchell v. Home,* 377 F.Supp.2d 361, 370 (S.D.N.Y.2005) (accord).

Moreover, in order to state a claim for relief under Section 1983, a plaintiff must allege the personal involvement of the defendant in the purported constitutional deprivation. *Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 135 (2d Cir.2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)); *Grullon v. City of New Haven.* 720 F.3d 133, 138–39 (2d Cir.2013).

"Personal involvement" may be established by evidence of direct participation by a supervisor in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of New York,* 352 F.3d 733, 753 (2d Cir.2003); see also *Grullon,* 720 F.3d at 139. "An individual cannot be held liable for damages under Section 1983 'merely because he held a high position of authority'...." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). A complaint based upon a violation under Section 1983 that does not allege the personal involvement of a defendant fails as a matter of law. *See Costello v. City of Burlington,* 632 F.3d 41, 48–49 (2d Cir.2011).

**\*6** Since, *inter alia,* defendant is nowhere mentioned or referenced in the body of the amended complaint, plaintiff has not adequately pled his personal involvement in any of the constitutional deprivations alleged in the amended complaint. Accordingly, plaintiff's Section 1983 claims are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) for failure to state a claim for relief.

1. Leave to Amend

Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." Although, "when addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Thompson v. Carter.* 284 F.3d 411, 416 (2d Cir.2002) (quotations and citation omitted), leave to amend is not required, *inter alia,* where a proposed amendment would be futile. *See Grullon,* 720 F.3d at 140; *Anderson News, L.L.C. v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir.2012), *cert. denied sub nom Curtis Circulation Co. v. Anderson News, L.L.C.,* —— U.S. ——, 133 S.Ct. 846, 184 L.Ed.2d 655 (2013). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Panther Partners. Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 119 (2d Cir.2012).

Since, *inter alia,* even a liberal reading of the amended complaint does not give any indication that plaintiff can state a plausible federal claim against defendant, and this is plaintiff's fourth unsuccessful attempt to litigate essentially the same claims, any amendment to the amended complaint to replead the Section 1983 claims against defendant would be futile. Accordingly, plaintiff's Section 1983 claims against defendant are dismissed with prejudice.

### C. Supplemental Jurisdiction

Although the dismissal of state law claims is not required when the federal claims in an action are dismissed, *see Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. 381, 391–92, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998), a federal court may decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U .S.C. § 1367(c)(3). *See Carlsbad Tech., Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 129 S.Ct. 1862, 1866–1867, 173 L.Ed.2d 843 (2009) (holding that a district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary); *Lundv v. Catholic Health Svs. of Long Island Inc.,* 711 F.3d 106, 117 (2d Cir.2013) ("The exercise of supplemental jurisdiction is within the sound discretion of the district court."). The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over the pendent state law claims. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Lundy,* 711 F.3d at 117–18 (accord). Generally, where all of the federal claims in an action are dismissed before trial, the balance of factors will favor declining to exercise supplemental jurisdiction over the remaining state law claims. *See Cohill,* 484 U.S. at 350 n. 7; *Lundy,* 711 F.3d at 118 ("Once all federal claims have been dismissed, the balance of factors will usually point toward a declination."); *Delaney v. Bank of Am. Corp.,* 766 F.3d 163, 170 (2d Cir.2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (quotations and citation omitted)).

 **\*7** In light of the dismissal of all federal claims in this action prior to service of a summons and the amended complaint upon defendant, and upon consideration of all relevant factors, i.e., judicial economy, convenience, fairness and comity, I decline to exercise supplemental jurisdiction over any remaining state law claims in this action. Accordingly, to the extent the amended complaint asserts any state law claims, those claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). Plaintiff is advised that pursuant to 28 U.S.C. § 1367(d), the statute of limitations for any state law claims, to the extent those claims were timely filed in this Court, is tolled for a period of **thirty (30) days after the date of this order,** unless a longer tolling period is otherwise provided under state law.

### D. Filing Injunction

Under the All Writs Act, district courts are empowered to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act grants district courts the power, under certain circumstances, to enjoin parties from filing further lawsuits." *MLE Realty Assocs. v. Handler,* 192 F.3d 259, 261 (2d Cir.1999); *see also Matter of Hartford Textile Corp.,* 613 F.2d 388, 390 (2d Cir.1979) (holding that the All Writs Act "grant[s] the district court power sua sponte to enjoin further filings in support of frivolous and vexatious claims.") "The district courts have the power and the obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel." *Lau v. Meddaugh,* 229 F.3d 121, 123 (2d Cir.2000) (quotations and citation omitted); *see also Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system." (quotations and citations omitted)); *Safir v. United States Lines, Inc.,* 792 F.2d 19, 24 (2d Cir.1986) ("A district court not only may but should protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation." (quoting *Abdullah v. Gatto.* 773 F.2d 487, 488 (2d Cir.1985) (*per curiam* )).

"The filing of repetitive and frivolous suits constitutes the type of abuse [of the judicial process] for which an injunction forbidding further litigation may be an appropriate sanction." *Shafii v. British Airways, PLC,* 83 F.3d 566, 571 (2d Cir.1996); *see also Lau,* 229 F.3d at 123 ("The issuance of a filing injunction is appropriate when a plaintiff abuses the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive proceedings." (quotations, alterations and citations omitted)). The following factors should be considered in determining whether to restrict a litigant's future access to the courts:

**\*8** "(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, *e.g.,* does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigation has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties."

*Safir,* 792 F.2d at 24; *see also Iwachiw v. New York State Dep't of Motor Vehicles,* 396 F.3d 525, 528 (2d Cir.2005) (accord). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir.* 792 F.2d at 24.

The court must first provide a litigant with notice and an opportunity to be heard before imposing a filing injunction, *see Lau,* 229 F.3d at 123; *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) (*per curiam),* and the filing injunction must be narrowly tailored so as to preserve the litigant's right of access to the court, *see Bd. of Managers of 2900 Ocean Ave. Condo. v. Bronkovic,* 83 F.3d 44, 45 (2d Cir.1996) (holding that filing injunctions "must be appropriately narrow."); *e.g. SBC 2010–1, LLC v. Morton,* 552 F. App'x 9, 12–13 (2d Cir. Dec.18, 2013) (summary order) (affirming the district court's issuance of a filing injunction on the basis, *inter alia,* that it was "narrowly crafted"); *Malcolm v. Bd. of Educ. of Honeoye Falls–Lima Cent. Sch. Dist.,* 506 F. App'x 65, 70 (2d Cir. Dec.26, 2012) (summary order) (accord).

This lawsuit is plaintiff's fourth unsuccessful attempt in this Court to litigate essentially the same claims regarding the treatment and care of Mr. Casino since September 2013. Given the court's "obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel," *Lau,* 229 F.3d

at 123, ***plaintiff is warned that similar, future actions will not be tolerated.*** If plaintiff persists in filing actions asserting claims previously asserted and dismissed by this Court with prejudice or for lack of subject matter jurisdiction, the Court will issue an order to show cause why she should not be required to seek leave of this Court before filing any future actions in this Court.

Finally, plaintiff is cautioned that Rule 11 of the Federal Rule of Civil Procedure applies to *pro se* litigants, *see Maduakolam v. Columbia Univ.,* 866 F.2d 53, 56 (2d Cir.1989) ("Rule 11 applies both to represented and *pro se* litigants * * *."); *e.g., Ginther v. Provident Life and Cas. Ins. Co.,* 350 F. App'x 494, 496 (2d Cir.2009) (affirming a district court's imposition of Rule 11 sanctions against a *pro se* litigant), and that should she file another frivolous action, it is within the Court's authority to consider imposing sanctions upon her. *See* Fed.R.Civ.P. 11. [5]

III. Conclusion

**\*9** For the reasons set forth above, plaintiffs application to proceed *in forma pauperis* is granted; plaintiff's Section 1983 claims against defendant are *sua sponte* dismissed in their entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim for relief; any state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3); and any claims asserted by plaintiff on behalf of her children and grandchild are dismissed without prejudice. ***Plaintiff is warned that her repetitive filing of actions in this Court asserting similar claims relating to the care and treatment of Mr. Donato will not be tolerated.*** If plaintiff persists in filing actions asserting claims previously asserted and dismissed by this Court with prejudice or for lack of subject matter jurisdiction, the Court: (1) ***will issue an order to show cause why she should not be required to seek leave of this Court before filing any future actions in this Court relating to the care and treatment of Mr. Donato;*** and (2) will consider imposing sanctions upon her pursuant to Rule 11 of the Federal Rules of Civil Procedure.

The Clerk of the Court shall close this case and, pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, serve notice of entry of this Order upon all parties as provided in Rule 5(b) of the Federal Rules of Civil Procedure and record such service on the docket.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good

faith and therefore in forma pauperis status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5425501

---

**Footnotes**

1    Although the caption of the complaint indicates that plaintiff is also asserting claims on behalf of her "children and grandchild," "[a] person who has not been admitted to the practice of law may not represent anybody other than himself." *Guest v. Hansen,* 603 F.3d 15, 20 (2d Cir.2010); *see* 28 U.S.C. § 1654. Accordingly any claims asserted by plaintiff on behalf of her children and grandchild are dismissed without prejudice.

2    As set forth below, each of plaintiff's earlier cases were *sua sponte* dismissed.

3    In her application to proceed *in forma pauperis* in this action, plaintiff identifies Mr. Rohl as the "owner/administrator" of Woodhaven. (Application to Proceed *In Forma Pauperis* ["IFP Applic."] at 1).

4    All material allegations in the Complaint are assumed to be true for the purposes of this order, *see, e.g. Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 58 (2d Cir.1998) (in reviewing a *pro se* complaint for *sua sponte* dismissal, a court is required to accept the material allegations in the complaint as true), and do not constitute findings of fact by the Court.

5    This Court's April 10, 2014 order in the third action also warned plaintiff that the Court is considering issuing an order to show cause why a filing injunction should not be imposed upon her and imposing sanctions upon her pursuant to Rule 11 of the Federal Rules of Civil Procedure based upon her filing of repetitive and frivolous lawsuits. However, this action was commenced one (1) week before the Court issued the April 10, 2014 order.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,

v.

Harry C. BUFFARDI, Sheriff; Schenectady County Jail;
Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

### *DECISION and ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

**\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order.[1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

**Footnotes**

[1]     Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

---

**End of Document**                                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1289874
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

William ELLIS as Administrator of the
Estate of James A. Ellis, Deceased, Plaintiff,
v.
ERIE COUNTY, et al., Defendants.

1:24-cv-1242-JLS-JJM
|
Signed March 26, 2026

**Attorneys and Law Firms**

Melissa Dorothy Wischerath, Lipsitz Green Scime Cambria LLP, Buffalo, NY, for Plaintiff.

Anthony B. Targia, Erie County Attorney's Office, Buffalo, NY, for Defendants Erie County, Kevin McGee, Senior NP Joanne McVey, Carrie Ludwig, Holly Bryant, Stephanie Sly, NP Amanda Martinez, Grace Moka R.N., Emily Taggart.

## REPORT AND RECOMMENDATION

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** William Ellis, as Administrator of the estate of James A. Ellis ("Ellis"), seeks relief pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, for Ellis's death while in pretrial custody at the Erie County Holding Center ("ECHC"). The Amended Complaint [11] [1] names Erie County, Kevin McGee, D.O. (a doctor allegedly employed by the County), in his individual and official capacity, and Joanne McVey, Carrie Ludwig, Holly Bryant, Stephanie Sly, Amanda Martinez, Grace Moka, Emily Taggart, and John Does 1 through 5, other County employees, in their official capacity.

Before the court is defendants' motion [17] for judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c), [2] which has been referred to me by District Judge John L. Sinatra, Jr. for initial consideration [2]. Having reviewed the parties' submissions [17, 21, 22], I recommend that the motion be granted in part and denied in part.

## BACKGROUND

The Amended Complaint alleges that Ellis died from complications of metastatic carcinoma "of probable gastrointestinal primary while in the custody of the Erie County Sheriff at the Holding Center". [11], ¶9. After his arrival at the Holding Center, Ellis "had persistent gastrointestinal symptoms over the course of three weeks", but was never referred to a gastroenterologist. Id., ¶12. "Instead he continued to languish and vomit". Id. The Medical Review Board reviewed the circumstances surrounding his death and concluded that "[a]lthough his death may not have been preventable ... there were failures by the medical providers to recognize clinical indicators of serious disease process during Ellis' incarceration and to address his chronic medical complaints". Id., ¶10; [25] at 2, ¶1. [3]

The Board "opined that there was a failure by medical staff to properly assess, failure to notify and consult with a physician and a grossly missed diagnosis". [11], ¶13; [25] at 4, ¶12. In addition, the Board "questioned the credibility of the medical staffs' findings" in Ellis's medical records. Id.

The Board's report includes additional facts relevant to Ellis's care. It found that he "had an undiagnosed cancer when admitted to the Holding Center". [25] at 2, ¶1. The Board found that there were "significant failures by medical staff at the sick call encounters on 11/28/2021 and 11/29/2021" (id. at 4, ¶12), and outlined these failures in more specific detail:

**\*2** "The Medical Review opines that there was a failure by medical staff to properly assess, failure to notify and consult with a physician and a grossly missed diagnosis. Additionally, the Medical Review Board questions the credibility of the medical staffs' findings that Ellis [had] clear lung sounds at both sick call encounters on 11/28/21 and 11/29/21 as the gross anatomic findings at autopsy revealed that Ellis had edematous lungs (right 1560 g/left 1260 g) with bronchopneumonia and a necrotic abscess of the right lung indicating possibly weeks of developing infection. The Medical Review Board opines that the cited failures collectively indicated inadequate supervision of the medical staff and health services delivery".

Id. The Board requested "an independent peer review" of James's health care, with focus on the following questions, among others:

"1. Why no physician referral nor gastrointestinal consultation was ordered for Ellis after having repeated complaints of gastrointestinal distress over a three week period.

2. Why Ellis was not immediately referred to a physician on 11/29/2021 after complaints of chest pain and unstable vital signs.

3. Why Ellis's 15 lbs. weight loss was not accounted for nor recognized by attending medical staff."

Id. at 5.

The Amended Complaint refers to a 2009 lawsuit against the County by the Department of Justice concerning medical care at the ECHC and other County facilities, and various other documents, all of it incorporates by reference.d into the Amended Complaint by reference. [11], ¶¶3, n.2; 4-5, n.3; 6, n.5; 10. Defendants attached to their Answer a copy of the June 13, 2023 Order terminating the 2009 action, along with the status reports referred to in the Order. [14], ¶27; [14-1].

**DISCUSSION**

**A. The Standard Governing Rule 12(c) Motion for Judgment on the Pleadings**

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." Lively v. WAFRA Investment Advisory Group, Inc., 6 F.4th 293, 301 (2d Cir. 2021). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully .... Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

See also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citing Iqbal, supra).

In deciding whether to dismiss a complaint under Rule 12(b)(6), this court "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference". McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). I must "assume that all well-pleaded factual allegations in the complaint are true unless they are contradicted by more specific allegations or documentary evidence." Vengalattore v. Cornell University, 36 F.4th 87, 112 (2d Cir. 2022) (internal alterations omitted). That rule, however, is "inapplicable to legal conclusions". Iqbal, 556 U.S. at 678 (2009).

**B. Claims Against Individuals in their Official Capacity**
*3  The County defendants argue that the claims against the individual defendants in their official capacity are invalid. [17-2] at 10-13. I agree. Claims asserted against municipal employees in their official capacity are essentially claims against the municipality. Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001).

Except for McGee, Ellis has not sued any of the individual defendants in their individual capacity. Accordingly, any claim involving them is functionally a claim against the County, and the claims against the individuals must therefore be dismissed. See Miller v. County of Erie, 2021 WL 4481195, *6 (W.D.N.Y. 2021) ("[p]laintiff's § 1983 official capacity claims against [defendants] - the only § 1983 claims he has asserted against them - are coextensive with his claims against Erie County and appropriately dismissed").

William Ellis does not address this argument in his response, apparently conceding it. "This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." Kabrovski v. City of Rochester, 149 F.Supp.3d 413, 422 (W.D.N.Y. 2015) (citation omitted). Accordingly, when a motion to dismiss raises arguments that plaintiff fails to address, plaintiff is "deemed to have conceded the point". Id.

For these reasons, I recommend that the court grant the motion as to defendants McVey, Ludwig, Bryant, Sly, Martinez, Moka, Taggart, and John Doe 1 through 5. I also recommend that the motion be granted as to McGee to the extent that he is sued in his official capacity.

I therefore address the claims in the Amended Complaint only as they relate to the remaining defendants: the County and McGee in his individual capacity.

## C. Deliberate Indifference to Serious Medical Need in Violation of the 14th Amendment

The first cause of action alleges that the County and McGee were deliberately indifferent to James's medical needs, causing him injury that led to his death. [11], ¶¶30-437 The second cause of action alleges further that the County had a custom, policy, pattern, or practice that caused the deprivation of James' constitutional rights. [11], ¶¶38-46.

To maintain a § 1983 claim against a municipality, a plaintiff must allege that the constitutional violation occurred because of the municipality's policy or custom. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978). To maintain a § 1983 claim against an individual, a plaintiff must allege that the individual was personally involved in the deprivation of rights. "[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983". Patterson v. County of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir. 2004).

### 1. Legal Elements of a Deliberate Indifference Claim

"A pretrial detainee's claim for deliberate indifference is evaluated under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, as pretrial detainees have not been convicted of a crime and thus may not be punished in any manner - neither cruelly nor otherwise." Davis v. McCready, RPA, 283 F.Supp.3d 108, 116 (S.D.N.Y. 2017) (cleaned up). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to his serious medical needs.' " Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

**\*4** The standard for deliberate indifference includes two components. The first is the same under both the Eighth and Fourteenth Amendments:

> "First, [plaintiff] must show that, while he was incarcerated, he suffered from a medical condition that is, in objective terms, sufficiently serious.... Though there is no single metric, we have previously held that a sufficiently serious medical condition in the Eight Amendment context refers to a condition of urgency that may result in degeneration or extreme pain, that significantly affects

daily activities or that involves chronic and substantial pain."

Mallet v. NYDOCCS, 126 F.4th 125, 132 (2d Cir. 2025). The first component involves two elements:

> "The first inquiry is whether the prisoner was actually deprived of adequate medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."

Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006).

Once a plaintiff proves that he suffers from an objectively serious medical condition, he must also establish the second element, which differs from the showing required for claims under the Eighth Amendment:

> "[A] plaintiff suing under the Fourteenth Amendment is required to show only that the prison official acted with objective recklessness, or that the defendant knew, or should have known, that an excessive risk to health or safety would result.... [M]ore than negligence is required to hold a defendant liable for violating either constitutional provision."

Grimmett v. Corizon Medical Associates of New York, 2017 WL 2274485, *4 (S.D.N.Y. 2017) (emphasis added).

The County and McGee do not dispute that Ellis had a serious medical condition. Instead, they argue that the Amended Complaint fails to satisfy Iqbal's "facial plausibility" pleading standard for either a deliberate indifference or a Monell claim. [17-2] at 8-10. McGee argues that the Amended Complaint fails to allege that he or any other defendant "committed any specific act or omission". [17-2] at 8. In response, plaintiff fails to identify any allegation that specified McGee's act or omission. See [21] at 6-8. Instead, apparently focusing on the second element of a deliberate indifference claim, he argues:

> "At the pleading stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent. 'A complaint is allowed to contain general allegations as to a defendant's knowledge, because of a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.' Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842,

864 (2d Cir. 2021) ... See also [Rule] 9(b) ("[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Id. at 7.

He points to several allegations of the Amended Complaint that focus on, and incorporate, news reports that include statements made by Sheriff Garcia, the 2009 and other litigation, the New York State Commission of Corrections report, other investigative reports, and the Medical Review Board Report. Id. at 7. He argues that "[t]hese statements in the [Amended] Complaint are sufficient to meet the pleading requirements in Federal Court." Id.

### 2. McGee

**\*5** None of these allegations establish, or even allege, McGee's "personal involvement in the claimed violation". *See* Patterson, 375 F.3d at 229. Moreover, facts contained in the Medical Review Board Report and incorporated into the Amended Complaint appear to establish that McGee was not personally involved in Ellis's care, or even had knowledge of it. For example, the Board found that the medical staff who examined Ellis failed "to notify and consult with a physician" concerning his care. [25] at 4, ¶12.

The Amended Complaint does allege that McGee, collectively with all the other individually named defendants, failed to: "ensure for and/or provide timely and proper medical treatment"; "provide medications and proper medical treatment"; and, "upon information and belief", to "detect his acute illness and significant disease". [11], ¶¶31, 33. However, in cases that involve multiple defendants, "a plausible claim is not stated where a complaint merely lumps defendants together; rather, the complaint must give each defendant fair notice of the claims being asserted against him". James v. Monroe County, 2022 WL 17155831, \*7 (W.D.N.Y. 2022). Furthermore, allegations made upon "information and belief ... are merely speculative, and by themselves insufficient to defeat defendants' motion". Curtis v. Cenlar FSB, 654 Fed. Appx. 17, 20-21 (2d Cir. 2016). "Even where facts are peculiarly within the possession and control of the defendant, the plaintiff must allege some factual basis for the allegations made upon information and belief". Flannery v. County of Niagara, 763 F.Supp.3d 364, 404 (W.D.N.Y. 2025).

"[E]ven assuming that the Amended Complaint alleged an underlying 14th Amendment violation against [Ellis] by

someone ... it does not plausibly allege personal involvement in such a violation" by McGee. [4] James, 2022 WL 17155831 at \*14. I therefore recommend that the court grant McGee's motion with respect to the first cause of action, and that this action be terminated as to McGee. *See* Acosta v. Thomas, 837 Fed. App'x. 32 (2d Cir. 2020) (granting summary judgment in favor of chief medical officer of correctional facility in the absence of any allegation that defendant was involved in plaintiff's care).

Moreover, to the extent that the first cause of action is alleged against the County, I recommend that it be dismissed because it fails to adequately assert that a custom, policy, or practice of the County caused the 14h Amendment violation.

### 3. The County

The second cause of action is alleged against the County for liability pursuant to Monell. In addition to its argument that the Amended Complaint failed to satisfy federal pleading standards, the County argues that it failed to adequately allege that "what happened to [Ellis] was unconstitutional ... did not sufficiently allege when [he] was subjected to the alleged unconstitutional acts ... did not sufficiently allege who was responsible for the unconstitutional acts, and ... pointed to no official policy or custom that was the root cause". [17-2] at 9.

**\*6** Plaintiff argues that the Amended Complaint "alleges and describes specific written and unwritten policies, customs, patterns, and practices that violated the Constitution and proximately caused the deprivation of the civil and constitutional rights of [James], and the damages and injuries described herein". [21] at 9. In addition, he argues evidence that the County's "facilities routinely and systemically deprived prisoners of constitutional rights through inadequate medical and mental health care" can be found in the 2009 lawsuit, the 2018 report of the New York State Commission of Correction, and by Sheriff Garcia's public statements, all of which Ellis incorporated into his complaint by reference. [21] at 8.

Rather than alleging that James' death was caused by a specific affirmative policy, custom, or practice of the County (or of the Sheriff or any other person with policy-making authority applicable to inmate health care provided in County facilities), plaintiff alleges the County's failures were equivalent to a custom, policy, or practice. Paragraph 40 of the Amended Complaint alleges that the County failed to:

• adequately staff medical personnel;

- train, supervise and discipline medical personnel;

- "utilize qualitative benchmarks to assess the quality of medical care" provided to detainees;

- "take steps to ensure" that medical and other staff "do not falsify medical assessments";

- "have in place, or failing to follow, a policy or procedure to prevent physicians and/or nurses from denying detainees access to necessary medical treatment";

- properly screen detainees during the intake process for serious medical conditions;

- timely administer medical treatment;

- respond to medical complaints, symptoms, and requests for treatment;

- provide access to necessary medical treatment for acute and chronic medical conditions;

- train, supervise, and instruct employees about timely medical treatment of detainees and recognizing signs and symptoms of acute disease;

- immediately seek a physician referral or hospitalization for detainees in need of such services; and

- review or implement findings of the NYS Commission of Correction.

[11], ¶40.

While these allegations would likely be deemed conclusory and insufficient to adequately plead the existence of a custom, policy, or practice if no additional facts were pleaded, this is not such a case.

As discussed above, the Amended Complaint alleges facts suggesting that someone on the medical staff at the ECHC violated Ellis's 14th Amendment rights through his, her, or their deliberate indifference to his medical needs. Ellis did not specify in his complaint which of the individuals that he sued in their official capacities provided care to James, however, even if he had, evidence that a specific individual acted with deliberate indifference to James' serious medical needs is not enough to allege a claim against the County. In such a case, "municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking

authority." Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004); *see also* Avant v. County of Erie, 2024 WL 1856828, *3 (W.D.N.Y. 2024).

"[A] § 1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation". Outlaw v. City of Hartford, 884 F.3d 351, 372 (2d Cir. 2018). "The existence of a municipal policy may be established in one of four ways: (1) a formal policy officially endorsed by the municipality; (2) actions taken by the government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policy makers to train or supervise subordinates with scienter that such failure may foreseeably lead to specific types of constitutional violations." Beckwith v. Erie County Water Authority, 413 F. Supp. 2d 214, 225 (W.D.N.Y. 2006).

**\*7** Certainly, "[i]t is unlikely that a plaintiff would have information about [a municipality's] training programs or about the cause of the misconduct at the pleading stage" and a plaintiff is not required "to identify a specific deficiency" in the municipality's training program in his complaint. Amnesty America, 361 F.3d at 130, n. 10. Nevertheless, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists". Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

The Amended Complaint adequately alleges such facts here. It alleges that there is a pervasive history of failure to provide adequate medical care at ECHC by referencing, and incorporating by reference, reports to that effect from the New York State Commissions of Correction and others, the September 2009 lawsuit against Erie County and the former Erie County Sheriff, and an article listing the persons who allegedly have died in Erie County custody since 2005. [11] at 2-3, n. 1-5; *see* Kucharczyk v. Westchester County, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) ("the DOJ Report appended to Plaintiff's Complaint is sufficient to allege a widespread practice at [Westchester County Jail] of which policymakers were aware").

The County points out that the 2009 lawsuit "was dismissed by stipulation" in 2023 after the Department of Justice had "determined [ECHC] to be in sustained full compliance regarding medical care". [22-1] at 4. The Order in that

case does not affect this analysis. The report referred to in that Order was based upon a monitoring visit that took place from October 1-4, 2019. [14-1] at 1-2. James' care (or lack thereof) was provided in 2021. The 2023 Order, therefore, is not documentary evidence sufficient to overcome the presumption of truth applied to statements in the Amended Complaint. *See* McCarthy, 482 F.3d at 191.

Plaintiff also references comments made by Sheriff Garcia that, on their face, seem to indicate an awareness of this ongoing problem and an institutional failure to address it. *See* Raina Lipsitz, *The New Republic*, "Why Do People Keep Dying in Erie County's Jails?" https://newrepublic.com/article/171009/erie-county-sheriff-garcia-howard (March 31, 2023) ("[w]e're set up to fail," Garcia told The New Republic. "We don't have the means to give individuals that come through the doors adequate medical help"); *see* Laboy v. Ontario County, 318 F. Supp. 3d 582, 590 (W.D.N.Y. 2018) (relying on a prosecutor's statements to support an inference of a municipal policy or custom favoring warrantless arrests).

Plaintiff thus alleges that the deficient medical care provided to Ellis was the result, at least in part, of a County custom, policy, or practice. It further alleges that Ellis's experience at ECHC, the lack of care provided to him, and his ultimate death was an example of adherence to such custom, policy, or practice. [11], ¶¶7-8, 15-19, 39-46. These allegations are sufficient at this stage of litigation to maintain a Monell claim. Accordingly, I recommend that the County's motion for dismissal of the second cause of action be denied.

**D. Plaintiff's ADA Claim**

The County argues that plaintiff's ADA claim should be dismissed as "duplicative" of the deliberate indifference claim. [17-2] at 10. The County cites no case, statute, or regulation to support this claim. For this reason alone, that argument should be rejected. *See, e.g.*, United States v. Botti, 711 F.3d 299, 313 (2d Cir. 2013) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); Sioson v. Knights of Columbus, 303 F.3d 458, 460 (2d Cir. 2002) ("[t]o make a legal argument is to advance one's contentions by connecting law to facts").

 **\*8**  In any event, the argument is without merit, as Section 1983 and the ADA are two separate statutory regimes and provide independent avenues for relief. *See, e.g.*, Allah v.

Goord, 405 F. Supp. 2d 265, 272-281 (S.D.N.Y. 2005) (denying dismissal and allowing both an ADA discrimination claim and § 1983 deliberate indifference claim to proceed); Lalonde v. City of Ogdensburg, 662 F.Supp.3d 289, 317, 332 (2d Cir. 2023) (same). I therefore recommend that the County's motion to dismiss the third cause of action be denied.

**CONCLUSION**

For these reasons, I recommend that this court grant defendants' motion [17] with respect to the individual defendants named in their official capacities, grant McGee's and the County's motion with respect to the first cause of action (deliberate indifference), and deny the County's motion with respect to the second (Monell) and third (ADA) causes of action. Unless otherwise ordered by District Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by April 9, 2026. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Slip Copy, 2026 WL 1289874

## Footnotes

1    Bracketed references are to CM/ECF docket entries. Unless otherwise noted, page references are to CM/ECF pagination.

2    While this motion is identified on the docket as a motion for summary judgment, and on the Notice of Motion [17] as a motion to dismiss pursuant to Rule 12(b)(6), defendants have answered [14] the Amended Complaint and describe their motion as a motion on the pleadings pursuant to Rule 12(c) in their Memorandum of Law ([17-2] at 3).

3    Paragraph 10 of the Amended Complaint provides a link to the Medical Review Board's redacted Report, which is printed from that link [25].

4    The Medical Review Board Report contains evidence that whoever examined Ellis on 11/28/2021 and 11/29/2021 either knew, or should have known, that he needed emergency medical attention. The Report states that the treatment notes documented "clear lung sounds", but his autopsy revealed fluid in his lungs. In addition, the Report notes that no further treatment, including referral to a physician, was ordered for James notwithstanding that he complained of gastrointestinal distress over the course of three weeks, and had rapidly lost 15 pounds. Thus, while *someone* who was involved in Ellis's care may have violated his 14th Amendment rights through their deliberate indifference to his serious medical needs, that person is not identified here.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 92 of 238

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent me an amended [1] civil rights complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No. 3). Plaintiff Flagg has also filed an application to proceed in forma pauperis ("IFP"). (Dkt. No. 4).

**I. IFP Application**
A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 4). The court finds that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

**II. Complaint**
Plaintiff states that she is the mother of Mario Leslie, who at the time of the incidents described in the complaint, was on parole. (Amended Complaint ("AC") at 1). [2] On August 8, 2016, defendant New York State Parole Officer ("PO") Mark Saben went to Mr. Leslie's home at 514 Marcellus Street in Syracuse, New York, to conduct a "standard home visit." [3] (*Id.*) Mr. Leslie lived at the Marcellus Street address with his girlfriend, Tamacha Rodriguez. (*Id.*) Plaintiff claims that Ms. Rodriguez answered the door for PO Saben, and that Mr. Leslie was "summoned" from his bedroom to speak with defendant Saben. (*Id.*) After some discussion, PO Saben was walking toward the front door, when he spotted some glassine packets "known to contain heroin." (*Id.*) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (*Id.*)

**\*2** Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set

of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department."[4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York. (AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant.[5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home.[6] (*Id.*) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (*Id.*) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (*Id.*)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (*Id.*) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3rd party (Feldman, Kramer & Monaco, P.C.)" (*Id.*) Plaintiff claims that

the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr. Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property.[7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (*Id.*) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

**\*3** Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (*Id.*) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (*Id.*) In

applying a very liberal reading of the AC, [8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours" worth of lost income [9] on the day of the search, unspecified lost income for the day that she had to appear in court, [10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

### III. Eleventh Amendment/New York State Division of Parole

#### A. Legal Standards

**\*4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

#### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home. [11]

### IV. Syracuse Police Department/Municipal Liability

#### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at \*24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

#### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an

individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir. 1979).

**\*5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York,* No. 17-CV-3563. 2019 WL 1434597, at \*10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester,* 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton,* 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

### V. Prosecutorial Immunity/Personal Involvement

#### A. Legal Standards

##### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County*

*of Suffolk,* 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk,* 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello,* 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse,* 876 F.2d 287, 292 (2d Cir. 1989).

##### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* *See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds,* *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

**\*6** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk,* 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*.

*Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

**B. Application**

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the

money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

**\*7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

## VI. Search and Seizure

**A. Legal Standards**

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.' " *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is " 'based on seemingly reliable information which is later found to be erroneous.' " *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

**B. Application**

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence

or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

**\*8** The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture.[17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5002215

---

## Footnotes

1  When plaintiff filed her original complaint, the case was administratively closed due to plaintiff's failure to comply with the filing fee requirement. (Dkt. No. 2). Prior to re-filing her motion to proceed IFP, (Dkt. No. 4), plaintiff also filed an amended complaint, which the court will review as the operative pleading. The case was re-opened on August 1, 2019. (Dkt. No. 6).

2  Plaintiff numbered the pages of the "Fact" section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits ("AC Ex.") with the page number as assigned by the court's electronic filing system ("CM/ECF").

3  Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

Case 6:25-cv-01081-BKS-ML     Document 45     Filed 07/29/26     Page 98 of 238

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

Plaintiff does not allege that PO Rigby participated in the search of her apartment.

Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF p.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint, and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

Article 13-a is entitled "Proceeds of a Crime -Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

Although not relevant to the court's decision because it is based on absolute immunity of the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's ***sworn*** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under

**Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)**

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 99 of 238

New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

15    To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit. *See Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

16    Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

17    The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau*, 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios*, the District Attorney was the proper "defendant" in New York State Court.

---

**End of Document**                                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 100 of 238

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge

### I. INTRODUCTION

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order and Report-Recommendation dated August 15, 2019 (Dkt. No. 7), Magistrate Judge Baxter grants Plaintiff's application to proceed in forma pauperis, and examines the sufficiency of the allegations set forth in the Amended Complaint ("AC") in light of 28 U.S.C. § 1915. He recommends that the AC (Dkt. No. 3) be dismissed in its entirety as against defendants N.Y.S. Division of Parole, Syracuse Police Department, William J. Fitzpatrick, and Sean Chase; that to the extent that the AC may be read as naming Sgt. Llukaci or PO Rigby, the AC be dismissed without prejudice for failure to state a claim; and that if the Court adopts these recommendations that the case be returned to him for further proceedings, including an order serving the remaining defendants Saben, Summers, Proud, and Curran. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

### II. DISCUSSION

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice.

### III. CONCLUSION

Accordingly, the Court **ACCEPTS and ADOPTS** the recommendations in the Order and Report-Recommendation (Dkt. No. 7) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3) is **DISMISSED IN ITS ENTIRETY** as against defendants N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may be read as naming SGT. LLUKACI or PO RIGBY, it is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge Baxter for further proceedings, including an order serving the remaining defendants: SABEN, SUMMERS, PROUD, and CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1296172
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

H.E. Amir M. HAMZA and
Francis Arthur Yakel, Plaintiffs,

v.

Athansios Dimadis KOTSIDIS, et al., Defendants.

H.E. Amir M. Hamza, Plaintiff,

v.

Chris Liberati-Conant, et al., Defendants.

H.E. Amir M. Hamza, Plaintiff,

v.

Athanasios Dimadis Kotsidis, a/k/
a Thanos Dimadis, et al., Defendants.

1:25-cv-968 (ECC/ML), 1:25-cv-1429
(ECC/ML), 1:25-cv-1506 (ECC/ML)
|
Signed 05/12/2026

**Attorneys and Law Firms**

H.E. Amir M. Hamza, Pro se Plaintiff

Francis Arthur Yakel, Pro se Plaintiff

### MEMORANDUM-DECISION AND ORDER

Elizabeth C. Coombe, United States District Judge:

## I. INTRODUCTION

**\*1** Plaintiffs H.E. Amir M. Hamza and Francis Arthur Yakel commenced the above captioned lead case by filing a Complaint on July 22, 2025. *Hamza et al. v. Kotsidis et al.*, 1:25-cv-968 (ECC/ML) (*Hamza I*) Dkt. No. 1. On August 7, 2025, the Court accepted Plaintiffs' Amended Complaint filed as of right. Dkt. No. 37. [1] Plaintiffs subsequently filed a motion to amend the Amended Complaint, which the Court granted on October 8, 2025, and the Second Amended Complaint became the operative pleading. Dkt. Nos. 49, 50. Hamza subsequently commenced the above captioned member cases by filing separate Complaints on October 13, 2025 and October 26, 2025. *Hamza v. Liberati-Conant, et al.*, 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) (*Hamza II*) Dkt. No. 1; *Hamza v. Kotsidis et al.*, 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) (*Hamza III*) Dkt. No. 1. Plaintiffs filed applications to proceed

in forma pauperis (IFP) in the above captioned actions. *Hamza I* Dkt. Nos. 3, 4; *Hamza II* Dkt. No. 2; *Hamza III* Dkt. No. 4.

These cases were referred to Magistrate Judge Miroslav Lovric who, on November 26, 2025, granted Plaintiffs' motions for IFP status and ordered the consolidation of these actions, designating *Hamza I* as the lead case. *Hamza I* Dkt. No. 54; *Hamza II* Dkt. No. 6; *Hamza III* Dkt. No. 7. Magistrate Judge Lovric further recommended that the *Hamza I* Second Amended Complaint, *Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as frivolous, or, in the alternative, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (iii) because they seek relief against defendants who are immune from such relief and for failure to state a claim upon which relief may be granted. *Id*.

Hamza filed objections to Magistrate Judge Lovric's recommendation on December 3, 2025. Dkt. No. 55. On December 7, 2025, Plaintiffs filed a letter motion seeking leave to file a Third Amended Complaint consolidating various claims from *Hamza I, Hamza II*, and *Hamza III* into a single action, in light of Magistrate Judge Lovric's recommendations. Dkt. No. 56. That motion, along with Magistrate Judge Lovric's Report-Recommendation, is presently before this Court.

## II. REPORT-RECOMMENDATION

This Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections "must be specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report[-]Recommendation must be specific and clearly aimed at particular findings in the magistrate [judge]'s proposal ...." *Machicote v. Ercole*, No. 06 Civ. 13320, 2011 WL 3809920, at \*2, (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**\*2** Hamza filed a 741-page submission in objection to Magistrate Judge Lovric's report-recommendation recommending dismissal of *Hamza I, Hamza II* and *Hamza III*. Dkt. No. 55. Namely, Hamza takes issue with Magistrate Judge Lovric's characterization of the pleadings, and otherwise attempts to interject new facts and allegations for consideration in conjunction with Plaintiffs' claims. Ultimately, Hamza requests the Court permit amendment in order to file a more streamlined and clarified pleading – that is, the proposed Third Amended Complaint that Plaintiffs filed soon after submitting objections to the report-recommendation. *See* Dkt. No. 56 at 3-32 (TAC).

Under de novo review, the Court agrees with Magistrate Judge Lovric's recommendations that the *Hamza I* Second Amended Complaint*, Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2), and the report-recommendation is therefore adopted in this respect. The Court shares Magistrate Judge Lovric's concerns regarding Hamza's abusive litigation history, and joins in cautioning Hamza that voluminous, frivolous filings that overwhelm the judiciary's resources, and congest the docket, will not be tolerated. Hamza represents, and the Court recognizes, that he is an experienced pro se litigant – having actively litigated numerous matters in federal and state court. Dkt. No. 56 at 1. Hamza states that these experiences have afforded him the ability to learn and understand the legal process. *Id.* Although a court "is ordinarily obligated to afford a special solicitude to pro se litigants," the "appropriate degree of special solicitude is not identical with regard to all pro se litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010). The "degree of solicitude may be lessened," for example, where a particular pro se litigant is "experienced in litigation and familiar with the procedural setting presented." *Id*. A court may exercise its discretion, "based on the totality of the relevant circumstances," to determine "what degree of solicitude, if any, should be afforded." *Id*. at 102–03. Thus, to the extent the Court recognizes that Plaintiff Hamza is an experienced pro se litigant, the Court expects that he be "conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits." *Zimmerman v. Burge*, No. 06-cv-0176 (GLS/GHL), 2008 WL 850677, at \*9 (N.D.N.Y. Mar. 28, 2008).

Notwithstanding these concerns, the Court recognizes that Magistrate Judge Lovric's report-recommendation was the first instance in which any pleading deficiencies were identified to the pro se Plaintiffs. Generally, when the court dismisses a pro se complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, in an abundance of caution regarding Plaintiffs' pro se status, and recognizing Plaintiffs' effort to consolidate their numerous claims across the three actions into one streamlined pleading, the Court exercises its authority to accept Plaintiffs' Third Amended Complaint for filing, and will proceed to review its sufficiency pursuant to 28 U.S.C. 1915(e)(2).

## III. THIRD AMENDED COMPLAINT

Plaintiffs' allegations in the Third Amended Complaint will be summarized to the extent they are relevant to the Court's analysis.

### A. Personal Involvement

"To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). The Second Circuit has also made clear that "there is no special rule for supervisory liability" under Section 1983. *Tangreti, 983 F.3d at 618*. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Tangreti, 983 F.3d at 618*).

**\*3** Plaintiffs identify Philip Tkacy, Douglas Cropper, Carla Ingersoll, and Morgan Klima as defendants in the caption and list of parties. However, these defendants are not otherwise referenced anywhere in the body of the Third Amended Complaint, and the pleading lacks factual allegations sufficient to allege that these individuals were personally involved in conduct that violated Plaintiff's constitutional rights. Accordingly, Plaintiffs fail to state a cognizable claim against Tkacy, Cropper, Ingersoll, and Klima, and the Third Amended Complaint is dismissed as against them. *See Cipriani v. Buffardi*, No. 06-cv-0889 (GTS/DRH), 2007 WL 607341, \*1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what

the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, No. 14-cv-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint).

Plaintiffs also name Village of Philmont Police Chief Vernon Doyle as a defendant. The minimal allegations against Doyle in the Third Amended Complaint are asserted in his supervisory capacity, and Plaintiffs do not assert that Doyle was personally involved in conduct violating their constitutional rights. *See* TAC ¶¶ 36 ("The Philmont Police Department, under Chief Doyle, responded to multiple calls and complaints but failed to curb Thanos and Marou's surveillance ...."), 84 (generally alleging supervisory liability against Doyle because he "knew of and condoned" allegedly unconstitutional practices). Plaintiffs' conclusory allegations are insufficient to show that Doyle personally violated their rights. Accordingly, the claims against Doyle fail to state a claim.

### B. State Action under § 1983

"It is well-settled that a plaintiff alleging a violation of his constitutional rights under Section 1983 must show that the defendant acted under color of state law." *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 112 (N.D.N.Y. 2023) (citing *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012)); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). As a general rule private parties are not state actors subject to § 1983 liability. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-cv-1624, 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.' ") (citation omitted). However, the actions of private individuals and entities may be attributed to the state for Section 1983 purposes if "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citation omitted). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

#### 1. Thanos and Marou

Plaintiffs allege that Defendants Athanasios Dimadis Kotsidis (Thanos) and Maroula Kotsidou (Marou) acquired an adjacent property to Hamza's residence (the property) in June 2022. TAC ¶¶ 13, 25-26. Plaintiffs further allege that the property is utilized for charitable purposes, in conjunction with an organization founded by Hamza and operated, in part, by Yakel. *Id.* at ¶¶ 11, 26-27. Plaintiffs contend that Thanos and Marou "began a pattern of conduct directed at Plaintiffs designed to interfere with the use, enjoyment, and charitable development" of the property. *Id.* at ¶ 28. Specifically, Plaintiffs allege that Thanos and Marou conducted video and camera surveillance of Plaintiffs on the property, and "obstructed or attempted to obstruct vehicular and pedestrian access" to the property, including blocking driveways, interfering with construction deliveries, and using "exaggerated, fabricated, or wholly false" complaints to officials to frustrate the charitable organization's purpose. *Id.* at ¶¶ 29-31. Thanos and Marou also "publicly and privately defamed Plaintiffs by spreading statements accusing them of criminal behavior, dishonesty, and instability, including in communications to neighbors, public officials, and third parties ...." *Id.* at ¶ 33.

**\*4** Plaintiffs allege that officials responded to some of Thanos and Marou's "false" complaints, and "initiated investigations and/or enforcement actions that, upon information and belief, were premised on false information from Thanos and Marou and were selectively pursued against Plaintiffs while similar or worse conditions nearby were ignored." TAC ¶ 32. Plaintiffs further allege that they "repeatedly notified" Village of Philmont officials of Thanos and Marou's ongoing surveillance and harassment, however "[i]nstead of providing even-handed support of enforcing neutral rules, the Village and its agents routinely took Thanos and Marou's side, treating Plaintiff's own reports as nuisances, delaying responses to FOIL requests, and selectively applying ordinances to Plaintiffs while overlooking comparable conduct by others." *Id.* at ¶¶ 34-35; *see also id.* at ¶ 36 (alleging that Village of Philmont Police Department responded to multiple calls and complaints but failed to curb the surveillance, and instead used the dispute to scrutinize Plaintiffs' conduct).

Liberally construed, Plaintiffs seek to proceed against Thanos and Marou under the "joint action" doctrine. " 'To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.' " *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting *Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999)). "The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action." *Id.* (citing *Ginsberg*, 189 F.3d at 272).

The Third Amended Complaint does not sufficiently allege joint action between Thanos and Marou and any state officials, such that the former could be held liable under § 1983. Liberally construed, Plaintiffs' allegations suggest that village and law enforcement officials did not respond favorably to their complaints about Thanos and Marou, but instead credited Thanos and Marou's complaints and otherwise scrutinized Plaintiffs' conduct in an unfair manner. Plaintiffs, however, do not allege any facts that Thanos and Marou directed or pressured state actors in pursuing the alleged violation of their constitutional rights. Nor is there any allegation that Thanos and Marou were involved in a plan, prearrangement, or conspiracy with any state officials. Even assuming Thanos and Marou intended to harm Plaintiffs by reporting their conduct, "a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 386 (E.D.N.Y. 2013) (citing *Kash v. Honey*, 38 F. App'x 73, 75–76 (2d Cir. 2002) (finding no state action by private lawyer who plaintiff alleged "maliciously, for purpose or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights ... falsely charged [plaintiff] in an accusatory instrument")). Otherwise, Plaintiffs' allegations do not plausibly allege joint action with state actors for purposes of § 1983. *See Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) ("[T]he provision of information to police officers, even if that information is

false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983."); *Sherman v. City of New York*, No. 18-cv-5359, 2019 WL 2164081, at *7 (E.D.N.Y. May 16, 2019) ("Plaintiff's allegations simply amount to the assertion that Eilenberg provided the officers with false information and the officers inappropriately accepted Eilenberg's version of events despite evidence to the contrary. This is patently insufficient to state a claim of joint action."); *United States v. Hanratty*, No. 24-cr-153, 2024 WL 4892742, at *3 (S.D.N.Y. Nov. 26, 2024) ("That EBCC was eager to cooperate with the Government does not convert EBCC's conduct in the Civil Case into joint activity or state action."). [2] In the absence of state action, Plaintiffs' allegations fail to state a § 1983 claim against Thanos and Marou.

### 2. U-Haul and Hudson Rentals

**\*5** Plaintiffs' only allegation against Defendants U-Haul, Inc. and Hudson Rentals and Garden Design is that these entities "were involved in actions related to a U-Haul truck and equipment on or near Elm Street that Thanos and Marou used as pretext for further complaints, obstruction, and allegations against Plaintiffs, with resulting interference in Plaintiffs' property rights and [the foundation's] operations." TAC ¶ 37. Even assuming that Plaintiffs articulated a constitutional violation as against these entities, which they have not, Plaintiffs' conclusory and vague allegations do not suffice to plead state action on their part, under any of the relevant tests enumerated above. Accordingly, Plaintiffs' allegations against U-Haul, Inc. and Hudson Rentals and Garden Design fail to state a claim under § 1983 for, among other reasons, lack of state action.

### C. Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citation omitted); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002). "To state a conspiracy claim under 42 U.S.C. § 1985[,]" a plaintiff must allege "(1) some racial or other class-based discriminatory animus underlying the [defendants'] actions; and (2) that the conspiracy was aimed at interfering with [the plaintiff's] protected rights." *Brito v. Arthur*, 403

F. App'x 620, 621 (2d Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).

In order to state a claim under either statute, allegations of direct evidence of conspiracy are not necessary, "but detailed allegations of the conspiracy's 'time and place' must be provided for a complaint to cross the plausibility threshold." *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 82 (N.D.N.Y. 2025) (citing *Ciambriello*, 292 F.3d at 325). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190 (2d Cir. 2012) (quoting *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)). "Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)." *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (citing *Kiryas Joel Alliance*, 495 F. App'x at 190-91); *see also Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011).

Here, Plaintiffs fail to state a plausible cause of action for conspiracy under either § 1983 or § 1985(3). At the outset, even viewing the allegations in the light most favorable to Plaintiffs, the Third Amended Complaint fails to allege any specific facts regarding a "meeting of the minds" among *all*, much less any, of the individual defendants. Instead, Plaintiffs' allegations regarding a meeting of the minds merely reiterate the relevant statutory language without any factual support. *See, e.g.,* TAC ¶ 77 ("Defendants reached an agreement, tacit or express, to deprive Plaintiffs of their constitutional rights...."), ¶ 80 ("Defendants conspired ... to deprive [Hamza] of equal protection and equal privileges and immunities.").

Furthermore, Plaintiffs have not sufficiently set forth how all the individual defendants acted in concert with one another to violate Plaintiffs' rights. Plaintiffs contend that the offending conduct includes "using Thanos and Marou's surveillance and reports as a pipeline to law enforcement and the DAO," "selectively targeting Plaintiffs with tickets, investigations, and criminal charges," "denying equal access to volunteer and civic opportunities," and "maintaining prosecutions and investigations as leverage." TAC ¶ 77. As previously discussed, evidence that private actors reported purported criminal activity to law enforcement does not establish a "meeting of the minds" or concerted behavior sufficient to state a conspiracy claim. Otherwise, these general and conclusory allegations do not plausibly allege that all the

individual defendants acted in concert with one another, as claimed.

**\*6** Finally, the Court notes that while "a plaintiff may assert a civil conspiracy claim under § 1983 for the deprivation of a constitutional right, he must first show a violation of the underlying constitutional right." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 373 (E.D.N.Y. 2016). It is unclear which of Plaintiffs' constitutionally protected rights the Defendants allegedly acted in concert to violate. However, to the extent Plaintiffs have failed to plausibly allege an underlying violation of their constitutional rights, they cannot sustain a claim of conspiracy to violate those rights.

For all of these reasons, Plaintiffs' conspiracy claims under § 1983 and § 1985(3) fail to state a claim as a matter of law.

### D. *Monell* Liability

"Under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), local governments may be held liable in § 1983 actions." *Frost v. New York City Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020). *Monell* emphasized, however, that "a municipality cannot be held liable ... on a respondeat superior theory." *Monell*, 436 U.S. at 691. Thus, "[t]he elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020)). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *Moran v. Cnty. of Suffolk*, No. 11 Civ. 3704, 2015 WL 1321685, at \*9 (E.D.N.Y. Mar. 24, 2015) (citations omitted).

Plaintiffs allege that "[t]he constitutional violations described" in the Third Amended Complaint "were caused by policies, customs, or practices" of the Village of Philmont.[3] TAC ¶ 83. With respect to Plaintiffs' claims premised on a failure-to-train theory, the Court is mindful that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

*Connick v. Thompson*, 563 U.S. 51, 61 (2011). A failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

 **\*7**  To set forth a failure-to-train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman v. City of Newburgh,* No. 13-cv-4178, 2015 WL 1379652, at \*22 (S.D.N.Y. Mar. 26, 2015). Here, Plaintiffs' claim fails because they have not alleged a specific training deficiency, nor does the Third Amended Complaint contain sufficient factual matter to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plaintiffs' broad allegation that that the municipality failed to train and supervise officers [4] on "neutral handling of neighbor disputes and petitioning," without more, is the sort that is regularly dismissed as too general and conclusory. *See Taranto v. Putnam Cnty.*, No. 21-cv-2455, 2023 WL 6318280, at \*19 (S.D.N.Y. Sept. 28, 2023) (collecting cases).

The remainder of Plaintiffs' *Monell* claims are liberally construed as alleging an actionable policy or custom through actions or decisions made by municipal officials with decision making authority. Although not specifically articulated in Plaintiffs' cause of action asserting *Monell* liability, the pleading as a whole can be construed to allege liability based on the Village of Philmont Trustees' alleged decision to reject Plaintiff Hamza's volunteer firefighter application in retaliation for his prior complaints and lawsuits. At this stage of the litigation, the Court will permit this claim to proceed to service. In doing so, the Court expresses no opinion on the merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

### E. Detzel and MacFarlane

Plaintiffs allege that Defendants Jason Detzel and Bob MacFarlane were Village trustees, employees and/or officials. TAC ¶ 17. Plaintiffs allege that Detzel and MacFarlane were repeatedly notified of Thanos and Marou's ongoing surveillance and harassment, and "routinely took Thanos and Marou's side" to the Plaintiff's detriment. *Id.* at ¶ 34-35. Plaintiffs further allege that Plaintiff Hamza's application to become a volunteer firefighter with the village was "rejected ... without explanation" by the Village Board of Trustees, and that in an "informal conversation, [ ] Detzel indicated that the rejection stemmed from a perception that Hamza was a 'rabble rouser' tied to his complaints, FOIL requests, and litigation[.]" *Id.* at ¶¶ 38-41.

Plaintiffs assert a First Amendment retaliation claim against Detzel and MacFarlane based on the denial of his volunteer application. TAC ¶¶ 57-62. At this stage of the litigation, the Court will permit only this claim to proceed to service as to Detzel and MacFarlane, as Plaintiffs' allegations otherwise fail to state any other § 1983 claims against them. In doing so, the Court expresses no opinion on the merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

### F. New York State Police

Plaintiffs name the New York State Police (NYSP) in the Third Amended Complaint "only to the extent permitted for declaratory and injunctive relief and under state law as appropriate." TAC ¶ 20. "The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)). "The doctrine of *Ex parte Young* is a limited exception to the general principle of sovereign immunity and allows 'a suit [for injunctive relief] challenging the constitutionality of a state official's actions in enforcing state law' under the theory that such a suit is not 'one against the State,' and therefore not barred by the Eleventh Amendment." *CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (quotation omitted). The *Ex parte Young* doctrine "does not apply when the state is the real, substantial party in interest." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp.*

*v. Halderman*, 465 U.S. 89, 101 (1984)) (additional quotation and quotation marks omitted); *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that *Ex parte Young* has "no application in suits against the States and their agencies, which are barred regardless of the relief sought"). "[A] plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly." *Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991). Accordingly, Plaintiffs' claims against the NYSP do not fall within the *Ex parte Young* exception, and are barred by sovereign immunity.

### G. Trooper Miguel Rodriguez

**\*8**  Plaintiff alleges that on August 1, 2025, "officers – including [Defendant] Trooper Rodriguez – arrived at Hamza's home and seized him on a Menacing 3° charge arising from allegations connected to the Elm Street dispute. No contemporaneous warrant or probable cause documentation was shown." TAC ¶ 48. Hamza "was subjected to custodial questioning without Miranda warnings, and the timing of the arrest, its execution, and its maintenance reflected retaliatory and selective motives tied to his ongoing speech and previous federal filings." *Id.* at ¶ 49.

"To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Whitbeck v. Otsego Cnty.*, No. 3:25-cv-00673 (AMN/ML), 2025 WL 2959467, at \*2 (N.D.N.Y. Oct. 20, 2025) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)). Confinement is otherwise privileged when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Here, although thin, Plaintiffs' allegations are sufficient at this juncture to permit the Fourth Amendment false arrest claim against Rodriguez to proceed to service. In making this determination, the Court expresses no opinion on the merits, or to whether Plaintiff Hamza's false arrest claim can survive a properly filed dispositive motion.

Plaintiffs have otherwise failed to state a First Amendment retaliation, Fourteenth Amendment equal protection or Fourteenth Amendment due process claim against Rodriguez,

as alleged in the Third Amended Complaint. Namely, Plaintiffs have failed to allege that Rodriguez had any personal involvement in the conduct giving rise to these claims. Plaintiffs' general allegations surrounding the "custodial questioning without Miranda warnings" do not identify Rodriguez or otherwise suggest he was personally involved in said conduct. Otherwise, the pleading is devoid of any reference to Rodriguez plausibly supporting these claims.

### H. Liberati-Conant and Davidson-Cunningham

#### 1. Individual Capacity

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)). "Instead of relying on strict categories of actions with respect to which absolute immunity attaches, the relevant question is 'whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate.'" *Id.* (quoting *Warney v. Monroe Cty.*, 587 F.3d 113, 123 (2d Cir. 2009)). Ultimately, the Court asks "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012). "The decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function." *Ogunkoya v. Monaghan*, 913 F.3d 64, 71 (2d Cir. 2019) (citations omitted).

Plaintiffs purport to sue District Attorney of Columbia County Chris Liberati-Conant "in his individual capacity for non-advocacy, administrative, and policy-making acts." TAC ¶ 22. It is, however, clear from the pleading that Plaintiffs' allegations against Liberati-Conant arise from his functional roles in the prosecutor's office. Specifically, Plaintiff contends that the district attorney's office, "through" Liberati-Conant, failed to sufficiently evaluate criminal charges against Thanos and Marou. TAC ¶ 45. Plaintiffs further allege that Liberati-Conant refused to recuse himself from Hamza's criminal prosecution, notwithstanding a purported conflict. *Id.* at ¶¶ 50-51. At a minimum, Liberati-Conant's decision whether or not to bring charges against Thanos and Marou is undoubtedly protected by absolute prosecutorial immunity. *Cruz v. Vill. of Spring Valley*, No. 21-cv-2073, 2022 WL 428247, at

*4 (S.D.N.Y. Feb. 11, 2022) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("It is clear that 'the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions' covered by absolute immunity.")); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).

**\*9** Liberati-Conant's decision not to recuse himself from prosecuting Hamza's criminal action, although a closer call, is also protected by prosecutorial immunity. *See McDonough v. Smith*, No. 1:15-cv-01505 (MAD), 2016 WL 5717263, at \*20 (N.D.N.Y. Sept. 30, 2016), *vacated and remanded on other grounds*, 783 F. App'x 91 (2d Cir. 2019) (evaluating whether district attorney's decision to recuse himself is entitled to absolute immunity in the absence of authority from the Second Circuit, and concluding that "a district attorney is entitled to absolute immunity for the act of recusing himself from a prosecution because such act is intimately tied to his functions as an advocate for the people."); *see also Delta Fuel Co., Inc. v. Maxwell,* 485 F. App'x 685, 686 (5th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976)) ("[B]ecause the recusal was done in [the defendant's] role as district attorney, [the defendant] was entitled to absolute prosecutorial immunity"); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 934 (9th Cir. 2012) applying absolute immunity to prosecutor's acts of recusing himself and appointing a special prosecutor upon evaluation of existing conflicts of interest).

Plaintiffs also name the Columbia County District Attorney's Office Chief of Staff Zechariah Davidson-Cunningham as a defendant in this action. Plaintiffs' allegations against Davidson-Cunningham are based on his involvement in the "intake, maintenance, and communications" concerning Hamza's criminal case. TAC ¶ 23. Plaintiffs allege Davidson-Cunningham also failed to properly evaluate their complaints against Thanos and Marou, and that Davidson-Cunningham "continued to oversee intake and decisions, allowing the [criminal case against Plaintiff Hamza] to remain pending without meaningful progress toward trial or dismissal." *Id.* at ¶¶ 45-47, 51. Assuming that Plaintiffs have alleged a plausible constitutional violation by Davidson-Cunningham, it is for conduct committed in the course of his duties as staff of the prosecutor of the state. Accordingly, he is also entitled to absolute immunity. *See Andrews v. Grillot*, No. 3:22-cv-873, 2023 WL 5228179, at \*4 (D. Conn. Aug. 15, 2023)

(concluding that agents of the EPA acting at the direction of the EPA's lawyers during the course of an enforcement action were shielded from suit by absolute immunity) (citing *Maqablh v. Heinz*, No. 3:16-cv-289, 2017 WL 1347695, at \*3 (W.D. Ky. Apr. 10, 2017) ("The immunity afforded to prosecuting attorneys also applies to members of the prosecutor's staff for acts committed in the course of their duties as staff of a prosecutor of the state.") (cleaned up))); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)).

### 2. Official Capacity – Prospective Relief

Plaintiff also names Liberati-Conant as a defendant "in his official capacity for prospective injunctive and declaratory relief concerning ongoing practices of the [district attorney's office]." TAC ¶ 22. The Eleventh Amendment does not "bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law."). The *Ex parte Young* doctrine requires that plaintiffs' complaint " '(a) alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). "In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (quoting *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011)); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, N.Y.*, 945 F.3d 83, 110 (2d Cir. 2019) (" '[C]onjectural' injuries do not suffice under Article III.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983)) ("[The plaintiffs] lack standing to pursue

injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

**\*10** In this case, Plaintiffs' requests for prospective relief against Liberati-Conant fail to state a claim. Even assuming Plaintiffs' plausibly alleged a constitutional violation, which the Court seriously questions, the injunctive relief they seek is not sufficiently pled to be tied to an allegation of ongoing violations of federal law. At the outset, Plaintiff's request for declaratory relief finding that "Defendants' actions violated Plaintiffs' rights under" §§ 1983 and 1985(3) is "wholly retrospective," and therefore does not fall under the *Ex parte Young* exception. *See T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025) (concluding that request for "only a declaration – in the past tense – that the Board '*violated* Title II' " is retrospective).

With respect to Plaintiffs' requests for prospective injunctive relief, Plaintiffs must plead more than conclusory, general requests that the "defendants" be enjoined from "selective enforcement of laws against Plaintiffs." TAC at 30. *Craig v. Connecticut Dep't of Mental Health Nov. 28, 2017 & Addiction Servs.*, No. 3:16-cv-2100, 2017 WL 5892193, at \*5 (D. Conn. Nov. 28, 2017) ("[Plaintiff's] request for injunctive relief - 'an order that each defendant shall fully comply with the provisions of [sic] pursuant to 42 U.S.C. § 1981 ...'- is impermissibly vague and overbroad."); *Peregrine Myanmar Ltd. V. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."). For these reasons, Plaintiffs' official capacity claim against Liberati-Conant fails to state a claim.

### I. Plaintiff Yakel

Yakel does not have standing to bring the limited claims this Court is permitting to proceed to service. To have standing to sue, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)*, as revised* (May 24, 2016) (citing, among others, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must also "assert his [or her] own legal rights and interests, and cannot rest his [or her] claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Rejamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("The 'prudential standing rule ... normally bars litigants from asserting the

rights or legal interests of others in order to obtain relief from injury to themselves.' ") (quoting *Warth*, 422 U.S. at 509). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Id*. (citation omitted).

Here, Yakel has failed to identify any concrete and particularized harms he has suffered that are fairly traceable to (1) the Village of Philmont's alleged rejection of Hamza's volunteer firefighter application in retaliation for his complaints and litigation, or (2) Rodriguez's alleged false arrest of Hamza on August 1, 2025. Indeed, Plaintiff Yakel is barely referenced throughout the body of the Third Amended Complaint. Because the surviving claims do not allege independent claims for relief on behalf of Yakel, he lacks standing to maintain this action. *See, e.g., Hesse v. E. Windsor Police Dep't*, No. 3:24-cv-2044, 2025 WL 2379269, at \*3 (D. Conn. Aug. 15, 2025) (wife lacked standing to bring claims alleging violations related to the arrest and prosecution of her husband); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) ("First, Angela Morgan lacks standing to bring individual claims under § 1983 based upon a deprivation of her daughter's constitutional rights."). Accordingly, Plaintiff Yakel is dismissed from this action without prejudice.

### IV. CONCLUSION

**\*11** For these reasons, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation is **ADOPTED** to the extent set forth above, and Plaintiffs' Second Amended Complaint in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) Dkt. No. 50, Complaint in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) Dkt. No. 1, and Complaint in *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) Dkt. No. 1 are **DISMISSED,** and it is further

**ORDERED** that in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) and *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.), the Clerk of the Court enter judgment closing these actions for the reasons set forth in this Memorandum-Decision and Order, and it is further

**ORDERED** that in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) the Third Amended Complaint is accepted for filing. The Clerk of the Court shall docket the Third Amended Complaint, as set forth in Dkt. No. 56 at 3-32, as a separate

entry on the docket, attaching as exhibits the submissions found at Dkt. No. 55-1;[5] and it is further

**ORDERED** that the Clerk of the Court serve a Rule 11 affidavit and a copy of the Third Amended Complaint on Plaintiff Hamza,[6] and it is further

**ORDERED** that, pursuant to the Court's careful review of the Third Amended Complaint under 28 U.S.C. § 1915(e)(2), the following claims **SURVIVE** initial review and require a response: (1) Hamza's First Amendment retaliation claim against Defendants Jason Detzel and Bob MacFarlane arising from the rejection of Hamza's volunteer firefighter application, (2) Hamza's *Monell* claim against Defendant Village of Philmont arising from the rejection of Hamza's volunteer firefighter application, and (3) Hamza's Fourth Amendment false arrest claim against Defendant Trooper Miguel Rodriguez arising from Hamza's arrest on August 1, 2025; and it is further

**\*12 ORDERED** that Plaintiff is directed to submit proposed summonses to the Clerk of the Court for Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez;[7] and upon receipt of the Rule 11 affidavit and proposed summonses, the Clerk shall issue summonses and forward them, along with the necessary copies of the Third Amended Complaint and a copy of this Memorandum-Decision and Order to the United States Marshal for service upon Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez. The Clerk shall forward a copy of the summons, Third Amended Complaint, and this Memorandum-Decision and Order by electronic mail to the New York State Attorney General's Office, and it is further

**ORDERED** that a response to the Third Amended Complaint be filed by Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez as provided for in the Federal Rules of Civil Procedure after service of process, and it is further

**ORDERED** that, except as to the foregoing, the remaining claims asserted in the Third Amended Complaint are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2); and it is further

**ORDERED** that the Clerk of the Court shall **TERMINATE** the following defendants from the *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) docket: Athanasios Dimadis Kotsidis, Maroula Kotsidou, Chief Vernon Doyle, U-Haul, Inc., New York Department of Environmental Conservation, Philip Tkacy, Douglas Cropper, Carla Ingersoll, Morgan Klima, Hudson Rentals and Garden Design, New York State Police, Chris Liberati-Conant, Zechariah Davidson-Cunningham, The Government of the Hellenic Republic, (Greece), Association of Foreign Press Correspondents in the USA, Inc. (AFPC-USA), The George Washington University Graduate School of Political Management (GPSM), and The United States Department of State, and it is further

**ORDERED** that the claims brought by Plaintiff Yakel are **DISMISSED,** and the Clerk of the Court shall **TERMINATE** Plaintiff Yakel from the docket.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 1296172

---

**Footnotes**

1    Citations to docket entries refer to those filed in *Hamza I,* unless otherwise noted.

2    The Court notes that Magistrate Judge Lovric provided an extensive list of allegations contained in Plaintiffs' *Hamza I* Second Amended Complaint, strongly suggesting that state actors were *not* acting in concert with Thanos and Marou to violate Plaintiffs' constitutional rights. Dkt. No. 54 at 32-34.

3    Plaintiff also alleges *Monell* liability against the New York State Police and the "DA in Official Capacity." TAC ¶¶ 82-84. However, the "holding in *Monell* was limited to local government units which are not considered part of the State for Eleventh Amendment purposes," and therefore does not apply to state agencies such as the

NYSP or the District Attorney's Office. *See Daly v. Town of Dewitt*, No. 18-cv-845 (TJM), 2019 WL 4170162, at *3–4 (N.D.N.Y. Sept. 2, 2019) (dismissing municipal liability claim against NYSP); *see also Strasser v. New York*, No. 10-cv-141 (FJS/DEP), 2012 WL 253391, at *3 (N.D.N.Y. Jan. 26, 2012) (adopting magistrate judge's recommendation to dismiss *Monell* claims against the state or its entities, including the NYSP, and noting that *Monell* "provides no basis to permit plaintiff to assert claims against the state or its agencies"); *Mobley v. Rodriguez*, No. 7:25-cv-6784, 2025 WL 3042024, at *3 (S.D.N.Y. Oct. 31, 2025) ("In the State of New York, a District Attorney's Office, when prosecuting a criminal matter, is deemed an arm of the State of New York and, therefore, in that context, enjoys Eleventh Amendment immunity from suit."). Accordingly, Plaintiffs fail to state a *Monell* claim against the NYSP and the District Attorney's Office.

4    Moreover, and to reiterate, Plaintiff has not alleged an underlying constitutional violation by any Village of Philmont law enforcement officer that would support such a *Monell* claim based on a failure-to-train theory.

5    In his letter motion seeking to file the Third Amended Complaint, Hamza contends that the draft pleading "references certain exhibits cited in [his] objections to the RRO," and states that "if the Court grants leave to amend, [he] will formally incorporate those exhibits and provide the Court with detailed descriptions of each exhibit so their relevance and evidentiary value are clear." Dkt. No. 56. To the extent the pleading relies on these documents, they will be docketed as exhibits to the Third Amended Complaint. Hamza's request to otherwise formally incorporate the exhibits and provide descriptions is denied.

6    The Third Amended Complaint is not signed. *See generally* Dkt. No. 56 at 3-32. Rule 11(a) of the Federal Rules of Civil Procedure requires that every pleading be signed "by at least one attorney of record in the attorney's name ... or by a party personally if the party is unrepresented." Therefore, as the only plaintiff with surviving claims, Hamza must, within fourteen days, execute and file an affidavit which states that he has read the Third Amended Complaint and the text of Federal Rule of Civil Procedure 11. By executing the same, Hamza shall be declaring that he is representing to the Court all of the representations delineated in Federal Rule of Civil Procedure 11(b) with respect to the Third Amended Complaint. Hamza is advised that if he does not comply, this action may be dismissed without prejudice.

7    The Clerk is directed to provide Plaintiff with blank summonses to complete.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4882774

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Silvio R. ILLESCAS, Plaintiff,

v.

Anthony ANNUCI, Vassar Brothers Medical Center, Dr. Daniel E. Laurie, Dar Sajin A. Pillai, Dr. Jesse Wolstein, Dr. Hector I. Ojeda-Martinez, Sehrish Shahid, Dr. Robert U. Mmerole, Defendants.

21-cv-8473 (NSR)
|
Signed November 25, 2024

**Attorneys and Law Firms**

Silvo R. Illescas, Coxsackie, NY, Pro Se.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** *Pro se* Plaintiff Silvio R. Illescas ("Plaintiff") initiated this action on October 13, 2021, alleging deprivation of rights under 42 U.S.C. § 1983 ("Section 1983") claiming violations of the Eighth Amendment and Fourteenth Amendment, as well as Article I, § 5 of the New York State Constitution, against Defendant Vassar Brothers Medical Center ("Vassar Brothers"), Defendant Doctor Daniel E. Laurie ("Laurie"), care physician provider, Defendant Doctor Sajin A. Pillai ("Pillai"), medical doctor provider, Defendant Doctor Hector I. Ojeda-Martinez ("Ojeda-Martinez"), medical doctor provider, Sehrish Shahid ("Shahid"), physician provider, Defendant Doctor Robert U. Mmereole ("Mmereole"), medical doctor provider, (together, "Vassar Defendants"), Defendant Anthony J. Annucci ("Annucci"), acting commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), and Defendant Doctor Jesse M. Wolstein ("Wolstein"), primary care physician provider.

Presently before the Court are Vassar Defendants, Annucci and Wolstein's Motions to Dismiss Plaintiff's claims as against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). For the following reasons, the motions are GRANTED.

BACKGROUND

The following facts are derived from the Second Amended Complaint ("Am. Compl.") and are taken as true and constructed in the light most favorable to the Plaintiff at this stage.

Plaintiff is an inmate at Green Haven Correctional Facility. (Am. Compl. p. 3.) On April 9, 2020, at around 3:00 AM, Plaintiff was awakened from his sleep and ordered to prepare himself for a trip to "an outside hospital." (Am. Compl. ¶ 1.) At that point, the Empire State Ambulance Corp was in the lobby awaiting Plaintiff. (Am. Compl. ¶ 3.) Plaintiff was then transported to Vassar Brothers Medical Center, arriving at 4:05 AM. (Am. Compl. ¶ 7.) At 4:29 AM, Dr. Bruce Gendron performed "an XR chest on Plaintiff's chest" and diagnosed Plaintiff with "bilateral lower lung infiltrates." (Am. Compl. ¶ 9.) Dr. Jesse M. Wolstein was the primary care physician provider and diagnosed Plaintiff with "[a]cute hypoxemic respiratory failure, Covid-19 virus infection, and pneumonia." (Am. Compl. ¶ 10.) Dr. Hector I. Ojeda-Martinez further diagnosed Plaintiff with "[a]bnormal liver enzymes and elevate[d] troponin." (Am. Compl. ¶ 11.) Dr. Robert U. Mmerole diagnosed Plaintiff with "[c]ough and ... non-ST elevated myocardial infarction." (Am. Compl. ¶ 12.) Nurse Caroline M. Devlin and Amber Funk also diagnosed Plaintiff with shortness of breath. (Am. Compl. ¶ 13.)

After performing an assessment of Plaintiff, Wolstein prescribed Plaintiff with a series of medication, and, thereafter, Plaintiff was "transported to an isolated room to begin with Covid-19 regimen test-trial." (Am. Compl. ¶¶ 17-19.) Plaintiff states that no member of Vassar Brothers Medical Center "warned him [of] the potential serious side effects" of his medication regiment. (Am. Compl. ¶ 20.) That same day at approximately 1:00 PM, Plaintiff was told by an "unknown doctor with face mask" that he had a fifty percent chance of survival. (Am. Compl. ¶ 21.) This caused the Plaintiff to panic, thinking he was going to die because he did not ask the purposes of the medication he was prescribed. (Am. Compl. ¶ 22.)

**\*2** Based on the foregoing, Plaintiff brings Section 1983 claims alleging violations of the Eighth Amendment.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 113 of 238

Illescas v. Annuci, Not Reported in Fed. Supp. (2024)

## PROCEDURAL HISTORY

On October 13, 2021, Plaintiff commenced this action against the Defendants in his Complaint. (ECF No. 1). On December 7, 2022, the Court issued an Opinion and Order dismissing the Complaint's claims in its entirety, granting Plaintiff leave to file an Amended Complaint. (ECF No. 95). Then, on July 31, 2023, Plaintiff filed his First Amended Complaint (ECF No. 117). Finally, on November 15, 2023, Plaintiff filed his Second Amended Complaint ("Am. Compl") (ECF No. 149). The Second Amended Complaint is the operative Complaint. On May 13, 2024, Annucci filed his motion to dismiss and his memorandum of law in support ("Annucci Motion") (ECF Nos. 177 and 178), Wolstein filed his motion to dismiss, memorandum of law in support, and reply affirmation in support of his motion ("Wolstein Motion") (ECF Nos. 180, 181 and 204), and Vassar Defendants filed their motion to dismiss and memorandum of law in support ("Vassar Motion") (ECF Nos. 182 and 183). On August 2, 2024, Plaintiff filed oppositions to Annucci, Wolstein, and Vassar Defendants' respective motions to dismiss (ECF Nos. 196 and 197, "196 Opposition" or "196 Opp." and "197 Opposition" or "197 Opp.", respectively.) On September 10, 2024, Annucci filed a reply in support of his motion to dismiss ("Annucci Reply") (ECF No. 206), Wolstein filed a reply in support of his motion to dismiss ("Wolstein Reply") (ECF No. 205), and Vassar Defendants filed a reply in support of their motion to dismiss ("Vassar Reply") (ECF No. 207). Finally, on September 25, 2024, Plaintiff filed an additional opposition to the Defendants' respective oppositions (ECF No. 208, "208 Opposition" or "208 Opp.")

## LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") provides in relevant part, that a case is properly dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. When resolving a Rule 12(b)(1) motion for lack of lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986).* Plaintiff bears the burden of demonstrating by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner, 82 F.3d 560, 562 (2d Cir.1996).*

### B. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id. at 679.* While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id. at 678* (quoting *Twombly, 550 U.S. at 555*). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly, 550 U.S. at 570.* A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678.*

### C. Section 1983

**\*3** Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979); see Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).* To assert a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York, No. 09-CV-5446(SHS), 2013 WL 1803896, at \*2 (S.D.N.Y. April 25, 2013); see Cornejo v. Bell, 592 F.3d*

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 114 of 238

Illescas v. Annucci, Not Reported in Fed. Supp. (2024)

121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. See *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution.")

### D. Law-of-the-Case Doctrine

The law-of-the-case doctrine "holds that when a court has ruled on an issue, that decision should generally be adhered to by the court in subsequent stages unless cogent and compelling reasons militate otherwise." *Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414, 425 (S.D.N.Y. 2014) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). *See also In re Peters*, 642 F.3d 381 (2d Cir. 2011) (noting that while not binding the law-of-the-case doctrine counsels against a court revisiting prior rulings absent compelling reasons such as the need to correct a clear error or prevent manifest injustice); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100 (S.D.N.Y. 2010) (same).

### E. *Pro Se* Pleading Standard

Where a litigant is *pro se*, the Court is empowered to consider "new facts raised in opposition papers to the extent they are consistent with the complaint, treating the new factual allegations as amending the original complaint." *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018). A Court may consider "new claims appearing for the first time in the briefing if 'the claims could have been asserted based on the facts alleged in the complaint.' " *Vlad-Berindan v.MTA New York City Transit*, No. 14-cv-675, 2014 WL 6982929, at *5 (S.D.N.Y.2014) (citing *Rosado v. Herard*, No. 12-cv-8943, 2013 WL 6170631, at *3 (S.D.N.Y. 2013)). Courts are to read a *pro se* litigant's papers "liberally" and "interpret them to raise the strongest argument that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 791 (2d Cir. 1994).

### DISCUSSION

Plaintiff brings claims pursuant to § 1983, alleging several Eighth Amendment violations. The Court addresses them in turn.

### A. Whether Annucci was Sufficiently Involved for Section 1983's Personal Involvement Requirement

This Court previously dismissed Plaintiff's Section 1983 claim for failure to demonstrate Annucci's personal involvement in any alleged deprivation of constitutional rights. (Doc. No. 95, Op. and Order, 12/7/22, pp. 10-11.) Plaintiff's Second Amended Complaint and opposition letters are similarly deficient, offering no further substantive allegations that would indicate Annucci's involvement in any purported constitutional violations. Therefore, the law-of-case doctrine favors dismissing Plaintiff's claim against Annucci once more.

To restate the relevant standard, in order to bring forward a Section 1983 claim, a plaintiff must demonstrate each defendant's personal involvement in the constitutional deprivation. *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996). Personal involvement is defined as "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Id.* A defendant "may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Id.* A defendant "may not be held responsible unless he was personally involved in the alleged constitutional violations." *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000).

**\*4** The Court finds that Plaintiff has still failed to allege sufficient personal involvement necessary to state a Section 1983 claim against Annucci. Except for naming Annucci as a Defendant (Am. Compl. p. 4), the Second Amended Complaint does not offer substantive allegations demonstrating Annucci's involvement in any deprivation of constitutional rights. Plaintiff's opposition papers similarly do not offer any substantive allegations that would indicate Annucci's personal involvement as required to effectuate a Section 1983 claim. (196 Opp., 197 Opp., and 208 Opp.) Plaintiff seems to suggest that Annucci received complaints from Plaintiff (*see* 208 Opp. p. 4), but "[a]mple Second Circuit case law makes clear that a Plaintiff does not state a claim where he alleges only that a supervisory official received reports of wrongdoing." *Samuels v. Fischer*, 168 F. Supp. 3d 625, 637 (S.D.N.Y. 2016) (citations omitted); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that DOCCS Commissioner was not personally involved simply because Plaintiff wrote complaint letters to him).

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 115 of 238

Illescas v. Annucci, Not Reported in Fed. Supp. (2024)

Annucci cannot be held liable solely by virtue of his title as Acting Commissioner of DOCCS. *See Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004) (noting that a defendant "in a § 1983 action is not liable simply on the basis of holding a high position of authority"). Without any further factual averments suggesting any personal involvement on the part of Annucci, the Second Amended Complaint remains deficient for the same reasons articulated in the Court's prior opinion. Therefore, the Second Amended Complaint, as currently written, has not stated a plausible Section 1983 claim against Annucci, and the Court grants Annucci's motion to dismiss Plaintiff's claims without prejudice.

**B. Whether the Vassar Defendants and Wolstein are State Actors for the Purposes of Section 1983 Liability**

The Court previously dismissed Plaintiff's Section 1983 claim against the Vassar Defendants and Wolstein on the grounds that they did not qualify as state actors for the purposes of imposing Section 1983 liability. (Doc. No. 95, Op. and Order, 12/7/22, pp. 6-7.) Plaintiff's Second Amended Complaint and opposition letters do not offer further substantive allegations that would justify a finding that the Vassar Defendants and Wolstein are state actors. As a result, the law-of-case doctrine counsels against deviating from the Court's prior ruling on the inapplicability of Section 1983 to the Vassar Defendants and Wolstein and favors dismissing Plaintiff's Section 1983 claim against the Vassar Defendants and Wolstein once more.

To reiterate the relevant standard, in order to prosecute a Section 1983 claim a Plaintiff must demonstrate that he suffered injury at the hands of a state actor or private party acting under color of state law. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Importantly, courts in this circuit have held that "mere conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Id.* Three tests are employed to ascertain whether a private entity's conduct can be considered state action: the compulsion test, the nexus test, and the public function test. *Wilson v. HSBC Bank, USA*, No. 16-CV-8405 (NSR), 2018 WL 1449204, *14 (S.D.N.Y. Mar. 22, 2018).

Plaintiff's Second Amended Complaint details Plaintiff's experiences with the Vassar Defendants and Wolstein, and his grievances with his treatment. (Am. Compl. ¶¶ 7-8, 20.) Such allegations do demonstrate that the Vassar Defendants and Wolstein were involved in administering care to an inmate. However, without pleading anything further, Plaintiff cannot

satisfy any of the three state action tests. Plaintiff does not assert that the Vassar Defendants and Wolstein acted under any "coercive power or significant encouragement ... that the[ir] choice[s] must be in law deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). *See also McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (affirming dismissal of § 1983 claim where private entity was not compelled by state to provide its services). Likewise, Plaintiff does not demonstrate a sufficient nexus between the Vassar Defendants, Wolstein and the government, given that while the Vassar Defendants and Wolstein were treating an inmate, they were doing so "in the ordinary course of diagnosis or treating an illness or injury." *Cf Johnson v. City of New York*, 2021 WL 4896477 (S.D.N.Y. Aug. 23, 2021) (finding sufficiently close nexus between hospital and the government where treatment was administered for investigatory purposes rather than in the hospital's general function of treating the public).

**\*5** As to whether the Vassar Defendants and Wolstein were performing a public function, the relevant consideration is whether the conduct at issue is "traditionally the exclusive prerogative of the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974). State action "may be found in situations where an activity that traditionally has been the exclusive, or near exclusive function of the State has been contracted out to a private entity." *Horvath v. Westport Libr. Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004). Here, Plaintiff does not offer any allegations that the Vassar Defendants and Wolstein were performing a public function, and it is difficult to envision the functioning of a private hospital providing care to the public being construed as an "exclusive or near exclusive function of the State." To the contrary, "[a]s a general rule, private hospitals do not act under color of state law for § 1983 purposes." *Thomas v. Beth Israel Hosp. Inc.*, 710 F. Supp. 935, 941 (S.D.N.Y. 1989). Courts have reiterated that "[u]nless certain rare conditions exist, private hospitals ... are not state actors for purposes of Section 1983." *Amofa v. Bronx-Lebanon Hosp. Ctr.*, 2006 WL 3316278 (S.D.N.Y. Nov. 13, 2006). As a result, the Vassar Defendants and Wolstein cannot be construed to be taking action that is tantamount to state action. Plaintiff's Second Amended Complaint and opposition letters therefore fail to demonstrate the Vassar Defendants and Wolstein's actions should be attributed to the state under any of the three state action tests.

The only additional further substantive allegations Plaintiff offers is when Plaintiff writes: "[e]ven though Dr. Wolstein may not qualify as a state actor" he "certainly qualif[ies] as

'private entity,' who violated plaintiff's federal rights." (197 Opp., p. 3.) Such an argument only offers a legal conclusion "couched as a factual allegation." *Iqbal*, 556 U.S. 662 at 678. *See Fahie v. Rivera*, 2009 WL 2780144, *2 (S.D.N.Y. Aug. 31, 2009)* (holding that Plaintiff failed to demonstrate hospital defendants acted under color of state law when Plaintiff only offered conclusory assertions that hospital defendants violated his rights). As acknowledged *supra*, conclusory allegations surrounding a private entity's conduct are not enough demonstrate that that they were a state actor or acting under the color of law for the purposes of Section 1983 liability. *Ciambriello*, 292 F.3d 307, 324. Additionally, this allegation is not enough to carry a Section 1983 claim against a private entity, as the "color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or unlawful." *Heicklen v. U.S. Dep't of Homeland Sec.*, 2011 WL 3841543 (S.D.N.Y. Aug. 30, 2011) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)). Thus, mere claims of discriminatory conduct on the part of a private actor are not, without more, enough to form the basis of a plausible Section 1983 claim. Lastly, while Wolstein did provide care to an inmate, the Second Amended Complaint and Plaintiff's opposition letters do not allege that Wolstein was employed by the government nor that he was under contract to provide medical care to inmates. As a general matter, providing care to an inmate does not, without more, justify imposing Section 1983 liability on a private party. *See Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (finding that physician was not acting under color of law where physician was "not employed by the Bureau of Prisons, nor was he under contract with the state to render medical services to prison inmates").

Accordingly, the Court finds that Plaintiff's Second Amended Complaint and opposition papers remain deficient for reasons the Court articulated in its prior opinion. The Court therefore concludes that Plaintiff has not plausibly alleged a viable Section 1983 claim against the Vassar Defendants and Wolstein and grants the Vassar Defendants and Wolstein's respective motions to dismiss Plaintiff's claims without prejudice.

## CONCLUSION

For the foregoing reasons, the Court GRANTS each of the moving Defendants' motion to dismiss Plaintiff's Eighth Amendment claims. Specifically, the Court grants Defendant Jesse M. Wolstein's motion to dismiss, Defendant Anthony

Annucci's motion to dismiss, and Defendants Vassar Brothers Medical Center, Doctor Daniel E. Laurie, Doctor Sajin A. Pillai, Doctor Hector I. Ojeda-Martinez, physician provider Sehrish Shahid and Doctor Robert U. Mmereole's motion to dismiss.

**\*6** *Pro se* Plaintiff is granted leave to file a Third Amended Complaint (blank form attached hereto) by January 6, 2025. *Pro se* Plaintiff is advised that the Third Amended Complaint will replace, not supplement, the Second Amended Complaint, and so any claims that he wishes to pursue must be included in the Third Amended Complaint. Should *pro se* Plaintiff file a Third Amended Complaint, the Defendants are directed to answer or otherwise respond by January 30, 2025, and the parties are directed to complete and file a Case Management Plan and Scheduling Order (blank form attached) by February 20, 2025. If *pro se* Plaintiff fails to file a Third Amended Complaint within the time allowed, those claims that were dismissed without prejudice shall be deemed dismissed with prejudice.

Attachment

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 117 of 238

Illescas v. Annuci, Not Reported in Fed. Supp. (2024)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Write the full name of each plaintiff.

-against-

_____

_____

_____

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

_____CV_____
(Include case number if one has been assigned)

**AMENDED COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes   ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

**I.   LEGAL BASIS FOR CLAIM**

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other: _____

**II.   PLAINTIFF INFORMATION**

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____

First Name          Middle Initial          Last Name

_____

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

_____

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

_____

Current Place of Detention

_____

Institutional Address

_____

County, City                    State            Zip Code

**III.   PRISONER STATUS**

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other: _____

Page 2

Rev. 5/20/16

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 118 of 238

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 4:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Page 3

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Page 4

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

_____

_____

_____

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

_____

_____

_____

Page 5

## VII.    PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied _in forma pauperis_ status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature |
|---|---|---|

| First Name | Middle Initial | Last Name |
|---|---|---|

Prison Address

| County, City | | State | Zip Code |
|---|---|---|---|

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

UNITED STATES DISTRICT COURT                                         Rev. Jan. 2012
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

                                                  **CIVIL CASE DISCOVERY PLAN**
                           Plaintiff(s),          **AND SCHEDULING ORDER**

        - against -

                           Defendant(s).          _____ CV _____ (NSR)

------------------------------------------------------------X

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.    All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.    This case [is] [is not] to be tried to a jury.

3.    Joinder of additional parties must be accomplished by _____.

4.    Amended pleadings may be filed until _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

   a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b. Depositions shall proceed concurrently.

   c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4882774

---

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant District
Attorney Robert Henoch, Captain of Corrections Martin,
Corrections Officer Schmidt, Corrections Officer Brown
and Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

**\*1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants.[1] *Id.* ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. *Id.* Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the

people against whom he was to testify were held and that he alerted ADA Henoch of this fact. *Id.* ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." *Id.* at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. *Id.* at 5.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." *Id.* As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. *Id.* ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." *Id.*

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See Jamison v. Dee,* 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

I. *Absolute Immunity*
**\*2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,*

996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before

the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818). To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

 **\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson. [2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, \*3 (S.D.N.Y. Nov. 6, 1995) (citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

"[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable

prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan, 996 F.2d at 534.* Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,*

484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1335865

---

### Footnotes

1    The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

2    Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Extend by Broadwater v. County of Onondaga, N.D.N.Y., March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,
v.
COUNTY OF CAYUGA; Cayuga County Sheriff's Department; City of Auburn; Shawn I. Butler, Chief of Auburn Police Department, as an Individual and in his official capacity; Cayuga County District Attorney's Office; Jon E. Budelmann, as an Individual and in his capacity as District Attorney for Cayuga County; and Anthony Spinelli, as an Individual and in his capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF JARROD W. SMITH, 11 South Main Street, P.O. Box 173, Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville, New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER, 6575 Kirkville Road, East Syracuse, New York 13057, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

**\*1** On or about February 18, 2020, Plaintiff filed a complaint against Defendants City of Auburn, Shawn L. Butler, County of Cayuga, Cayuga County District Attorney's Office, Jon E. Budelmann, and Anthony Spinelli, asserting eight claims

pursuant to 42 U.S.C. §§ 1983 and 1988, and state law. *See* Dkt. No. 5. Specifically, Plaintiff's complaint alleges the following causes of action: (1) false arrest under the Fourth and Fourteenth Amendments; (2) malicious prosecution under the Fourth and Fourteenth Amendments; (3) negligent failure to train or supervise; (4) state law false arrest; (5) state law false imprisonment; (6) intentional and negligent infliction of emotional distress under New York State law; (7) negligence; and (8) deliberate indifference to medical care under the Eighth Amendment. *See* Dkt. No. 5 at ¶¶ 40-114. Currently before the Court is Defendants' motion to dismiss the complaint in its entirety. *See* Dkt. No. 9.

## II. BACKGROUND

According to the complaint, on August 10, 2018, Plaintiff was the passenger in a vehicle that was driven by 140 Wall Street, allegedly in violation of an order of protection for Linda Fitzsimmons and Lee Joyner, who both reside at that address. *See* Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145 Wall Street, several houses down from 140 Wall Street, on the opposite side of the street. *See id.* at ¶ 25. Plaintiff was not the driver of the vehicle and had no control over how the driver was delivering him to his home. *See id.*

On August 13, 2018, Plaintiff was arraigned on two felony complaints charging him with two counts of Criminal Contempt in the First Degree based on the alleged violation of the order of protection. *See id.* at ¶ 22. At the conclusion of his arraignment, Plaintiff was remanded to the Cayuga County Jail. *See id.* Plaintiff claims that "Defendant police officer lacked the requisite requirement of having probable cause to arrest the Plaintiff; and did falsely arrest and imprison the Plaintiff." *Id.* at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his capacity as Cayuga County District Attorney, presented Plaintiff's charges to a grand jury, which "No Billed" the case. *See id.* at ¶ 26. At this point, Plaintiff was released from custody. *See id.*

During the fifty-three days during which Plaintiff "was being illegally imprisoned," he slipped and fell at the Cayuga County Jail. *See id.* at ¶ 31. According to Plaintiff, on August 31, 2018, a water pipe burst at the Cayuga County Jail near Plaintiff's cell while he was already locked in for the night and sleeping. *See id.* at ¶ 32. Plaintiff was woken by a bursting water pipe that was turned off by a Cayuga County

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water off" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

#### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

#### B. Documents Considered in Deciding Motion to Dismiss

In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, \*3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 127 of 238

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*, No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

## C. *Monell* and Supervisory Liability

**\*4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted). [1]

### D. Cayuga County District Attorney's Office and Auburn Police Department

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

### E. False Arrest

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 129 of 238

Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

**\*6**  In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7**  Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

### F. Malicious Prosecution

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 130 of 238

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution.[3]

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced

or continued the underlying criminal proceeding.' " *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### 1. Initiation of Criminal Prosecution

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 131 of 238

### 2. Malice

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### 3. Prosecutorial Immunity

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, *3 (W.D.N.Y. June 22, 2017) (quoting Doe *v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, *3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not

so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses 'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, *4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at *4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983

liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress

In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional

distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

### H. Negligence

In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 133 of 238

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

**I. Deliberate Indifference to Serious Medical Needs**

In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a '*mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person

actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 134 of 238

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/ or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See Connick*, 131 S. Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At best, the facts set forth in the

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 135 of 238

complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

## IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**;[4] and the Court further

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

---

## Footnotes

1      As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

2      Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

3      Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case, not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 136 of 238

with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

4    As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

---

**End of Document**                                       © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2006 WL 3316183
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Diana L. KELLY, Plaintiff,
v.
YORKTOWN POLICE
DEPARTMENT et al., Defendants.

No. 05 Civ. 6984(DC).
|
Nov. 13, 2006.

**Attorneys and Law Firms**

Diana L. Kelly, Peekskill, NY, Plaintiff, pro se.

Boeggeman, George, Hodges & Corde, P.C., By: Cynthia Dolan, White Plains, NY, for Defendant Stephen Boylan.

Lynch Rowin LLP, By: Karen L. Kirshenbaum, New York, NY, for Defendants Sears, Roebuck & Company and Brian Aisenstat.

*MEMORANDUM DECISION*

CHIN, J.

 **\*1** *Pro se* plaintiff Diana L. Kelly brings these claims pursuant to 42 U.S.C. §§ 1983 and 2000a, alleging that defendants violated her constitutional rights by racially profiling her, subjecting her to false arrest and/or imprisonment and malicious prosecution, and by denying her access to a place of public accommodation when they detained her allegedly for shoplifting. Kelly requests declaratory relief and compensatory and punitive damages totaling $2,000,000. Defendants Sears, Roebuck & Company ("Sears") and Sears security guard Brian Aisenstat move to dismiss Kelly's complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant Officer Stephen Boylan moves to dismiss on the same grounds, and in the alternative moves for summary judgment on the issues of liability and/ or qualified immunity, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Kelly's claims are dismissed with respect to all defendants.

*BACKGROUND*

A. *Facts*

The facts alleged in the original and amended complaints are assumed to be true for purposes of these motions. except as otherwise stated below. [1]

On May 17, 2003, Kelly and her twelve-year old daughter were shopping at the Sears department store in the Jefferson Valley Mall in Yorktown Heights, New York. [2] (Am. Compl. 1; Compl. ¶ 24). In her pleadings, Kelly refers to a video surveillance tape made by Sears, which she claims shows that: (a) Sears engaged in racial profiling of her and (b) that neither she nor her daughter did anything wrong. (Am. Compl. 1-2; Compl. ¶¶ 5, 23-24; Pl. Opp'n ¶ 12). Sears provided two video surveillance tapes made of Kelly and her daughter, one approximately eleven minutes ("Tape 1") and one approximately seven minutes ("Tape 2") (together, the "Tapes"). [3]

Tape 1 begins at 5:21 pm on May 17, 2003. It shows Kelly and her daughter carrying some shopping bags in the electronics department of Sears. They walk to a corner behind a display shelf, and the camera moves to view them from a mirror showing this corner. While there, they appear to look through their bags and to move some items around in them. Next, they walk through the housewares department to the bedding section. Tape 1 shows Kelly and her daughter pick up a large comforter set. From there, they move to a corner of the bedding department, and are not seen on Tape 1 for several minutes. Tape 2, in this same time frame, shows them in a far corner of the store behind a second display shelf. Still carrying the comforter, Kelly and her daughter next walk out of the bedding area and past a checkout register. For a third time they move behind a display shelf in the store. Next, both Tapes show Kelly's daughter carrying the comforter set as they walk through the outdoor furniture area and into the hardware department. They then enter a back hallway together.

Tape 1 then shows Kelly's daughter exiting the back hallway carrying the comforter. Tape 2 shows Kelly's daughter walk through the store. She momentarily stops in the bedding department, putting down the comforter on a bed. Moments later she picks up the comforter and, as both Tapes clearly show, she exits Sears with it into the mall. Together, the Tapes provide nearly unbroken footage of Kelly and her daughter inside Sears from before they select the comforter to the time

Kelly's daughter exits Sears. At no point does Kelly or her daughter purchase the comforter, and Kelly nowhere claims to have purchased the comforter. [4]

 **\*2**  After leaving the restroom, Kelly went to look for her daughter, but did not find her. (Pl. Opp'n ¶ 5). Kelly was approached by three security guards, who informed her that her daughter was in Sears's custody. (*Id.* ¶¶ 6-7; Am. Compl. 1). [5] Kelly and her daughter were detained by Sears security, during which time Kelly alleges that Aisenstat stated "that all Black people lie and stale (sic) and your (sic) no different" (Am.Compl.2), and that "[a]ll you people are known for stealing." (Pl. Opp'n ¶ 9). Aisenstat asked that Kelly empty all her shopping bags (Am.Compl.2), and looked through Kelly's personal belongings, including her pocketbook and wallet. (Pl. Opp'n ¶ 9). Kelly also contends that Aisenstat said to Kelly and her daughter that he was "having you both locked up with the rest of your people and kind." (*Id.* ¶ 11). Kelly told Aisenstat that there was a "misunderstanding." (*Id.* ¶ 10).

Officer Boylan of the Yorktown Police Department arrived, spoke with Aisenstat, and viewed the Tapes. (Compl.¶ 5). After viewing the Tapes, Boylan stated that they "[s]howed [Kelly] in the act of committing a crime," and arrested her and her daughter. (*Id.*). Kelly was charged with Petit Larceny pursuant to New York Penal Law § 155.25. (Dolan Aff., Ex. C). Kelly and her daughter were released from custody that same day. (Def. Boylan's Mem. of Law in Supp. of Mot. to Dismiss 4).

Kelly was prosecuted by the Yorktown District Attorney's Office (the "Yorktown DA"). (Compl.¶ 25). The charges ultimately were dismissed in the interests of justice. (*Id.*).

B. *Procedural History*
On August 5, 2005, Kelly filed the original complaint in this action, naming five defendants: the Yorktown Police Department, Boylan, Sears, the Yorktown DA, and attorney Charles J. Diven, who had represented Kelly in the charges related to her arrest at Sears. In an Order filed the same day, Chief Judge Michael B. Mukasey dismissed Kelly's claims against the Yorktown Police Department, the Yorktown DA, and Diven. (Order of Partial Dismissal, Aug. 5, 2005 at 10). Kelly, an African American, contends that her surveillance and detention at Sears, and her subsequent arrest, were racially motivated in violation of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983. (Compl.¶¶

5, 18, 25-26). Kelly alleges that she was denied access to a place of public accommodation because of her race, a violation of 42 U.S.C. § 2000a. (*Id.*).

On March 22, 2006, Kelly requested this Court appoint counsel. On May 4, 2006, I denied this request without prejudice to renewal.

On June 28, 2006, Sears filed this motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief can be granted. On July 5, 2006, Boylan moved to dismiss pursuant to 12(b)(6), and in the alternative moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. On July 28, 2006, Kelly filed a notice of motion to amend, and attached the amended complaint. On August 9, 2006, this Court accepted the amended complaint, and ordered that defendants' motions be deemed directed to it. The amended complaint recited additional facts, reduced the amount of relief requested to $2,000,000 from $1,000,000,000, and added Sears security guard Aisenstat as a defendant (hereinafter included in references to Sears).

 **\*3**  On August 17, 2006, Kelly made a second request for the appointment of counsel. I did not previously decide the request, but I conclude now that the appointment of counsel is not warranted.

On September 7, 2006, Kelly filed a document with the Clerk of the Court denominated "(Amended Complaint)," along with a letter to this Court asking for a further extension of time to file opposition papers to defendants' motions to dismiss and for summary judgment. This pleading differed from the amended complaint filed on July 28, 2006, and included Kelly's arguments as to why this Court should not grant Sears's and Boylan's motions. On August 9, 2006, this Court had ordered Kelly to file her opposition to the motions "explaining why the Amended Complaint should not be dismissed" by August 31, 2006. That Order also advised Kelly that if she failed to file any opposition, this Court would decide the motions without her input. Having received nothing further from Kelly, on October 16, 2006, this Court accepted the September 7 pleading as Kelly's opposition to Sears's and Boylan's motions.

*DISCUSSION*

A *pro se* complaint is reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam). Accordingly, the Court interprets Kelly's *pro se* pleadings " 'to raise the strongest arguments that they suggest." ' *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

Before the Court are Sears's motion to dismiss and Boylan's motion to dismiss, or, alternatively, for summary judgment. For the reasons set forth below, I dismiss the original and amended complaints.

A. *Applicable Law*

1. *Standard on a Motion to Dismiss*
A complaint may not be dismissed under Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The test for dismissal is not whether the plaintiff is likely to prevail, but whether it is entitled to offer evidence to support its claims. *Id.* "In considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer,* 937 F.2d at 773.

A court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). But, while a court "is required to draw all reasonable inferences," it is not required to draw "all possible inferences." *Fisher v. Painewebber Inc.,* No. 94 Civ. 2202(LMM), 1994 WL 512356, at *2 (S .D.N.Y. Sept. 20, 1994). "The Court ... is not obliged to reconcile a plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman,* 401 F.Supp.2d 362, 368 (S.D.N.Y.2005).

2. *False Arrest*
 **\*4** To the extent that a plaintiff alleges false arrest and false imprisonment, they are considered synonymous causes of action. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). "False arrest is simply an unlawful detention or confinement

brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." *Covington v. City of New York,* 171 F.3d 117, 125 (2d Cir.1999) (Glasser, J., dissenting).

The elements necessary to state a claim for false arrest under § 1983 are the same as those necessary to state a claim for false arrest under New York law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). To state a claim for false arrest under New York law, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified. *See Posr,* 944 F.2d at 97.

Probable cause to arrest is a complete defense to an action for false arrest, even where a person is ultimately acquitted, because it constitutes justification. *See Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *see also Montalvo v. New York City Police Officer Jennings,* No. 93 Civ. 8351(KMW), 1996 WL 148483, at *2 (S.D.N.Y. Apr. 1, 1996). "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991). The Second Circuit has held that a determination of whether probable cause to arrest existed may be made "as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant,* 101 F.3d at 852 (citations omitted).

3. *Malicious Prosecution*
To state a claim for malicious prosecution under New York law, the plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against her; (2) termination of the proceeding in her favor; (3) lack of probable cause to commence the proceeding; and (4) actual malice as motivation for the defendant's actions. *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997); *Cantalino v. Danner,* 96 N.Y.2d 391, 407-08 (2001).

Furthermore, " 'a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for ... malicious prosecution." ' *Paisley v. Coin Device Corp.,* 773 N.Y.S.2d 582, 749-50 (2d Dep't 2004) (quoting *Du Chateau v. Metro-*

*North Commuter R.R. Co.,* 688 N.Y.S.2d 12, 15 (1st Dep't 1999)).

#### 4. *42 U.S.C. § 2000a*

**\*5** Enacted under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the grounds of race." 42 U.S.C. § 2000a. Places of "public accommodation" are defined as establishments either affecting interstate commerce or supported by state action, and falling into one of the following categories: (1) a lodging for transient guests located within a building with more than five rooms for rent; (2) a facility principally engaged in selling food for consumption on the premises, including such facilities located within retail establishments and gasoline stations; (3) any place of exhibition of entertainment; or (4) any establishment located within an establishment falling into one of the first three categories, and which holds itself out as serving patrons of that establishment. *Id.*

The text of § 2000a does not explicitly include retail establishments. *See id.* Case law confirms that retail stores are not places of public accommodation with the meaning of § 2000a. *See Priddy v. Shopko Corp.,* 918 F.Supp. 358, 359 (D.Utah 1995); *McCrea v. Saks, Inc.,* No. Civ. A. 00-CV-1936 (MAM), 2000 WL 1912726, at \*2 (E.D.Pa. Dec. 22, 2000); *Gigliotti v. Wawa Inc.,* No. CIV. A. 99-3432(LCB), 2000 WL 133755, at \*1 (E.D.Pa. Feb. 2, 2000); *cf. Denny v. Elizabeth Arden Salons, Inc.,* 456 F.3d 427, 431-34 (4th Cir.2006) (discussing at length the panel's finding that a hair salon did not fit within the statutory definition of a "place of entertainment"); *United States v. Baird,* 85 F.3d 450, 455 (9th Cir.1996) (finding that the presence of two video game machines transformed a retail store, otherwise not a place of public accommodation under 42 U.S.C. § 2000a, into a place of entertainment for purposes of the statute).

#### 5. *42 U.S.C. § 1983*

Section 1983 imposes civil liability upon a party "who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. " 'A claim under § 1983 is aimed at state action

and state actors." ' *Johns v. Home Depot U.S.A., Inc.,* 221 F.R.D. 400, 404 (S.D.N.Y.2004) (quoting *Liwer v. Hair Anew,* No. 99 Civ. 11117(SAS), 2000 WL 223828, at \*2 (S.D.N.Y. Feb. 25, 2000) (citation omitted)); *see Fisk,* 401 F.Supp.2d at 366. "A private individual may be subject to § 1983 liability if that individual willfully collaborated with an official state actor in the deprivation of a federal right." *Bacquie v. City of New York,* No. 99 CIV. 10951(JSM), 2000 WL 1051904, at \*1 (S.D.N.Y. July 31, 2000) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970)); *see also Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1992); *Alexanian v. New York State Urban Dev. Corp.,* 554 F.2d 15, 16 (2d Cir.1977). "[A] private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor ..., unless the police officers were improperly influenced or controlled by the private party." *Fisk,* 401 F.Supp.2d at 367; *Johns,* 221 F.R.D. at 405; *see Newman v. Bloomingdale's,* 543 F.Supp. 1029, 1031-32 (S.D.N.Y.1982) (" 'The vision of a citizen's hesitating to call for police assistance in fear they may, when they arrive, employ some unconstitutional procedure over which he has no control and thus render him liable in a[§ ] 1983 action is not an attractive one." ' (quoting *Smith v. Brookshire Bros., Inc.,* 519 F.2d 93, 97 (5th Cir.1975))).

### B. *Application*

#### 1. *Kelly's Arrest*

**\*6** Kelly contends that her arrest by Boylan amounts to a false arrest. (Compl.¶ 24). Additionally, I construe Kelly's original and amended complaints to contend that Sears's detention of her was a false imprisonment. (*Id.* ¶ 25 (alleging that defendants "unlawfully ... detained" her); Am. Compl. 2 (contending that Aisenstat "falsely accused [her] of a crime and detained her in a locked room within Sears")).

An arrest or confinement is privileged where there is probable cause to believe plaintiff committed a crime. *See Posr,* 944 F.2d at 97. In her pleadings, Kelly repeatedly claims that she and her daughter did not commit any crime or act warranting their detention, and that Tapes 1 and 2, which Sears and Officer Boylan reviewed, "clearly" show this. (Am. Compl. 1; Compl. ¶ 24; Pl. Opp'n ¶ 12). This is simply not true, and no reasonable fact finder viewing the Tapes could conclude otherwise. *See Fisk,* 401 F.Supp.2d at 368. Together, Tapes 1 and 2 show Kelly and her daughter picking up the comforter and wandering throughout Sears without paying for it, and moving behind display shelves on several occasions, in what a reasonable security officer would construe as suspicious

behavior. Finally, the Tapes show Kelly's twelve-year old daughter exiting Sears without her mother, carrying the still unpaid-for comforter.

In her opposition to the motions to dismiss, Kelly states that she informed Aisenstat that the May 17, 2003, incident was a "misunderstanding." (Pl. Opp'n ¶ 10). For purposes of these motions, I assume there was a misunderstanding, and that Kelly and her daughter were not engaging in criminal conduct. To prevail on a motion to dismiss, however, a defendant need not show that the plaintiff committed a crime; rather, a defendant must show only that there was probable cause to believe that the plaintiff committed a crime. *See Golino,* 950 F.2d at 870. Aisenstat observed, and there is indisputable video footage of, Kelly's twelve-year old daughter leaving Sears with unpaid merchandise. On this basis, I conclude as a matter of law that there was probable cause to believe that Kelly committed offenses warranting her detention. *See Weyant,* 101 F.3d at 852. Therefore, Kelly fails to state a claim against Sears for false imprisonment.

In her pleadings Kelly alleges that Aisenstat made several racist comments to her in the course of her detention, prior to the arrival of Officer Boylan. (Am. Compl. 2; Pl. Opp'n ¶¶ 9, 11). Even assuming these comments were made, they do not negate the clear showing of probable cause to believe that Kelly and her daughter had committed a crime, namely, theft of the comforter. *See Golino,* 950 F.2d at 870.

Furthermore, Kelly nowhere contends that Officer Boylan made racist comments similar to the alleged comments made by Aisenstat, or that Boylan participated in a conspiracy with Aisenstat or Sears to discriminate against Kelly based on race. Boylan, a police officer, was summoned by Sears security. (Compl. ¶ 5). Upon arrival, Boylan took statements from Kelly and her daughter and viewed the Tapes of Kelly's daughter leaving Sears with unpaid merchandise. I conclude on this basis that Boylan had probable cause to believe that Kelly and her daughter had committed a crime. *See Weyant,* 101 F.3d at 852; *Golino,* 950 F.2d at 870. Accordingly, Kelly cannot state a claim against Boylan for false arrest.

**\*7** Because I conclude as a matter of law that there was probable cause to believe that Kelly and her daughter had committed a crime, Kelly fails to state a claim for false imprisonment or false arrest. Accordingly, this claim is dismissed.

*2. Kelly's Prosecution*

Kelly alleges that her prosecution by the Yorktown DA constituted malicious prosecution. (Compl. ¶ 25). As to the Yorktown DA, this claim was dismissed by Chief Judge Mukasey. (Order of Partial Dismissal, Aug. 5, 2005 at 10). As to Sears and Boylan, the malicious prosecution claim must be dismissed now.

A claim for malicious prosecution requires a plaintiff to show that there was no probable cause for the prosecution. *See Murphy,* 118 F.3d at 947. As discussed above, Kelly's detention at Sears and subsequent arrest by Boylan were premised on probable cause. Accordingly, Kelly fails to state a claim for malicious prosecution because probable cause existed.

Finally, as to Sears, Kelly's malicious prosecution claim also fails because a civilian cannot be held liable for malicious prosecution merely by seeking police assistance or by furnishing information to law enforcement authorities. *See Paisley,* 773 N.Y.S.2d at 749-50. Therefore, Sears may not be held liable for malicious prosecution.

Kelly has failed to state a claim for malicious prosecution. Thus, this claim is dismissed.

*3. Places of Public Accommodation*

Kelly contends that Sears discriminated against her on the basis of race, in violation of the 14th Amendment and 42 U.S.C. § 2000a, by allowing persons of other races to access public accommodations, but disallowing her equal access because of her race. (Compl. ¶ 23). Retail stores, however, are not places of public accommodation within the meaning of § 2000a. *See* 42 U.S.C. § 2000a (enumerating many establishments that are places of public accommodation, including places providing lodging, entertainment, or places providing facilities for consumption of food on the premises, or any establishment located inside these; but not including retail establishments); *Priddy,* 918 F.Supp. at 359; *McCrea,* 2000 WL 1912726, at \*2; *Gigliotti,* 2000 WL 133755, at \*1. Sears is a retail store. Even assuming that Sears placed Kelly under video surveillance because of her race, 42 U.S.C. § 2000a provides no relief, because Sears is not a place of public accommodation. For this reason as well, Kelly's racial profiling claim fails. *See also Youngblood v. HyVee Food Stores, Inc.,* 266 F.3d 851, 855 (8th Cir.2001) (reviewing a 42 U.S.C. § 1981 right-to-contract claim brought against a retail store, and finding that "[§ ] 1981 does not provide a general cause of action for race discrimination.... The

requirement remains that a plaintiff must point to some contractual relationship.").

Accordingly, Kelly fails to state a claim for any violation of 42 U.S.C. § 2000a, and her claim for violation of 42 U.S.C. § 2000a is dismissed.

#### 4. *Section 1983 Claim*

**\*8** Kelly has failed to state a claim for violation of "any statute, ordinance, regulation, custom, or usage," and therefore has failed to state a claim under 42 U.S.C. § 1983. Kelly states that Sears and Boylan discriminated against her based on race, denies any wrongdoing by her or her daughter, and claims that the Tapes confirm both these assertions. (Am. Compl. 2; Compl. ¶ 24; Pl. Opp'n ¶ 8). The Tapes, however, show Kelly's twelve-year old daughter leaving Sears with unpaid merchandise.

Kelly's claims for false imprisonment and arrest fail, because both Sears and Boylan had probable cause to believe Kelly had committed a crime. *See Weyant,* 101 F.3d at 852. Her claim of malicious prosecution also fails, because there was probable cause to prosecute her. *See Murphy,* 118 F.3d at 947. Finally, Kelly's claim alleging denial of equal access to a place of public accommodation pursuant to 42 U.S.C. § 2000a fails, because Sears is not a place of public accommodation. *See* 42 U.S.C. § 2000a. Without more, Kelly's allegation of racial discrimination is insufficient to sustain a claim for liability under 42 U.S.C. § 1983.

Even if Kelly could show a violation of some ordinance supporting her § 1983 claim against Boylan, Kelly cannot state a claim against Sears, a non-state actor. *See Fisk,* 401 F.Supp.2d at 366. A private individual may be liable for a violation under § 1983 if the citizen "willfully collaborated with an official state actor in the deprivation of a federal right," *Bacquie,* 2000 WL 1051904, at \*1, or if the citizen "improperly influenced or controlled" a state actor. *Fisk,* 401 F.Supp.2d at 367. Kelly nowhere alleges that Sears engaged in such conduct.

As Kelly has shown no violation of any statute, ordinance, regulation, custom, or usage that caused her to suffer the deprivation of any right, privilege, or immunity secured by the Constitution or the law, I conclude that Kelly has failed to state a claim for a violation of 42 U.S.C. § 1983. Accordingly, this claim is dismissed.

#### *CONCLUSION*

For the foregoing reasons, the motions to dismiss are granted.[6] The original and amended complaints are dismissed as to all defendants, with prejudice but without costs. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3316183

---

#### Footnotes

1     Because the amended complaint supplements, rather than supersedes, the original complaint, the facts are taken from both. Kelly avers additional facts relevant to this motion in her Opposition to the Motion to Dismiss; these facts are incorporated into the pleadings as well.

2     In her original complaint, Kelly identified the date of the incident at Sears as May 8, 2003. (Compl.¶ 5). In all other pleadings, the date of arrest is stated as May 17, 2003. (Am. Compl. 1; Pl.'s Opp'n to Mot. to Dismiss ("Pl.Opp'n") ¶ 5).

3     Because plaintiff refers to the Tapes in her pleadings, they are deemed incorporated by reference. *See Kramer v. Time Warner,* 937 F.2d 767, 773 (2d Cir.1991).

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 143 of 238

4    In her pleadings, Kelly asserts that sometime after picking up the comforter she decided that she needed to use the restroom, and so took her paid merchandise in with her, while her daughter, carrying the unpaid-for comforter, agreed to wait in the bedding department. (Am. Compl. 1; Pl. Opp'n ¶ 5).

5    In Kelly's complaint to the New York State Division of Human Rights, she states that she left Sears and "walked through the mall looking for her [daughter]." (Dolan Aff., Ex. D ¶ 2). In the amended complaint and opposition to the motions, it is ambiguous whether she had left Sears or was still within Sears when security approached her. (Am. Compl. 1; Pl. Opp'n ¶¶ 6-7).

6    Thus, I need not reach Boylan's alternative request for summary judgment.

---

**End of Document**                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 144 of 238

Kirby v. Abraham, Not Reported in Fed. Supp. (2024)

2024 WL 4906112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, [1] Defendant.

5:24-cv-0522 (BKS/TWD)
|
Signed October 25, 2024

**Attorneys and Law Firms**

DAVID L. KIRBY, III, Plaintiff, pro se, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** On April 15, 2024, *pro se* Plaintiff David L. Kirby, III, commenced this action by filing a complaint naming the Syracuse Police Department as the sole defendant. Dkt. No. 1. Plaintiff did not pay the Court's filing fee or file a motion to proceed *in forma pauperis* ("IFP"), and the Court administratively closed the case. Dkt. No. 2. Plaintiff subsequently submitted a complete application to proceed IFP, and the case was reopened. Dkt. Nos. 3, 4, 5. On June 14, 2024, the undersigned granted Plaintiff's EFP application and performed an initial review of the complaint. Dkt. No. 6. On June 24, 2024, Plaintiff filed an amended complaint. Dkt. No. 7. In light of Plaintiff's amended complaint, the Court terminated the pending Report-Recommendation, and referred the action back to the undersigned for an initial review of the amended complaint. [2] Dkt. No. 9.

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

Because Plaintiff is proceeding IFP and is a prisoner suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). [3]

**A. Relevant Legal Standard**

The Court shall dismiss a complaint in a civil action if it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

**\*2** To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served

and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).

Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

### B. Summary of the Amended Complaint [4]

Plaintiff brings this action against Defendant John Doe, a Syracuse Police Officer. Dkt. No. 7. In the "Statement of Facts" section, Plaintiff states, in full:

> John Doe hit me with his police car while he was off-duty working as an security guard. The results of me getting hit by car my neck, arm on right side and upper body collarbone was hurting very bad. I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff. Also after that I was placed in handcuffs. Also John Doe illegally searched me which is violating my rights 4[th] Amendment he searched me after hitting me with car and placing me in handcuffs. Then I was sent to hospital. And that is false arrest and false imprisonment.

*Id.* at 4. Plaintiff lists his first claim as "excessive force" and his second claim as "unconstitutional conditions of confinement." *Id.* at 5. Plaintiff seeks monetary damages. *Id.*

On July 2, 2024, Plaintiff filed a letter stating, "Officer Mamoun Abraham was the officer that struck me with deadly force using his car off-duty knowing that he was not supposed to do that." Dkt. No. 10. On August 14, 2024, Plaintiff filed another letter, stating, in part, "Brandon Hanks used excessive force, violated my 4[th] Amendment right by his unreasonable search which led to false arrest and false imprisonment

because my rights were violated and no probable cause to arrest me." [5] Dkt. No. 11.

## III. ANALYSIS

**\*3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a valid claim under Section 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).

### A. Defendant John Doe

The Court has reviewed Dkt. No. 10, wherein Plaintiff has identified the Doe defendant by name. Therefore, the Court construes Dkt. No. 10 as a request to substitute the name of "Mamoun Abraham" for John Doe, which is granted. While piecemeal pleadings are generally not accepted by the Court, an exception will be made since the letter was filed while the amended complaint was still under initial review. The amended complaint will be deemed to name Mamoun Abraham in place of John Doe and the Court will conduct its initial review accordingly. [6]

### B. Color of State Law

By its terms, Section 1983 applies only where the defendant acts "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983; *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A] plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law."). A "defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988). By contrast, "acts of officers in the ambit of

their personal pursuits are plainly excluded." *United States v. Giordano*, 442 F.3d 30, 42-43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)).

"[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). A defendant acts under color of state law for the purposes of Section 1983 when he exercises a power "possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (citation omitted). The "focus" of the color of law inquiry is on "whether there was an abuse or misuse of a power conferred upon [the state employee] by state authority," and "look[s] to the nature of the officer's act, not simply his duty status." *Pitchell*, 13 F.3d at 548-49.

**\*4** Courts therefore "look at a variety of factors, including, *inter alia*, whether the officer: (1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise detained her." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007). An individual engaging in conduct as a private actor can still be liable under Section 1983, but only if he "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). "Conclusory allegations that [the] private individual conspired or took concerted action with state actors will not suffice" to establish this element. *Lienau v. Garcia*, No. 12-CV-6572, 2013 WL 6697834, at \*5 (S.D.N.Y. Dec. 19, 2013) (citation and internal punctuation omitted).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court assumes for purposes of initial review that defendant Abraham was acting under color of state law.

### C. Excessive Force

As noted above, Plaintiff lists excessive force as his first claim. Dkt. No. 7 at 5. " '[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard.' " *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148-49 (2d Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis and internal quotation marks

omitted)). Examining the reasonableness of the force used "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). An officer may not constitutionally employ "a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). Additionally, "[w]hile handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

It is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). But " '[n]ot every push or shove' amounts to a Fourth Amendment violation. Indeed, a '*de minimis* use of force will rarely suffice to state a Constitutional claim.' " *Acosta v. City of New York*, No. 11 Civ. 856, 2012 WL 1506954, at \*10 (S.D.N.Y. Apr. 26, 2012) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 2005)).

Here, Plaintiff's explanation of the alleged incident with defendant Abraham is conclusory and vague. He has not listed a date on which he was "struck" by the police vehicle and has not described *any* facts surrounding the alleged incident. Thus, Plaintiff has not provided "a short and plain statement of the claim showing that he is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Accordingly, the Court recommends dismissal of the excessive force claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### D. False Arrest and False Imprisonment

Liberally construed, Plaintiff alleges he was subjected to "false arrest and false imprisonment." Dkt. No. 7 at 4. A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause ...." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see*

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 147 of 238

Kirby v. Abraham, Not Reported in Fed. Supp. (2024)

*also Jenkins v. City of New York*, 478 F.3d 76, 88 n. 10 (2d Cir. 2007) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest.") (citation omitted).

**\*5** "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins*, 478 F.3d at 84 (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal punctuation omitted). An arrest is privileged if it is based on probable cause. *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (internal punctuation and citations omitted). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.

Here, Plaintiff alleges in wholly conclusory fashion he was subject to a false arrest and false imprisonment. He alleges no facts related to his arrest suggesting there was no probable cause for his arrest. Further, to the extent that Plaintiff may be claiming that the alleged unlawful search led to his arrest and, thus, the arrest was unlawful, said claim does not set forth a cognizable false arrest claim because the "fruit of poisonous tree" doctrine applied in criminal cases to exclude evidence derived from an unlawful act—e.g., an unlawful search or seizure—does not apply to § 1983 actions. *See Tinsdale v. Hartley*, 442 F. Supp. 3d 569, 573 (W.D.N.Y. 2020) (citing, *inter alia, DiMascio v. City of Albany*, 205 F.3d 1322 (Table), No. 99-7653, 2000 WL 232053, at \*1 (2d Cir. 2000) ("We have held ... that the fruit of the poisonous tree doctrine is inapplicable to civil § 1983 actions." (internal punctuation omitted))).

Therefore, the Court recommends dismissal of Plaintiff's false arrest or false imprisonment claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### E. Illegal Search

Plaintiff also alleges he was searched "illegally" by defendant Abraham. Dkt. No. 7 at 4. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable ... subject to only a few specifically established and well-delineated exceptions.' " *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Indeed, whether a search incident to an arrest was lawful turns upon whether such search was reasonable. *Id.* The permissibility of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).

Here, the Court finds Plaintiff's allegations regarding the alleged illegal search are entirely conclusory and insufficient to plead a plausible cause of action. Plaintiff merely alleges that defendant Abraham "searched me which is violating my rights," Dkt. No. 7 at 4, "but fails to support this assertion with any supporting factual allegations." *Lautman v. Vill. of Saugerties, N.Y.*, No. 1:13-CV-00264 (MAD), 2014 WL 1653189, at \*6 (N.D.N.Y. Apr. 23, 2014) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)); *see also Cannon v. Wood*, No. 9:10-cv-1332 (GTS/RFT), 2011 WL 7071100, \*7 (N.D.N.Y. Aug. 12, 2011) (dismissing the plaintiff's illegal search claim where the plaintiff merely "states in a conclusory fashion that he was subjected to an illegal search" and the complaint was "devoid of any factual allegations to support this claim").

**\*6** Accordingly, the Court recommends dismissal of Plaintiff's illegal search claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### F. Conditions of Confinement

Plaintiff lists "unconstitutional conditions of confinement" as his second claim. Dkt. No. 7 at 5. Even when liberally construed, it is entirely unclear to the Court what "conditions"

Case 6:25-cv-01081-BKS-ML Document 45 Filed 07/29/26 Page 148 of 238

Kirby v. Abraham, Not Reported in Fed. Supp. (2024)

Plaintiff claims are "unconstitutional" or who was personally involved in the constitutional violation or when and where the alleged deprivation occurred. Accordingly, the Court recommends dismissal of Plaintiff's condition of confinement claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### G. Rule 10

Plaintiff refers to the "Justice Center medical staff" in the body of the amended complaint. *See* Dkt. No. 7 at 4. Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A party not named in the caption of the complaint is not a party to the action. *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name the individual defendants against whom the plaintiff intends to assert claims makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Accordingly, the Court does not construe any claims in the amended complaint to be asserted against the Justice Center medical staff. *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007) ("If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case.").

Even if the amended complaint was liberally construed to assert a Fourteenth Amendment medical indifference claim against the Justice Center medical staff, the claim would fail for two reasons. First, "[p]leadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) which requires a short and plain statement of the claim showing that the pleader is entitled to relief (citation and internal punctuation omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *see, e.g., Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU

Officers' " and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint" should he choose to do so).

**\*7** Second, to state a Fourteenth Amendment medical indifference claim, a detainee "must meet two requirements: (1) that Plaintiff[ ] had a serious medical need ..., and (2) that the Defendants acted with deliberate indifference to such needs." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); and *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). A detainee's medical need is "sufficiently serious" where it "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). To satisfy the deliberate indifference requirement, a pretrial detainee "can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.* at 87 (emphasis in original).

Here, even if Plaintiff had alleged a defendant's personal involvement, Plaintiff's sparse allegations do not satisfy either prong of a plausible deliberate indifference to medical needs claim. Plaintiff's conclusory allegation that "I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff is insufficient given that the Second Circuit has made clear that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (*citing Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

Thus, dismissal without prejudice would also be warranted for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### IV. CONCLUSION

For these reasons, the Court recommends Plaintiff's amended complaint be dismissed in its entirely for failure to state a

claim upon which relief may be granted. In recognition of his *pro se* status, the Court also recommends Plaintiff be granted leave to file a second amended complaint to cure the deficiencies identified above. [7] *See Ruffolo*, 987 F.2d at 131.

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 4), and notify the official that this action has been filed and that Plaintiff is required to pay the Northern District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; [8] and it is further

**\*8 ORDERED** that the Clerk provide a copy of Plaintiff's inmate authorization (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk update the docket to substitute Mamoun Abraham for John Doe; and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 7) be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff be granted leave to file a second amended complaint that cures the deficiencies identified in this Report-Recommendation; and it is further

**ORDERED** that the Clerk provide Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen (14) days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4906112

---

**Footnotes**

1    For reasons discussed below, the Clerk is directed to update the docket to substitute "Mamoun Abraham" for Defendant John Doe.

2    The Court will also consider the two letters, Dkt. Nos. 10 and 11, filed by Plaintiff. See Dkt. No. 12.

3    *See* 28 U.S.C. § 1915A(c) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."). Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed IFP. *See* 28 U.S.C. § 1915(b)(1); *see also Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010) ("Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts.") *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

4    Plaintiff utilized the Court's form complaint for civil rights actions under 42 U.S.C. § 1983. Citations to Plaintiff's amended complaint will be to the pagination generated by CM/ECF, the Court's electronic filing system.

**Kirby v. Abraham, Not Reported in Fed. Supp. (2024)**

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 150 of 238

Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

5      At the top of the letter, Plaintiff lists three civil action numbers: 5:21-cv-886, 5:24-cv-124, and 5:24-cv-522. Dkt. No. 11. Thus, the letter was filed in all three of Plaintiff's cases. The Clerk's Office and the Court should not be tasked with determining which case Plaintiff's filing should be filed in. In this District, if a litigant has more than one action pending, any paper filed in a case must contain and relate to one civil action number unless the civil actions have been consolidated by the Court. Any motion or other papers purporting to relate to more than one action will not be accepted for filing and may be stricken by the Court. N.D.N.Y. L.R. 10.1(c)(1). On August 15, 2024, Plaintiff was advised by Text Order in *Kirby v. Hanks*, 5:24-cv-0124 (MAD/ML), proper case identification is required for all filings, which should include a case number, case name, and what relief Plaintiff is seeking.

6      The Court reaches a different result, however, with respect to Dkt. No. 11. Because Plaintiff's letter includes three civil action numbers, the submission does not include a caption and, based upon the allegations in the letter, it is not clear which action Plaintiff intended this letter to supplement, the Court does not construe Dkt. No. 11 as a request to amend the amended complaint. Moving forward, Plaintiff is advised he may not attempt to amend his pleadings in a piecemeal manner. *See* L.R. 15.1.

7      If the District Court adopts this Report-Recommendation, the second amended complaint must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any second amended complaint should contain *all* factual allegations relevant to Plaintiff's claims, including, when possible, the dates, times, and places of the alleged underlying acts, as well as each individual who committed each alleged wrongful act, and the paragraphs should be correctly numbered. Any second amended complaint should allege facts demonstrating the personal involvement of any named defendant. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Any second amended complaint will replace the existing amended complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Jeanty v. Sciortino*, No. 6:22-CV-319 (BKS/TWD), 2023 WL 2931863, *14 (N.D.N.Y. Apr. 13, 2023).

8      Plaintiff will also be required to pay fees he may incur in this action, including copying and/or witness fees.

9      If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                            © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Kirby v. Abraham, Not Reported in Fed. Supp. (2024)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 151 of 238

2024 WL 4905131
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David L. KIRBY, III, Plaintiff,
v.
Mamoun ABRAHAM, Defendant.

5:24-cv-522 (BKS/TWD)
|
Signed November 27, 2024

**Attorneys and Law Firms**

Plaintiff pro se: David L. Kirby, III, 05002304, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

### MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, Chief United States District Judge:

**\*1** Plaintiff David L. Kirby, III brought this action under 42 U.S.C. § 1983 against the Syracuse Police Department and sought leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 3). This matter was referred to United States Magistrate Judge Therese Wiley Dancks who, on June 14, 2024, granted Plaintiff's application to proceed IFP and issued a Report-Recommendation, recommending that Plaintiff's complaint be dismissed with prejudice and without leave to amend as to the Syracuse Police Department, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A), but with leave to file an amended complaint. (Dkt. No. 6). Plaintiff did not file objections to the Report-Recommendation, but instead filed an amended complaint. (Dkt. No. 7). On June 26, 2024, this Court issued a text order terminating the recommendations in the Report-Recommendation as moot and recommitting the matter to Magistrate Judge Dancks for an initial review of the amended complaint. (Dkt. No. 9). On October 25, 2024, Magistrate Judge Dancks issued a Report-Recommendation recommending that Plaintiff's amended complaint be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted, and that Plaintiff be granted leave to file a second amended complaint. (Dkt. No. 15). Magistrate Judge Dancks informed Plaintiff that he had fourteen days within which to file written objections to the Report under 28 U.S.C. § 636(b)(1), and that the failure to object to the Report within fourteen days would preclude appellate review. (*Id.* at 16). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 15) is **ADOPTED**; and it is further

**ORDERED** that the amended complaint (Dkt. No. 7) is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that any second amended complaint must be filed **within thirty (30) days** of the date of this Order. Any second amended complaint must be a complete pleading which will replace the current complaint in total and must comply with the directions in the Report-Recommendation (Dkt. No. 15, at 14–15, n. 7); and it is further

**ORDERED** that if Plaintiff files a timely second amended complaint, it shall be referred to Magistrate Judge Dancks for review; and it is further

**ORDERED** that if Plaintiff fails to file a timely second amended complaint, the Clerk shall close this case without further order; and it is further

**ORDERED** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**\*2 IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4905131

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 152 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

KeyCite Yellow Flag

Distinguished by   Berrio v. City of New York,   S.D.N.Y.,   January 10, 2017

KeyCite Overruling Risk

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2004 WL 2429811
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Caryll KRAMER, Plaintiff,

v.

THE CITY, NEW YORK CITY NEW YORK
POLICE DEPARTMENT, Police Officer Craig De
Oliviera, Detective Patrick Kennedy, Sheld 2041, and
Unidentified New York City Police Officers Defendant.

No. 04 Civ.106 HB.
|
Nov. 1, 2004.

*OPINION & ORDER*

BAER, J.

 **\*1**  Plaintiff, Caryll Kramer brought a civil rights claim, under 42 U . S.C. § 1983, against Defendants, the City of New York ("City"), New York City Police Department ("NYPD"), Police Officer Craig De Oliviera ("Oliviera"), Detective Patrick Kennedy ("Kennedy"), Shield 2041, and Unidentified New York City Police officers (collectively, "Defendants"). Pursuant to Federal Rule of Civil Procedure 56, Defendants move for summary judgment.[1] For the reasons set forth below, Defendants motion for summary judgment is GRANTED.

## I. *BACKGROUND*

A. Factual Background

Noel Kramer had consulted the same physician, Dr. Jonathan Raskin ("Raskin"), for over 12 years. In fear, Noel Kramer asked Raskin to run tests to determine whether, in fact, Plaintiff had attempted to kill him. Raskin, aware of Plaintiff's alleged alcoholism, alleged abusiveness, and his patient's belief that his wife had attempted to poison him (Raskin Dep. at 23:5—24:16), ran tests in April 2001, and the results

indicated that the arsenic level in Noel Kramer's blood were seven times greater than normal. (Raskin Dep. at 21:7—15).

In response to consistent illness because of his wife's food and fear for his safety, on May 10, 2001, Noel Kramer, accompanied by Oliveira and a nurse's aide, entered the 17th Precinct and lodged a complaint, which alleged that his wife, the Plaintiff here, had attempted to poison him. In support of his allegation, Noel Kramer informed the police of (1) a lab analysis that indicated an increased level of arsenic (N.Y.PD Compl. Rep. # 2001–17–0032932); (2) "that his doctor couldn't explain why he had such high levels of arsenic in his system"; (3) that his wife would not allow anyone else to prepare his food; and, (4) that his relationship with his wife had significantly deteriorated. (Kennedy Dep. at 18:23 —24:2).

To discern the legitimacy of Noel Kramer's criminal complaint, the New York County District Attorney's Office directed that newly prepared food be tested for poison. (Hughes Dep. at 23:22—24:14). On the evening of May 10, 2001, at the direction of the Assistant District Attorney, Noel Kramer returned to his apartment and ordered food. The police entered the apartment and Plaintiff refused to follow the police officer's directions. (Heiman Dep. at 22:11). Plaintiff went for her purse and Heiman pushed the pocketbook away and looked inside to make sure there were no weapons. (Heiman Dep. at 22:11; Kennedy Dep. at 66:10 —67:22; Sullivan Dep. at 31:2—19; Pl. Dep. at 137:9— 138:22). The Detectives handcuffed Plaintiff and escorted her out of the apartment. (Pl. Dep. at 139:16—20). Plaintiff never complained or sought treatment for any injuries that resulted from the arrest and never sought medical treatment for any injuries she allegedly sustained as a result of being handcuffed. (Pl. Dep. at 147:7—151:23).

Upon arrival at the 17th Precinct, the police locked Plaintiff in a holding cell. (Pl. Dep. at 156:4—9). Plaintiff was in the holding cell for several hours, but not searched until she requested to use the bathroom. (Pl. Dep. at 154:19—155:23). On the evening of the arrest, while at the 17th Precinct, Plaintiff requested the use of the ladies room twice. (Pl. Dep. at 154:23). During both occasions, a female law enforcement officer escorted Plaintiff into the bathroom where Plaintiff "had to bear" her "derriere." (Pl. Dep. at 154:18—24). The following morning, May 11, 2001, Plaintiff was escorted to Central Booking and later that day arraigned for attempted murder in the second degree and resisting arrest. Bail was set

Case 6:25-cv-01081-BKS-ML Document 45 Filed 07/29/26 Page 153 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

at $100,000. (N.Y. County Dock. No.2001NY041680, dated May 11, 2001).

**\*2** In response to the arrest, Noel Kramer cancelled all of his wife's credit cards, changed all the joint bank accounts over to his name, and stopped payments on Plaintiff's health insurance. (Pl. Dep. at 174:17—183:15). On November 16, 2001, the charges against Plaintiff were dismissed after the District Attorney's Office failed to prosecute.

### B. Procedural History

On April 29, 2002, Plaintiff filed an action against the City, the NYPD, Oliviera, and Noel Kramer in New York County Supreme Court. *Kramer v. New York,* No. 108657/02 (N.Y.Sup.Ct. Nov. 26, 2003). Plaintiff alleged that on May 10, 2001 she was falsely arrested and maliciously prosecuted because of the accusations fabricated by Noel Kramer and Oliviera. In response, Oliviera filed a motion for summary judgment to dismiss the State Court action. On November 26, 2003, Judge Soto dismissed the malicious prosecution charge, but the false arrest and imprisonment, intentional infliction of emotional distress, libel/slander, and defamation of character charges against Oliviera survived. *Id.*

On January 7, 2004, Plaintiff filed a Federal action based on the same May 10, 2001 events. The action alleged that Plaintiff's civil rights were violated, pursuant to 42 U.S.C. § 1983, and named the City, the NYPD, Kennedy, and Oliviera as defendants. The City and NYPD consented to the removal of the state-law action to federal court. On March 26, 2004, Judge Soto stayed the state law claims against Oliviera and, pursuant to Plaintiff's request, dismissed the allegations against Noel Kramer.

### II. *APPLICABLE STANDARD*

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities,

and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (*per curiam* ); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. *Donohue,* 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### III. *DISCUSSION*

**\*3** Pursuant to Fed.R.Civ.P. 56, Defendants move for summary judgment contending that at this stage of the litigation: plaintiff's false arrest claim should be dismissed because there was probable cause; plaintiff's malicious prosecution claim is barred by the doctrine of collateral estoppel, the *Rooker–Feldman* doctrine, and also fails as a matter of law; plaintiff fails to state a claim under the Equal Protection and Due Process Clauses of the Fourteenth Amendment; any purported conspiracy claim must be dismissed; Detective Patrick Kennedy is entitled to qualified immunity; and, plaintiff's state law claims should be dismissed as a matter of law.

### A. False Arrest

Plaintiff alleges that Kennedy lacked the requisite information that would lead a reasonable person to conclude that Plaintiff had committed or is about to commit a crime and, therefore, failed to have probable cause to justify an arrest. *See Boyd v. City of N.Y.,* 336 F.3d 72 (2d Cir.2003). Plaintiff's § 1983 claim for false arrest "derives from an individual's right to remain free from unreasonable seizures." *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). This includes the right to remain free from arrest absent probable cause. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). When reviewed in the light most favorable to Plaintiff, *Saucier v. Katz,* 533 U.S. 194, 201 (2001), the complaint alleges that the police arrested Plaintiff without probable cause in violation of the constitution. *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) ("The right not to be arrested without probable cause is a clearly established right.").

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 154 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

However, at the time of the arrest, it was "equally well established that the existence of probable cause is an absolute defense to a false arrest claim and affords the arresting officer qualified immunity from litigation." *Caldarola,* 298 F.3d at 162. "Probable cause is a complete defense to a cause of action for false arrest." *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999) (internal citation omitted). "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino v. City of N.Y.,* 331 F.3d 63, 77 (2d Cir.1999) (internal citation omitted).

Noel Kramer walked into the 17th Precinct on May 10, 2001 and alleged that his wife was attempting to murder him. In support of his allegations, Noel Kramer informed the police of (1) consistent illness which he believed resulted from his wife's food preparation; (2) his wife's unwillingness to allow anyone but herself to prepare his dinner; and, (3) a deteriorating marriage. Noel Kramer also provided the police with information regarding lab results that indicated a high level of arsenic in his blood and corroboration of the test results by a nurses' aid. (Pl. Dep. at 123:23—124:9; NYPD Compl. Rep. # 2001–17–0032932). Taken together, these allegations establish probable cause to arrest Plaintiff and "there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004).

**\*4** Accordingly, this claim must be dismissed.

B. Qualified Immunity [2]

Assuming *arguendo* that Plaintiff was falsely arrested, the individual defendants are still entitled to qualified immunity. Qualified immunity shields a government official acting in an official capacity from suit for damages under Section § 1983 provided that the official did not violate "clearly established rights of which an objectively reasonable official would have known." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Kent v. Katz,* 312 F.3d 568, 573 (2d Cir.2002). The focus of a qualified immunity analysis is on "objective circumstances rather than an officer's subjective motivation." *Bradway v. Gonzales,* 26 F.3d 313, 319 (2d Cir.1994) (citation omitted). "The Supreme

Court has stated that the immunity accorded officials by this doctrine protects all but the plainly incompetent or those who knowingly violate the law, and added that if officers of reasonable competence could disagree on the legality of an act, immunity should be recognized." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996).

Moreover, even if Plaintiff's constitutional rights were violated, Detective Kennedy is still entitled to qualified immunity because of Kennedy's "belief that his conduct was lawful was reasonable." *Cowan,* 352 F.3d at 762. *See also Saucier,* 533 U.S. at 202 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.").

Accordingly, Defendant Kennedy is entitled to qualified immunity.

C. Malicious Prosecution Claim

Under New York law, collateral estoppel occurs if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Vargas v. City of N.Y.,* 377 F.3d 200, 204 (2d Cir.2004). When claimed, the moving party must demonstrate that the non-moving party's previous claim was actually and necessarily decided and that Plaintiff had a full and fair opportunity to litigate those issues. *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

As I have previously noted, "under the *Rooker–Feldman* doctrine, lower federal courts lack subject matter jurisdiction over claims that effectively challenge state court judgments," based on comity and the firmly-established principle that only the Supreme Court can review a final decision of a state court. *Allianz Ins. Co. v. Cavagnuolo,* No. 03 Civ. 1636, 2004 WL 1048243 at \*4 (S.D.N.Y. May 7, 2004) (Baer, J.) (*citing to Kropelnicki v. Siegel,* 290 F.3d 118, 128 (2d Cir.2002)). [3] The essence of the *Rooker–Feldman* doctrine "is that inferior federal courts have no subject matter jurisdiction over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court." *Moccio v. New York State Office of Court Admin,* 95 F.3d 95, 197 (2d Cir.2000). *Rooker–Feldman* bars those claims that were adjudicated in a prior state court action, as well as those claims that are

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 155 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

"inextricably intertwined" with the state court judgment. We have held that "inextricably intertwined means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion." *Santini v. Conn. Hazardous Waste Mgmt. Serv.,* 342 F.3d 118, 126 (2d Cir.2003) (*quoting and citing Moccio,* 95 F.3d at 197). This doctrine protects the integrity of state court judgments and must, therefore, be invoked "if adjudication of a claim in federal court would require the court to determine that a state court judgment was erroneously entered or was void." *Kropelnicki,* 290 F.3d at 129.

**\*5** The Plaintiff's claim for malicious prosecution, which followed the November 16, 2001 dismissal of the criminal case, necessitates federal court review of the state court's determination of Plaintiff's civil complaint issued on November 26, 2003. In particular, New York State Supreme Court Judge Soto adjudicated, among other things, the malicious prosecution claim and entered a final judgment:

> On this cause of action [Malicious Prosecution], the complaint on its face fails to allege an essential element —the termination of the criminal proceedings in plaintiff's favor, which has been held to mean a termination on the merits. Failure to establish any one of the four requisite elements defeats the entire claim."

*Kramer v. New York,* No. 108657/02 (N.Y.Sup.Ct. Nov. 26, 2003). The decision constitutes a final judgment for the purposes of the *Rooker–Feldman doctrine. See Alleyne v. City of N.Y.,* 225 F.Supp.2d 391, 394 (S.D.N.Y.2002) (holding that "a party may not evade these rules and principles of federalism by recasting his claims pending in state court as a civil rights action under 42 U.S.C. § 1983."). Plaintiff has had an opportunity to litigate the claim already once in state court and now seeks a second bite at the apple in federal court. In order to succeed on the malicious prosecution claim, this Court would have to overturn the state court decision and "[a] plaintiff ... 'may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action'." *Brooks–Jones v. Jones,* 916 F.Supp. 280,

281—282 (S.D.N.Y.1996). Accordingly, Plaintiff's malicious prosecution claims must be dismissed.

Accordingly, Plaintiff's malicious prosecution claim must be dismissed.

**D. Fourteenth Amendment Violation**

Plaintiff argues that the Defendants violated her rights under the Fourteenth Amendment by favoring the allegations of Oliviera over Plaintiff. To establish an equal protection violation, plaintiffs must prove purposeful discrimination, *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987), directed at an identifiable or suspect class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

Plaintiff's equal protection claim is facially deficient. An equal protection claim requires "purposeful discrimination, directed at an identifiable or suspect class." *Id.* at 1057 (internal citation omitted). Kramer has made no such class allegation. Instead, Plaintiff's claim is based on the particular circumstances of her arrest. While it is possible for Plaintiff to allege a "class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000), Plaintiff is "required to show either that there was no rational basis for the unequal treatment received or that the denial of the application was motivated by animus." *Harlen Assoc. v. Vill. of Mineola,* 273 F.3d 494, 500 (2d Cir.2001) (internal citation omitted).

**\*6** Plaintiff has failed to present any evidence of unequal treatment sufficient to defeat summary judgment. *See Foy v. City of N.Y.,* No. 03 Civ. 7318, 2004 WL 2033074 (S.D.N.Y. Sept. 10 2004) (Baer, J.). Indeed, the available evidence demonstrates the Plaintiff's "arrest was not arbitrary, irrational, or motivated by animus of any sort." *Id.,* 2004 WL 2033074 at \*3. As was already stated, *see supra at* 4–5, the police officers had probable cause to arrest Plaintiff and received fair and equal treatment. Accordingly, this claim must be dismissed.

**E. Impermissible Search Leading to Damage to Reputation**

Plaintiff alleges that, because of the NYPD's unlawful entrance and search of Plaintiff's apartment and handbag, Plaintiff's reputation in the community was impaired and she was otherwise injured. (Complaint, ¶ 20).

The Supreme Court stated that reputation alone is not a protected liberty interest. *Siegert v. Filley,* 500 U.S. 226, 233 (1991). Plaintiff must demonstrate damage to her reputation "coupled with some other tangible element in order to rise to the level of a protectable liberty interest." *Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994). This requirement is commonly known as "stigma plus." *Valmonte,* 18 F.3d at 999. Defamation or damaged reputation alone fails to trigger a constitutional deprivation of a liberty interest. *See Siegert v. Gilley,* 500 U.S. 226, 233–34 (1991). "The stigma prong requires [Plaintiff] to show that the ... defendants' statements [or action] will result in stigma, public opprobrium and damage to [her] reputation." *Martinez v. City of N .Y.,* No. 00 Civ. 7914, 2003 WL 2006619 at *6 (S.D.N.Y. Apr. 30, 2003). If Plaintiff demonstrates sufficient stigma, she must also satisfy the "plus" requirement. In the Section 1983 context, a plaintiff who alleges governmental defamation must demonstrate:

> The utterance of a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and some tangible and material state-imposed burden or alteration of his or her status or of a right in addition to the stigmatizing statement.

*Paul v. Davis,* 424 U.S. 693, 701–702 (1976).

Here, the stigma-plus standard is not satisfied. Plaintiff fails to demonstrate that Defendants, as state actors, "altered or extinguished a right or status that was previously recognized under state law." *Avello v. Hammons,* 963 F.Supp. 262, 266 (S.D.N.Y.1997). Plaintiff has never attempted to obtain employment (Pl. Dep. at 196:21—24) and the pecuniary loss she suffered was a direct result of Noel Kramer's decision to cease financial support. (Pl. Dep. at 97:22—98:24; 172:19 —183:15). Furthermore, Plaintiff has not presented any evidence that would suggest that Plaintiff has been unable to garner employment. Any pecuniary loss cannot be attributed to the Defendants and, as such, Plaintiff cannot establish anything more than purported damage to her reputation resulting from her arrest.

**\*7** Accordingly, Plaintiff's damage to reputation must be dismissed.

F. Conspiracy Claim

Plaintiff alleges that under the circumstances, the friendship between Oliviera and Noel Kramer permit an inference that there was a meeting of the minds sufficient to establish a conspiracy liability theory.

To demonstrate a 42 U.S.C. § 1983 conspiracy, a plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324—25 (2d Cir.2002). In *Ciambriello,* the Second Circuit explained that "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* [4] The Second Circuit deemed the factual allegations inadequate in *Ciambriello* because plaintiff had "not provided any details of time and place and failed to specify in detail the factual basis necessary to enable defendants intelligently to prepare their defense." *Hernandez v. Goord,* 312 F.Supp.2d 537, 546 (S.D.N.Y.2004). [5] While Section 1983 claims "are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," *Hernandez,* 312 F.Supp.2d at 546, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002).

While Plaintiff extensively itemizes each instance of Noel Kramer interacting with the police department and Oliviera, neither the Complaint nor opposition to Defendants' motion for summary judgment articulates a single example of an impermissible agreement or *quid pro quo* arrangement. Plaintiff fails to present even a scintilla of evidence regarding the existence, or even inference, of any specific agreement to violate Plaintiff's rights, whether such an agreement was entered into, the nature of the agreement, or specific acts in furtherance of the agreement. Friendship alone is insufficient to support the existence of a conspiracy.

Accordingly, Plaintiff's conspiracy claim must be dismissed.

G. State Law Claims

    1. *Libel and Slander*

According to Plaintiff, Detective Kennedy and the NYPD disclosed false and defamatory information regarding Plaintiff to various newspapers. In particular, Plaintiff points to a May 15, 2001 New York Daily News article, which identified Plaintiff, her alleged attempt to poison her husband, her husband's sickness every time his wife cooked for him, her unwillingness to permit others to prepare food, and Noel Kramer's wealth. (Pl.Ex. O). Plaintiff also points to a New York Times article that paints a similar picture.

 **\*8** In order to establish a *prima facie* case for slander or libel under New York law, "all of the following elements are required: (1) a false and defamatory statement of and concerning the plaintiff; (2) publication by defendant of such a statement to a third party; (3) fault on part of the defendant; and, (4) injury to plaintiff." *Idema v. Wager,* 120 F.Supp.2d 361, 365 (S.D.N.Y.2000).

However, New York law recognizes "an absolute and qualified privilege for law enforcement personal, depending on the circumstances, and requires a showing of actual malice before a plaintiff will be allowed to prevail in a defamation action." *Regan v. Sullivan,* 557 F.2d 300, 309 n. 11 (2d Cir.1977). To overcome the qualified privilege:

> [T]he plaintiff must challenge the defendant's good faith and allege that [ ]he acted either with actual malice (i.e., [ ]he made a defamatory statement with the knowledge that it was false or with reckless disregard as to whether it was false), or with common law malice (i.e., [ ]he made the defamatory statement solely with the desire to injure the plaintiff).

*Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1165 (E.D.N .Y.2003). Mere allegations of libel and slander are not enough. *Shamley v. ITT Corp.,* 869 F.2d 167, 173 (2d Cir.1989). A plaintiff must present evidentiary facts that support this conclusion. *Id.* To survive a motion for summary judgment, a plaintiff must present "evidence in admissible form sufficient to raise a triable issue whether the statements

were made with malice." *County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 317 F.Supp.2d 383, 389 (S.D.N.Y.2004). "A plaintiff does not make the requisite showing of malice simply by conclusorily labeling the defamation malicious." *Id.* at 390 (*citing to Shamley v. ITT Corp.,* 869 F.2d 167, 173 (2d Cir.1989)). A plaintiff must present evidentiary facts that support this conclusion. *Id.* "This burden may not be met by surmise, conjecture and suspicion nor by mere conclusions, expressions of hope or unsubstantiated allegations or assertions." *Id.*

Assuming the statements made to the newspapers by law enforcement personnel were false, the Complaint fails to allege that the statements were made with the requisite malice. Malice, which "means spite or ill will," defeats the privilege "only if it is the one and only cause for the publication." *Id.* at 390 (collecting cases). Plaintiff failed to present a scintilla of evidence that would suggest the police falsely commented on the incident out of spite or because of any ill will towards Plaintiff. The Defendants' statements were "neither gratuitous nor irrelevant references to a prior incident that allegedly involved plaintiff." *Lee v. City of Rochester,* 677 N.Y.S.2d 848, 851 (N.Y.A.D. 4 Dep't 1998). The references to Plaintiff, assuming erroneous, were germane to the police investigation and "[a] police officer may give details of past and present incidents that would interest or affect the public." *Id.* Absent any evidence that the comments made to the press regarding Plaintiff were made in spite or ill will, the officer's statements appear to have merely been a reasonable mistake and, therefore does not establish either constitutional or common-law malice. [6]

 **\*9** Accordingly, Plaintiff's libel and slander claim must be dismissed.

    2. *Invasion of Privacy*

Plaintiff claims an invasion of privacy from the NYPD's unlawful entrance into Plaintiff's apartment and the searches of her person, her purse, and the apartment. (Pl. Dep. at 21). The record is unclear whether the police actually entered the apartment to arrest Plaintiff. [7] In her deposition, Plaintiff alleged that she refused the police entry into her apartment when they sought to arrest her on May 10, 2001, and that the police in response forcibly took her from the entrance of her apartment to arrest her (without actually entering the apartment). (Pl. Dep. at 137:6—140:25). The Supreme Court has held that arrest warrants are required to arrest suspects

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 158 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

within their homes, absent consent or exigent circumstances. *Payton v. New York,* 445 U.S. 573 (1980).

The reasonableness of a police determination of consent to enter is judged by the objective standard of whether the facts available at the moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises without a warrant. *Illinois v. Rodriguez,* 497 U.S. 177 (1990). In this case, the owner of the apartment and potential victim of the alleged crime gave the police permission to enter the apartment when he filed his complaint earlier on May 10, 2001. (Kennedy Dep. at 62:16—20; Hughes Dep. at 23:22—24:14; 31:2—16). Thus, whether or not the police entered Plaintiff's apartment to arrest her, the entry was made on a reasonable belief of consent to enter the apartment by a person with actual authority to grant such consent. Without a Fourth Amendment violation in the manner of her arrest or the entry into her apartment, defendants did not violate Plaintiff's reasonable expectations of privacy.

Accordingly, Plaintiff's invasion of privacy claim must be dismissed.

### 3. *Intentional Infliction of Emotion Distress*

Under New York law, to state a claim for intentional infliction of emotional distress, Plaintiff must demonstrate: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and, (4) severe emotional distress." *Hart v. Westchester County Dep't of Soc. Serv.,* 160 F.Supp.2d 570, 579 (S.D.N.Y.2001). "Liability has been found *only* where the conduct has been so *outrageous* in character, and so *extreme* in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Arena v. Agip,* No. 95 Civ. 1529, 2000 WL 264312 at *4 (S.D.N.Y. Mar. 8, 2000) (emphasis added).

There is no evidence in the record from which a fair-minded trier of fact could reasonably conclude that the conduct of these defendants constitutes either extreme or outrageous conduct. *See, e.g., Rall v. Hellman,* 726 N.Y.S.2d 629 (1st Dep't 2001); *Andrews v. Bruk,* 631 N.Y.S.2d 771 (2d Dep't 1995). Under the facts presented here, *see supra* at 4–11, the Court concludes that the record lacks any evidence even remotely satisfying this rigorous threshold and upon which a

rational fact-finder could find liability. *Brown v. City of N.Y.,* 306 F.Supp.2d 473, 481 (S.D.N.Y.2004).

**\*10** Accordingly, Plaintiff's claim of intentional infliction of emotional distress must be dismissed.

### 4. *Unlawful Strip Search*

Plaintiff contends that when she was forced to expose her derrière, the police officers engaged in an unlawful strip search while at the police precinct.

The Constitution mandates that searches of individuals, even those arrested or incarcerated, be reasonable under the circumstances. *Bell v. Wolfish,* 441 U.S. 520, 559 (1979). The reasonableness of a strip search turns on the scope of the intrusion, the manner in which the search is conducted, the justification for initiating the search, and the place in which the search is conducted. *Id.* (citations omitted). The Fourth Amendment prohibits strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses absent a "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charge, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v.. Dell,* 804 F.2d 796, 802 (2d Cir.1986). Several courts within this circuit have applied this particularized or individualized reasonable suspicion test to strip searches of felony arrestees. *See Sarnicola v. County of Westchester,* 299 F.Supp.2d 259, 270 (S.D.N.Y.2002) (holding that the mere arrest for felony drug charges does not permit strip search absent reasonable suspicion that the individual is secreting drugs or other contraband within body cavities); *Murcia v. County of Orange,* 226 F.Supp.2d 489, 494 (S.D.N.Y.2002) (policy to strip search felony arrestees arriving at correction facility is unconstitutional).

In this case, the officer satisfies even a heightened standard of particularized reasonable suspicion that the plaintiff was secreting contraband within her body cavity. Plaintiff was arrested for attempted murder. Plaintiff was alleged to have attempted to murder her husband by poisoning him with arsenic, a substance that is capable of being carried in a container small enough to be hidden in a body cavity. *See Covino v. Patrissi,* 967 F.2d 73, 79 (2d Cir.1992) (drugs and contraband often found in body cavities); *Storms v. Coughlin,* 600 F.Supp. 1214, 1219 (S.D.N.Y.1984) (same); *see also* 48 AMJUR POF 2d 431 at § 1 (description of arsenic). Perhaps most significant is the fact that plaintiff was searched *only* upon the two occasions she indicated she had to use the restroom. (Pl. Dep. at 154:16—155:17). This raised the

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 159 of 238

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

reasonable suspicion that plaintiff may have been secreting arsenic or other contraband within her and would take the opportunity to use the restroom to expunge it.

Additionally, the nature of the strip search itself was not unreasonable. The scope of the search was minimal insofar as plaintiff was only requested "to bear" her "derriere." (Pl. Dep. at 154:22). She was not forced to undergo a visual body cavity search. *See Sec. and Law Enforcement Empl. v. Carey,* 737 F.2d 187, 207—08 (2d Cir.1984) (distinguishing strip searches from more intrusive visual body cavity searches). She was not even asked to disrobe. Moreover, the search was conducted by a female officer in a holding cell without anyone else present. (Pl. Dep. at 154—55.) There is also evidence of the reasons for the search. The plaintiff testified she was not searched in any way when she first was placed in the holding cell. (Pl. Dep. at 155:6—10). It was only upon each of her two requests to use the restroom that she was searched by the officer, presumably suspicious that such requests were really efforts to destroy hidden contraband. (Pl. Dep. at 154—155). The search was thus not gratuitous or unjustified. Although one court in this jurisdiction has utilized a list of factors to be assessed under *Weber's* particularized reasonable suspicion test, *see Sarnicola,* 299 F.Supp.2d at 271—74, the circumstances here are nevertheless adequate to satisfy that test. The search of plaintiff was not unreasonable.

**\*11** Accordingly, Plaintiff's claim of unlawful strip search must be dismissed

### 5. *Assault and Battery*

The Plaintiff alleges that she suffered an assault and battery when the Detectives pushed and handcuffed her, as the handcuffs caused her to suffer black and blue marks, pain, and swelling. (Pl. Dep. at 139:16—19; 141:1—7).

In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force. *Green v. City of N.Y.,* No. 01 Civ.1996, 2004 WL 213009 at *3 (S.D.N.Y. Jan. 5, 2004).[8] Under federal or state law, a plaintiff must demonstrate that "the amount of force used was objectively unreasonable" based upon a consideration of "the perspective of the officer at the time of the arrest." *Anthony v. City of N.Y.,* No. 00 Civ. 4688, 2001 WL 741743 at *13 (S.D.N.Y. Jul. 2, 2001) (*quoting Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996)). Where there has been an unlawful arrest, any degree of force is unreasonable and excessive. *See Black*

*v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at *6 (S.D.N.Y. Sep. 5, 2002).

Here, we have already determined that the Detectives had probable cause and Plaintiff's arrest was lawful. *See supra* at 4. As Plaintiff does not allege that the officers used excessive force during the arrest, her claim of assault and battery should be dismissed.[9] Assuming an allegation of excessive force, the Plaintiff has not offered any evidence to show that the any force used against her was objectively unreasonable and the record supports the officers extremely limited use force when arresting her. While the Plaintiff states that she only complained to the officers who drove her from the 17th Precinct to Central Booking at Centre Street about how the tightness of the handcuffs (Pl. Dep. at 153:6—12) and the Plaintiff admitted that she did not tell Kennedy or the other detectives that arrested her that the handcuffs were too tight during her journey to the 17th Precinct. (Pl. Dep. at 152:12—24; 153:2—5). In addition, the Plaintiff admits that she did not sustain any physical injuries when the Detectives "pushed" her out of the apartment. (Pl. Dep. at 140:22—25). The Plaintiff's statements strongly imply that force was not used at all, much less unreasonable force, as the manner in which the Plaintiff was pushed did not hurt her at all, and the manner in which the Plaintiff was handcuffed clearly did not injure her at the time.

Accordingly, Plaintiff's claim of assault and battery should be dismissed.

### 6. *Negligent Hiring and Retention*

Plaintiff's claim that City and NYPD carelessly and recklessly hired, retained, trained, supervised, and promoted the officers who investigated and/or arrested the Plaintiff as well as Oliveira. The result of City and NYPD's negligent practices were the intentional torts listed above.

#### a. *Detective Kennedy, Shield 2041, and Unidentified NYC Police Officers*

**\*12** The City concedes that the individual defendants were employed by it on the date in question and, with the exception of Oliviera, acted *within* the scope of their employment. (Pl. Mtn. Sum. J. at 22). Plaintiff, therefore, has no claim for negligent training and supervision in light of this concession. *Colodney v. Continuum Health Partners, Inc.,* No. 03 Civ. 7276, 2004 WL 829158 at *9 (S.D .N.Y. Apr. 15, 2004) (holding that "[w]hen an employee is acting within the scope

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 160 of 238

of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior,* and no claim may proceed against the employer for negligent hiring or retention."). [10]

#### b. Oliviera

The Plaintiffs' claims for negligent hiring, retention, and supervision cannot provide a basis for liability against Oliviera. Under New York law, a plaintiff cannot establish a negligent hiring claim when the alleged employee acted outside the scope of his employment and was not under the City's supervision or control. *Estevez–Yalcin v. Children's Vill.,* 331 F.Supp.2d 170 (S.D.N.Y.2004). The "employer is only liable for the actions of an employee where the employee was engaged in the furtherance of the employer's business and the employer was, or could have been, exercising some control, directly or indirectly, over the employee's activities." *Mahmood v. City of N.Y.,* No. 01 Civ. 5899, 2003 WL 21047728 at *2—3 (S.D.N.Y. May 8, 2003). As this district recently noted:

> [A]n employee's actions are not within the scope of employment unless the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business. Thus, where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job-related, his actions cannot be said to fall within the scope of his employment.

*Id.,* 2003 WL 21047728, at *2—3 (citations omitted).

Here, the issue is whether Noel Kramer's friend and police officer, Oliviera, acted in his official capacity when he accompanied Noel Kramer to the police station. (Pl.Ex. Q, 54—56). The facts indicate that Oliviera acted in his personal capacity as a friend of Noel Kramer and not as a New York City police officer. First, Oliviera was off-duty when he made the decision to go to the 17th Precinct with Noel Kramer. (Heiman Dep. at 166:9—10). Second, no NYPD supervisor authorized Oliviera to go to the 17th Precinct with Noel Kramer. (Sullivan Dep. at 166:5—7). Third, Oliviera never spoke in his official capacity or acted on behalf of the NYPD while at the police station. Fourth, Oliviera never assisted with the search, spoke with any of the detectives, or carried an official assignment when you testified at Plaintiff's arraignment. (Sullivan Dep. at 166:12—167:14). It is well-settled that conduct "where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job-related, his actions cannot be said to fall within the scope of his employment" and, therefore, this claim must be dismissed.

### IV. *CONCLUSION*

**\*13**  For all of the foregoing reasons, Plaintiff's motion for Summary Judgment is GRANTED. The Clerk is instructed to close this motion and any other open motions and remove this case from my docket.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 2429811

---

**Footnotes**

1    In addition, for the sake of judicial economy, Defendant Oliveira's Motion to Dismiss will be adjudicated in tandem with NYC's motion for summary judgment. *See Ellis v. Guarino,* No. 03 Civ. 6562, 2004 WL 1879834 (S.D.N.Y. Aug. 24, 2004).

---

The determination of whether police officers are entitled to qualified immunity is to be determined independent of the merits of the underlying action. *Washington Square Post # 1212 v. Madura,* 907 F.2d 1288, 1297 (2d Cir.1990) (citation omitted).

This Court has no authority to review final judgments of a state court judicial proceeding, except for general constitutional challenges and reviews pursuant to an application for a writ of habeas corpus. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16 (1923); *D.C. Ct. of App. v. Feldman,* 460 U.S. 462, 482—86 (1983). Thus, "[a] plaintiff ... 'may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action'." *Brooks–Jones v. Jones,* 916 F.Supp. 280, 281—282 (S.D.N.Y.1996).

*See Toussie v. Powell,* 323 F.3d 178, 185 n. 3 (2d Cir.2003) ( "[W]e do not have occasion to examine the pleading requirements for [Section] § 1983 conspiracy claims. In particular we do not consider whether our previous statements on the pleading requirements for such conspiracy allegations, ... [requiring more than conclusory allegations to avoid dismissal] ... remain valid in light of ... *Leatherman v. [Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993) ] ... and *Swierkiewicz [v. Sorema N.A.,* 534 U.S. 506 (2002) ]...."

*See also Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993).

Under the *New York Times* standard, a plaintiff need not prove that actual ill will was the sole motivating factor for the publication of the defamatory statement, but "must demonstrate that the statements [were] made with [a] high degree of awareness of their probable falsity.... In other words, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication ." *Liberman v. Gelstein,* 80 N.Y.2d 429, 438 (1992) (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Accordingly, a defendant must act with "reckless disregard" for the truth. *Liberman,* 80 N.Y.2d at 439. *See, e.g., Time, Inc. v. Pape,* 401 U.S. 279, 289–92 (1971) (finding that deliberate omission of the word "allegation" or its equivalent in an article describing a government report, while erroneous, was insufficient to create a jury issue regarding actual malice); *Reliance Ins. Co. v. Barron's,* 442 F.Supp. 1341, 1350 (S.D.N.Y.1977). ("We must affirm the longstanding principle that inaccuracy itself will not demonstrate actual malice in a libel case."); *Suozzi v. Parente,* 616 N.Y.S.2d 355, 359 (1st Dep't 1994) (holding that "misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff or in accordance with a particular political view" does not constitute actual malice)

While Plaintiff testified at her deposition that the police never actually entered the apartment, Officer Kennedy, in his deposition, claimed that the police did enter. (Kennedy Dep. at 66:7).

Under New York law, an assault is an intentional placing of another person in fear of imminent harmful or offensive contact. *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001). A battery is an intentional wrongful physical contact with another person without consent. *Id.* at 203. An assault claim must allege facts that support a finding that the defendant intentionally placed the plaintiff in reasonable fear of imminent harmful or offensive bodily contact. *Black v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at *6 (S.D.N.Y. Sept. 5, 2002). To sustain a battery claim, a plaintiff must introduce evidence tending to show that the defendant intentionally and wrongfully engaged in physical contact with the plaintiff without the plaintiff's consent. *Id.,* 2002 WL 31002824 at *5.

As the plaintiff, in her complaint, does not allege facts that indicate that the officers used "objectively unreasonable force" against her during the arrest, but simply alleges that that the officers' contact in arresting, handcuffing and transporting her was "unnecessary and unlawful and was offensive" to her, (State Complaint, Paragraphs 23–26) there is no need to evaluate her claim under an "objectively unreasonable" standard. *See Black v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at *6 (S.D.N.Y. Sept. 5, 2002) (where the

court found that the Plaintiff was not solely relying on an unlawful arrest claim due to alleged facts indicating that the police hit the Plaintiff's head upon a dresser, and left her handcuffed for 15 minutes).

10      *See, e.g., Griffin v. City of N.Y.,* 287 F.Supp.2d 392 (S . D.N.Y.2003); *see also Karoon v. N.Y.C. Transit Auth.,* 659 N.Y.S.2d 27 (1st Dep't 1997).

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1953431
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Louis LUCIANO, Plaintiff,

v.

CITY OF NEW YORK et al., Defendants.

No. 09 Civ. 00359(DC).
|
July 2, 2009.

**Attorneys and Law Firms**

Aaron David Frishberg, Esq., New York, NY, for Plaintiff.

Martin Clearwater & Bell LLP, by: Gregory J. Radomisli, Esq., New York, NY, for Defendants New York–Presbyterian Hospital and Its Employees.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, by: Bradford C. Patrick, Esq., Assistant Corporation Counsel, New York, NY, for City Defendants.

*MEMORANDUM ORDER*

CHIN, District Judge.

 **\*1**  In this civil rights action, plaintiff Louis Luciano alleges under 42 U.S.C. § 1983 that defendants New York–Presbyterian Hospital (the "Hospital"), five of its employees, the City of New York, and two police officers violated his Fourth and Fourteenth Amendment rights when he was involuntarily committed to the Hospital as a psychiatric patient. For the following reasons, the Court hereby orders Luciano to show cause in writing within ten days why the Court should not dismiss his complaint against the Hospital and its employees.

*BACKGROUND*

For the purposes of this Memorandum Order, I accept the allegations in the complaint as true.

On May 27, 2005, Columbia Presbyterian Medical Center involuntarily committed Luciano as a psychiatric patient.

(Compl.¶ 6). That day, police officers had responded to defendant Jacqueline Luciano's—Luciano's sister and an employee of the Hospital—911 call and requested that emergency medical service workers take Luciano to the Hospital. (Compl.¶ 5, 21). The defendant doctors then evaluated Luciano and decided to commit him. (Compl.¶ 6, 33).

Luciano brought this suit, although it is unclear when. It appears that some papers were submitted in 2008, though the case was not docketed until 2009. It also appears that Luciano has served two different complaints, although only one complaint has been filed. On June 26, 2009, I held a pre-trial conference to discuss defendants' proposed motions to dismiss. During this conference, plaintiff's counsel was unable to articulate any basis for holding the Hospital and its employees liable as state actors under § 1983. In addition, the Court set a motion schedule at this conference; that schedule is hereby modified as to the Hospital and its employees.

*DISCUSSION*

"Section 1983 imposes civil liability upon a party who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." *Williams v. N.Y.C. Hous. Auth. & Local 237, I.B.T.,* No. 05 Civ. 2750(DC), 2007 U.S. Dist. LEXIS 91134, at —— 12–13, 2007 WL 4215876 (S.D.N.Y. Nov. 30, 2007) (internal citations and quotations omitted). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) defendants acted under "color of state law" (2) to deprive plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Pitchell v. Callan,* 13 F.3d 545, 547–48 (2d Cir.1994); *see also Am. Mfrs. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Generally, to withstand a motion to dismiss, a § 1983 complaint must set forth specific factual allegations indicating a deprivation of constitutional rights. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983."); *Martin v. N.Y. State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978).

 **\*2**  Here, Luciano fails to allege an essential element of his § 1983 claim—that the Hospital and its employees acted under

color of law. A private hospital can be considered a state actor for the purposes of a § 1983 claim if the hospital fulfills the "state compulsion," "public function," or "close nexus" test. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see also Doe v. Rosenberg,* 996 F.Supp. 343, 348–58 (S.D.N.Y.1998) (holding private hospital and its employees do not fulfill any of the three tests in similar situation); *Amofa v. Bronx–Lebanon Hosp. Ctr.,* No. 05 Civ. 9230(SHS), 2006 WL 3316278 at *4 (S.D.N.Y. Nov.13, 2006) (finding generally that private hospital is not state actor under § 1983). Luciano does not even allege that any of the exceptions to the general rule that a private hospital is not liable as a state actor under a § 1983 claim applies in his broad and conclusory complaint.

Luciano's allegation that his sister, Jacqueline Luciano, used her influence as a certified social worker to induce the police officers to transport Luciano to the Hospital does not save his claim, because merely supplying information to a police officer does not make the supplier of information a state actor. *See Bloom v. Town of New Windsor Police Dep't, et al.,* 234 F.3d 1261 (2d Cir.2000); *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999). Also, Luciano has not alleged that Jacqueline Luciano and the police officers were acting in concert. *See Bacquie v. City of N.Y.,* No. 99 Civ. 10951(JSM), 2000 WL 1051904 at *2 (S.D.N.Y. July 31, 2000) (holding that private individual may be subject to liability under § 1983 if he willfully collaborated with

an official state actor in the deprivation of a federal right). Accordingly, I am inclined to dismiss Luciano's § 1983 claims against the Hospital and its employees.

In addition, where the federal claims are dismissed at an early stage in the litigation, the Second Circuit has generally held that it is inappropriate for the district court to exercise supplemental jurisdiction. *See, e.g., Valencia,* 316 F.3d at 305; *Giordano v. City of N.Y.,* 274 F.3d 740, 754 (2d Cir.2001); *Seabrook v. Jacobson,* 153 F.3d 70, 72 (2d Cir.1998). Because it would appear that all of Luciano's federal claims against the Hospital and its employees lack merit, I would likely decline to exercise supplemental jurisdiction over his state law claims against the Hospital and its employees.

### *CONCLUSION*

For the foregoing reasons, Luciano is ordered to show cause in writing within ten days why the claims against the Hospital and its employees should not be dismissed. If he does not respond within ten days, I will dismiss these claims.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1953431

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2042919
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

MARK HOGAN, Plaintiff,
v.
DAVID VANDEWATER; GLEN E. TAYLOR, New York State Trooper; RICKY CRAFT, New York State Trooper; DUSTIN THOMAS, New York State Trooper; DAVID M. HOVENDON, New York State Trooper; JUSTIN R. HIRSCHEY, New York State Trooper; JOHN DOE(S); and JANE DOE(S), Defendants. [*]

6:25-cv-01359 (BKS/ML)
|
Filed 07/15/2026

**Attorneys and Law Firms**

Appearances:

For Plaintiff: A.J. Bosman, Robert Strum, Bosman Law, LLC, 3000 McConnellsville Road, Blossvale, New York 13308

For Defendant Vandewater: Matthew E. Whritenour, Knych & Whritenour, LLC, 6713 Collamer Road, East Syracuse, New York 13057

For New York State Trooper Defendants: Letitia James, Attorney General of the State of New York, John C. Jensen, Deputy Assistant Attorney General-In-Charge, Utica Regional Office, 207 Genesee Street, Fifth Floor, Utica, New York 13501

A.J. Bosman, Robert J. Strum, Bosman Law Firm, LLC, Blossvale, NY, for Plaintiff.

Matthew E. Whritenour, Elizabeth B. Zimmer, Knych & Whritenour, LLC, East Syracuse, NY, for Defendant David Vandewater.

John C. Jensen, Office of the Attorney General, Utica, NY, for Defendants Glen E. Taylor, Ricky Craft, Dustin Thomas, David M. Hovendon, Justin R. Hirschey.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes Chief U.S. District Judge

## I. INTRODUCTION

**\*1** Plaintiff Mark Hogan brought this 42 U.S.C. § 1983 action in New York State Supreme Court against Defendants David Vandewater and New York State Troopers Glen E. Taylor, Ricky Craft, Dustin Thomas, David M. Hovendon, and Justin R. Hirschey. [1] (Dkt. No. 2). The trooper Defendants subsequently removed the action to federal court. (Dkt. No. 1). Presently before the Court are Defendants' motions to dismiss and for judgment on the pleadings. (Dkt. Nos. 17, 22). The motions are fully briefed. (Dkt. Nos. 17-1, 22-8, 23, 26, 28, 29). For the reasons that follow, the motions are denied.

## II. BACKGROUND

### A. Facts [2]

Plaintiff owned property on Hiawatha Lake in Lewis County. (Dkt. No. 2, ¶ 13). His property, however, was "bounded along the real property line by" Defendant Vandewater's. (*Id.*). Following 2006 state court litigation, the two "stipulated to a designated" right of way, which Plaintiff then began to clear. (*Id.* ¶¶ 14–15). But Vandewater maintained that, in clearing that property, Plaintiff trespassed on his land. (*See id.* ¶ 16). So Vandewater "repeatedly urged" Plaintiff's arrest and prosecution for trespass, culminating in those charges' dismissal "years later, after repeated speedy trial motions." (*Id.*).

In 2016, Vandewater "propounded a new survey," arguing that the designated right of way "was at a different location than previously believed, stipulated, or agreed upon." (*Id.* ¶ 17). The parties litigated that issue in federal court, which adopted the new survey. (*Id.*). Plaintiff contacted the new surveyor to confirm "the location of the 'new' lot line boundary so he could commence clearing ... without fear of arrest." (*Id.* ¶ 18). The surveyor "assured Plaintiff that he had [correctly] placed the pins/stakes for the new boundary," and that Plaintiff "was 'all set.' " (*Id.*). Accordingly, Plaintiff "began marking and clearing trees to access his property." (*Id.*).

But the trooper Defendants "arrested and charged" Plaintiff "with various criminal offenses, including a felony." (*Id.*). Specifically, Hirschey charged Plaintiff on June 26, 2018 with trespass and second-degree criminal contempt for a May 26, 2018 incident, (*id.* ¶ 19); Thomas charged Plaintiff on June 23, 2019 with trespass and second-degree criminal contempt for a May 26, 2019 incident, (*id.* ¶ 20); and Taylor charged Plaintiff on June 26, 2019 with trespass and second-degree criminal

contempt for a different May 26, 2019 incident, and with trespass, third-degree criminal mischief, and second-degree criminal contempt for a June 12, 2019 incident, (*id.* ¶¶ 21–22). Hovendon also charged Plaintiff with trespass and second-degree criminal contempt on July 17, 2019 for two incidents occurring that day, and on August 21, 2019 for August 18 and 19 incidents. (*Id.* ¶¶ 23–26).

**\*2** Vandewater, Plaintiff says, "initiated" these prosecutions "by contacting law enforcement, providing knowingly false information in sworn statements, and requesting Plaintiff's arrest and criminal prosecution." (*Id.* ¶ 27). He "falsely represented" to the troopers "that Plaintiff disregarded a right of way established by courts, trespassed on Vandewater's land, and damaged his property while knowing that his representations were false." (*Id.*). Previously, Vandewater had "yelled obscenities at Plaintiff and threatened him with physical violence [when Plaintiff] attempted to use his" right of way—including one July 2011 incident, during which "Vandewater stated to Plaintiff, 'I'm going to keep making up these bullshit charges until I drive you out of here!' " (*Id.*).

The trooper Defendants, for their part, "charged Plaintiff ... without probable cause or a warrant and proceeded with criminal prosecution without sworn supporting depositions or statements as required under the law." (*Id.* ¶ 28). The troopers "were repeatedly advised of the absence of supporting depositions" and knew that "Vandewater, over the course of more than a decade, set in motion Plaintiff's criminal prosecution on occasions too numerous to mention." (*Id.*). They also knew "that none of the prior criminal prosecutions were successful." (*Id.*). Vandewater told the trooper Defendants that Plaintiff "ha[d] a right of way and thus [was] permitted to be on the premises"; but he provided them "no facts identifying or describing the location of the right of way." (*Id.* ¶ 29). The troopers thus "possessed no information that Plaintiff [had] exceeded his right of way and did not obtain any information as to the true location of the right of way." (*Id.*).

"Plaintiff was subjected to the deprivation of his liberty from on or about June 30, 2018 through May 12, 2022." (*Id.* ¶ 31). He was also "deprived of access and use of his property [for] fear that he [would] face additional [prosecution] and/or further verbal/physical violence" from Vandewater. (*Id.*). The criminal charges "were dismissed or Plaintiff's counsel was notified of their dismissal" on April 7, 2022; April 11, 2022; May 12, 2022; and August 9, 2022. (*Id.* ¶ 32).

### B. Procedural History

Plaintiff commenced this action in New York State Supreme Court, Lewis County, on April 14, 2025. (*See* Dkt. No. 1-2, at 2). In September, the trooper Defendants removed the action to federal court. (Dkt. No. 1). Shortly thereafter, Magistrate Judge Thérèse Wiley Dancks ordered Plaintiff to file proof of service on Vandewater. (Dkt. No. 6). Plaintiff then filed an affirmation of service explaining that he had unsuccessfully attempted to serve Vandewater personally at his residence on several occasions between July and October 2025. (Dkt. No. 8, at 1). Following these attempts, Plaintiff's process server avers, he served Vandewater using New York's "nail-and-mail" method, *see, e.g.*, *Unitrin Safeguard Ins. Co. v. Della-Noce*, 246 A.D.3d 448, 449 (1st Dep't 2026) (citing N.Y. C.P.L.R. § 308(4)), by affixing the summons and notice to the door of Vandewater's residence and mailing it to the same address, (Dkt. No. 8, at 1).

In an affidavit submitted in connection with his motion, however, Vandewater avers that the address reflected on this affirmation of service is his business address, not his residential address. (Dkt. No. 22-7, ¶ 2). Vandewater further denies that "a copy of Plaintiff's Summons with Notice or a Summons and Complaint [was] left at [his] place of business," or that he received those documents "through the mail at [his] place of business." (*Id.* ¶ 4). Responding to Vandewater's affidavit, Plaintiff submitted an "amended affirmation of service." (Dkt. No. 27). This amended affirmation correctly identifies Vandewater's business address; it further asserts that the process server attempted to personally serve Vandewater on an additional occasion in July 2025 at Vandewater's actual residence. (*See id.* at 1).

### III. SERVICE OF PROCESS

**\*3** As an initial matter, Vandewater and Hovendon raise arguments concerning insufficient service of process. (Dkt. No. 22-8, at 18–21; Dkt. No. 26, at 3; Dkt. No. 29, at 6–16). Hovendon, however, has forfeited any such argument by cursorily raising it for the first time in his reply. *See United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023) (collecting cases); (Dkt. No. 26, at 3). As to Vandewater, to survive a Rule 12(b)(5) motion for insufficient service of process, "the plaintiff must demonstrate that [he] adequately served the defendant[ ]." *Buon v. Spindler*, 65 F.4th 64, 73 (2d Cir. 2023). "[T]he Court may 'look to materials outside of the pleadings in determining whether service of process has been insufficient.' " *Nandalall v. Liberty Ins. Corp.*, No. 25-CV-4790, 2026 WL 1707575, at \*3, 2026 U.S. Dist. LEXIS

131704, at \*7 (E.D.N.Y. June 12, 2026) (alteration adopted) (quoting *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 (E.D.N.Y. 2013)); *cf. Dickerson v. Napolitano*, 604 F.3d 732, 752–53 (2d Cir. 2010).

"Although the Federal Rules of Civil Procedure apply to actions after removal, state law governs the sufficiency of service of process before removal." *Montefiore Med. Ctr. v. Aetna Health, Inc.*, No. 21-CV-7838, 2021 WL 5113013, at \*1, 2021 U.S. Dist. LEXIS 212765, at \*2 (S.D.N.Y. Nov. 3, 2021) (citing *PH Int'l Trading Corp. v. Nordstrom, Inc.*, No. 07-CV-10680, 2009 WL 859084, at \*3, 2009 U.S. Dist. LEXIS 27110, at \*8 (S.D.N.Y. Mar. 31, 2009)). For removed cases "in which any one or more of the defendants has not been served with process ... prior to removal," "such process or service may be completed or new process issued in the same manner as in cases originally filed in [the] district court." 28 U.S.C. § 1448. "This is so 'even if the time to serve under state law ha[s] expired before' " removal. *Nandalall*, 2026 WL 1707575, at \*6, 2026 U.S. Dist. LEXIS 131704, at \*15 (quoting 2 Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 81:13 (2025)).

But "removal does not automatically restart the clock for timely service or keep a district court from considering a plaintiff's previous delays in effecting service." *Consiglio v. Ward Trucking, LLC*, No. 11-CV-06100, 2012 WL 4498895, at \*1, 2012 U.S. Dist. LEXIS 139578, at \*4 (E.D.N.Y. Sept. 27, 2012); *Millet v. Selip & Stylianou LLP*, No. 15-CV-773, 2020 WL 979787, at \*2, 2020 U.S. Dist. LEXIS 34713, at \*4 (W.D.N.Y. Feb. 28, 2020) (same). Instead, courts have "discretion to allow service to be completed or new process issued pursuant to Rule 4 'in the same manner as cases originally filed in [the] district court' where 'any one or more of the defendants has not been served with process.' " *Consiglio*, 2012 WL 4498895, at \*2, 2012 U.S. Dist. LEXIS 139578, at \*5 (quoting § 1448); *Millet*, 2020 WL 979787, at \*2, 2020 U.S. Dist. LEXIS 34713, at \*5.

In turn, Rule 4(m) allows the Court to extend the time for service upon "good cause" shown, and in some circumstances "even in the absence of good cause." *See Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007); *see also Harmon v. Bogart*, 788 F. App'x 808, 810 (2d Cir. 2019); *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010). Similarly, as the parties note, New York law allows for extensions of its 120-day service period for good cause or in the interest of justice. N.Y. C.P.L.R. § 306-b; *see Leader v. Maroney, Ponzini & Spencer*, 97 N.Y.2d 95, 104–06 (2001).[3]

\*4 Here, Plaintiff did not serve Vandewater before the trooper Defendants' September 2025 removal. Yet the parties failed to address § 1448 or Rule 4(m), instead presenting arguments related only to New York's good cause and interest of justice standards. Moreover, there exists a factual dispute as to whether Plaintiff effectuated service on October 23, 2025. Plaintiff's process server avers that he served Vandewater via the "nail and mail" method permitted under New York law, (Dkt. No. 27, at 1–2); Vandewater, however, denies that "a copy of [the] Summons with Notice or a Summons and Complaint [was] left at [his] place of business," or that he received those documents "through the mail at [his] place of business." (Dkt. No. 22-7, ¶ 4). Additionally, as described above, Plaintiff's two affirmations of service contain factual discrepancies. Counsel characterizes these discrepancies as a "clerical error" and further asserts that "only one attempt could be made to serve [Vandewater] at his residence due to [Vandewater's] own attempts to deter access." (Dkt. No. 28, at 9). But none of this information has been provided in an affidavit from the process server.

In light of the above issues, the Court declines to rule on the sufficiency of service of process at this time. However, Vandewater may file a renewed Rule 12(b)(5) motion to dismiss within 30 days of the date of this decision.

## IV. MOTIONS FOR JUDGMENT ON THE PLEADINGS

### A. Standard of Review

Defendants move to dismiss for failure to state a claim, and for judgment on the pleadings, under Federal Rules of Civil Procedure 12(b)(6) and 12(c). (*See* Dkt. No. 17, at 1; Dkt. No. 22, at 1). Because they have already answered the complaint, (Dkt. Nos. 3, 14), the Court construes Defendants' motions as seeking judgment on the pleadings under Rule 12(c). *See Fed. R. Civ. P.* 12(b), (c), (h)(2)(B); *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). In any event, "[t]he standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).

To survive a Rule 12(b)(6) or Rule 12(c) motion, the "complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Lynch*, 952 F.3d at 74–75. The court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *L-7 Designs, Inc.*, 647 F.3d at 429. Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hayden*, 594 F.3d at 161.

### B. Analysis

### 1. Preclusion

Vandewater first argues that Plaintiff's claims are barred by claim and issue preclusion.[4] (Dkt. No. 22-8, at 8–18; Dkt. No. 29, at 3–6). Specifically, he points to an October 2023 state supreme court decision dismissing Plaintiff's state-law malicious prosecution claim against him for failure to state a claim. (*See* Dkt. No. 22-5, at 9–12). Plaintiff counters that the October 2023 decision did not constitute a merits dismissal with preclusive effect. (*See* Dkt. No. 28, at 4–6).

**\*5** The Court may address preclusion on a motion to dismiss or for judgment on the pleadings, considering facts that "are apparent on the face of the complaint, documents incorporated into or integral to the complaint, and matters of which the court may take judicial notice, including court records." *Reif v. Art Inst. of Chi.*, No. 24-809-CV, 2025 WL 763424, at \*3, 2025 U.S. App. LEXIS 5586, at \*6–7 (2d Cir. Mar. 11, 2025) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)); *cf. L-7 Designs, Inc.*, 647 F.3d at 422. In determining the "preclusive effect of a state-court judgment in the context of a subsequent" § 1983 suit, "a federal court must give to [that] judgment the same preclusive effect as would be given ... under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77, 81, 85 (1984) (footnote omitted). New York law therefore determines "the preclusive effect of a New York State court judgment." *21647 LLC v. Deutsche Bank Nat'l Tr. Co. as Tr. for New Century Home Equity Loan Tr. 2005-3*, No. 22-2793-CV, 2023 WL 7648624,

at \*2, 2023 U.S. App. LEXIS 30372, at \*3 (2d Cir. Nov. 15, 2023) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

Under New York law, dismissals for failure to state a claim generally carry no preclusive effect because they are not "determination[s] on the merits." *See Blake v. City of New York*, 144 A.D.3d 1071, 1073 (2d Dep't 2016). They do, however, carry "preclusive effect as to 'a new complaint for the same cause of action which fails to correct the defect or supply the omission determined to exist in the earlier complaint.' " *Id.* (quoting *175 E. 74th Corp. v. Hartford Accident & Indem. Co.*, 51 N.Y.2d 585, 590 n.1 (1980)). New York courts have applied this principle to both claim and issue preclusion. *See Wilder v. Fresenius Med. Care Holdings, Inc.*, 215 A.D.3d 511, 513 (1st Dep't 2023) (claim preclusion); *Ross v. Triborough Bridge & Tunnel Auth.*, 218 A.D.3d 810, 812 (2d Dep't 2023) (issue preclusion).

Here, then, the October 2023 dismissal carries no preclusive effect unless Plaintiff failed to correct the deficiency that decision identified. *See Blake*, 144 A.D.3d at 1073. And as discussed below, Plaintiff has stated a plausible claim by providing additional details in his complaint. The Court therefore declines to dismiss the complaint on preclusion grounds.

### 2. Statute of Limitations

"A statute of limitations defense may be decided on a Rule 12(b)(6) motion," and by extension a Rule 12(c) motion, "if the defense appears on the face of the complaint." *K.W. ex rel. K.A. v. City of New York*, 177 F.4th 127, 150 n.26 (2d Cir. 2026) (alteration adopted) (quoting *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021)); *cf. L-7 Designs, Inc.*, 647 F.3d at 422. The statute of limitations for Plaintiff's § 1983 claim is three years. *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 107–08 (2d Cir. 2023); *Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir. 1995). "In malicious prosecution suits under Section 1983, the statute of limitations begins to run when the prosecution 'terminates in the plaintiff's favor,' " which occurs once the prosecution "has 'conclusively' ended." *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) (alteration adopted) (first quoting *Poventud v. City of New York*, 750 F.3d 121, 130 (2d Cir. 2014) (en banc); then quoting *Murphy*, 53 F.3d at 548).

Although the parties dispute the sufficiency of Plaintiff's service, all appear to agree that he commenced this action on April 14, 2025. (Dkt. No. 17-1, at 8; Dkt. No. 22-8, at 18; Dkt. No. 28, at 7; *see also* Dkt. No. 1-2, at 2). And according to the complaint, the "criminal charges were dismissed or Plaintiff's counsel was notified of their dismissal" on or about April 7, 2022; April 11, 2022; May 12, 2022; and August 9, 2022. (Dkt. No. 2, ¶ 32). Had some or all of the charges been dismissed on April 7 or 11, 2022, they would be untimely. *See Spak*, 857 F.3d at 462. But those dates are approximate, and within a week of being timely; moreover, some may be the date counsel became aware of the dismissal, not the dismissal date. (*See* Dkt. No. 2, ¶ 32). In light of these allegations, the statute of limitations defense does not "appear[ ] on the face of the complaint," so at this stage the Court cannot dismiss the action on that ground. [5] *See K.W.*, 177 F.4th at 150 n.26; *L-7 Designs, Inc.*, 647 F.3d at 422. To the extent the parties argue that the sufficiency of service affects the statute of limitations analysis, (*see* Dkt. No. 22-8, at 18–20; Dkt. No. 26, at 3), that determination would require facts outside the complaint. And in any event, as explained above, the Court cannot decide the sufficiency of service issue on this record. The Court therefore will not consider such arguments at this time. *Cf. K.W.*, 177 F.4th at 150 n.26; *L-7 Designs, Inc.*, 647 F.3d at 422.

### 3. Malicious Prosecution

 **\*6** Finally, the parties dispute whether the complaint states a plausible malicious prosecution claim. In New York, "[t]o prevail on a malicious prosecution claim brought under Section 1983, a plaintiff must establish: '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, (4) actual malice,' and '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Carruthers v. Colton*, 153 F.4th 169, 181 (2d Cir. 2025) (alteration adopted) (quoting *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025)). Plaintiff must also allege state action, *i.e.*, "that he was injured by either a state actor or a private party acting under color of state law." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

Here, Vandewater argues that the complaint fails to allege he acted under color of state law. (Dkt. No. 22-8, at 21). The trooper Defendants contest the probable cause and malice

elements; they also raise qualified immunity. [6] (Dkt. No. 17-1, at 10–24).

Turning first to Vandewater, in the malicious prosecution context, "[a] private individual ... acts 'under color of state law' when [he] is a 'willful participant in joint activity with the State or its agents,' " *McDonald v. Molina*, No. 22-1261-CV, 2023 WL 2229365, at \*2, 2023 U.S. App. LEXIS 4624, at \*4 (2d Cir. Feb. 27, 2023) (quoting *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014)), such that "the two share some common goal to violate the plaintiff's rights," *Betts*, 751 F.3d at 85. Neither a private party's "provision of information" to police, nor an "officer's actions [taken on his] own initiative," suffice. *Anilao v. Spota*, 340 F. Supp. 3d 224, 253 (E.D.N.Y. 2018) (Bianco, J.); *Ginsberg v. Healy Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999). When "a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not jointly engaged in the officer's conduct." *Ginsberg*, 189 F.3d at 272 (citation modified). Courts, however, have "determined the 'under color of state law' requirement" met (1) where private defendants "had a clear objective of influencing the action of the state and fabricated evidence to achieve that objective," (2) "where police have arrested individuals based solely on the private defendants' request, without making an independent investigation of the matter," and (3) where private defendants "made false statements to the police to invoke the state's power to intentionally violate another's rights." *Anilao*, 340 F. Supp. 3d at 254.

To "begin" this analysis, the Court must "identify[ ] the specific conduct of which the plaintiff complains." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)). Here, Plaintiff says, Vandewater contacted the troopers and requested "Plaintiff's arrest and criminal prosecution"; Vandewater then provided sworn statements that Plaintiff "disregarded" a right of way, "trespassed on Vandewater's land," and "damaged his property," all "while knowing that his representations were false." (*See* Dkt. No. 2, ¶ 27). The troopers to whom Plaintiff provided the statements were aware that "over the course of more than a decade," Vandewater had "set in motion" numerous criminal prosecutions against Plaintiff, none of which were successful. (*Id.* ¶ 28). Vandewater told the troopers that Plaintiff had a right of way, but "provided no facts identifying or describing the location of the right of way," and without "any information as to the true location of the right of way," the troopers arrested and charged Plaintiff with the offenses described

above. (*See id.* ¶ 29). Plaintiff further alleges that before the events underlying the present claims, "Vandewater stated to Plaintiff, 'I'm going to keep making up these bullshit charges until I drive you out of here.' " (*Id.* ¶ 27).

**\*7** These allegations are sparse. But at this early stage, the Court must assume their truth and draw all reasonable inferences in Plaintiff's favor. *L-7 Designs, Inc.*, 647 F.3d at 429. Doing so, the Court concludes that Plaintiff has sufficiently, if barely, alleged the color of state law requirement as to Vandewater. *See Anilao*, 340 F. Supp. 3d at 254 (state action requirement met where private defendant had "clear objective of influencing" state's action and "fabricated evidence to achieve that objective," and where police charged individuals "based solely on the private defendants' request, without making an independent investigation of the matter"); *cf. Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996) (same based on inference that, during 20-minute conversation between private defendant and officers following officers' arrival, defendant "urged the officers to arrest both plaintiffs without probable in furtherance of what became the shared goal of depriving plaintiffs of federally guaranteed rights"); *Betts*, 751 F.3d at 85 (discussing *Bang* decision approvingly).

As to the trooper Defendants' arguments, "[p]robable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Carruthers*, 153 F.4th at 181 (alteration adopted) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). It "exists where officers have 'knowledge or reasonably trustworthy information' that a crime has been committed." *Alexander*, 132 F.4th at 158 (quoting *Triolo v. Cnty. of Nassau*, 24 F.4th 98, 106 (2d Cir. 2022)). Courts take a "charge by charge" approach, *Carruthers*, 153 F.4th at 181 (quoting *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024)); thus, "probable cause must support *each* charge brought by the prosecution," *Alexander*, 132 F.4th at 158. As now relevant, a person commits trespass "when he knowingly enters or remains unlawfully in or upon premises," N.Y. Penal Law § 140.05; second-degree criminal contempt when he engages in "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court," *id.* § 215.50(3); and third-degree criminal mischief when he "damages property of another person in an amount exceeding two hundred fifty dollars," *id.* § 145.05(2).

The complaint here sufficiently alleges the absence of probable cause. Vandewater told the troopers that Plaintiff "disregarded a right of way," "trespassed on Vandewater's land, and damaged his property." (Dkt. No. 2, ¶ 27). But Vandewater also told them that Plaintiff "ha[d] a right of way and" could therefore "be on the premises"; and the trooper Defendants "possessed no information ... as to the true location of the right of way." (*Id.* ¶ 29). Additionally, the troopers "were aware" that Vandewater previously "set in motion" criminal prosecutions against Plaintiff, none of which "were successful." (*Id.* ¶ 28). Accepting the complaint's allegations as true and drawing reasonable inferences in Plaintiff's favor, the troopers possessed no additional information—and conducted no additional investigation— to support the charges. They therefore lacked sufficient "knowledge or reasonably trustworthy information" to determine that Plaintiff had knowingly entered another's premises, intentionally disobeyed a lawful court mandate, or damaged another person's property. *See Alexander*, 132 F.4th at 158.

The complaint also sufficiently alleges malice. In this context, " 'malice' is 'a wrong or improper motive, something other than a desire to see the ends of justice served.' " *Barnes v. City of New York*, 338 F. Supp. 3d 317, 325 (S.D.N.Y. 2018) (quoting *Fulton v. Robinson*, 289 F.3d 188, 198 (2d Cir. 2002)). The "lack of probable cause generally creates an inference of malice." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (quoting *Boyd*, 336 F.3d at 78); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997). At this stage, the lack of probable cause—in addition to the trooper Defendants' knowledge that all the previous prosecutions Vandewater prompted against Plaintiff failed— sufficiently demonstrates malice.

**\*8** Finally, the trooper Defendants invoke qualified immunity. (Dkt. No. 17-1, at 10–15). To prevail on a qualified immunity defense at the pleadings stage, "the facts supporting the defense must appear on the face of the complaint." *Sabir v. Williams*, 52 F.4th 51, 63 (2d Cir. 2022) (alteration adopted) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). "Moreover, 'the plaintiff is entitled to all reasonable inferences from the facts alleged,' including 'those that defeat the immunity defense.' " *Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021) (quoting *McKenna*, 386 F.3d at 436).

Under this "stringent standard," *McKenna*, 386 F.3d at 436, the Court cannot conclude—from the facts appearing on the face of the complaint—that the trooper Defendants are

entitled to qualified immunity at this stage. Indeed, in arguing otherwise, they urge the Court to discount the complaint's factual allegations and look to matters outside the complaint. (*See* Dkt. No. 17-1, at 14 ("None of the [Defendants' alleged conduct violated] clearly established law as they received complaints [that] they had no reason to believe were not sufficiently credible, *notwithstanding Plaintiff's conclusory arguments to that effect in the Complaint*." (emphasis added)); Dkt. No. 26, at 7 ("[I]t was objectively reasonable for officers to conclude *based upon Mark Hogan's history of conduct towards his neighbors* and the complaints made to them by Vandewater or others, that they had probable cause to arrest Plaintiff." (emphasis added))). Making reasonable inferences in Plaintiff's favor, the complaint's allegations do not on their face reflect that the trooper Defendants possessed the required "arguable probable cause" as to each offense, which would "entitl[e] [them] to qualified immunity." *Betts*, 751 F.3d at 83; *Horn*, 11 F.4th at 170.

**V. CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendants' motions (Dkt. Nos. 17, 22) are **DENIED**; and it is further

**ORDERED** that, as set forth above, Defendant Vandewater may file a renewed Rule 12(b)(5) motion to dismiss for insufficient service of process within 30 days of the date of this decision.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 2042919

---

**Footnotes**

\*       The Clerk of Court is respectfully directed to amend the caption as set forth above.

1       Plaintiff also sued John and Jane Does, whom this decision does not address. (*See* Dkt. No. 2, ¶ 11).

2       The facts are drawn from the complaint. (Dkt. No. 2). The Court assumes the truth of, and draws all reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). The trooper Defendants request that the Court take judicial notice of certain facts underlying previous litigation involving Plaintiff. (Dkt. No. 17-1, at 17–22). But the Court cannot take judicial notice of those facts for their truth. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

3       Section 306-b's separate 15-day service deadline applies to actions "where *the applicable statute of limitations* is" itself "four months or less"—not, as Vandewater asserts, (Dkt. No. 22-8, at 18–19), in any action where the statute of limitations will expire within four months or less. *See* § 306-b (emphasis added); *see also Flores-Grgas v. N.Y. State Off. of Child. & Fam. Servs.*, 242 A.D.3d 572, 572–73 (1st Dep't 2025) (applying 15-day deadline to proceeding with four-month statute of limitations).

4       Although the parties use the terms "res judicata" and "collateral estoppel," the Court refers to "claim preclusion" and "issue preclusion" for clarity and consistency with "modern usage." *See Hedrington v. United States*, 176 F.4th 1177, 1180 n.1 (9th Cir. 2026) (citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

5       However, in the interest of efficiency, the parties would benefit from expedited discovery on the statute of limitations issue to determine the precise dates on which the prosecutions were terminated.

6       The trooper Defendants also contest personal involvement. (*See* Dkt. No. 17-1, at 15, 16, 24). They are correct that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). But each trooper is alleged to have participated in at least one prosecution.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban,
P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O.
Edward Simonetti, P.O. Matthew Boorman, P.O.
Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan;
P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

**\*1** Plaintiff Ronald Moye has brought claims against the City of New York, former New York County Assistant District Attorney Dustin Chao, and eight members of the New York City Police Department ("NYPD") under 42 U.S.C. § 1983 and state law. Moye claims that Chao is liable for damages under Section 1983 and state law for malicious prosecution, abuse of process, denial of a fair trial, fabrication of evidence, conspiracy "to inflict an unconstitutional injury," and intentional and negligent infliction of emotional distress. (Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Claims) Chao has moved to dismiss the Amended Complaint on grounds of absolute immunity. For the reasons stated below, Chao's motion to dismiss will be granted.

### BACKGROUND

For purposes of deciding Defendant Chao's motion to dismiss, the Court has assumed that the following facts presented in the Amended Complaint are true.

### I. *MOYE'S ARREST*

On or about March 12, 2002, at approximately 8:00 p.m., NYPD officers Paul Jeselon and Tawaina O'Neal were stationed on the rooftop of an apartment building on the south side of West 118th Street near the corner of Morningside Avenue conducting nighttime narcotics surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located on the north side of West 118th Street, near Manhattan Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed Plaintiff "extend his hand from the driver's side window and hand a small glassine" to another individual—later arrested—who, in turn, handed it to an unapprehended customer. (*Id.* ¶ 20) The Defendant officers moved in and arrested Moye in the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the officers searched Moye and his car and found United States currency, both in Moye's possession and inside the vehicle. (*Id.* ¶ 27) The Defendant officers unnecessarily grabbed Moye, pushed him, and placed excessively tight handcuffs on him (*id.* ¶ 30), causing him to suffer bruises to and numbness in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal Possession of a Controlled Substance in the Third Degree. (Am. Cmplt. ¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that the police officer defendants "conspired [to give] and gave false testimony and intentionally placed false evidence before the grand jury." [1] (Am.Cmplt.¶ 35)

### II. *MOYE'S FIRST TRIAL*

Moye's first trial began on January 14, 2003. (Schwartz Decl., Ex. B) A.D.A. Chao introduced photographs at trial which he claimed showed the position of Plaintiff s car as it was parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer Jeselson, and Officer Papa were present when a District Attorney's office photographer took these photos in June 2002 from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42, 44) Although the photographs were intended to convey the vantage point of the officers on the night of the arrest, they did not replicate the "nighttime conditions." (*Id.* ¶ 45) According to Moye, these photographs nonetheless showed that the officers could not have seen Plaintiff extend his hand from the driver's side window and pass a small glassine to another individual, because the driver's side could not be seen from the vantage point of the rooftop observation post, even with binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*

**\*2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers would have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

> "[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

> "And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's

office. Well, if Officer Jeselson thought he was going to get away with it—

> "[DEFENSE counsel]: Mr. Chao is vouching for his witness.

> "THE COURT: Overruled.

> "[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

> "[DEFENSE counsel]: That's objectionable vouching for his witness.

> "THE COURT: Overruled.

> "[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

> **\*3** "THE COURT: Overruled.

> "[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

> "So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken....

> "[DEFENSE counsel]: He is vouching for his witness using the pronoun I.

> "THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Move,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

### IV. *THE CHARGES AGAINST MOYE ARE DISMISSED*

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Move,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched

for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id.* at 6. The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

## DISCUSSION

### I. *IMMUNITY*

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity.[2]

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

**\*4** As the Second Circuit has explained:

> Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their

direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).

By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

> [t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

### A. *Legal Standard for Absolute Prosecutorial Immunity*

A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at \*4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b)(6) motion where facts establishing the defense may be

"gleaned from the complaint")). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. [3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

**\*5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

> not retreated ... from the principle that acts undertaken by a prosecutor

preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

**\*6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett v. United States,* 798 F.2d

565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir.1986); *see also Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.1988) (*per curiam* ) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties. *See Imbler,* 424 U.S. at 426–428.

*Dory,* 25 F.3d at 83.[4]

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City,* No. 11 CV 0195 FB, 2012 WL 603561, at *4 (E.D.N.Y.2012) (citing *Barbera v. Smith,* 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. *Id.* While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley,* 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct." *Cousin v. Small.*

325 F.3d 627, 633 (5th Cir.2003); *accord Barbera,* 836 F.2d at 99 (noting "that in each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts"); *see also DiBlasio v. Novello,* 344 F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether absolute immunity should attach to a prosecutor ... we have focused on the timing of the conduct at issue....") Thus, in interpreting *Buckley,* the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand, with only the former entitling a prosecutor to absolute immunity. *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

**\*7** In assessing a prosecutor's claim of absolute immunity, the court employs a "functional approach," *see, e.g., Burns,* 500 U.S. at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229 (1988); *see also Van de Kamp v. Goldstein,* 555 U.S. 335, 335–336 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of ... 'functional' considerations"). The court must inquire whether the actions in question are part of a prosecutor's traditional function and whether they are closely associated with the judicial process. *Blouin v. Spitzer,* 356 F.3d 348, 357 (2d Cir.2004) (a court must examine the "nature of the function performed" in assessing whether absolute immunity will attach.); *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

**B.** *Analysis*

**1.** *Malicious Prosecution, Abuse of Process*

To the extent that the Amended Complaint seeks to hold Chao liable for initiating the prosecution of Moye, absolute immunity is clearly applicable. *Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."); *see also Hill,* 45 F.3d at 660–61 (holding that prosecutors and those working under their direction are absolutely immune for claims relating to the initiation of a prosecution and for conduct before a grand jury). Plaintiff s federal and state law claims alleging malicious prosecution and abuse of process will therefore be dismissed.[5]

### 2. *Creation of Misleading Photographs, Conspiracy to Present False Evidence at Trial*

Moye alleges that Chao, in preparation for Moye's second trial, returned to West 118th Street and instructed Nancy Badger—the District Attorney's office photographer—to take photographs that inaccurately represented the position of Moye's car on the night of his arrest. Chao then presented these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40, 50, 50–54, 66–67) Moye alleges that these photographs gave the false impression that the police in the observation post would have been able to see Moye's hand outside the driver's side window. (*Id.* ¶ 60) Moye further argues that absolute immunity does not extend to Chao's role in obtaining these allegedly misleading photographs, because obtaining such evidence is "not a traditional prosecutorial function" and was "done for the purpose of misleading the second jury." (Pltf. Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for presentation of testimony," however, but also to preparatory conduct "relating to their advocacy." *Dory,* 24 F.3d at 83. The Supreme Court and the Second Circuit have emphasized that ' "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d at 571 ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....").

**\*8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at \*10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at \*5, \*11, \*13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at \*21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at \*30–\*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ... conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

**\*9** Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

### 3. *Misconduct at Trial*

Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at \*4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony...." ' ") (citations omitted); *Bertuglia,* 2012 WL 906958, at \*23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at \*2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at \*2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff); *see Imbler,* 424 U.S. at 430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard.* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at \*3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at \*2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express [ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

**\*10** In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

\* \* \* \*

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

### CONCLUSION

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

---

## Footnotes

1    The Amended Complaint does not disclose what false testimony or other false evidence was laid before the grand jury. Moreover, there is no suggestion that Chao was involved in presenting false testimony or false evidence to the grand jury.

2    Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

3    District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

4    By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

5    Absolute immunity is a defense not only to Section 1983 claims but to related state law claims. *See Shmueli,* 424 F.3d at 238 (dismissing Section 1983 and related state law malicious prosecution claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112 (E.D.N.Y.2004) (dismissing abuse of process and civil conspiracy claims on grounds of absolute prosecutorial immunity); *Imbler,* 424 U.S. at 424 (same principles require conferral of absolute immunity for damage claims against prosecutors under Section 1983 and state law).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7176374
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Millie Amelia NEAL, Plaintiff,
v.
Pamelia Ann NEAL, City of Ogdensburg Police
Department, Officer Bouchard, Officer Weslott,
Officer La Claire, and Officer Slater, Defendants.

No. 7:11–CV–0297 (TJM/GHL).
|
Dec. 16, 2011.

**Attorneys and Law Firms**

Millie Amelia Neal, Birmingham, MI, pro se.

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** Presently before the Court is a *pro se* amended complaint filed by Plaintiff Millie Amelia Neal. (Dkt. No. 10.) For the reasons discussed below, I recommend that the Court dismiss the amended complaint without leave to amend.

### I. PROCEDURAL HISTORY

Plaintiff filed her original complaint on March 17, 2011. (Dkt. No. 1.) In that complaint, she made allegations about events occurring in *September* 2011. On May 18, 2011, I recommended that the complaint be dismissed with leave to amend because, due to the date discrepancy, the allegations were factually impossible. (Dkt. No. 7 at 2.) Before Judge McAvoy could act on the Report–Recommendation, Plaintiff filed an amended complaint. (Dkt. No. 10.) On September 29, 2011, Judge McAvoy referred the amended complaint to me for review. (Dkt. No. 11.)

### II. SUMMARY OF THE AMENDED COMPLAINT

The amended complaint alleges as follows:

Plaintiff's mother resided in Ogdensburg, New York. (Dkt. No. 10 ¶ 2 1.) Plaintiff alleges that her mother had "life ownership of the house" and that upon her passing "house ownership would be transferred" to Plaintiff's two surviving brothers. *Id.* Plaintiff's sister, Defendant Pamelia Ann Neal, "resided in the house ... for over [ten] years, as a tenant." *Id.* ¶ 22.

Plaintiff alleges that on September 2, 2010, she attempted to visit her mother at the Albany Medical Center. *Id.* ¶ 46. When hospital staff told her that her mother did not want to see her, Plaintiff "had to threaten the hospital with a lawsuit in order to gain access to her dying Mother who had tearfully expressly requested for Plaintiff to come see her at the hospital the previous day." *Id.* During that visit, Plaintiff learned that her mother had been "anxious to see her" and that it was her siblings-especially Defendant Neal-who "had been attempting to prevent the Plaintiff from" seeing her mother. *Id.* ¶ 47. During the visit, Plaintiff learned that she and her mother had been estranged for fifteen years because of "a lie that Defendant Pam Neal had contrived in 1995 in a criminal complaint." *Id.* ¶ 48.

Plaintiff's mother died on September 11, 2010. *Id.* ¶ 19. Plaintiff alleges that Defendant Neal agreed that day to allow Plaintiff and her daughter to pay $20 per night to stay at the family home in Ogdensburg for the funeral and family reunion. *Id.* ¶¶ 23–25. However, Defendant Neal refused to honor the agreement and "demanded that Plaintiff and her daughter [ ] stay at a hotel" when they arrived in Ogdensburg on September 12, 2010. *Id.* ¶ 26. As a result, Plaintiff incurred expenses for a one-night hotel stay at the Grand View hotel and "approximately [three] nights hotel expense at an additional, less expensive area motel." *Id.* ¶ 29.

On September 13, 2010, Defendant Neal asked Plaintiff to return to the family home for wake preparations. *Id.* ¶ 30. However, when Plaintiff arrived she "was barred from entry and riddled with insults, mockery, and more breach of agreement ...." *Id.* Plaintiff was allowed entry to the house after additional discussion with other siblings. *Id.* ¶ 31. At that point "it was confirmed that Defendant Pam Neal had no legal rights" to the family home and did not have any authority to bar Plaintiff from entering the home. *Id.*

**\*2** On September 14, 2010, Plaintiff was instructed to return to the family home to meet with her siblings before attending her mother's wake. *Id.* ¶ 32. She was informed that the will was scheduled to be read the next day. *Id.*

On September 15, 2010, Plaintiff was instructed to return to the family home to meet her siblings and to be escorted by

limousine to her mother's funeral and burial service. *Id.* ¶ 33. The plan was that the family would attend the services and the reception and then return to the family home. *Id.* ¶ 34. Things went as planned and Plaintiff returned to the family home after the services and "peaceably entered." *Id.* ¶ 35. "At about 6:30 p.m., Defendant Pam Neal suddenly insisted that Plaintiff leave the house" because "she was just sick of seeing her ...." *Id.* ¶ 36. Plaintiff "asked to be left alone as this would be the last time she would be visiting that house ... and would be leaving after getting information about attending the reading of their Mother's will." *Id.* ¶ 37. When Plaintiff said that she wanted to be present for the reading, Defendant Neal yelled "Now, just leave, now!" *Id.* ¶ 38.

Plaintiff refused to leave. *Id.* ¶ 39. Defendant Neal conferred with three other members of the family. *Id.* Moments later, Plaintiff was "informed they were going to call the police to have Plaintiff arrested if she would not leave the house immediately." *Id.*

The police arrived at approximately 6:45 p.m. *Id.* ¶ 41. Defendant Officers Bouchard, Westlott, LaClaire, and Slater entered the house and demanded that Plaintiff leave immediately or be arrested and charged with trespassing. *Id.* ¶¶ 15, 41. Plaintiff explained the situation to Defendants Bouchard and Westlott. *Id.* ¶¶ 42–43. Despite being "informed that Defendant Pam Neal and the other siblings had no legal authority to the house and no legal right or jurisdiction to threaten arrest of their sibling for not leaving the house upon command," the officers "ignored the rights of the Plaintiff to ... be present at the Dearly Departed's house and ordered Plaintiff to leave or be arrested." *Id.* ¶ 43.

Plaintiff left the house. *Id.* ¶ 44. Defendant LaClaire, who was on the front porch, told Plaintiff that she would be arrested if she did not hurry up and leave. *Id.*

Plaintiff alleges that "Defendant Pam Neal did so deliberately plan to deprive her sister ... of the right to be present and aware of the reading of the Dearly Departed's Last Will and Testament and it is further believed that said Defendant co-conspired with the other siblings to deprive the Plaintiff of her rightful previously inherited property that was being held on the premises ..." *Id.* ¶ 45.

Plaintiff alleges that Defendants violated her rights under 42 U.S.C. §§ 1983 and 1986 to free speech and assembly, conspired to violate those same rights in violation of 42 U.S.C. §§ 1983, 1985(3), and 1986, violated 18 U.S.C. §

242, and committed the state law torts of intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at 9–17.

### III. ANALYSIS

**\*3** Section 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). The court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond. *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983).

#### A. Claim Under 18 U.S.C. § 242

Plaintiff alleges that Defendants violated 18 U.S.C. § 242. (Dkt. No. 10 at 13–15.) 18 U.S.C. § 242 is a criminal statute that does not create a private right of action. *Christian v. Town of Riga,* 649 F.Supp.2d 84, 90 (W.D.N.Y.2009) (citations omitted). Thus, Plaintiff lacks standing to maintain a cause of action under 18 U.S.C. § 242.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, the problem with Plaintiff's 18 U.S.C. § 242 claim is substantive and better pleading will not cure it. Therefore, I recommend that the Court dismiss Plaintiff's 18 U.S.C. § 242 claim without leave to amend.

#### B. 42 U.S.C. § 1983 Claims Against Defendant Neal

Plaintiff alleges that Defendant Neal violated her rights under 42 U.S.C. § 1983. (Dkt. No. 10 at 9.) 42 U.S.C. § 1983 permits a person to recover damages from another who has deprived her of her constitutional rights "under color of any statute, ordinance, regulation, custom, or usage of

any State or Territory." It is the duty of the plaintiff to allege state action on the part of the defendants named in a complaint, and a court may dismiss an action under 28 U.S.C. § 1915(e) where a plaintiff fails to plead such a nexus. *See, e.g., Carollo–Gardner v. Diners Club,* 628 F.Supp. 1253, 1256–57 (E.D.N.Y.1986) (dismissing as frivolous *pro se* complaint where plaintiff failed to allege state action on part of defendants) (citations omitted); *see also DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, 311 (2d Cir.1975) (affirming dismissal of complaint where plaintiff failed to include allegations of state action in complaint), *modified on other grounds* 520 F.2d 409 (2d Cir.1975).

**\*4** Defendant Neal is a private actor. Private actors can be liable under § 1983 pursuant to the "joint action" doctrine, under which "a private actor can be found to act under color of state law for § 1983 purposes if the private party is a willful participant in a joint action with the State or its agents." *Anilao v. Spota,* 774 F.Supp.2d 457, 498 (S.D.N.Y.2011) (citation and punctuation omitted). However, "[t]he provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action." *Id.* (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999)); *Fisk v. Letterman,* 401 F.Supp.2d 362, 367 (S.D.N.Y.2005) ("[A] private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor ...."). Here, Plaintiff alleges only that Defendant Neal summoned the police to remove Plaintiff from her mother's home. This fact does not plausibly suggest that Defendant Neal engaged in joint action with state actors. Further, better pleading could not cure this defect. Therefore, I recommend that the § 1983 claims against Defendant Neal be dismissed without leave to amend.

### C. § 1983 Free Speech Claim

Plaintiff alleges that Defendant Officers Bouchard, Westlott, LaClaire, and Slater violated her right to freedom of speech when they told her she would be arrested if she did not leave her mother's home. (Dkt. No. 10 at 9–10.) This allegation fails to state a claim.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." This provision has been incorporated to the states (*Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)) and to their political subdivisions (*Lovell v. City of Griffin,*

303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938)) through the Fourteenth Amendment. Although the First Amendment protects speech from government interference in public and quasi-public forums [1] and in one's own home, [2] there is no First Amendment right to speech in the private home of another person. [3] Here, Plaintiff alleges merely that she was prevented from speaking in the private home of another person. Therefore, I recommend that the Court dismiss Plaintiff's free speech claim without leave to amend.

### D. 42 U.S.C. § 1983 Free Association Claim

Plaintiff alleges that Defendant Officers Bouchard, Westlott, LaClaire, and Slater "did wrongfully disrupt, chill, punish, 'neutralize' and otherwise infringe upon the lawful, protected activities of the Plaintiff on behalf of challenging her right to freedom of ... association." (Dkt. No. 10 at 9–10.)

"The freedom of association guaranteed by the First Amendment does not comprise the freedom to associate in any location of one's choice." *Schuloff v. Fields,* 950 F.Supp. 66, 68 (E.D.N.Y.1997). The Court can find no authority holding that individuals have a free association right to remain in the private home of another person when asked to leave by that person. Therefore, I recommend that the Court dismiss Plaintiff's freedom of association claim without leave to amend.

### E. 42 U.S.C. § 1983 Conspiracy Claim

**\*5** Plaintiff alleges that Defendants conspired to deprive her of her right to free speech and free association in violation of 42 U.S.C. § 1983. (Dkt. No. 10 at 11–12.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted). Here, as discussed above, Plaintiff has not alleged facts plausibly suggesting that Defendants inflicted any unconstitutional injury on her. Therefore, I recommend that the Court dismiss the § 1983 conspiracy claim without leave to amend.

### F. 42 U.S.C. § 1985(3) Claim

Plaintiff claims that Defendants violated 42 U.S.C. § 1985(3) by conspiring to deprive her of her civil rights. (Dkt. No. 10 at 12–13.) "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a

person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999)

The complaint fails to state a § 1985(3) claim for two reasons. First, Plaintiff does not allege facts plausibly suggesting that Defendants deprived her of equal protection or equal privileges and immunities. "Section 1985(3) clearly provides a remedy for conspiracies to deprive persons of their rights under the United States Constitution." *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 587 (2d Cir.1988). In *Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), Justices Powell and Stevens issued concurrences stating that § 1985(3) provides a cause of action *only* when a "federal right" or a "fundamental right[ ] derived from the Constitution" is violated. *Novotny,* 442 U.S. at 376, 379. District courts in the Second Circuit have cited *Novotny* for the proposition that § 1985(3) "creates no substantive rights, but, instead, provides a remedy for the deprivation of rights guaranteed by *the United States Constitution." Zaidi v. Amerada Hess Corp.,* 723 F.Supp.2d 506, 515 (E.D.N.Y.2010); *Bibeau v. Soden,* No. 8:08–CV–0671 (LEK/RFT), 2009 WL 701918, at *8 (N.D.N.Y. Mar.13, 2009) ("if there is no underlying *constitutional* violation, there can be neither a §§ 1983 or 1985 cause of action for conspiracy") (emphasis added) [4]; *Vertical Broadcasting, Inc. v. Town of Southhampton,* 84 F.Supp.2d 379 (E.D.N.Y.2000). [5] Here, as discussed above, Plaintiff has not alleged any facts plausibly suggesting that she was deprived of any constitutional or federal right. Therefore, she has not stated a § 1985(3) conspiracy claim.

**\*6** The complaint fails to state a § 1985(3) claim for a second reason. To state a claim under § 1985(3), "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Plaintiff does not allege that Defendants discriminated against her on the basis of race or because of her membership in any class. The defects with Plaintiff's § 1985(3) claim cannot be cured by better pleading. Therefore, I recommend that the Court dismiss the 42 U.S.C. § 1985(3) claim without leave to amend.

### G. 42 U.S.C. § 1986 Claim

Plaintiff alleges that Defendants violated her rights under 42 U.S.C. § 1986. (Dkt. No. 10 at 9–12.) "Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under § 1985." *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996). Here, as discussed above, Plaintiff has not pleaded a viable cause of action under § 1985. Accordingly, Plaintiff has not stated a claim under § 1986. Therefore, I recommend that the Court dismiss Plaintiff's § 1986 claim without leave to amend.

### H. State Law Claims

Plaintiff claims that Defendants committed the state-law torts of intentional infliction of emotional distress and negligent infliction of emotional distress. (Dkt. No. 10 at 15–17.) Because I recommend dismissing all of the federal claims against each Defendant, I recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. § 28 U.S.C. § 1367(c)(3); *Ciambriello v. C'nty of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (vacating dismissal of state-law claims against a defendant where § 1983 claim remained against other defendants).

**WHEREFORE,** it is hereby

**RECOMMENDED** that the Court dismiss Plaintiff's amended complaint (Dkt. No. 10) without leave to amend; and it is further

**ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on Plaintiff by regular and certified mail; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Bibeau v. Soden,* No. 8:08–CV–0671 (LEK/RFT), 2009 WL 701918 (N.D.N.Y. Mar.13, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7176374

---

## Footnotes

1    *See Christian Legal Soc. v. Martinez,* —— U.S. ——, 130 S.Ct. 2971, 2984 n. 11, 177 L.Ed.2d 838 (2010) (summarizing legal standards).

2    *See Ladue v. Gilleo,* 512 U.S. 43, 58, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there.") (citations omitted, emphasis in original).

3    It is irrelevant for the purposes of this matter who, exactly, held title to the family home because Plaintiff admits that she had no claim to the house. (Dkt. No. 10 ¶ 21.) Plaintiff admits that Defendant Neal, who asked Plaintiff to leave, had been a tenant in the house for over ten years. *Id.*

4    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

5    The Second Circuit has considered, but declined to decide, whether § 1985(3) provides a remedy for private conspiracies to violate *state* law. *Katz v. Klehammer,* 902 F.2d 204, 208 (2d Cir.1990); *Traggis,* 851 F.2d at 586–91.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 992885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Benjamin Samuel RICH, formerly
known as Samuel Guillaume, Plaintiff,
v.
State of NEW YORK, New York City; New
York City Police Department; New York County;
New York County District Attorney's Office;
Detective Michael Miller, Vincent Corrando, John
Passementi, Cyrus Vance, Jr., Shipla Kalra, David
Nasar, and Does 1–100, Inclusive., Defendants.

21 Civ. 3835 (AT)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Benjamin Samuel Rich, Staten Island, NY, Pro Se.

Gee Won Cha, Julinda A. Dawkins, New York State Office
of the Attorney General, New York, NY, for Defendant State
of New York.

Andrew B. Spears, New York City Law Department, New
York, NY, for Defendants City New York, Michael Miller,
Vincent Corrando, John Passementi.

Patricia Jean Bailey, New York County District Attorney's
Office, New York, NY, for Defendants Cyrus Vance, Jr.,
David Nasar.

**ORDER**

ANALISA TORRES, District Judge:

 **\*1** This action arises from a 2016 arrest and prosecution
of Plaintiff *pro se*, Benjamin Samuel Rich, in New York
County. He brings claims against the State of New York (the
"State"); former New York County District Attorney ("DA")
Cyrus R. Vance, Jr. and two Assistant District Attorneys
("ADAs"), Shilpa Kalra and David Nasar, (collectively, the
"DA Defendants"); and the City of New York (the "City"),
the New York City Police Department (the "NYPD"), and
NYPD officers Michael Miller, Vincent Corrando, and John
Passementi (collectively, the "City Defendants"), pursuant to,

*inter alia*, 42 U.S.C. §§ 1983, 1985, and 1986, the New York
State Constitution, and New York common law. *See generally*
Compl., ECF No. 1. Before the Court are three motions to
dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and
12(b)(6) of the Federal Rules of Civil Procedure, brought by
the State, ECF No. 20, the DA Defendants, ECF No. 22, and
the City Defendants, ECF No. 32.

For the reasons stated below, the State's motion to
dismiss is GRANTED, and Plaintiff's claims against the
State are DISMISSED. The DA Defendants' motion to
dismiss is GRANTED—Plaintiff's claims against Vance
are DISMISSED; and his claims against Kalra and Nasar
are DISMISSED except for Counts 3 and 4, which are
DISMISSED without prejudice to renewal in an amended
complaint. The City Defendants' motion to dismiss is
DENIED as to Count 4, and GRANTED in all other respects.
Plaintiff's claims against Passamenti, the NYPD, and the City
are DISMISSED; and his claims against Miller and Corrando
are DISMISSED, except for Count 3, which is DISMISSED
without prejudice to renewal in an amended complaint.

**BACKGROUND** [1]

On January 6, 2016, Plaintiff was at the Highline Ballroom
("the Highline"), a nightclub in Manhattan, as an invited
guest of Wasief Quahtan, a Highline employee. Compl. ¶ 24.
Quahtan and the club owner began arguing over "Quahtan['s]
[having brought] Plaintiff to the party." *Id.* ¶ 25. Security
staff, and an individual named Avery Jackson, asked Plaintiff
to leave. *Id.* ¶ 26. Plaintiff alleges that he was "forcibly
escorted" from the club, and that Jackson became "belligerent
and aggressive" towards him. *Id.* ¶ 27. Shortly thereafter, a
shooting occurred outside the Highline. *Id.* ¶ 28.

Plaintiff believes that Jackson "ran down the street and
jumped into a black sedan ... at the time the shots were fired."
*Id.* ¶ 37. He also states that there were "numerous witnesses"
to the shooting, including a "female 911 caller," who lived
"next door" to the Highline. *Id.* ¶ 36. In that 911 call, the
witness said that she had seen a "man jump into a black sedan
speeding down the street" after shots were fired. *Id.* Based
on this call, Plaintiff believes "it was more likely that it was
[ ] Jackson who fired the shots before jumping into the black
sedan to chase Plaintiff down." *Id.* ¶ 37.

 **\*2** The shooting was investigated by Detective Michael
Miller, who interviewed Jackson. *Id.* ¶¶ 29–30. Jackson told

Miller that he saw Plaintiff go to a car, "pull out a gun, and shoot in the direction of the Highline," and that Jackson "ran back into the club" when shots were fired. *Id.* ¶¶ 30, 37. But, Plaintiff alleges that many of Jackson's representations to Miller contradicted his initial statements to the NYPD officers who first responded to the shooting, as well as other eyewitness accounts. *See, e.g.*, ¶¶ 30–32. For instance, Plaintiff alleges that Jackson told the responding officers that Plaintiff was "escorted from the club because he was intoxicated," and that Plaintiff then "went to his car, [a Rolls Royce] removed a firearm ... and fired several shots." *Id.* ¶¶ 31, 46. But, Jackson told Miller that Plaintiff was "forcibly ejected from the club" after an altercation with its manager, that Plaintiff was "belligerent," and threatened that he had a gun. *Id.* ¶ 32. Plaintiff also contends that Jackson's statements were demonstrably false, because surveillance videos showed that Jackson "was the aggressor towards Plaintiff," and that Plaintiff was "calm, peaceful, and cooperative" when escorted from the club. *Id.* ¶¶ 32, 41.

Plaintiff alleges that Miller failed to conduct a thorough and complete investigation of the shooting, because he did not interview several witnesses, including the 911 caller. *Id.* ¶¶ 36–37, 39. Plaintiff also suggests that Miller obtained—but disregarded—surveillance video from the inside and the outside of the club that would have corroborated Plaintiff's version of events. *See id.* ¶¶ 40–43. Plaintiff also complains that Officer Vincent Corrando, Miller's supervisor, "approved all [of the] reports written" in the investigation and "should have notice[d] or known of all the inconsistencies and contradictory statements" in Miller's reports. *Id.* ¶ 95. And, Plaintiff alleges that Officer John Passementi "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." *Id.* ¶ 96.

On January 9, 2016, Miller obtained a search warrant for Plaintiff's car, based on what Plaintiff contends were "false, misleading and/or embellished information" in the underlying affidavits. *Id.* ¶ 46. The next day, Jackson picked Plaintiff's mugshot out of a photo lineup. *Id.* ¶ 92. Plaintiff appears to argue that this lineup was unduly suggestive, because his "mugshot had a lighter background than the other photographs." *Id.* ¶ 92. The same day, Miller obtained a warrant for Plaintiff's arrest for attempted murder, assault, and weapons possession, and in February obtained additional search warrants for Plaintiff's cell phone and laptop, allegedly based, again, on false and misleading statements provided by Miller and Jackson. *Id.* ¶¶ 45, 47. According to Plaintiff, no "physical evidence [ ] tie[d] him to any part of the shooting,"

*id.* ¶ 81, and the police did not recover a gun or find gunshot residue in Plaintiff's car, *id.* ¶ 91.

On January 22, 2016, a grand jury indicted Plaintiff for second-degree attempted murder, first-degree assault, and two counts of criminal possession of a weapon. *See id.* ¶¶ 45, 51. On January 27, 2016, Plaintiff was arrested. *Id.* ¶ 51. He was incarcerated until February 18, 2016, when he was released on bail. *Id.* ¶ 52.

In November 2016, Plaintiff was taken back into custody on suspicion of witness tampering, after Jackson allegedly made a "false[ ]" report to the DA's Office that Plaintiff had tried to contact him. *Id.* ¶¶ 53, 103. Plaintiff remained in jail until his trial, which began in June 2017. *Id.* ¶¶ 54, 64; *see also* Trial Tr. at 1, ECF No. 22-3. [2]

On March 26, 2016, ADAs Shilpa Kalra and David Nasar provided surveillance videos from the Highline to Plaintiff's counsel. Compl. ¶ 64. Plaintiff alleges, however, that the relevant video showed only "one (1) camera angle [out] of 14 camera angles." *Id.* He alleges that prosecutors did not provide videos from the thirteen additional camera angles until a week after trial commenced, even though these videos were collected from the Highline eighteen months earlier. Compl. ¶ 64. The trial court accordingly granted counsel's request to review the additional videos before conducting Jackson's cross-examination. Trial Tr. at 3. On direct examination, Jackson testified that he did not participate in escorting Plaintiff out of the club. *Id.* at 47–48.

**\*3** On June 12, 2017, prior to Jackson's cross-examination, Plaintiff's counsel reported to the trial court that Jackson could be identified in the additional videos based on his clothing. *Id.* at 135. Nasar acknowledged that if Jackson was indeed visible in the videos, he was "doing a bunch of things contrary to what he testified about." *Id.*; *see also id.* at 136. The trial court then determined that Jackson should be questioned, under oath, outside the jury's presence, about his clothing on the night in question, and whether he could identify himself on the videos, among other matters. *See id.* at 146–50, 152–54. Jackson was brought in, and warned about perjury. *See id.* at 154–56. Jackson identified himself on the videos wearing a jacket and a light-colored shirt. *See id.* at 156–59. The court then adjourned the proceedings. *See id.* at 159. When the court resumed, Jackson, through counsel, invoked his Fifth Amendment right against self-incrimination, *id.* at 176, and the court declared a mistrial, *id.* at 186–88.

Plaintiff's counsel then moved to dismiss the indictment against Plaintiff on two grounds: first, that it was based on false testimony, and second, because of prosecutorial misconduct. Compl. ¶ 100. On October 17, 2017, Kalra consented to dismissal of the indictment on the first ground, but opposed the assertion of prosecutorial misconduct. Dismissal Tr. at 12–13, 15–16. The court dismissed the indictment, but the presiding judge stated he did not "see any prosecutorial misconduct." *Id.* at 16.

On March 12, 2021, over three years after the indictment was dismissed, Plaintiff commenced this action. Compl. Defendants move separately to dismiss the claims against them. ECF Nos. 20, 22, 32. The Court considers each motion in turn.

## DISCUSSION

I. Legal Standard

  A. Rule 12(b)(1)

An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court lacks subject matter jurisdiction—that is, the statutory or constitutional power—to adjudicate it. *See* Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal. *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

On a Rule 12(b)(1) motion, the Court must accept all material factual allegations as true. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). It may not, however, "draw inferences ... favorable to [the] plaintiff[ ]" on such a motion. *Id.* And, the Court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction. *See id.*

  B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide

"detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Additionally, because Plaintiff proceeds *pro se*, the Court is obligated to construe his submissions "liberally and interpret[ ] [them] to raise the strongest arguments they suggest." *Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted). And, on a motion to dismiss, the Court may appropriately consider a *pro se* plaintiff's opposition papers to "supplement or clarify" the allegations in their complaint. *Sommersett v. City of N.Y.*, No. 09 Civ. 5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) (citation omitted).

II. Duplicative and Improper Claims

 **\*4** Count 7 of the complaint asserts a claim under 18 U.S.C. § 245 for the deprivation of rights under the color of law. Compl. ¶¶ 148–51. But, no private right of action exists under this federal criminal statute, and accordingly, Plaintiff cannot raise a cognizable claim under it. *See Corrado v. State of N.Y. Univ. Stony Brook Police*, No. 15 Civ. 7443, 2016 WL 4179946, at *3 (E.D.N.Y. Aug. 5, 2016). Count 7 is, accordingly, DISMISSED with prejudice.

Further, the Court finds that Count 9 of the complaint—fraudulent misrepresentation under § 1983, Compl. ¶¶ 157–63—is duplicative of Count 4—deprivation of a fair trial under § 1983, *id.* ¶¶ 133–37—because both seek redress for violations of Plaintiff's liberty interests arising from the alleged "fabrication of evidence by a government officer." *See Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). Count 9 is, accordingly, DISMISSED with prejudice.

Finally, three of Plaintiff's claims—Counts 4, 5, and 6—include both federal constitutional claims and analogous state constitutional claims. Compl. ¶¶ 133–47. The New York State Constitution "provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016). But, where alternative remedies are available under the federal civil rights statutes, including § 1983, courts must

dismiss the plaintiff's state constitutional claims. *Id.* Because § 1983 provides a remedy for all of Plaintiff's alleged federal constitutional violations, any analogous state constitutional claims are duplicative. Accordingly, the state constitutional claims pleaded in Counts 4, 5, and 6 are DISMISSED with prejudice.

### III. The State's Motion

The State moves to dismiss the complaint under Rule 12(b)(1), on the ground that the Eleventh Amendment bars Plaintiff's claims against it by virtue of sovereign immunity. State Mem. at 3, ECF No. 21. The Court agrees.

The Eleventh Amendment bars federal courts from exercising jurisdiction over claims against states. U.S. CONST. AMEND. XI. This extends to a state sued by its own citizens, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000), and state agencies, *see Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987). There are only limited exceptions to this rule, none of which are applicable here.

First, a state may waive its Eleventh Amendment defense. *See Coll. Sav. Bank v. Fla. Prepaid Postsec. Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the State has not explicitly waived its immunity, or consented to be sued. *See* State Mem. at 3. And, by filing a motion to dismiss, rather than an answer to the complaint, the State cannot be said to have taken actions inconsistent with an assertion of immunity. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (finding waiver of immunity where state removed action to federal court, then asserted immunity).

Second, Congress may abrogate the states' immunity from suit through statute. *Kimel*, 528 U.S. at 80. But, Congress has not done so for claims brought under § 1983, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), § 1985, *see Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013), or § 1986, *Medina v. Cuomo*, No. 15 Civ. 1283, 2015 WL 13744627, at *6–7 (N.D.N.Y. Nov. 9, 2015). In the "absence of [the State's] consent," accordingly, such claims are "proscribed by the Eleventh Amendment." *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

**\*5** Finally, the Eleventh Amendment does not bar a "suit against a state official when that suit seeks prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *see also Ex parte Young*, 209 U.S. 123 (1908). But here, Plaintiff seeks only money damages, and retrospective declaratory and equitable relief. Compl. § IX. And, Eleventh Amendment immunity shields states from claims for money damages, *Liner v. Hochul*, No. 21 Civ. 11116, 2022 WL 826342, at *1 (S.D.N.Y. Mar. 17, 2022), and "declaratory relief dealing solely with past violations," *Medina*, 2015 WL 13744627, at *7. Although Plaintiff demands "affirmative relief necessary to eradicate the effects of Defendants' unlawful practices," *see* Compl. § IX(B), he does not allege any present violations of his rights, *see id. See Medina*, 2015 WL 13744627, at *7 (noting that "declaratory relief where there is no present violation, is also barred under the Eleventh Amendment"). Accordingly, this exception does not preclude the State's immunity defense in this matter.

Where a defendant is found to have sovereign immunity from suit, the Court is deprived of subject-matter jurisdiction under Rule 12(b)(1). *McGinty v. New York*, 251 F.3d 84, 89, 101 (2d Cir. 2001). Accordingly, because the State is immune from liability on all of Plaintiff's claims under the Eleventh Amendment, its motion to dismiss is GRANTED. And, because amendment would be futile, Plaintiff's claims against the State are DISMISSED with prejudice to renewal. [3]

### IV. The DA Defendants' Motion

Plaintiff raises claims against the DA Defendants "in their individual capacities" [4] arising *inter alia* under § 1983, § 1985, and § 1986, [5] based on three main factual assertions. *See generally* Compl. First, Plaintiff alleges that Kalra and Nasar wrongfully chose to prosecute him, despite the lack of physical evidence tying him to the shooting. Compl. ¶ 81. Second, Plaintiff asserts that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of his trial, *see id.* ¶¶ 75–76, 78. Third, Plaintiff alleges that the "[p]rosecuting [a]ttorneys" "coached" Jackson to give false testimony to the grand jury that indicted him. *Id.* ¶¶ 50–51.

#### A. Absolute Immunity

**\*6** The DA Defendants argue that Plaintiff's claims are barred by absolute and qualified prosecutorial immunity. DA Defs. Mem. at 10–12, ECF No. 22-1. To the extent Plaintiff's claims are predicated on his allegations that Kalra and Nasar wrongfully chose to prosecute him and withheld allegedly exculpatory evidence, the Court agrees.

### 1. Federal Claims

Although § 1983 has no immunities on its face, the Supreme Court has held that, when Congress initially enacted the statute, it did not intend to abrogate existing immunities established at common law. *See Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). Thus, both absolute and qualified immunity are applicable defenses to § 1983 claims. *See Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). Prosecutors are entitled to "absolute immunity" from liability when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. But, prosecutors are entitled only to "qualified immunity" when they perform "investigative functions" normally undertaken by a police officer. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Under the doctrine of qualified immunity, an official is immune from liability "only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995).

Courts employ a "functional approach" to determine the availability of absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations omitted). And, although the party claiming absolute immunity bears the burden of establishing its applicability, *see Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), if the court finds that that the conduct at issue is covered by absolute immunity, then the actor is shielded from liability for damages no matter "how[ ] erroneous the act ... and how[ ] injurious ... its consequences." *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) (citation omitted); *see also Anilao v. Spota*, No. 19 Civ. 3949, 2022 WL 697663, at *4 (2d Cir. Mar. 9, 2022).

Plaintiff first alleges that Kalra and Nasar improperly chose to prosecute him, despite a lack of physical evidence tying him to the crime. Compl. ¶ 81. But, prosecutors are immune from suit for decisions regarding "whether and when to prosecute," *Imbler*, 424 U.S. at 430–31 n.32–33, even where they may prosecute an innocent individual, *Schmueli*, 424 F.3d at 237–39. Kalra and Nasar are, therefore, entitled to absolute immunity to the extent Plaintiff's claims are based on their decision to prosecute him. [6]

Second, Plaintiff alleges that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of trial, Compl. ¶¶ 75–76, 78. But again, prosecutors are entitled to absolute immunity for all decisions taken "in their prosecutorial capacity, including decisions regarding which evidence should be disclosed to a criminal defendant." *Newson v. City of N.Y.*, No. 16 Civ. 6773, 2019 WL 3997466, at *3 (E.D.N.Y. Aug. 23, 2019). This is true even where information was deliberately withheld, *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 640 (E.D.N.Y. 2017), or where such withholding violated the defendant's constitutional rights, *see Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009). Accordingly, Kalra and Nasar have absolute immunity to the extent any of Plaintiff's claims are predicated on a violation under this factual allegation.

**\*7** Finally, Plaintiff alleges that the "Prosecuting Attorneys" coached Jackson to give false testimony to the grand jury, which then formed the basis for his indictment. Compl. ¶¶ 50–51. Prosecutors generally only have qualified immunity for actions taken before there is probable cause to arrest a defendant, because they are performing an investigative function, rather than acting as advocates. *See Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273. And, although "knowingly presenting evidence" to a grand jury is considered the "core of a prosecutor's role as an advocate," *Bernard*, 356 F.3d at 503, the Second Circuit has distinguished between a prosecutor's knowing presentation of false evidence to the grand jury—which is still entitled to absolute immunity—from a prosecutor's deliberate fabrication of evidence, *Hill*, 45 F.3d at 662–63 (finding that where prosecutor deliberately manufactured evidence to establish probable cause for plaintiff's arrest, his conduct was investigatory, regardless of whether, when the evidence was manufactured, the prosecutor intended to present it to the grand jury). In *Hill*, the Second Circuit also established that "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of qualified immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Id.* at 663.

As in *Hill*, Plaintiff alleges that the prosecutors deliberately participated in the fabrication of false evidence by coaching a material witness to give perjured testimony to the grand jury, so that the jury would return an indictment. Compl. ¶¶ 50–51. Allegations that the prosecution falsified evidence are distinct from allegations that the prosecution merely presented evidence they knew to be false. *Compare Hill*,

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 191 of 238

Rich v. New York, Not Reported in Fed. Supp. (2022)

45 F.3d at 662–63*, with* *Urrego v. United States*, No. 00 Civ. 1203, 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (prosecutors receive absolute immunity for claims predicated on "false presentation of evidence to a grand jury"). And, considering the Court's obligation to liberally construe Plaintiff's pleadings and afford every reasonable inference in his favor at this stage, the Court concludes the DA Defendants have not established that they were acting as "advocates," rather than "investigators," when they engaged in the challenged conduct. *Hill*, 45 F.3d at 660 (officials asserting absolute immunity bear the burden of establishing it for the action in question). And, accepting the facts in the complaint as true, the DA Defendants would not be entitled to even qualified immunity, because it is objectively unreasonable for them to have knowingly coached a witness to give false testimony before a grand jury. *See* *Cipolla v. Cty. of Rensselaer*, 129 F. Supp. 2d 436, 456 (N.D.N.Y. 2001) (not "objectively reasonable" to believe presenting or soliciting perjured testimony did not violate plaintiff's clearly established rights). Accordingly, to the extent that Counts 3, 4, 5, 6, and 8 are predicated on the claim that the DA Defendants coached Jackson to give false testimony, they are not entitled to either absolute or qualified immunity.

### 2. State Claims

Plaintiff raises state-law claims against the DA Defendants in Counts 10 and 14 of the complaint. Compl. ¶¶ 164–67, 182–85. As with federal law, under New York law, a district attorney prosecuting crime is performing a quasi-judicial function, and, as such, is entitled to absolute immunity. *Arteaga v. State*, 72 N.Y.2d 212, 217 n.1 (N.Y. 1988). But, unlike federal law, prosecutors are absolutely immune for official acts in both the prosecution and investigation of criminal charges. *See* *Moore v. Dormin*, 173 Misc. 2d 836, 843, (N.Y. Sup. Ct. 1997), *aff'd as modified*, 252 A.D.2d 421 (N.Y. App. Div. 1998). A prosecutor does not receive absolute immunity, however, "when knowingly acting in violation of law." *Id.* As with Plaintiff's federal claims, to the extent his state law claims against the DA Defendants are predicated on his allegations that they improperly targeted him for prosecution or deliberately withheld exculpatory evidence, the DA Defendants are entitled to absolute immunity. But, construing Plaintiff's third allegation liberally, he essentially claims that the prosecutors knowingly acted in violation of the law by suborning perjury. The Court cannot conclude, therefore, that the DA Defendants are entitled to absolute

immunity as a matter of state law to the extent Counts 10 and 14 rest on this allegation. [7]

### B. Time Bar

**\*8** The DA Defendants argue that Plaintiff's claims are untimely. DA Defs. Mem. at 6–8. With the exception of Counts 3 (§ 1983 malicious prosecution) and 4 (§ 1983 deprivation of a fair trial), the Court agrees.

### 1. Federal Claims

Claims arising under §§ 1983 and 1985, when brought in this district, are governed by New York's three-year statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214; *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citation omitted); *Hernandez-Avila v. Averill,* 725 F.2d 25, 27 n.3 (2d Cir. 1984). But, claims under § 1986 have a one-year statute of limitations, *see* 42 U.S.C. § 1986. Federal courts are also obligated to apply New York's tolling rules. *Bd. of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic. 9 N.Y.C.R.R. § 8.202.8. Subsequent orders extended the tolling period until November 3, 2020. Exec. Order 202.67 (Oct. 4, 2020). Contrary to the DA Defendants' assertion, *see* DA Defs. Mem. at 7–8, other courts in this district have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims. *See, e.g.*, *Lewis v. Westchester Cnty.*, No. 20 Civ. 9017, 2021 WL 3932626, at *2 n.3 (S.D.N.Y. Sept. 2, 2021). [8] The Court concludes, therefore, that Executive Order 202.8 tolls the statute of limitations for Plaintiff's §§ 1983 and 1985 claims, which apply New York's three-year limitations period —but not Plaintiff's § 1986 claims, because the applicable statute of limitations for that claim is found in the federal statute itself.

Section 1983 claims based on malicious prosecution or deprivation of a fair trial accrue when the underlying criminal action against the plaintiff is "favorably" terminated, rather than at the time of arrest. *Sharp v. Cnty. of Putnam*, No. 18 Civ. 780, 2019 WL 2250412, at *4 (S.D.N.Y May 24, 2019); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016). The dismissal of an indictment constitutes

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 192 of 238

Rich v. New York, Not Reported in Fed. Supp. (2022)

the termination of a proceeding. *Sharp*, 2019 WL 2250412, at \*4–5. Applying these principles, Plaintiff's § 1983 claims for malicious prosecution (Count 3) and denial of a fair trial (Count 4) accrued on October 17, 2017, the date the trial court dismissed the indictment against him. Dismissal Tr. at 5. And, although the statute of limitations would have expired on October 17, 2020, New York's COVID-19 tolling rule extended the limitations period until June 2, 2021.[9] Because Plaintiff commenced this suit on March 12, 2021, Counts 3 and 4 are timely.

**\*9** By contrast, a § 1983 abuse-of-process claim accrues when the criminal process is "set in motion—typically at arrest—against the plaintiff." *Hadid v. City of N.Y.*, No. 15 Civ. 19, 2015 WL 7734098, at \*5 (E.D.N.Y. Nov. 30, 2015), *aff'd* 730 F. App'x 68 (2d Cir. 2018). Because Plaintiff was arrested on January 27, 2016, the relevant statute of limitations for Count 8, § 1983 abuse of process, expired on January 27, 2019, and COVID-19 tolling provisions are, therefore, inapplicable. Accordingly, this claim is DISMISSED with prejudice as untimely.

Section 1985(3) conspiracy claims accrue "at the time of the events that caused the injury." *Panetta v. Cassel*, 20 Civ. 2255, 2020 WL 2521533, at \*5 (S.D.N.Y. May 18, 2020). The existence of a conspiracy "does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether the act is labelled a tort or a violation of [federal civil rights statutes]." *Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980) (citation omitted). As discussed, the single allegation that escapes absolute immunity—and therefore is the only remaining basis for Plaintiff's claims against the DA Defendants—is that those defendants suborned perjury in the grand jury proceedings by coaching Jackson to give false testimony, resulting in Plaintiff's indictment and arrest. Plaintiff's § 1985(3) claim—Count 5 of the complaint—accrued no later than January 27, 2016, the date of his arrest—which again, applying a three-year statute of limitations untouched by COVID-19 tolling provisions, renders it untimely. Count 5 is, accordingly, DISMISSED with prejudice.

Similarly, Count 6, Plaintiff's § 1986 conspiracy claim, accrued when Plaintiff knew, or had reason to know of the harm or injury. *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). Plaintiff knew of the injury by his arrest date. Applying § 1986's one-year statute of limitations, any § 1986 claim Plaintiff brought after January 27, 2017,

is untimely.[10] Accordingly, Count 6 is DISMISSED with prejudice.

### 2. State Claims

Counts 10 and 14 of the complaint—both state common-law claims—are also time-barred. "Under New York law, a plaintiff asserting tort claims against the City or its employees," as well as against municipal officials like district attorneys, "must file a notice of claim within [90] days after the incident giving rise to the claim and commence the action within a year and [90] days from the date of the incident." *Brown v. City of N.Y.*, No. 18 Civ. 3287, 2020 WL 1819880, at \*7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1)); *see also Gonzalez v. City of N.Y.*, No. 94 Civ. 7377, 1996 WL 227824, \*2 (S.D.N.Y. May 3, 1996). Plaintiff asserts that he filed the requisite notice of claim with the City on January 16, 2018—720 days after his arrest, and 91 days after the dismissal of the indictment. Compl. ¶ 16. Plaintiff did not commence this action until March 12, 2021. *See* Compl. Therefore, Plaintiff neither timely filed a notice of claim within 90 days, nor did he commence this lawsuit within a year and 90 days after the date the indictment was dismissed —the last date that could possibly serve as the trigger for the statute of limitations. Failure to comply with the mandatory notice of claim requirements is a basis for dismissal of a plaintiff's claims. *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). The Court, accordingly, concludes that Counts 10 and 14 are also time-barred, and therefore, these claims are DISMISSED with prejudice.

### C. Personal Involvement

**\*10** Liability under § 1983 must be premised on a defendant's direct, personal involvement in the alleged violations. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). A defendant cannot be held vicariously liable under § 1983 for employing or supervising an employee that violated the plaintiff's rights—rather, a plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

As to Vance, Plaintiff only alleges that he served as the DA of New York County. Compl. ¶ 11. Vance may not be held liable for merely employing or supervising Kalra and Nasar. *See Iqbal*, 556 U.S. at 676. And, Plaintiff neither pleads that Vance was personally involved in investigating the shooting

or prosecuting him, nor is there any evidence in the record to support such a finding. Accordingly, Plaintiff's claims against Vance are DISMISSED with prejudice, because given the lack of evidence of Vance's personal involvement, the Court finds that granting leave to amend would be futile. *Hill v. Curcione,* 657 F.3d 116, 123–24 (2d Cir. 2011).

Plaintiff similarly fails to specify Kalra and Nasar's personal involvement in his claimed constitutional violations, stating only that the "Prosecuting Attorneys" coached Jackson to provide testimony. Compl. ¶ 50. But, given Plaintiff's position as a *pro se* litigant, the Court recognizes that there may be additional information made available to Plaintiff through discovery that would enable Plaintiff to assert claims directly against Kalra and Nasar, such as if, for example, either of them prepared Jackson to testify. By **April 15, 2022,** accordingly, the DA Defendants shall, through counsel, inform Plaintiff and the Court whether Kalra or Nasar prepared Jackson to testify before the grand jury with respect to any potential criminal charges against Plaintiff, and/or conducted an examination of Jackson before the grand jury. No later than **May 16, 2022,** Plaintiff shall file an amended complaint, alleging with specificity Kalra and Nasar's direct, personal involvement in either "coaching" Jackson to testify falsely before the grand jury, or deliberately eliciting false testimony from Jackson during the grand jury proceedings. In addition, because, as detailed *infra* at 25–26, the Court finds that Plaintiff's malicious prosecution claim is deficient because he failed to allege that the underlying criminal proceedings terminated in his favor, an argument raised by the City Defendants but not the DA Defendants, any amended malicious prosecution claim that Plaintiff wishes to assert against Kalra and Nasar should also address this issue. Failure to do so shall result in dismissal with prejudice of Plaintiff's remaining claims against Kalra and Nasar.

## V. City's Motion to Dismiss

Plaintiff brings claims against the City Defendants, on the grounds that (1) Miller failed to conduct a thorough and complete investigation of the shooting, by not interviewing several witnesses, including the 911 caller, Compl. ¶¶ 36–37, 39; (2) in his investigation, Miller obtained—but disregarded—surveillance video from both the inside and outside of Highline Ballroom, *id.* ¶¶ 40–43; (3) that Miller "used his own added facts and embellished statements" in his investigative reports to target Plaintiff as the sole suspect in the shooting, *id.* ¶ 44, *see also* ¶ 39; (4) that Corrando, as Miller's supervisor, approved his investigative reports but failed to notice the inconsistencies and contradictions therein, *id.* ¶ 95; and (5)

that Passamenti "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff," *id.* ¶ 96. The Court addresses each remaining [11] cause of action.

### A. Time Bar

#### 1. Section 1983 Claims

**\*11** Plaintiff brings claims under § 1983 for unlawful search and seizure (Count 1); false arrest (Count 2); malicious prosecution (Count 3); deprivation of a fair trial (Count 4); and abuse of process (Count 8). As noted, § 1983 claims are subject to a three-year statute of limitations in this district. *See supra* at 15. And, for the reasons discussed with respect to the DA Defendants, the Court concludes that Counts 3 and 4 were timely pleaded. *See supra* at 16–17.

A § 1983 unlawful search and seizure claim, however, accrues on the date the allegedly unlawful search occurred. *McClanahan v. Kelly,* No. 12 Civ. 5326, 2014 WL 1317612, at \*4 (S.D.N.Y. Mar. 31, 2014). Plaintiff alleges that his property was searched on January 9, February 12, and February 15, 2016. Compl. ¶¶ 46–47. The applicable statute of limitations, therefore, expired no later than February 15, 2019, nearly two years before Plaintiff brought suit. Plaintiff's claims are, therefore, untimely, and Count 1 is DISMISSED with prejudice as time-barred.

Section 1983 false arrest claims and abuse-of-process claims accrue from the date of Plaintiff's arrest. *See Rivera v. City of N.Y.,* No. 16 Civ. 9709, 2019 WL 252019, at \*4 (S.D.N.Y. Jan. 17, 2019) (false arrest); *Anderson v. Cnty. of Putnam,* No. 14 Civ. 7162, 2016 WL 297737, at \*3 (S.D.N.Y. Jan. 22, 2016) (abuse-of-process). Plaintiff was arrested on January 27, 2016, and therefore, any such claims should have been brought no later than January 27, 2019. Counts 2 and 8 are, accordingly, DISMISSED with prejudice as untimely.

#### 2. Sections 1985(3) and 1986 Claims

Liberally construing the complaint, in Count 5, Plaintiff sets forth a conspiracy cause of action under § 1985(3), alleging that the City Defendants engaged in a conspiracy to have Plaintiff wrongfully convicted, *see* Compl. ¶ 97. This claim appears predicated on the NYPD investigation into the January 6, 2016 shooting, and Miller's alleged embellishment

of information, and focus on Plaintiff as the sole suspect. *Id.* ¶¶ 36–37, 39, 46, 90. Plaintiff also raises a failure-to-intervene claim under § 1986 (Count 6), seemingly arising from Corrando's alleged failure to notice the inconsistencies and contradictory statements allegedly included in Miller's police reports. *Id.* ¶ 95.

Section 1985(3) claims accrue "at the time of the events that caused the injury," and are subject to a three-year statute of limitations, *Panetta*, 2020 WL 2521533, at *5. Section 1986 claims based on a failure to intervene accrue when the defendant fails to intervene, *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018), and must be brought within one year, *see* 42 U.S.C. § 1986. Plaintiff's claims each began accruing no later than January 27, 2016, the date of Plaintiff's arrest, because Plaintiff does not suggest that any investigation took place after that date. The applicable limitations period extends no later than January 27, 2019, for Plaintiff's § 1985(3) claim, and January 27, 2017 for Plaintiff's § 1986 claim, two and four years, respectively, before the complaint was filed. Counts 5 and 6 are, therefore, DISMISSED with prejudice as time-barred.

### 3. State Claims

To the extent Plaintiff's state common-law claims, asserting various types of negligence, arise from the NYPD investigation into the shooting on January 6, 2016; the searches of Plaintiff's property on January 9, February 12, and February 15, 2016; and Plaintiff's arrest on January 27, 2016, Plaintiff was required to file a notice of claim within 90 days of those events, *see* N.Y. Gen. Mun. L. § 50-e. As noted, Plaintiff did not file a notice of claim with the City until January 16, 2018—one year and eleven months after the latest of those dates. Compl. ¶ 16. Accordingly, each of Plaintiff's negligence claims (Counts 10–14) are DISMISSED with prejudice. [12]

### B. Claim Against the City [13]

**\*12** The Court reads Plaintiff's complaint as claiming, under *Monell v. Department of Social Services*, 436 U.S. 658, that the City is liable for the allegedly unlawful conduct of the named NYPD officers. *See* Compl. ¶ 179. The City Defendants argue that Plaintiff does not include sufficient factual allegations to support a municipal liability claim. City Defs. Mem. at 20–22, ECF No. 34. The Court agrees.

To bring a municipal liability claim under § 1983, the plaintiff must "prove the existence of a municipal policy or custom," then demonstrate a causal connection between the policy and the alleged constitutional deprivation. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). Plaintiff pleads neither, offering only conclusory allegations that the City Defendants "engaged in a pattern and practice to commit the aforementioned unlawful acts," Compl. ¶ 179, and that a policy is "inferred" because the City Defendants "took no steps to reprimand or discharge the officers involved," ECF No. 39 at 27. These allegations cannot, without more, state a claim for municipal liability. *E.g.*, *Fleming v. City of New York*, No. 18 Civ. 4866, 2020 WL 5522871, at *6 (S.D.N.Y. July 23, 2020). Because Plaintiff offers no facts which suggest that the deficiencies in his *Monell* claim may be cured by amendment, any such claim is DISMISSED with prejudice. *Strong v. City of Syracuse*, No. 16 Civ. 1054, 2020 WL 137250, at *3–4 (N.D.N.Y. Jan. 13, 2020) (dismissing *Monell* claim, with prejudice, given "[p]laintiff's conclusory allegations are insufficient to plausibly infer a custom or policy to support municipal liability").

### C. Passamenti's Personal Involvement

Plaintiff's remaining claims are Counts 3 (malicious prosecution) and 4 (denial of a fair trial). As to Defendant Passamenti, Plaintiff alleges that Passamenti authorized DNA tests, which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." Compl. ¶ 96. Plaintiff does not allege that Passamenti was involved in falsification of evidence, that he attempted to hide the results of the relevant DNA tests, or that he was otherwise responsible for, or even aware of, the alleged "embellishment" of statements in the NYPD's investigative reports. Plaintiff has not, therefore, sufficiently alleged Passamenti's direct, personal involvement in any constitutional violations under § 1983. *Tangreti*, 983 F.3d at 618. And, because the record does not establish that Plaintiff could cure this pleading defect by amendment, Plaintiff's claims against Passamenti are DISMISSED with prejudice.

### D. Malicious Prosecution

A claim for malicious prosecution under § 1983—Count 3 of the complaint—requires the plaintiff to show that the criminal proceedings against him were terminated "in his favor," typically by an acquittal or another form of dismissal of the charges on the merits. *Janetka v. Dabe*, 892 F.2d 187, 189–90 (1989). The City Defendants argue that Plaintiff has not made such a showing. City Defs. Mem. at 10, 14–17. The

Court agrees. Plaintiff asserts—citing no authority in support—that the dismissal of the indictment was a "termination in his favor" because dismissals that "include constitutional privilege assertions are considered favorable terminations." ECF No. 39 at 7, 10 (quotation marks omitted). It is not clear what Plaintiff means by this. And, from the Court's review of the state court transcript, it appears that, in dismissing the indictment, neither the prosecution, nor the court, made any statements indicating a belief in Plaintiff's innocence. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) (looking to the "reasons ... stated on the record for dismissing the charges" in determining whether the termination of the criminal case was in plaintiff's favor). Indeed, Kalra expressly declined to concede that Plaintiff was innocent, instead reaffirming her belief that Plaintiff "was the shooter." Dismissal Tr. at 15. The presiding judge similarly stated on the record that dismissal of the indictment was warranted even though he did not "see any prosecutorial misconduct." *Id.* at 16. The dismissal of the indictment, therefore, left open the question of Plaintiff's guilt or innocence, and Plaintiff cannot, accordingly, assert on that basis alone, that the proceedings were terminated in his favor.

**\*13** The Court notes, however, that because four years have passed since the dismissal of the indictment, Plaintiff may be able to plead additional facts from that time that support this relevant element of his claim. There is no information before the Court as to whether, for example, Plaintiff was ever informed by the prosecutors that he had been cleared of wrongdoing, whether Jackson or anyone else was later prosecuted for the shooting, or whether the state court made any further statements regarding the merits of the charges against Plaintiff. Count 3 is, accordingly, DISMISSED without prejudice, to provide Plaintiff with an opportunity to plead additional facts to support this claim.

### E. Denial of Fair Trial

To state a claim under § 1983 for denial of a fair trial based on the fabrication of evidence by a police officer—Count 4 of the complaint—a plaintiff must allege that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted). The plaintiff need not show a favorable termination indicative of innocence to state such a claim. *Smalls v. Collins*, 10 F. 4th 117, 142–43 (2d Cir. 2021). The City Defendants argue that Plaintiff has failed to show a deprivation of his

liberty interests because there was probable cause for his prosecution, in the form of corroborative ballistics evidence. City Defs. Mem. at 16 (citing Dismissal Tr. at 15); City Defs. Reply at 6–7, ECF No. 46.

Probable cause is not a complete defense to a fair trial claim. *Torres v. City of N.Y.*, No. 16 Civ. 6719, 2017 WL 4325822, at \*5 (E.D.N.Y. Sept. 27, 2017) (noting that where "independent probable cause exists for the prosecution," a plaintiff must "show that the misconduct caused some deprivation above and beyond the fact of the prosecution itself." (citation omitted)). Plaintiff plausibly alleges that Miller fabricated and "embellished" Jackson's statements in his investigative report; that Miller provided these reports to prosecutors to secure Plaintiff's indictment and arrest; and that Corrando, as Miller's supervisor, reviewed and approved these reports without identifying any "embellishments" or obvious factual contradictions. *See* Compl. ¶¶ 44–49, 95. On a motion to dismiss, the Court cannot take as true the City Defendants' factual assertion that, regardless of any alleged fabrications in Miller's reports, the prosecution had independent ballistics evidence to satisfy the probable cause standard. *Compare* City Defs. Reply at 6–7, *with* ECF No. 39 at 9–12. It cannot, therefore, find as a matter of law, that the City Defendants had probable cause for Plaintiff's indictment and prosecution. *See Bullard v. City of N.Y.*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003). The Court concludes, therefore, that Plaintiff has sufficiently alleged a § 1983 denial of fair trial claim against Miller and Corrando. The City Defendants' motion to dismiss Count 4 of the complaint is, accordingly, DENIED.

### CONCLUSION

For the reasons stated above, the State's motion to dismiss, ECF No. 20, is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss, ECF No. 22, is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. By **April 15, 2022,** the DA Defendants shall make the disclosures directed in this order. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

Rich v. New York, Not Reported in Fed. Supp. (2022)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 196 of 238

**\*14** By **May 16, 2022**, Plaintiff shall file an amended complaint as to Counts 3 and 4, with the additional factual allegations detailed in this order. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 20, 22, and 32, and mail a copy of this order to Plaintiff *pro se.* The Court shall separately provide Plaintiff with a copy of all unpublished cases cited herein.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 992885

---

**Footnotes**

1    Unless otherwise stated, the following facts are taken from the complaint and assumed, for purposes of this motion, to be true. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

2    The relevant state court trial transcripts were submitted by the DA Defendants in their motion to dismiss. *See* Trial Tr.; Dismissal Tr., ECF No. 22-4. The Court may take judicial notice of these transcripts as a matter of public record. *See Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005).

3    Because the Court concludes that it lacks jurisdiction over Plaintiff's claims against the State under Rule 12(b)(1), it need not reach the State's alternative ground for dismissal, that Plaintiff's § 1983 and § 1985 claims must be dismissed because the State is not a suable "person" within the meaning of those statutes. State Mem. at 3–4.

4    Plaintiff makes this clarification for the first time in his opposition papers. ECF No. 28 at 14. The Court notes that because, as discussed, the Eleventh Amendment bars suits against states, *see supra* at 8–10, when a defendant is sued in his official capacity, the court treats the suit as one against the "entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Serves*, 436 U.S. 658, 690 n.55 (1978)). And, where a "district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 8 (2d Cir. 2017). Accordingly, any claims Plaintiff may raise against the DA Defendants in their "official capacity" would be precluded by immunity under the Eleventh Amendment. *See id.*

5    Although Plaintiff asserts that he pleads each of his claims against "all Defendants," even a liberal read of the complaint makes clear that certain of Plaintiff's claims cannot implicate the DA Defendants' conduct, including counts 1 (unreasonable search and seizure); 2 (false arrest/imprisonment); 11 (personal injury); 12 (property damage) and 13 (negligent hiring, training, supervision, and discipline of officers). Compl. ¶¶ 117–27, 168–81. As the Court has already dismissed Counts 7 and 9, *see supra* at 7–8, it only considers Counts 3 (malicious prosecution); 4 (deprivation of fair trial); 5 (conspiracy); 6 (failure to intervene); 8 (abuse of process); 10 (negligent misrepresentation); and 14 (negligent infliction of emotional distress) against the DA Defendants.

6    Because the Court finds that the DA Defendants are entitled to absolute immunity on any claims arising from the withholding of exculpatory evidence, the Court does not reach their alternative argument that Plaintiff fails to state a claim for an alleged *Brady* violation, *see* DA Defs. Mem. at 12–15.

---

7       As noted, the parallel state-law constitutional claims in Counts 4, 5, and 6 are dismissed with prejudice. *See supra* at 8.

8       The DA Defendants' reliance on *Johnson v. Fargione* is unavailing. In that case, the court found that the plaintiff's claims, which had expired weeks before the issuance of Executive Order 202.8, could not "be said to have been tolled" by that Executive Order, as the time for filing had already passed and the plaintiff had offered no excuse for the delay. 20 Civ. 764, 2021 WL 1406683, at *3 (N.D.N.Y. Feb. 17, 2021), *report and recommendation adopted* 2021 WL 1404554 (Apr. 14, 2021). Although *Johnson* is instructive with respect to how claims that may have expired *before* the issuance of Executive Order 202.8 (*i.e.*, before March 20, 2020) should be treated, it does not address the applicability of the Executive Order to federal claims that, like Plaintiff's, had not yet expired by that date.

9       Executive Order 202.8 tolled applicable limitations periods from March 20, 2020 to November 3, 2020. The order amounted to a "pause" in the limitations period—that is, during the duration of the toll, the clock to file [did] not run," but "[o]nce the toll end[ed,] the clock resume[d] from where it was when the toll began, and the plaintiff ha[d] the rest of his limitations period to file his complaint," *Johnston v. City of Syracuse*, No. 20 Civ. 1497, 2021 WL 3930703, at *6 (N.D.N.Y. Sept. 2, 2021). Because, as of March 20, 2020, when the clock was "paused," Plaintiff had 211 days remaining before the expiration of the limitations period on October 17, 2020, the Court calculates 211 days after November 3, 2020, as the end of the relevant limitations period when tolled—which is June 2, 2021.

10      Even assuming, *arguendo*, that Plaintiff would not have had reason to know of the harm or injury that was the basis of his Section 1986 claim until the date the indictment was dismissed (October 17, 2017), the claim would still be time-barred, because this would only extend the limitations period to October 17, 2018—nearly three years before the commencement of this action.

11      As noted, the Court dismissed Count 7 for relying on a statute that does not provide a private right of action, *see supra* at 7; Count 9 for being duplicative of Count 4, *see id.* at 8, and all the state constitutional claims Plaintiff asserts analogously to his federal constitutional claims, *see id.*

12      As discussed *supra* at 18–19, even if the Court construes Plaintiff's notice of claim as timely based on the dismissal of Plaintiff's criminal case on October 17, 2017, Plaintiff still failed to commence this action within one year and 90 days, as required by statute. This provides an alternative ground for dismissal.

13      Plaintiff also names the NYPD as a defendant. *See* Compl. But, the NYPD is a non-suable agency of the City, and thus, to the extent any of Plaintiff's claims are brought against it, they fail as a matter of law. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Any such claims are, accordingly, DISMISSED with prejudice.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 198 of 238

Roark v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 8827185
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark A. ROARK, Plaintiff,
v.
The People of the State of NEW YORK;
Watertown Police Dep't; Samaritan Hosp.;
and the Watertown District Attorney's
Office, Kristyna S. Mills, [1] Defendants.

5:23-CV-1237 (DNH/ML)
|
Signed December 21, 2023

**Attorneys and Law Firms**

MARK A. ROARK, Plaintiff, Pro Se, Ulster Correctional Facility, Post Office Box 800, Berme Road, Napanoch, New York 12458.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent a *pro se* complaint in the above captioned action together with an application to proceed *in forma pauperis* and inmate authorization filed by Mark A. Roark ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2.) For the reasons discussed below, I grant Plaintiff's *in forma pauperis* application and recommend that Plaintiff's Complaint be dismissed in its entirety. (Dkt. Nos. 1, 2.)

**I. BACKGROUND**

Construed as liberally [2] as possible, Plaintiff's Complaint appears to allege that his civil rights were violated by Defendants The People of the State of New York, Watertown Police Department ("WPD"), Samaritan Hospital, and the Watertown District Attorney's Office (collectively "Defendants"). (*See generally* Dkt. No 1.) More specifically, the Complaint alleges that on an unspecified date, time, and year, he was walking around an unspecified town where he was "pulled to the side of the road" by officers employed by Defendant WPD and asked why he was J-walking. (Dkt. No. 1 at 5, 7.) The Complaint alleges that, despite not being "put through any test," the officers insisted that Plaintiff was under the influence of a substance, placed handcuffs on him, and

transported him to the WPD headquarters. (Dkt. No. 1 at 5, 7.) The Complaint alleges that while at WPD headquarters, "6 John Doe's came in and assaulted [Plaintiff] while being fully [restrained]." (Dkt. No. 1 at 5.)

The Complaint alleges that after Plaintiff was assaulted, he was taken to Defendant Samaritan Hospital, where he was admitted for medical care. (Dkt. No. 1 at 5.)

The Complaint alleges that Defendant Watertown District Attorney's Office "never spoke to [Plaintiff] nor read [him his] rights" but that he sat in jail for ten days before being transported by the New York State Police to the Clinton County Jail for a probation violation. (Dkt. No. 1 at 6.) The Complaint alleges that no new charges were filed against Plaintiff, he did not plead guilty, and did not appear before a judge. (*Id.*)

Notwithstanding these allegations, the Complaint also alleges that on an unspecified date and at an unspecified time, Plaintiff was "brought in[ ]front of a [j]udge and ... charged [with] orderly misconduct." (Dkt. No. 1 at 8.)

Plaintiff alleges that as a result of the incidents alleged in the Complaint, he has lost his dog, his belongings, and his freedom. (Dkt. No. 1 at 8.)

Based on these factual allegations, Plaintiff appears to assert the following nine claims: (1) a claim of false arrest against Defendant WPD in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim of excessive force against Defendant WPD in violation of the Fourth Amendment and 42 U.S.C. § 1983; (3) a claim of failure to protect against Defendant WPD in violation of the Fourth Amendment and 42 U.S.C. and § 1983; (4) a claim that his right to equal protection of the law was violated by Defendant WPD pursuant to Fourteenth Amendment and 42 U.S.C. § 1983; (5) a claim that Defendant Watertown District Attorney's Office denied his right of access to the courts pursuant to First Amendment and 42 U.S.C. § 1983; (6) claim of false arrest against Defendant Watertown District Attorney's Office in violation of the Fourth Amendment and 42 U.S.C. § 1983; (7) a claim that Defendant Watertown District Attorney's Office violated his right to freedom of speech pursuant to the First Amendment and 42 U.S.C. § 1983; (8) a claim that Defendant Watertown District Attorney's Office violated his due process rights pursuant to Fourteenth Amendment and 42 U.S.C. § 1983; and (9) a claim that Defendant Watertown District Attorney's Office violated his right to counsel pursuant to the

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 199 of 238

Roark v. New York, Not Reported in Fed. Supp. (2023)

Sixth Amendment and 42 U.S.C. § 1983. (Dkt. No. 1 at 5-7.) As relief, Plaintiff seeks $5,000,000.00 in damages and would like to "fully charge the officers from [his] assault." (Dkt. No. 1 at 5.)

**\*2** Plaintiff also filed a motion for leave to proceed *in forma pauperis*. (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). [3] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at \*1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 2 at 2), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. (Dkt. No. 2 at 3.)

Accordingly, Plaintiff's application to proceed with this action IFP is granted. (Dkt. No. 2.)

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

Having found that Plaintiff met the financial criteria for commencing this action *in forma pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e). Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that— ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *see also* 28 U.S.C. 1915A(a) ("The court shall review ... as soon as practicable ... a complaint in a civil action in which a prisoner seeks redress from a

governmental entity or officer or employee of a governmental entity."). [4]

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

**\*3** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *rev'd on other grounds*, 682 F. App'x 30. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a ... complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee).

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 200 of 238

Roark v. New York, Not Reported in Fed. Supp. (2023)

"Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Defendants The People of the State of New York and Watertown District Attorney's Office [5]

To the extent Plaintiff seeks money damages against Defendants The People of the State of New York and Watertown District Attorney's Office, those claims are barred by the Eleventh Amendment. *Drawhorne v. Aloise*, 23-CV-1278, 2023 WL 8188396, at *3 (N.D.N.Y. Nov. 27, 2023) (Dancks, M.J.) (citing *Best v. Brown*, 19-CV-3724, 2019 WL 3067118, at *2 (E.D.N.Y. July 12, 2019) (dismissing the plaintiff's claim against the Office of the Queens County District Attorney as barred by the Eleventh Amendment); *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New York*, 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry v. New York*, 21-CV-0319, 2021 WL 3037709, at *6 (N.D.N.Y. June 14, 2021) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York—as barred by the Eleventh Amendment) *adopted by*, 2021 WL 3032691 (N.D.N.Y. July 19, 2021) (Suddaby, C.J.)).

Therefore, the undersigned recommends Plaintiff's Section 1983 claims against Defendants The People of the State of New York and Watertown District Attorney's Office be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A. *Drawhorne*, 2023 WL 8188396, at *3.

### B. Defendant Watertown Police Department

**\*4** "Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). Thus, Defendant WPD is not a proper party which would be amenable to suit.

To the extent that Plaintiff's claims are liberally construed as against the City of Watertown, I recommend that they be dismissed.

A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so

widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train the municipality's employees. *Connick*, 563 U.S. at 51. However, municipal liability is most tenuous when a claim turns on the failure to train. *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")). To satisfy the statute, a municipality's failure to train its employees must amount to " 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

There is no basis for municipal liability alleged in the Complaint. Plaintiff essentially complains of a single incident, during which an officer or officers employed by the Watertown Police Department did not act properly. There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Defendant WPD.

 **\*5** As a result, I recommend that, to the extent Plaintiff's claims against Defendant WPD are construed as against the City of Watertown, they be dismissed at this time. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at \*5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.).

### C. Defendant Samaritan Hospital

A claim for relief under 42 U.S.C. § 1983 must allege facts showing that the defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or

a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Private parties are generally not state actors, and are therefore not usually liable under § 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties.") (internal quotation marks and citation omitted).

"For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Caballero v. Shayna*, 18-CV-1627, 2019 WL 2491717, at \*3 (E.D.N.Y. June 14, 2019) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Caballero*, 2019 WL 2491717, at \*3 (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

Plaintiff is suing Samaritan Hospital, a private medical institution.[6] The Complaint alleges no facts suggesting that the hospital is under any of the aforementioned exceptions, or describing how Defendant Samaritan Hospital's actions are otherwise "fairly attributable to the state." Because Plaintiff has failed to plausibly allege that Defendant Samaritan Hospital acted under color of state law, the Complaint fails to state any claims for relief under § 1983. *See White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals ... named as defendants in [plaintiff's] complaint, are generally not proper § 1983 defendants because they do not act under color of state law."). As a result, I recommend that the district court dismiss Plaintiff's claims alleged pursuant to § 1983. *Guillory v. Benedict*, 21-CV-0073, 2021 WL 707076, at \*2 (N.D.N.Y. Feb. 4, 2021) (Baxter, M.J.) (recommending dismissal of the plaintiff's § 1983 claims against private medical institution St. Joseph's Hospital), *report and recommendation adopted by*, 2021 WL 706644 (N.D.N.Y. Feb. 23, 2021) (Sharpe, J.); *see Guillory v. Crouse Hosp.*, 21-CV-1177, 2021 WL 5605260, at \*2 (N.D.N.Y. Nov.

2, 2021) (Baxter, M.J.) (citing *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014); *White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010); *Doe v. Rosenberg*, 996 F. Supp. 343, 352 (S.D.N.Y. 1998), *aff'd*, 166 F.3d 507 (2d Cir. 1999)) ("it remains well settled in this Circuit that a private hospital, and its employees, are not deemed state actors solely because the state has granted them authority to practice medicine within its borders."), *report and recommendation adopted by*, 2021 WL 5585926 (N.D.N.Y. Nov. 30, 2021) (Hurd, J.).

## V. OPPORTUNITY TO AMEND

**\*6** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [7]

Here, I find that leave to replead would be futile with respect to Plaintiff's claims against Defendants The People of the State of New York and Watertown District Attorney's Office. [8]

Although I have serious doubts about whether Plaintiff can replead to assert an actionable claim against Defendants WPD and Samaritan Hospital, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution, I recommend that he be permitted to replead the Complaint with respect to those claims.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are

insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at \*7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**\*7 ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 2 at 3) and notify that official that Plaintiff has filed this action and is required to pay the Northern District of New York the entire statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization form (Dkt. No. 2 at 3) to the Financial Deputy of the Clerk's office; and it is further

**ORDERED** that the Clerk of the Court add "Watertown District Attorney's Office, Kristyna S. Mills" as a defendant in this action; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS** the Complaint (Dkt. No. 1) **WITH PREJUDICE AND WITHOUT LEAVE TO REPLEAD** to the extent that it asserted claims against Defendants The People of the State of New York

Case 6:25-cv-01081-BKS-ML Document 45 Filed 07/29/26 Page 203 of 238

Roark v. New York, Not Reported in Fed. Supp. (2023)

and Watertown District Attorney's office, and **WITHOUT PREJUDICE AND WITH LEAVE TO REPLEAD** to the extent that it asserted claims against Defendants WPD and Samaritan Hospital; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [9]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8827185

---

**Footnotes**

1     The Clerk of the Court is directed to add Watertown District Attorney's Office, Kristyna S. Mills to the docket as a defendant in this action. (Dkt. No. 1 at 2.)

2     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

3     Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

4     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

5     The Court presumes that Plaintiff intended to assert claims against the Jefferson County District Attorney's Office. Watertown, New York is located within Jefferson County and the current District Attorney of Jefferson County is Kristyna S. Mills.

6     "Samaritan Medical Center (Watertown, New York) is a 290-bed not-for-profit community medical center, offering a full spectrum of inpatient and outpatient health services." Samaritan Health, https://samaritanhealth.com/ (last visited December 20, 2023).

7     *See also Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Case 6:25-cv-01081-BKS-ML   Document 45   Filed 07/29/26   Page 204 of 238

8      The undersigned notes that a dismissal based on the doctrine of sovereign immunity, is consequently a dismissal for lack of subject matter jurisdiction. *Crumble v. United States*, 23-CV-4427, 2023 WL 5102907, at *7 (S.D.N.Y. Aug. 7, 2023); *Nguyen v. Kijakazi*, 20-CV-0607, 2022 WL 542265, at *8 (E.D.N.Y. Feb. 23, 2022). Moreover, the Second Circuit has directed that dismissals for lack of subject matter jurisdiction are to be made without prejudice. *Abadi v. City of New York*, 22-CV-1560, 2023 WL 3295949, at *3 n.3 (2d Cir. May 8, 2023) (summary order) (citing *Katz v. Donna Karan Co.,* 872 F.3d 114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the dismissal is due to the court's lack of subject matter jurisdiction.")) ("Because the Court lacks subject matter jurisdiction ... the amended complaint should be dismissed *without* prejudice.") (emphasis in original). Notwithstanding, the undersigned recommends dismissal with prejudice and without leave to amend because any amendment or attempt to bring these claims against Defendants The People of the State of New York and Watertown District Attorney's Office, would be futile. *Drawhorne,* 2023 WL 8188396, at *3 (recommending that the plaintiff's "Section 1983 claims against The People of the State of New York be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.").

9      The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

10     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2024 WL 125512
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark A. ROARK, Plaintiff,
v.
The People of the State of
NEW YORK et al., Defendants.

5:23-CV-1237
|
Signed January 11, 2024

**Attorneys and Law Firms**

MARK A. ROARK, Plaintiff, Pro Se, 23-R-2152, Ulster Correctional Facility, P.O. Box 800, Berme Road, Napanoch, NY 12458.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

**\*1** On September 29, 2023, *pro se* plaintiff Mark A. Roark ("plaintiff"), who is currently incarcerated at Ulster Correctional Facility, initially filed this civil action in the U.S. District Court for the Western District of New York. Dkt. No. 1. Along with his complaint, plaintiff sought leave to proceed *in forma pauperis* ("IFP Application"). Dkt. No. 2. But the case was transferred to this judicial district because it involved events that occurred in Watertown, New York, which is located in Jefferson County. Dkt. Nos. 3, 4.

On December 21, 2023, U.S. Magistrate Judge Miroslav Lovric granted plaintiff's IFP Application and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed with leave to replead some claims but not others. Dkt. No. 5. As Judge Lovric explained, plaintiff's claims for money damages against the State of New York or the Watertown District Attorney's Office (or one of its named employee for actions taken in the course of her official duties) were barred by Eleventh Amendment immunity. *Id.* So Judge Lovric recommended that those claims be dismissed for lack of subject matter jurisdiction. *Id.* But Judge Lovric

concluded that plaintiff might be able to plead one or more actionable claims for relief against defendant Watertown Police Department and/or defendant Samaritan Hospital. *Id.*

Plaintiff has not filed objections, and the time period in which to do so has expired. *See* Dkt. No. 5. Upon review for clear error, the R&R is accepted and will be adopted in all respects. *See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation (Dkt. No. 5) is ACCEPTED;

2. Plaintiff's complaint (Dkt. No. 1) is DISMISSED;

3. Plaintiff's claims against defendants The People of the State of New York and Watertown District Attorney's Office are DISMISSED without prejudice but without leave to amend for lack of subject matter jurisdiction;

4. Plaintiff's claims against defendants Watertown Police Department and Samaritan Hospital are DISMISSED with leave to amend;

5. Plaintiff shall have THIRTY DAYS in which to submit an amended complaint in accordance with the instructions set forth in Judge Lovric's R&R;

6. If plaintiff timely files an amended complaint, this matter shall be referred to Judge Lovric for further review or other action as appropriate; and

7. If plaintiff does not timely file an amended complaint, the Clerk of the Court is directed to close this matter without further Order of the Court.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 125512

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through
Barbara McGREGOR, as Administratrix of
the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

 **\*1**  Plaintiff Kylie Ann Turczyn, deceased, by and through Barbara McGregor, as administratrix of the estate of Kylie Ann Turczyn, commenced this action against defendants City of Utica, City of Utica Police Dept., and Elizabeth Shanley alleging substantive due process claims pursuant to 42 U.S.C. § 1983 and separate state law causes of action. (Am.Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 19.) For the reasons that follow, the motion is granted in part and denied in part.

### II. *Background*

### A. *Facts* [1]

Shanley, an Oneida County domestic violence investigator, was at all relevant times assigned by the Police Department to accomplish the goals of reducing "occurrence[s] of domestic violence by increasing reporting and by identifying and tracking repeat victims and/or offenders," and "increas[ing] victims' access to supportive services by encouraging [them] to report their abuse, thereby increasing arrest rates for domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012, Thomas Anderson, Turczyn's former boyfriend and the father of her daughter, broke into Turczyn's home armed with a 9 mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking her life in view of their four-year-old daughter, G.T. (*Id.*) Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn made between five and ten complaints to Utica police officers, "including informing them of a specific threat by Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told Shanley "that Anderson was armed and had threatened to kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic violence between Turczyn and Anderson, neither Shanley, New York State Police, nor Utica Police took any steps to arrest Anderson, investigate Turczyn's complaints, or follow-up with Anderson "as is the policy and protocol of the domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of protection, which she attempted to do, but was told by an unknown person at the Oneida County Family Court to return the following day because the court was " 'too busy.' " (*Id.* ¶¶ 15–16.) The following day, Turczyn left a voice message for Shanley, explaining that she was unable to obtain an order of protection and that Anderson had a gun and planned to kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge, "Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly believed that Turczyn's issues with Anderson were outside of the purview of Utica Police and should, instead, be dealt with by New York State Police; however, "she did not inform any other police agency or take any action herself." (*Id.* ¶¶ 18, 19, 20.)

### B. *Procedural History*

Turczyn commenced this action by filing a complaint on October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved to dismiss, (Dkt. No. 10.) In response, Turczyn filed an amended complaint as of right, which is now the operative pleading. (*See generally* Am. Compl.) In her amended complaint, Turczyn alleges the following causes of action: (1) a denial of substantive due process rights under the Fifth and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4)

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

**A.** *Preliminary Matters*

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal

quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b) (6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

### B. *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

### C. *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to

protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Case 6:25-cv-01081-BKS-ML     Document 45     Filed 07/29/26     Page 209 of 238

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

**\*5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

**\*6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at \*10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y .,* No. 12–CV–6151, 2014 WL 1224257, at \*13 (E.D.N.Y. Mar. 24, 2014).

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 210 of 238

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

---

### Footnotes

1    The facts are presented in the light most favorable to plaintiff.

2    *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3    In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND
Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda

and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]
When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

 **\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

2. Analysis of Plaintiff's Claims

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

**\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

**Footnotes**

1       Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2       The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3       Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4       The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5       If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT; Abraham
Mamoun, Syracuse Police Dept.; William Kittle,
Syracuse Police Dept.; Shawn Hauck, Syracuse
Police Dept.; Altimonda, Syracuse Police Dept.;
and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Jeramie White ("Plaintiff") against the Syracuse Police Department and five of its employees ("Defendants"), is United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that (1) Plaintiff's Complaint be accepted for filing by the Court with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and (2) Plaintiff's remaining cause of action against the Syracuse Police Department be dismissed with leave to replead within thirty days of the issuance of an Order adopting the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not submit an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) [1]

Based upon a review of this matter, the Court can find no clear error in the Report-Recommendation: [2] Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein; Plaintiff's Complaint is accepted for filing with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's remaining cause of action against the Syracuse Police Department is dismissed with leave to replead within thirty days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 9) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action against the Syracuse Police Department is **DISMISSED with leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 216 of 238

**Footnotes**

1	The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2	When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**End of Document**	© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:25-cv-01081-BKS-ML Document 45 Filed 07/29/26 Page 217 of 238

🚩 KeyCite Yellow Flag

Declined to Extend by Jordan v. County of Chemung, W.D.N.Y., September 5, 2017

2014 WL 1293527
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Guynell WRIGHT, Plaintiff,
v.
CITY OF SYRACUSE; Jeffrey T. Wright; Andrew Nolan; Donald Thompson; Robert Calkin; John Doe(s); Jane Doe(s); John M. O'Connor, III; and Thomas Simone, Defendants.

No. 5:10–CV–0661 (GTS/TWD).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Bosman Law Firm, L.L.C., A.J. Bosman, Esq., Daniel W. Flynn, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Robert P. Stamey, James P. McGinty, Esq., Aimee M. Paquette, Esq., of Counsel, Syracuse, NY, for City of Syracuse Counsel for Defendants.

Hancock Estabrook LLP, John G. Powers, Esq., of Counsel, Syracuse, NY, for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment discrimination action filed by Guynell Wright ("Plaintiff") against the City of Syracuse, six of its employees and an unstated number of John and Jane Does ("Defendants") is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 95.) For the reasons set forth below, the motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, in his Third Amended Complaint, Plaintiff, an African–American man who was formerly employed by the City of Syracuse ("the City") as a laborer for the Department of Public Works ("the Department"), alleges that, throughout his employment with the City, he was treated differently than similarly situated white employees in the form of promotions, work assignments and discipline; he was retaliated against for his complaints of racial discrimination; and he was subject to continuous hostile work environment conditions. (Dkt. No. 45.)

Based on the factual allegations of Plaintiff's Third Amended Complaint, he asserts the following twenty-one claims: (1) a claim against all Defendants alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a claim against all Defendants alleging race discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296 ("NYHRL"); (3) a claim against all Defendants alleging hostile work environment in violation of Title VII; (4) a claim against all Defendants alleging hostile work environment in violation of NYHRL; (5) a claim against all Defendants alleging retaliation in violation of Title VII; (6) a claim against ll Defendants alleging retaliation in violation of NYHRL; (7) a claim against all Defendants alleging race discrimination in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983"); (8) a claim against all Defendants alleging hostile work environment in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to Section 1983; (9) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983; (10) a claim against the City alleging municipal liability on Plaintiff's Section 1983 claims against the individually named Defendants; (11) a claim alleging breach of contract against all Defendants; (12) a claim against all Defendants alleging race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (13) a claim against all Defendants alleging hostile work environment in violation of Section 1981; (14) a claim against all Defendants alleging retaliation in violation of Section 1981; (15) a claim against all Defendants alleging the deprivation of Plaintiff's property interest in his continued employment in violation of his right to due process under the Fourteenth Amendment pursuant to Section 1983; (16) a claim against all Defendants alleging the deprivation of Plaintiff's property and liberty interest in his good name and reputation in violation of his right to due process under the Fourteenth Amendment

pursuant to Section 1983; (17) a claim against all Defendants alleging the deprivations of Plaintiff's rights under Article I of the New York State Constitution; (18) a claim against all Defendants alleging retaliation in violation of Title VII based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (19) a claim against all Defendants alleging retaliation in violation of Section 296 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (20) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; and (21) a claim against all Defendants alleging retaliation in violation of Section 1981 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits. (*Id.*)

### B. Undisputed Material Facts

**\*2** The following material facts [1] are gleaned from Defendants' Local Rule 7.1 Statement of Undisputed Material Facts, and Plaintiff's response thereto. (*See* Dkt. No. 100–7 [Defs.' Rule 7.1 Statement]; Dkt. No. 105 [Pl.'s Rule 7.1 Response Statement].) Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id.*

Plaintiff was employed as a "Laborer I" in the Department's Street Cleaning Bureau from at least June of 2006 until his termination in February of 2010. [2] Laborer I is a civil service classified job title that includes a written job description and written qualifications. The Laborer I position is covered within the American Federation of State, County and Municipal Employees ("AFSCME") Local 400 ("Local 400") bargaining unit, of which Plaintiff was a member.

The collective bargaining agreement ("CBA") for the relevant period between the City and Local 400 provides that the City shall furnish each employee member of Local 400 with a copy of the existing Work Rules and that any amendments or additions to the Work Rules shall be discussed with Local 400 and published to its members prior to becoming effective and that thereafter, any complaint shall be resolved through the grievance procedure. (*See* Dkt. No. 96–2, at 64 [Ex. B to Decl. of Donald Thompson, June 13, 2013].) Section 8.1.4 of the CBA also provides that, "[i]n the event that an employee receives a written reprimand and one (1) year elapses without any other disciplinary action being imposed on the employee, such reprimand shall be removed from the employee's personal file.

The Work Rules provide, in relevant part, at follows:

### VII. Employee Discipline

The City shall not exercise its right to discharge or otherwise discipline an employee without just cause. Whenever reasonable, the City shall subscribe to the principles of progressive discipline. Set forth below are the guidelines used by the City in enforcing progressive discipline and determining the appropriate disciplinary penalty in any particular circumstance. These guidelines may be deviated from when, in the City's opinion, circumstances warrant.

### MINOR OFFENSES

| | | |
|---|---|---|
| FIRST, SECOND, THIRD | - | Write up |
| FORTH | - | Write up and one day suspension |
| FIFTH | - | Write up and three day suspension |
| SIXTH | - | Write up and five day suspension |
| SEVENTH | - | Write up and ten day suspension |
| EIGHTH | - | Write up and termination |

MAJOR OFFENSES

| | | |
|---|---|---|
| FIRST | - | Write up and suspension or termination |
| SECOND | - | Write up and suspension or termination |
| THIRD | - | Write up and termination |

**\*3** Notwithstanding the provisions of Article 8.1.4 of the parties ['] collective bargaining agreement, the discipline imposed for those violations considered to be 'minor' shall be determined by reviewing the number of such violations for which an employee has been disciplined in the twelve (12) months preceding the current violation;

However, upon committing a fourth (4th) 'minor' violation within the above stated twelve (12) month[ ] period, then that minor violation and each succeeding 'minor' violation shall be based on discipline[ ] received within the preceding eighteen (18) month period. The discipline imposed for each succeeding violation shall be in accordance with progressive discipline as outlined in the above guidelines;

In all cases of 'major' violations which are subject to suspension and/or termination, the preceding eighteen (18) months disciplinary record (including 'minor' violations) shall be considered in determining the discipline to be imposed in accordance with those outlined in the above guidelines.

(Dkt. No. 107–1, at 9–10 [Ex. 1 to Flynn Aff. ].) The Work Rules expressly provide that "[i]nsubordination is a major ... violation." (*Id.,* at 7.) To be sure, the Work Rules provide that "[t]heft of any City property or services is prohibited[,]" the level of violation attached to such conduct is not specified. (*Id.*) However, Section 9.2.1 of the CBA refers to fighting, theft, substance abuse and insubordination as "serious violations." (*See* Dkt. No. 96–2, at 53.)

From July 2006 until he was terminated, Plaintiff was subject to a series of disciplinary actions by the City. First, in July 2006, Plaintiff was given a one-day suspension for insubordination. In February 2007, Plaintiff was given a 20–day suspension for fighting with another employee. [3] In July 2007, Plaintiff was given a 20–day suspension for theft of City property. In January 2009, Plaintiff was terminated for insubordination, but then was brought back to work through a "last chance" agreement between the City and Local 400. [4] Finally, on February 24, 2010, Plaintiff was terminated for

theft of City Property. Plaintiff does not dispute the fact of these disciplinary actions, but disputes the bases for the actions and/or argues that the City applies their policies inconsistently, discretionarily and disparately.

Defendant, John M. O'Connor, III ("O'Connor") made the decision to terminate Plaintiff. O'Connor was appointed Commissioner of the Department in January 2010 and had no involvement in Plaintiff's discipline or any employment actions regarding Plaintiff prior to his termination in February 2010. Defendant, Jeffrey Wright ("Wright") was the Commissioner of the Department through December 2009 and had no involvement in the decision to terminate Plaintiff in February 2010. Defendant, Thomas Simone, III ("Simone") has been the First Deputy Commissioner of the Department since January 2010. He was not a decision maker regarding the determination to terminate Plaintiff in February 2010.

**\*4** Defendant, Donald Thompson ("Thompson") was the Director of Personnel during the relevant period. Thompson asserts by Declaration that he agreed that it was appropriate to terminate Plaintiff under the circumstances and concurred with O'Connor's decision in that regard. (*See* Dkt. No. 96 at ¶¶ 34–35 [Decl. of Donald Thompson, June 13, 2013].) At his deposition, O'Connor testified regarding his communication with Thompson prior to terminating Plaintiff, as follows: "I had [a] conversation with Don Thompson, who told me the level of progression [Plaintiff] was at and [sic] was instructed and encouraged that I should investigate, and most likely there would be termination here." (Dkt. No. 112, at 56 [Dep. of John M. O'Connor, III, at 152: 4–8, Jan. 4, 2013].) According to Plaintiff, O'Connor told him that Don (meaning Thompson) "said to fire you." (Dkt. No. 106 at 7–8 [Aff. of Guynell Wright at ¶ 41].)

During the relevant time period, Defendant, Robert Culkin ("Culkin") was the Acting Assistant Superintendent of the Department's Street Cleaning Bureau and Defendant, Andrew Nolan ("Nolan") was Acting Superintendent. Both Culkin and Nolan assert that they did not initiate the discipline leading up to Plaintiff's termination, did not participate in the

pretermination hearing and played no role in the decision to terminate Plaintiff, nor were they consulted by O'Connor for their input regarding Plaintiff's discipline. (*See* Dkt. No. 98 at 8 [Decl. of Andrew Nolan at ¶ 49, June 13, 2013]; Dkt. No. 100 at 5 [Decl. of Robert Culkin at ¶ 32, June 13, 2013].) Plaintiff counters that he "personally observed [ ] O'Conn[o]r go to [ ] Nolan and [ ] C[u]lkin for advice on how to perform his duties as Commissioner." (Dkt. No. 106 at 8 [Wright Aff. ¶ 42].)

Prior to his termination in February 2010, Plaintiff was provided a copy of the notice of the disciplinary charges against him as well as the possibility that termination would be considered as a result. Plaintiff was afforded a disciplinary hearing at which he was given the chance to respond to the disciplinary charges against him and was permitted to have union representation present to advocate on his behalf. Simone was present at Plaintiff's disciplinary hearing. Although Simone has the authority to advise regarding discipline, his role at Plaintiff's hearing was as an observer and gatherer of information.

Also, Plaintiff exercised his procedural right to grieve his termination. That procedure ran its course according to the grievance procedure set forth in the CBA and terminated prior to the final step, when Local 400 voted not to take the grievance to arbitration.

Plaintiff ultimately filed complaints with the New York State Division of Human Rights ("DHR") on March 26, 2010 and April 28, 2010 challenging his February 2010 termination. [5] (*See* Dkt. No. 96–33 [Ex. GG to Thompson Decl.].) In those complaints, Plaintiff alleges that he was suspended and terminated based on his race and that he was retaliated against for his prior DHR complaints. Plaintiff alleges that white employees are treated differently than black employees in terms of employee discipline. (*See id.*) On June 3, 2010 and June 10, 2010, respectively, the DHR dismissed those complaints for administrative convenience. (*See* Dkt. No. 9'–13 [Ex. L to Decl. of Aimee Paquette, June 14, 2013]; Dkt. No. 96–34 [Ex. HH to Thompson Decl.].)

**\*5** After Plaintiff was terminated, he filed a claim for unemployment benefits with the Department of Labor ("DOL"). When the DOL inquired about the circumstances of Plaintiff's termination, the City responded that he had been terminated for cause. Plaintiff availed himself of the administrative appeal process to challenge the DOL's

determination, which was ultimately overturned. Plaintiff received full payment of back benefits owed.

### C. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, the Defendants assert twelve arguments with regard to Plaintiff's claims against them. (Dkt. No. 100–8 [Defs.' Mem. of Law].)

First, argue the Defendants, Plaintiff's employment discrimination claims based on his termination may be dismissed for the following three reasons: (1) the discriminatory determination claim against Simone, Wright, Culkin, Thompson and Nolan should be dismissed because each was either not the decision maker or was not otherwise actionably involved in the decision to terminate Plaintiff; (2) the discriminatory determination claim against O'Connor and the City should be dismissed because (a) Plaintiff cannot make out a prima facie case that his termination was discriminatory, (b) Defendants have come forward with legitimate, nondiscriminatory reasons for Plaintiff's termination, and (c) Plaintiff has no evidence that Defendants' stated reasons for his termination are a pretext for discrimination; and (3) absent individual liability for discriminatory termination, no liability will lie against the City pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018 (1978). (*Id.* at 14–25.)

Second, argue the Defendants, Plaintiffs 18th, 19th, 20th and 21st causes of action alleging discrimination against the City for opposing his application for unemployment benefits may be dismissed for the following three reasons: (1) there is caselaw supporting the legal conclusion that an employer's opposition of a former employee's application for unemployment benefits is not adverse employment action; (2) where an employer opposes a former employee's unemployment application, but the employee is ultimately awarded those benefits, no adverse employment action occurs in any event; and (3) Plaintiff cannot prove discriminatory animus in the opposition of his unemployment application because he failed to seek any discovery or deposition from the City employee responsible for responding to DOL inquiries. (*Id.* at 26–27.)

Third, argue the Defendants, Plaintiff's hostile work environment claims may be dismissed as a matter of law for the following five reasons: (1) Plaintiff's Title VII and NYHRL claims of hostile work environment must be

dismissed for failure to exhaust his administrative remedies before the DHR; (2) Plaintiff's NYHRL claim must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) all of Plaintiff's hostile work environment claims must be dismissed because Plaintiff has failed to identify evidence that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his employment; (4) Plaintiff's hostile work environment claims against Simone, O'Connor, Wright and Thompson must be dismissed because there is a lack of evidence of their personal involvement or discriminatory purpose; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell*. (*Id.* at 27–36.)

**\*6** Fourth, argue the Defendants, there is no claim for discriminatory overtime in this action for the following six reasons: (1) the Third Amended Complaint does not include a claim for discriminatory overtime; (2) any claim for discriminatory overtime under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (3) any discriminatory overtime claim under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (4) Plaintiff cannot identify any evidence that he was denied overtime due to discrimination; (5) Plaintiff cannot identify any evidence that he was denied overtime because of his race or protected activity; and (6) any claim of discriminatory overtime against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory overtime assignments. (*Id.* at 36–43.)

Fifth, argue the Defendants, Plaintiff's discrimination and retaliation claims based on less desirable work assignments must be dismissed for the following five reasons: (1) Plaintiff's claimed discriminatory work assignments fail or do not constitute adverse employment action; (2) any claim of discriminatory work assignments against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory work assignments; (3) any claim for discriminatory work assignments under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (4) any discriminatory claim for discriminatory work assignments under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; and

(5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell*. (*Id.* at 43–48.)

Sixth, argue the Defendants, Plaintiff's discriminatory and retaliatory discipline claims must be dismissed for the following six reasons: (1) Plaintiff's claim for discriminatory and retaliatory discipline under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory and retaliatory discipline under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) some or all of Plaintiff's claims for discriminatory and retaliatory discipline are barred by the relevant statute of limitations; (4) Plaintiff cannot established that the challenged disciplinary actions were premised on discriminatory or retaliatory animus; (5) discriminatory discipline claim against Simone, O'Connor, Nolan, Culkin and Thompson must be dismissed because none of them was a decision maker or involved in the discipline of Plaintiff; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell*. (*Id.* at 48–57.)

**\*7** Seventh, argue the Defendants, Plaintiff's claims of discriminatory and retaliatory denial of promotion may be dismissed for the following six reasons: (1) Plaintiff's claims for discriminatory denial of promotion under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory denial of promotion under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) Plaintiff's claims for discriminatory denial of promotion under Title VII, NYHRL and Section 1983 must be dismissed because they are timebarred; (4) Plaintiff cannot establish that the claimed promotions for which he was passed over were filled based on discriminatory or retaliatory intent; (5) Plaintiff's claims for discriminatory denial of promotion against Simone, Nolan, Culkin, Thompson and O'Connor should be dismissed because none of them was a decision maker or involved in the alleged failure to promote Plaintiff to crew leader; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell*. (*Id.* at 57–67.)

Eighth, argue the Defendants, Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to file a claim against Local 400, which is a prerequisite to a breach

of contract claim based on a union's breach of its duty of fair representation. (*Id.* at 67–68.)

Ninth, argue the Defendants, Plaintiff's 15th and 16th causes of action, brought under Section 1983 for violation of his Fourteenth Amendment right to Due Process may be dismissed because (1) municipal employees hold no due process rights to promotions, overtime, discipline or work assignments; and (2) a municipal employee's liberty interest in keeping his employment is adequately served where there is a process available to challenge the employer's deprivation, such as a grievance procedure. (*Id.* at 68–70.)

Tenth, argue the Defendants, Plaintiff's 17th cause of action for violations of the New York State Constitution must be dismissed because no private right of action exists under the New York State Constitution where a claim based on the same allegations is asserted under Section 1983. (*Id.* at 70–71.)

Eleventh, argue the Defendants, Plaintiff's claim for punitive damages must be dismissed because no such claim may be maintained against the City as a matter of law and because Plaintiff has failed to identify any evidence to establish that the individual Defendants acted with evil motive or intent. (*Id.* at 71.)

Twelfth, argue the Defendants, Plaintiff's claims against John and Jane Doe defendants must be dismissed because Plaintiff failed to identify them through amendment of his pleading prior to the close of discovery. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts eleven arguments: (1) because Plaintiff asserts claims under the NYHZL and the New York State Constitution, this Court should apply New York procedural law when deciding the pending motion for summary judgment; (2) Defendants' motion should be denied because there are triable issues of fact to support Plaintiff's claims that he was unlawfully discriminated against; (3) Defendants' arguments of failure to exhaust should be rejected because they rely only on the formal charges to the DHR rather than Plaintiff's intake form and handwritten submissions; (4) Plaintiff's hostile work environment claims should not be dismissed because there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation, ridicule and insult that the terms and conditions of his employment were altered for the worse; (5) the City Charter's Notice of Claim

provision does not apply to Plaintiff's NYHRL claims; (6) Plaintiff's claims relating to his unemployment benefits should not be dismissed because the City's opposition of Plaintiff's unemployment applications should be deemed adverse employment action under *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006); (7) Plaintiff has viable due process claims because the CBA here only allows Local 400 to seek a post-termination hearing through arbitration; (8) Plaintiff's breach of contract claim should not be dismissed because it is a matter of fact for the jury to decide whether Local 400 breached its duty of fair representation; (9) Plaintiff's claims under the New York State Constitution should not be dismissed because the availability of a federal constitutional or statutory claim does not render a claim under the New York State Constitution subordinate; (10) Plaintiff's entitlement to punitive damages is not suitable for resolution at the summary judgment stage; and (11) Defendants lack standing to seek dismissal of the John and Jane Doe defendants. (*See* Dkt. No. 104 [Pl.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply Memorandum of Law

**\*8** Generally, in their reply memorandum of law, the Defendants assert eleven arguments: (1) Plaintiff mischaracterizes his summary judgment burden; (2) Plaintiff fails to meet his burden with respect to his wrongful termination claim; (3) Plaintiff fails to oppose, and therefore concedes, Defendants' argument that no claim exists based on discriminatory overtime; (4) Plaintiff fails to meet his burden on his discriminatory promotion claim; (5) Plaintiff fails to meet his burden on his excessive discipline claim; (6) Plaintiff fails to meet his burden on his hostile work environment claim; (7) Plaintiff effectively concedes he has no discriminatory assignments claim; (8) post-employment contestation of unemployment benefits is not actionable; (9) Plaintiff is barred from asserting a contract claim against the City; (10) Plaintiff does not have a viable due process claim; and (11) Plaintiff has failed to establish sufficient evidence to support a *Monell* claim against the City. (Dkt. No. 124 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine

dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted; emphasis added). [6] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). [7]

**B. Legal Standard Governing Unopposed Motions**

**\*9** In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases);

*Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

**C. Plaintiff's Claims**

**1. Title VII**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals. *See Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012).

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See Morgan v. NYS Attorney Gen.'s Office,* No. 11–CV–9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 146 (2d Cir.2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))). Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency. *See id.* (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998)). A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402. When determining whether a claim is reasonably related to the claims filed with the EEOC, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (internal alteration and citation omitted). "[I]t is the substance of the charge and not its label that controls." *Mathirampuzha v. Potter,* 548 F.3d 70, 76–77 (2d Cir.2008) (quoting *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Mathirampuzha,* 548 F.3d at 76–77 (citing *Williams,* 458 F.3d at70).

**a. Hostile Work Environment**

Wright v. City of Syracuse, Not Reported in F.Supp.3d (2014)

**\*10** In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U .S. 57, 67, 106 S.Ct. 2399 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Further, the plaintiff must establish that the hostile or abusive treatment was because of his membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that his "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there [generally] must be more than a few

isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation marks omitted).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ .,* No. 11–CV–3582, 2012 WL 3150388, at \*8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)). Thus, "the 'mere utterance of an epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment claim." *Tolbert v. Smith,* 09–CV–6579, 2014 WL 906158, at \*19 (W.D.N.Y. Mar. 7, 2014) (quoting *Hannon v. Wilson Greatbatch, Ltd.,* No. 00–CV–0203, 2002 WL 1012971, \*7 (W.D.N.Y. Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

 **\*11** In addition to showing that he was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to his employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at \*4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d. Cir.2001)).

The actions of a plaintiff's coworkers will be imputed to the employer if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at \* 10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, the actions of a plaintiff's supervisor are "automatically imputed to the employer unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at \*4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any

harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257 (1998).

Where an employer "maintains a policy against [ ] harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

### b. Race Discrimination and Disparate Treatment

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and its progeny. *See Mathirampuzha,* 548 F.3d at 78 citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013) (quoting *Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003).

**\*12** In order to establish a prima facie case of discrimination based on failure to promote under Title VII, a plaintiff ordinarily must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Yu v. New York City Housing Development Corp.,* 494 F. App'x 122, 124–125 C.A.2 (2d Cir.2012) (quoting *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quotation marks omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir,* 2013 WL 362973, at*1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010)).

" 'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' A change that is 'materially adverse' could consist of, inter alia, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Morgan,* 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

### c. Retaliation

To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d

203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

**\*13** Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640; *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at \*4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII are governed by the burden-shifting analysis announced in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at \* 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at \*9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23, ——, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

**\*14** If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at \* 19. *See also Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at \*11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* —— F.Supp.2d. ——, ——, 2013 WL 5338516, at \*18 (S.D.N.Y.2013).

**2. NYHRL**

"Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.* 174 F.3d 261, 264, n. 1 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n. 4 (2d Cir.1995), abrogated on other grounds by *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226, n. 2 (2d Cir.2008). Accordingly, a

court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold,* 174 F.3d at 264, n. 1.

Under the NYHRL, however, a plaintiff may allege claims against an individual defendant as an aider or abettor of NYHRL violations. In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that [ ]he engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination." *Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citations omitted). *See also* N.Y. Exec. Law § 296.1(a) (McKinney 2012). Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself." *Jordan v. Cayuga Cnty.,* No. 01–CV1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 213 (N.D.N.Y.2002) (internal quotation and emphasis omitted)). *See DeJohn v. Wal–Mart Stores East, LP,* No. 09–CV–1315, 2012 WL 3679204, at * 16 (N.D.N.Y. Aug. 17, 2012). However, an individual cannot be held liable for aiding and abetting their own violations of the NYHRL. *See Reid v.. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012). Finally, an employee is not individually subject to suit as an aider or abettor under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Miotto v. Yonkers Public Schools,* 534 F.Supp.2d 422, 427 (S.D.N.Y.2008) (quoting *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)). *See also Tomka,* 66 F.3d at 1317.

### 3. 42 U.S.C. § 1983

**\*15**  In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct.2018). Thus, isolated acts of municipal employees are typically not sufficient to establish municipal liability. However, acts done "pursuant to municipal policy, or [that] were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware" would justify liability of the municipality. *Jones,* 691 F.3d at 81. Further, "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

### a. First Amendment Retaliation

**\*16**  "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Caballus,* 547 U.S. 410, 417, 126 S.Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must show that (1) he engaged in "constitutionally protected speech" because

Case 6:25-cv-01081-BKS-ML    Document 45    Filed 07/29/26    Page 228 of 238

he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 2013 WL 208950, at *6 (quoting *Johnson v.. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684 (1983)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

### b. Equal Protection

A plaintiff may establish a claim for the violation of her right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (quoting *Feingold,* 366 F.3d at159 & n. 20). Thus, claims for hostile work environment and disparate treatment may be brought under § 1983 as equal protection claims. *See Demoret,* 451 F.3d at 149. However, a claim of retaliation for complaining of race discrimination is not properly brought under the Equal Protection Clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996).

### c. Due Process

**\*17** The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to prevail on a due process cause of action, a plaintiff must establish the deprivation of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite consciousshocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701 (1972); *Ciambriello v. County of Nassau,* 292 F.3d 307, 314 (2d Cir.2002).

Where a government employee has a constitutionally protected property interest in his employment, "some kind of hearing [is required] prior to [termination]." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (internal quotation marks and citation omitted).

> However, in general, something less than a full evidentiary hearing is sufficient prior to adverse action. Before being terminated, the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. As long as a full post-termination hearing

is provided for, the pre-termination hearing may be minimal.

*Arteta v. Cnty. of Orange,* 141 F. App'x. 3, 7 (2d Cir.2005) (citing *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487; *Locurto v. Safir,* 264 F.3d 154, 173–74 (2d Cir.2001)) (quotations omitted).

It is a well-established legal principle in the Second Circuit "that there is no [procedural] due process violation where ... pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008) (citing cases). *See also Coollick v. Hughes,* 699 F.3d 211, 217 (2d Cir.2012).

A government employee may have a cause of action for violation of his right to substantive due process where a government defamation occurs in the course of dismissal from employment resulting in a deprivation of a liberty interest, commonly referred to as a stigma plus claim. *See Lawson v. Rochester City Sch. Dist.,* 446 F. App'x. 327, 329 (2d Cir.2011) (citing *Patterson,* 370 F.3d at 330). In order to prevail on such a claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *See Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010). "An employee's liberty interest is not ordinarily implicated by statements in connection with his termination of employment if there has been no public disclosure of the reasons for the discharge." *Walsh v. Suffolk Cnty. Police Dep't,* 341 F. App'x 674, 675 (2d Cir.2009) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 (1976) ("Since the ... communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Moreover, a plaintiff cannot prevail on a substantive due process claim unless he shows that the defendants infringed a liberty interest in an arbitrary or irrational manner and in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). *See also Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001).

### 4. 42 U.S.C. § 1981

**\*18** Employment discrimination claims brought under Section 1981, like those brought under Section 1983, are subject to the same substantive standards as claims brought pursuant to Title VII and NYHRL. *See Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at \*4 (E.D.N.Y. Mar. 17, 2014). Procedurally, employment discrimination claims brought pursuant to Sections 1981 and 1983 are also analyzed under the *McDonnell Douglas* framework. *See id.* [8] Finally, Section 1981 claims against a municipality, like Section 1983 claims, are subject to analysis under *Monell. See Lang. v. New York City Health & Hosps. Corp.,* No. 12–CV–5523, 2013 WL 4774751, at \* 5 (S.D.N.Y. Sept. 5, 2013).

### 5. New York State Constitution

Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. *See Canzoneri v. Incorporated Vill. of Rockville Ctr.,* 2013 WL 6330671, at \*11 (E.D.N.Y. Dec. 5, 2013) (citing *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 247–48 (N.D.N.Y.2008)). *See also Clayton v. City of Poughkeepsie,* 2007 WL 2154196, at \*7 (S.D.N.Y. June 21, 2007) (quoting *De Vito v. Barrant,* No. 03–CV–1927, 2005 WL 2033722, at \*6–7 (E.D.N.Y. Aug. 23, 2005)); *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446–47 (S.D.N.Y.1999).

## II. ANALYSIS

### A. Whether A Discriminatory Overtime Claim Exists in This Action

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 36–43 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

Plaintiff fails to plead a claim for discriminatory overtime in his Third Amended Complaint. Moreover, Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met

the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The only evidence of Plaintiff being denied overtime occurred in January 2006, before the period that is relevant to the claims in this action. Moreover, the evidence reflects that Plaintiff grieved the issue, which was resolved in his favor. Accordingly, there is no evidence that Plaintiff endured a materially adverse change in the terms and conditions of his employment as it relates to overtime. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory denial of overtime is granted.

**B. Whether Plaintiff's Claims Under Article I of the New York State Constitution Must Be Dismissed**

**\*19** After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 70–71 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

First, Plaintiff's purported claim under the New York State Constitution is that Defendants deprived him of his rights under Article I, essentially claiming a violation of the entire Bill of Rights. Accordingly, Plaintiffs' New York Constitutional claim is overly broad and therefore, should be dismissed for failure to state a claim. In an abundance of caution, the Court interprets Plaintiff's Third Amended Complaint to allege claims under Article I, Sections 6 (due process), 8 (freedom of speech), and 11 (equal protection).

Second, and in any event, as indicated above in Point II.C.5. of this Decision and Order, where Plaintiff's state constitutional claims mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. Accordingly, for this reason alone, Defendants' motion for summary judgment on Plaintiff's 17th cause of action under the New York State Constitution is granted.

**C. Whether Plaintiff's Claims Against John Doe(s) and Jane Doe(s) Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at

71 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' legally supported motion for summary judgment seeking dismissal of the John and Jane Doe defendants Plaintiff makes the bald and completely unsupported assertion that Defendants "have no standing" in that regard. (Dkt. No. 104 at 22 [Pl.'s Mem. of Law].) Plaintiff does not dispute that discovery in this action, which lasted in excess of two years, is complete, nor does he argue that further discovery would reveal the identity of these unnamed defendants. Accordingly, the completion of discovery and Plaintiff's failure to identify the John and Jane Doe defendants mandates their dismissal. *See Epps v. City of Schenectady,* No. 10–CV–1101, 2013 WL 717915, at \*5 (N.D.N.Y. Feb. 27, 2013). Therefore, Defendants' motion for summary judgment is granted in this regard.

**D. Whether Plaintiff's Breach of Contract Claim Against Defendants Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 67–68 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' motion in this regard, Plaintiff cites inapposite caselaw and fails to address the point made by Defendants, which is that in order to pursue a breach of contract claim against the City under the undisputed facts of this case, Plaintiff must have also pursued a claim against Local 400 for breach of the duty of fair representation. *See Lore v. City of Syracuse,* 670 F.3d 127, 151 (2d Cir.2012). Plaintiff fails to identify any such claim against Local 400, nor has he alleged such a claim against Local 400 in this action. Accordingly, the caselaw Plaintiff cites, for the proposition that whether a union has breached its duty of fair representation is a fact question for a jury to decide, is irrelevant to the pending issue before the Court. (*See* Dkt. No. 104 at 20 [Pl.'s Mem. of Law citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1244–45 (8th Cir.1980) ].) Finally, it is worth noting that Plaintiff's misunderstanding of the law in this regard is dubious considering the supporting legal authority cited by Defendants, *Lore v. City of Syracuse,* is a case out of the Second Circuit Court of Appeals, a party to which was represented by Plaintiff's counsel in this action.

**\*20** Therefore, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is granted.

**E. Whether Plaintiff's Claims Alleging Discrimination and Retaliation Due to the City's Contestation of His Application for Unemployment Benefits Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 26–27 [Defs.' Mem. of Law]; Dkt. No. 124 at 14–15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff opposes Defendants' motion in this regard, arguing that the City's contestation of his application for unemployment benefits was an adverse action. However, Plaintiff concedes that his retaliation claims in this regard are asserted solely against the City, despite the allegations in the Third Amended Complaint.

Plaintiff acknowledges that courts disagree whether an employer's decision to contest unemployment benefits constitutes an adverse action, but cites only one case in support of his argument that opposing unemployment benefits is adverse action, ostensibly suggesting that this Court should decide the issue here accordingly. *See Brown v. JP Morgan Chase Bank,* No. 12–CV–544, 2013 U.S. Dist. LEXIS 95946, at *21–22 (E.D.N.Y. Apr. 10, 2013).[9]

Nonetheless, this Court finds instructive and persuasive the caselaw holding that an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim. *See Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.,* No. 10–CV–681, 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *U.S. v. N.Y. City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996)). *See also Belardo v. Con–Way Transp. Servs., Inc.,* No. 02–CV5406, 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y.

Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim, failed to award severance pay, and informed the EEOC that the plaintiff resigned); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action).

Therefore, Defendants' motion for summary judgment regarding Plaintiff's retaliation claims as it relates to the City's contestation of his unemployment benefits is granted.

**F. Whether Plaintiff's Hostile Work Environment Claims Must Be Dismissed**

**\*21** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 31–34 [Defs.' Mem. of Law]; Dkt. No. 124 at 12–14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Defendants point to Plaintiff's deposition testimony to demonstrate the lack of evidence supporting Plaintiff's hostile work environment claim. Specifically, Plaintiff testified that he felt his employment environment was hostile because nobody on his crew liked him nor would they communicate with him, despite the fact that they never made any racial comments to him. (*See* Dkt. No. 108 at 264–264 [Dep. of Guynell Wright, Jan. 18, 2013].) Plaintiff further testified that he felt like he was walking on egg shells at work because he feared being disciplined for things that other people were not disciplined for, and that despite being a victim when a white employee lifted his leg up behind Plaintiff's head and when another employee patted his butt, Plaintiff was still disciplined.[10] (*Id.,* at 267–268.) Defendants argue that these instances do not rise to the level of severity or pervasiveness to establish hostile work environment and that Plaintiff has not established that the alleged hostile or abusive treatment was because of his race.

Plaintiff, in opposition, fails to identify any evidence in the record to create a question of fact on the issues of severity or pervasiveness or the issue of whether the alleged hostile treatment was because of his race. Instead, Plaintiff argues, in conclusory fashion, that "there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation,

ridicule and insult that the terms and conditions of his employment were altered for the worse." (Dkt. No. 104 at 12 [Pl.'s Mem. of Law].) Accordingly, Plaintiff has not met his burden to identify any fact question for a jury to decide regarding his hostile work environment claim and summary judgment may be granted on this basis alone. However, in an abundance of caution, the Court has reviewed the record to identify any other evidence that could possibly support Plaintiff's hostile work environment claim.

In his affirmation, Plaintiff states that when Nolan was crew leader an employee called Plaintiff the N word in Nolan's presence, but Nolan asked Plaintiff to shake the other employee's hand to resolve the conflict, without disciplining the other employee. (*See* Dkt. No. 106 at 10, ¶ 56 [Pl.'s Aff.].) Plaintiff further asserts that, "[u]pon information and belief, Department of Personnel employee Terri Macri has made statements to other DPW employees that she does not approve of mixed race babies." (*Id.,* ¶ 60.) Other evidence includes Plaintiff's assertion that Nolan said that "no black man was ever going to make anything on my watch" in 2007. (*Id.,* at 8, ¶ 46.)

 **\*22**  To be sure, even assuming the admissibility of Plaintiff's double hearsay statements attributable to Terri Macri, their relevance is dubious considering they were made outside the presence of Plaintiff. *See, e.g., Greaves v. St. Luke's–Roosevelt Hosp. Ctr.,* 03–CV–7424, 2005 U.S. Dist. LEXIS 4082, at \*33 (S.D.N.Y. March 17, 2005) (rejecting plaintiff's claim of hostile work environment because, "[w]ith the exception of a single hearsay remark, made outside his presence, Greaves fails to point to any discriminatory insult or abuse"); *cf. Benjamin v. Metro. Transp. Auth.,* 07–CV–3561, 2012 WL 3188764, at \*12 (S.D.N.Y. Aug. 2, 2012) ("While some of Benjamin's fellow Plaintiffs also make allegations about a hostile work environment, the record does not indicate that Benjamin was aware of any comments made to other Plaintiffs, let alone was present to hear them and have them impact his own work environment."). Moreover, Plaintiff's assertion regarding another employee calling him the N-word in Nolan's presence is also of questionable relevance because, while Plaintiff fails to state with specificity when the statement was made, he asserts that it was made when Nolan was a crew leader, which would have been prior to the relevant time period at issue in this action. (*See* Dkt. No. 117, at 6 [Dep. of Andrew Nolan, Jan. 8, 2013].)

Nonetheless, even assuming the truth, relevance and admissibility of all of the aforementioned evidence, Plaintiff still cannot identify a question of fact regarding his hostile work environment claims. As indicated in Point II.C. 1.a. of this Decision and Order, occasional offensive racial comments are not sufficiently severe or pervasive in order to establish a hostile work environment claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

### G. Whether Plaintiff's Due Process Claims Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 68–70 [Defs.' Mem. of Law]; Dkt. No. 124 at 15–16 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

First, the Court notes that the Third Amended Complaint contains an allegation that "Plaintiff maintained a property and liberty interest in his good name and reputation" which was deprived by Defendants. (Dkt. No. 45 ¶¶ 103–104 [Pl.'s Third Am. Compl.].) In his papers in opposition to Defendants' motion for summary judgment on his due process claim, Plaintiff makes no mention of a liberty interest in his reputation, nor does the record contain any evidence of an offensive statement that was made public. Accordingly, to the extent any substantive due process claim was intended by Plaintiff, it is dismissed from this action.

Second, to the extent Plaintiff alleges a procedural due process claim based on any employment action other than termination, those claims are dismissed. Courts in this Circuit hold that an employee does not have a constitutionally protected interest to be free from employment actions other than termination. *See Barnes v. Pilgrim Psychiatric Ctr.,* 860 F.Supp.2d 194, 204 (E.D.N.Y.2012) (citing cases).

 **\*23**  Finally, regarding Plaintiff's termination, it is clear that the grievance procedure set forth in the CBA provided Plaintiff the appropriate pre-deprivation hearing as required by the Due Process Clause. *See Adams,* 517 F.3d at 128. Regarding post-deprivation procedures, Plaintiff argues that the CBA "replaces N.Y. Civil Service Law § 75 and any other procedures to challenge the termination of employment." (Dkt. No. 104 at 17 [Pl.'s Mem. of Law].) To be sure, the CBA provides, in relevant part, that the grievance procedure outlined therein "shall apply in lieu of Section 75 and 76 of the Civil Service Law for any employee who

would be covered by those sections." (Dkt. No. 96–2 at 52 [Ex. B to Thompson Decl.].) However, there is nothing in the CBA or otherwise that prevents Plaintiff from seeking a post-deprivation hearing. "[T]he availability of an Article 78 proceeding after the fact provides all the process that is due." *Kruggel v. Town of Arietta,* No. 11–CV–1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (quoting *Sebast v. Mahan,* 754 F.Supp.2d 423, 431–32 (N.D.N.Y.2010)).

For these reasons, Defendants' motion for summary judgment regarding Plaintiff's due process claims is granted.

**H. Whether Plaintiff's Claims Based on Discriminatory Assignments Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 43–45 [Defs.' Mem. of Law]; Dkt. No. 124 at 14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable. *See Henry v. NYC Health & Hosp. Corp.,* No. 13–CV–6909, 2014 WL 957074, at *5 (S.D.N.Y. Mar. 10, 2014). Here, Plaintiff complains that "he and other Black employees have been given less desirable assignments" such as those requiring work outdoors in the hazardous weather. (*See* Dkt. No. 42 at ¶ 28 [Pl.'s Third Am. Compl.].) At his deposition, however, Plaintiff conceded that it was part of his job to go out in the cold and shovel snow. (*See* Dkt. No. 108 at 116 [Pl.'s Dep.].) There is no evidence that such job assignments

were accompanied by a loss in job title or pay. Accordingly, the alleged discriminatory job assignments cannot form the basis of a discrimination or retaliation claim since they were not materially adverse. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory reassignment of job duties is granted.

**I. Whether Plaintiff's Claims Based on Discriminatory Denial of Promotion Must Be Dismissed**

**\*24** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 57–67 [Defs.' Mem. of Law]; Dkt. No. 124 at 6–9 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

In support of his discriminatory failure to promote claim, Plaintiff alleges that he asked Defendants Nolan and Wright for promotions and that, when asked why he did not promote black employees, Nolan responded, "A black man will never make anything on my watch." (*See* Dkt. No. 42 at ¶¶ 26–27 [Pl.'s Third Am. Compl.].)

The following facts are undisputed. The opportunities for a pay grade promotion just above Plaintiff's job title, Laborer I, include Laborer II, Motor Equipment Operator ("MEO") I and MEO II, all of which are within Plaintiff's bargaining unit. Each of these positions require a Commercial Driver's License ("CDL"), which Plaintiff never sought. Plaintiff also never applied for any of these pay grade promotions. The title of "Crew Leader" is a position within the Street Cleaning Bureau, which falls under a separate CBA between the AFSCME 1773 and the City. (*See* Dkt. No. 96–7 [Ex. G to Thompson Decl.].) Under that CBA, all Crew Leader vacancies must be advertised and filled by qualified Local 1773 members before being offered to members of other bargaining units, such as Local 400.

Although the City has no record of Plaintiff ever having applied for a Crew Leader position, Plaintiff asserts that between 2006 and 2010, whenever a bid was posted for a Crew Leader position, he submitted an application, but was never promoted to Crew Leader. However, at his deposition, when asked what positions he put in a bid for between 2006 and 2010, Plaintiff replied that he "put in a bid for a crew leader" and later that he bid for "a couple of" and "more than one bid" for Crew Leader. (Dkt. No. 108 at 96, 99.) [11]

Plaintiff went on to explain that there was one Crew Leader position in Sanitation, and another in Street Cleaning. Plaintiff said that Sanitation position went to Efren Maldonado, who had previously worked in Street Cleaning and Sanitation, and the other position went to Thomas Rubado, who came from the Aviation Department. Finally, when asked what reason he has to believe he did not get those jobs because of his race, Plaintiff testified that he believes he didn't get those positions because "they didn't like me." (*Id.* at 105.)

According to Jeffrey Wright, who was Commissioner through the end of 2009, the only Crew Leader positions that he appointed in the Street Cleaning Bureau during his tenure were filled by existing Local 1773 members, Thomas Rubado and Richard Shepherd. Since both were qualified, the position would not have been opened to other bargaining units. The only non Local 1773 member who filled a Crew Leader position during Wright's tenure was Efran Maldonado, a minority who was an MEO at the time of his promotion. Also, that position opened in the Department of Sanitation in 2006 and had entirely different job responsibilities than that of the Street Cleaning Bureau. (*See* Dkt. No. 97 at ¶¶ 48–49 [Decl. of Jeffrey Wright, June 13, 2013].)

 **\*25**  Nolan, Superintendent, asserts that he was not involved in formal hiring decisions, which are made by the Commissioner. (*See* Dkt. No. 98 at ¶ 13 [Decl. of Andrew Nolan, June 13, 2013].) Plaintiff disputes this, citing Nolan's promotion of Ray Garcia to the vacant position of "acting crew leader" in 2007. It was at that time that, Plaintiff asserts, Nolan made the comment that "no black man was ever going to make anything on my watch." (Dkt. No. 106 at ¶¶ 44–46 [Pl.'s Aff.].)

Jeffrey Wright, who was Commissioner through 2009, affirms that, in the day-to-day operation of the Street Cleaning Bureau, it becomes necessary to name an acting Crew Leader if the actual Crew Leader is out sick or on vacation. These positions are temporary and are made by the Superintendent, not the Commissioner. (*See* Dkt. No. 97 at ¶ 51 [Jeffrey Wright Decl.].) Wright further affirmed that "at some point in 2007," Plaintiff came to Wright and told him that he should be considered for promotion to Crew Leader; not for a specific opening, but more generally in the future. Then Commissioner Wright explained to Plaintiff that he needed to make himself more competitive, "including obtaining his CDL and applying for some of the intermediate positions such as Laborer II and MEO." (*Id.,* at ¶ 50.) Wright explained that, "[i]n other words, since a Crew Leader must supervise

laborers and heavy equipment and motor vehicle operators and be familiar with the operation of all of the equipment in the Bureau, it helps to have experience actually performing those jobs and operating that equipment." (*Id.*)

At his deposition, Plaintiff explains that he was told by Bobby Reed, a supervisor, that "next week you are going to be the acting crew leader" but then when that week arrived, Ray Garcia was the acting crew leader. (Dkt. No. 108 at 106–107 [Pl.s' Dep.].) Plaintiff agreed "that an acting crew leader is someone who is working out of title for a short period of time while somebody is either on medical leave or vacation." (*Id.* at 107:9–14.) Plaintiff also explained that during this short period of time, the acting crew leader is paid at the Crew Leader rate. Plaintiff testified that he felt that Nolan gave Ray Garcia the acting crew leader position because of racial animosity toward Plaintiff due to Nolan's comment that a black man wasn't going to make anything on his watch. (*Id.* at 108.) Plaintiff clarified that Nolan made this comment after he made Ray Garcia acting crew leader. (*Id.*)

In his opposition to Defendants' motion, Plaintiff cites one factual question that he argues warrants a denial of summary judgment. Specifically, Plaintiff argues that there is a question of fact regarding whether Nolan made the statement that no black man will ever make anything on his watch. Moreover, Plaintiff contends that even where Nolan was not the decision maker, under a Cat's Paw theory of liability, his racial animus may be imputed to the decision maker.

 **\*26**  As indicated in Point II.C. 1.b. of this Decision and Order, Plaintiff bears the burden at trial to show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013). In order to establish a prima facie case of discrimination based on failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

Plaintiff cannot establish a prima facie case of discriminatory failure to promote for several reasons. First, there is evidence that Plaintiff was not qualified to be a Crew Leader, given

his lack of experience and failure to obtain a CDL, which Plaintiff does not dispute. Next, as it relates to Plaintiff's claim that Defendants failed to promote him, instead promoting Mr. Rubado and Mr. Maldonado, to vacant Crew Leader positions, there is absolutely no evidence of racial animus underlying the decision to promote Mr. Rubado and Mr. Maldonado. In fact, Plaintiff testified that he was not promoted to either of these positions because "they didn't like me" but then later also testified that Mr. Rubado and Mr. Maldonado were in a position to get those jobs. (Dkt. No. 108 at 105, 106.) Moreover, even if Plaintiff could establish a prima facie case of discrimination on this basis, Defendants have identified legitimate, non-discriminatory reasons, which Plaintiff does not dispute, for promoting Mr. Rubado and Mr. Maldonado rather than Plaintiff: those gentlemen were qualified for the position and were members of Local 1773, which, pursuant to the CBA, required that the City promote them before opening the position up to members of other bargaining units, such as Local 400. Given the lack of evidence regarding racial animus attached to those promotions, Defendants are entitled to summary judgment in that regard.

Regarding Nolan's assignment of Ray Garcia to a temporary, acting crew leader position instead of Plaintiff, the Court notes that it is questionable whether such an assignment may be considered a promotion. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004) (concluding that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion). Nonetheless, Plaintiff does not identify any evidence suggesting that he was qualified for the acting crew leader position, while Mr. Garcia, who was an MEO II, three positions ahead of Plaintiff, was clearly qualified. Because Plaintiff cannot show that the acting crew leader position was given to someone less qualified than him, he cannot establish a prima facie case of discrimination based on failure to promote.

 **\*27** For these reasons, Defendants' motion for summary judgment on Plaintiff's claims based on failure to promote is granted.

### J. Whether Plaintiff's Claims Based on Discriminatory Discipline Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 48–577 [Defs.' Mem. of Law]; Dkt. No. 124 at 9–12 [Defs.'

Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to discipline. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to the disciplinary actions taken against Plaintiff. It is undisputed that the only Defendant who was the decision maker regarding the disciplinary actions against Plaintiff was Commissioner Wright. [12] Moreover, other than a bald and unsupported assertion by Plaintiff in his response to Defendants' Local Rule 7.1 statement, there is no evidence that Nolan had anything to do with the Commissioner's decision to discipline Plaintiff. Finally, there is absolutely no evidence of racial animus or bias on behalf of Commissioner Wright against Plaintiff.

Moreover, for the reasons stated in Defendants' memoranda, Plaintiff has failed to adduce any evidence that similarly situated white employees were treated more favorably than Plaintiff in terms of discipline. (*See* Dkt. No. 100–8 at 51–55 [Defs.' Mem. of Law].)

For these reasons, Defendants' motion for summary judgment on Plaintiff's claims regarding discriminatory and/ or retaliatory discipline is granted.

### K. Whether Plaintiff's Claims Based on Discriminatory Termination Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 14–25 [Defs.' Mem. of Law]; Dkt. No. 124 at 2–6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to his termination. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to Plaintiff's termination. The evidence reflects that Defendant O'Connor, who was Commissioner at the time, made the decision to terminate Plaintiff. Even assuming that Defendants Thompson and Simone advised or encouraged O'Connor to terminate Plaintiff, there is no evidence of racial animus or

bias on behalf of O'Connor, Thompson [13] or Simone against Plaintiff.

The only person that Plaintiff has identified as having racial animus is Nolan. Nolan affirms that he did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. Nolan further affirms that O'Connor did not ask for his input regarding the termination. (*See* Dkt. No. 98 at ¶ 49 [Nolan Decl.].) O'Connor affirms that he was the sole decision maker in the determination to terminate Plaintiff. (*See* Dkt. No. 99 at ¶ 36 [Decl. of John M. O'Connor, III, June 13, 2013].). In making the decision to terminate Plaintiff, O'Connor states that he relied upon

> **\*28** (a) the Police Report and the statements Guynell Wright made to the police that he knew he was violating DPW policy; (b) the fact that Guynell Wright was in the last stage of disciplinary progression; (c) the fact that Guynell Wright had been previously received significant discipline in 2007 for near identical conduct; and (d) a review of Guynell Wright's prior "thick" disciplinary file which reflected numerous prior major and minor violations and demonstrated a pattern of misconduct over time.

(*Id.* at ¶ 37.) In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies the assertion that Nolan did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. (*See* Dkt. No. 105 at ¶ 47 [Pl.'s Rule 7.1 Response Statement].) In support of his purported denial, Plaintiff cites his affirmation

that he personally observed O'Connor go to Nolan and Culkin for advice on how to perform his duties as Commissioner. (*See* Dkt. No. 106 at ¶ 42 [Pl.'s Aff.].) Plaintiff has failed to identify any evidence of Nolan's participation in his termination, either directly or by communication or encouragement of a decision maker.

For these reasons, Defendants' motion for summary judgment as it relates to Plaintiff's claims for discriminatory and/or retaliatory termination is granted.

Finally, the Court notes that Plaintiff has identified no evidence of a causal connection between his DHR complaints and the alleged adverse actions. There is no direct evidence of retaliatory motive on behalf of any decision maker. Moreover, there is no temporal proximity between Plaintiff's complaints and the adverse actions. For example, Plaintiff complained to DHR in March 2008, but the next adverse action did not occur until January 2009. Also, Plaintiff was terminated an entire year after his February 2009 DHR complaint. For these reasons, in addition to those asserted by Defendants in their memoranda of law, Plaintiffs' retaliation claims are dismissed.

Because the Court dismisses Plaintiff's claims for the absence of a question of material fact as to the substantive elements of those claims, the Court need not address the remainder of Defendants' arguments for dismissal, such as failure to exhaust and failure to file a notice of claim.

**ACCORDINGLY,** it is

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 95) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's claims are dismissed with prejudice. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1293527

---

**Footnotes**

Conclusions of law in a Local Rule 7.1 Statement, even where unopposed, are not deemed admitted. *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M .J.), *adopted in its entirety by,* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

Plaintiff asserts that he began working for the City on October 3, 1988 as a "Laborer I" for the Department's Sanitation Bureau. (*See* Dkt. No. 108, at 44–45 [Dep. of Guynell Wright, Jan. 18, 2013].) However, events which occurred prior to June of 2006 are irrelevant to the resolution of the pending motion since the longest statute of limitations applicable to any of the claims in this action is four years. *See James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 317–318 (E.D.N.Y.2012) (finding that four-year statute of limitations set forth in 28 U.S.C. § 1658(a) applies to employment discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981); *Asanjarani v. City of New York,* No. 09–CV–7493, 2011 WL 4343687, at * 10 (Aug. 18, 2011) (statute of limitations for employment discrimination claims brought pursuant to Section 1983 is three years); *Ruggerio v. Dynamic Elec. Sys. Inc.,* No. 12–CV–100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)(f)) (claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a rightto-sue letter by the administrative body); *Sloth v. Constellation Brands, Inc.,* 883 F.Supp.2d 359, 373 (W.D.N.Y.2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)) (under Section 296, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter).

Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on March 3, 2008, in which he argued that his 20–day suspension by the City for fighting was disparate treatment based on race. On August 18, 2008, DHR dismissed the complaint based on a lack of probable cause. (*See* Dkt. Nos. 96–29 and 96–30 [Exs. CC and DD to Thompson Decl.].)

Plaintiff ostensibly filed a complaint with DHR on February 18, 2009, charging the City with race discrimination due to his termination. The DHR later dismissed the complaint citing a lack of evidence of unlawful discrimination. (*See* Dkt. No. 96–31 [Ex. EE to Thompson Decl.].)

Plaintiff's complaints were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348 (1986) (citations omitted).

Plaintiff's counsel argues that here, this Court must apply the "universal" rule in the courts of the State of New York that allows a non-moving party to successfully oppose summary judgment with evidence that would be inadmissible at trial because some of Plaintiff's claims arise under New York law. (*See* Dkt. No. 104 at 1–2 [Pl.'s Mem. of Law].) Without commenting on the veracity of Plaintiff's counsel's interpretation of New York law in this regard, the Court notes that it is by now very well-settled law that "[t]he issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive, under the distinction created by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938) and its progeny, and accordingly is subject to federal rather than state law ." *Tingling v. Great Atl. & Pac. Tea Co.,* 02–CV–4196, 2003 WL 22973452, *2 (S.D.N.Y. Dec. 17, 2003), citing *Erie R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817 (1938) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) (applying federal law on defendant's burden at summary judgment stage to diversity action).

"The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983

plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4, n. 10 (E.D.N.Y. Mar. 17, 2014) (citing *Patterson,* 375 F.3d at 225–227).

9       Although, as Defendants point out, this decision is a Report and Recommendation that was later vacated, the case was thereafter reassigned to another District Judge who adopted the Report and recommendation in full. See *See Brown v. JP Morgan Chase Bank,* No. 12–CV544, 2013 U.S. Dist. LEXIS 109700 (E.D.N.Y. Aug. 5, 2013).

10      Regarding these incidents of discipline, the Court notes Plaintiff's affirmation that in 1997, another black employee slapped his bottom in the restroom, which resulted in two separate physical altercations between Plaintiff and this other employee: one in the restroom and another later in the day when Plaintiff was on his way home from work. Plaintiff asserts that both he and the other employee were disciplined as a result. (*See* Dkt. No. 106 at 2, ¶ 8 [Pl.'s Aff.].) Plaintiff further asserts that in February 2007, Stanley Gardynski, a white employee, made humping motions with his groin at Plaintiff's head. Plaintiff admits that afterward, when Gardynski was provoking him again, Plaintiff hit him. Both Plaintiff and Gardynski were disciplined as a result. (*Id.* at 3, ¶ 13.)

11      Plaintiff also put in a bid for a gardener position in the Parks and Recreation Department.

12      In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies that Nolan was not the decision maker regarding the discipline he received between 2006 and 2009. (*See* Dkt. No. 105 at ¶ 68 [Pl.'s Rule 7.1 Response Statement] .) In support of this purported denial, Plaintiff asserts that Commissioner Wright relied on Defendants Nolan and Culkin to make the final determination regarding discipline. However, Plaintiff cites a portion of his deposition testimony that does not support this assertion. Accordingly, this fact is deemed admitted.

13      At his deposition, Plaintiff testified that he did not believe that O'Connor or Thompson decided to terminate him because he is black. (*See* Dkt. No. 108 at 222 [Pl.'s Dep.].) Plaintiff testified that he thought Thompson retaliated against him for making complaints of discrimination because Thompson "never helped me out" when Plaintiff would go to him with problems. (*Id.* at 222–223.) Finally, at his deposition, Plaintiff testified that the only involvement Simone had was being present at meetings and that "[h]e didn't do anything, really." (*Id.* at 247.)

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.